**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UL LLC,** | |
| Plaintiff, | |
| v. | No. |
| **JOSHUA CALLINGTON,** | |
| Defendant. | |

## COMPLAINT

Plaintiff UL LLC ("Plaintiff" or "UL"), by and through its attorneys, Littler endelson P.C., by way of this Complaint against Defendant, Joshua Callington ("Defendant"), states as follows:

## INTRODUCTION

1.      This case is about Defendant's covert, unapproved, and systematic electronic transfer of *tens of thousands* of Plaintiff's internal business documents. The documents contain highly confidential business information belonging both to UL and its customers. Defendant's conduct has breached or interfered with numerous UL contracts and confidential business information policies; has violated various legal obligations Defendant owes to UL; and contradicts the Association of Professional Social Compliance Auditors' ("APSCA's") Code of Professional Conduct, an Association in which Defendant is a member and which decides possible violations of the Code.

2.      Defendant, without UL's knowledge or approval, transferred the internal documents and information outside of UL's secure computer system and into his own personal email, Dropbox and iCloud accounts. Also, without UL's knowledge or approval, Defendant further disclosed certain confidential documents and information to a *New York Times* reporter to

assist the reporter in ultimately publishing a national article about corporate America's purported approach to social responsibility audits. The *New York Times* article, in turn, also disclosed UL's and the customers' internal business information.

3.     Notably, whatever concerns Defendant may have raised with the *New York Times* about UL's or any customer's business could have—and, according to UL policy, should have—been raised through UL's established reporting channels. Those channels are plainly set forth and explained in, for example, UL's 2023-2024 Standards of Business Conduct, a copy of which every UL employee receives and acknowledges annually—as did Defendant. Under the Standards' "Duty to Report" policy, UL expressly welcomes reporting and prohibits retaliation against those "who speak up in good faith." The policy further provides in part:

> "All of our employees are responsible for promptly reporting integrity concerns or issues. Possible violations of the Standards of Business Conduct or other unethical, illegal, or improper behavior **must be reported to management or to the Ethics and Compliance Officer**." (Emphasis added.)

4.     While Defendant has returned *copies* of a large portion of the documents back to UL following UL's repeated demands, Defendant has refused to return significant portions of the documents; has deleted from his UL-issued laptop certain documents he was instructed to preserve; has failed to delete other documents he was instructed to delete from personal accounts; and, upon UL's information and belief, he still retains a large volume of copies of UL's and its customers' internal business documents and information. Defendant's massive and systematic misappropriation of UL's and its customers' confidential business documents and information, and flagrant and intentional violation of or interference with numerous contracts, policies, and laws, form the bases and support for the following claims set forth in this Complaint.

5.     Customers retain UL and its Responsible Sourcing personnel to conduct

confidential "social responsibility compliance" assessments and audits of their suppliers that operate as part of the customers' overall supply chain. Critical to UL's business, UL and its auditors must build and maintain trust with both UL's customers and the customers' suppliers that UL audits. UL's audit services require both customers and their suppliers to provide confidential information to UL's auditors. In addition, UL's contracts with its customers contain non-disclosure of confidential business information obligations. UL's customers expect UL to develop and maintain policies and procedures to safeguard their confidential business information while utilizing the information confidentially with the customer and the customers' suppliers.

6. UL implements and enforces numerous confidentiality contracts and policies to help ensure that UL's and its customers' internal business information is protected from public disclosure.

7. Defendant's conduct not only violated and interfered with UL's contracts, and violated UL's policies and various laws, but his conduct also has negatively impacted or potentially negatively impacted UL's reputation with its customers, in the industry, and within UL's own work force. To flourish in its market, UL must be viewed as a reliable and trusted business partner, one that can be counted on to participate in the integral and sensitive relationship between its customers and social responsibility auditors—auditors who are retained to spot and help the client address potentially sensitive compliance issues occurring in their supply chains. Defendant's position with UL also required him to train other UL Responsible Sourcing auditors.

8. Defendant's unapproved and unprovoked assault on UL's business has caused, is continuing to cause, and threatens to continue to cause, immediate, irreparable harm to UL by, among other things, impairing and interfering with UL's goodwill, reputation, and established business relationships with its customers, within the industry, and within its own work force. This

lawsuit seeks to rectify Defendant's misconduct and enjoin Defendant from violating his clear and unequivocal legal obligations.

## PARTIES

9.     UL is a limited liability company organized under Delaware law and with its principal place of business in Northbrook, Illinois. The sole member of UL LLC is UL Solutions Inc., a corporation organized under Delaware law and with its principal place of business in Northbrook, Illinois.

10.     UL is a global leader in applied safety science and offers testing, inspection, audit, and certification services, as well as software products and advisory offerings.

11.     Defendant Joshua Callington's permanent home and residence is, upon information and belief, presently located in Portland, Oregon. Defendant has worked for UL between May 2017 and June 2024, initially as an independent contractor and then as a full-time employee. Callington's most recent position with UL was a "Team Leader CRS."

## JURISDICTION AND VENUE

12.     This Court has federal question and subject matter jurisdiction under 28 U.S.C. § 1331 over Count I, which is a claim under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836 *et seq*. The DTSA is applicable because UL's trade secrets are related to and an integral part of its audit procedures and services, which used, sold and conducted in interstate and foreign commerce.

13.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining Counts because they form part of the same case or controversy as Count I.

14.     In the alternative, this Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and

costs, and there is complete diversity of citizenship between the parties. UL is a citizen of the States of Delaware and Illinois. Defendant is a citizen of the State of Oregon. Complete diversity therefore exists. *See* 28 U.S.C. § 1332(a)(2).

15.     The Court has personal jurisdiction over Defendant because of his numerous and ongoing contacts with the State of Illinois. The facts show that he first worked for UL as an independent contractor between 2017 and 2019. During this time, he regularly communicated with UL business managers and other personnel located at UL's headquarters in Northbrook, Illinois. He also sent his invoices to and was paid out of UL's accounts payable department located in Northbrook. When he was hired by UL as an employee in 2019, he communicated with UL human resources and recruitment personnel located at UL's headquarters in Northbrook. His written employment offer was issued to him and signed by UL personnel sitting in Northbrook. During his employment with UL, Defendant's employee benefits were determined, approved, provided, administered, and communicated to him by and from UL employee benefits personnel located in Northbrook. During his employment, Defendant also traveled to Illinois for work-related business, including to conduct more than five supplier audits within Illinois over the past three years. He also performed a significant number of supplier audits around the country for customers who are headquartered in Illinois, and ultimately provided audit reports to those Illinois-based customers. In addition, in early 2024 when UL initiated an investigation into Defendant's misappropriation of UL's confidential business information, Defendant retained Chicago legal counsel—Michael Leonard—and traveled—in March 2024—to Chicago to sit with his legal counsel for an interview with UL's investigator on March 5, 2024. Finally, due to Defendant's participation in the creation and national publication of the *New York Times* article Defendant, upon UL's information and belief, knowingly engaged in and directed his wrongful conduct toward UL's headquarters in

Illinois to cause harm to UL in Illinois.

16.     Venue in this Court is also proper because Defendant is subject to the personal jurisdiction of this Court and for the reasons stated above.

## FACTUAL ALLEGATIONS

### *UL's Business and Its Customers*

17.     Among other things, UL provides social responsibility compliance auditing and inspection services to its customers' suppliers across a variety of industries. UL also has invested significant time, effort and money on developing customer contacts, relationships, and customer listings. This has led to UL creating internal spreadsheets, listings, compilations, and planning documents related to customers' audit requests, preferences, compliance issues, future requests and opportunities for UL. UL also takes significant measures to maintain the confidentially of its and its customers' internal business information.

18.     Through these audits, UL assesses certain facilities, processes, and systems of its customers' suppliers. The audits then provide the customers with information to position them to better identify, address and manage their suppliers' sustainability issues and initiatives, supply network relationships, brand reputation, and various regulatory requirements.

19.     For UL to conduct an audit, the suppliers must grant UL access to their worksites and to their internal business documents and communications. The documentation and communications often contain highly sensitive and confidential information, such as payroll and work authorization documentation.

20.     As evidenced in its many contracts and policies attached to and/or described in this Complaint, UL also has invested significant time, efforts, and money in developing numerous

measures to protect and maintain the confidentiality of its own confidential documents and information as well as its customers'.

21.     Given the importance and sensitivity of UL's work, UL must also invest significant time, money, and resources in developing the methods, techniques, processes, training, and procedures by which its auditor employees and contractors plan, conduct, and complete audits, including, but not limited to:

- How information is properly obtained from customers' suppliers;

- How the information is properly stored and safeguarded once obtained from the suppliers; and

- How the information is reviewed, analyzed, and effectively summarized for the customer and for UL.

22.     Because customers and their suppliers share confidential information with UL as part of its completion of audits, UL often enters into Non-Disclosure Agreements with customers, outlining the requirement for UL to keep any internal information learned during an audit and assessment strictly confidential.

23.     Given the nature of its business, UL must not only safeguard its own confidential, propriety, and trade secret information, but it must also protect its customers' confidential and propriety information.

### *Defendant's Contractor and Employment History with UL*

24.     During Defendant's career, he has upon information and belief worked for at least seven different auditing firms, including UL.

25.     UL hired Defendant as an independent contract auditor on or around May 17, 2017. Defendant provided services to UL in his independent contractor capacity between May 26, 2017

and May 12, 2019.

26.     Upon hire as an independent contract auditor, Defendant signed an Independent Assessor Agreement ("First 2017 Agreement," attached as **Exhibit 1**).

27.     Defendant continued to serve as an independent contract auditor for UL in 2017 and signed another Independent Assessor Agreement on or around November 4, 2017 ("Second 2017 Agreement," attached as **Exhibit 2**).

28.     Defendant again served as an independent contractor for UL in 2018 and signed another Independent Assessor Agreement on or around May 4, 2018 ("2018 Agreement," attached as **Exhibit 3)** (collectively, with the First 2017 Agreement and Second 2017 Agreement, the "Assessor Agreements.")

29.     The Assessor Agreements outlined Defendant's expectations including, but not limited to, evaluating the workplace compliance of suppliers to UL's customers with local labor laws, workplace safety laws, security regulations, international labor organization standards, and/or the customer's code of conduct. Defendant was also expected to write comprehensive evaluations reports for each audit conducted.

30.     Under the 2018 Agreement (dated May 4, 2018), Defendant agreed to the following confidentiality provisions:

> **7.1 Assessor shall not voluntarily disclose information obtained by Assessor from UL or its client(s) ("Confidential Information") to any third party, without the prior written consent of UL.** The term "Confidential Information" as used herein means and includes any and all data or information and documentation relating to the business of UL or its client(s) that is not generally known to the public or readily obtainable from outside sources. Confidential Information includes, by way of example and without limitation, the following: financial information, including but not limited to earnings, assets, debts, prices, cost information, budgets, sales and profit projections or other financial data; information used in the preparation and auditing of financial statements; marketing information, including but not limited to details about ongoing or proposed marketing strategies, marketing forecasts, or information about impending

transactions; product information, including but not limited to development plans, product designs, product costs and pricing policies; information regarding actual or potential customers; employee information, compensation information and recruiting plans. Assessor acknowledges that such information is confidential whether or not such information is labeled as such by UL or UL's client(s). Assessor may disclose audit results to UL and its client(s) immediately upon the completion of the audit. Assessor shall protect Confidential Information with the same degree of care that it uses to protect its own confidential information of a similar nature and never use less than a reasonable degree of care to protect Confidential Information, which may include requiring its employees, if any, to sign appropriate nondisclosure agreements to comply with the terms of this Agreement.

**7.2** Confidential Information shall not include information or material that is (a) in the public domain other than due to a violation of this Agreement; (b) documented by competent evidence to be known to Assessor before disclosure by Assessor under this Agreement and without violation of any confidentiality obligation owed to UL or any third party; or (c) independently developed by Assessor without reference or access to the Confidential Information, as demonstrated by competent evidence. If Assessor is required by law or regulatory authority to disclose any Confidential Information, Assessor shall: (a) promptly notify UL in writing upon receipt of the request; (b) reasonably assist the UL to obtain a protective order or other remedy of UL's election; (c) provide UL prior review of any disclosure; (d) provide only that portion of the Confidential Information that is legally required; and (e) make reasonable efforts to obtain reliable assurance that the Confidential Information shall be maintained in confidence.

**7.3 Assessor agrees that all aspects of the services performed on behalf of UL and its clients, including without limitation the number and frequency of Assessments, shall be kept confidential.**

(*See* Exhibit 3) (emphasis added).

31.     The 2018 Agreement also provides that, "The provisions of Paragraph 7 (Confidentiality) … shall survive the termination of this Agreement." (*See* Exhibit 3). But the Agreement contains no "Term" period or a specific termination date.

32.     In April 2019, Defendant applied for a full-time Team Leader CRS role at UL.

33.     UL offered Defendant the Team Leader CRS role in or around April or May 2019 and was subject to Defendant agreeing to maintain the highest ethical standards in all aspects of

9

his work.

34.     UL's employment offer was also subject to Defendant agreeing to the Company's

Confidentiality and Invention Assignment Agreement (the "Confidentiality Agreement," attached

as **Exhibit 4**), which includes the following provisions:

> During and after my employment with UL, I will keep all Confidential Information in strict confidence and will not disclose it without UL's prior written permission. During my employment, I will use Confidential Information solely as necessary for the performance of my duties as a UL employee and not for the benefit of any third parties, and I will not use Confidential Information after I am no longer a UL employee.
>
> ***
>
> Immediately upon demand by UL or termination of my employment for any reason, I will immediately deliver to UL all Confidential Information and all documents, notes, analyses, computer files, storage devices and other items that include Confidential Information that are in my possession.

(*See id*.).

35.     On or about April 30, 2019, Defendant accepted UL's job offer via an electronic

acknowledgment. He began in the Team Leader CRS role on or around May 28, 2019.

36.     In the Team Leader CRS role, Defendant was responsible for performing high-level

assessments of facilities of suppliers to customers regarding quality control and compliance with

labor laws, safety laws, and codes of conduct. Following an assessment, Defendant was expected

to prepare a report of his findings in accordance with UL processes, industry standards, and the

customers' audit protocol. Defendant's Team Leader CRS role also required him to participate in

and help UL conduct training of other auditors.

***UL's Significant Efforts to Protect***
***Confidential and Trade Secret Information***

37.     Based on the work UL conducts, its auditor employees and independent contractors are given access to confidential information of both UL and UL's customers.

38.     As such, UL has taken significant and reasonable efforts to protect its confidential information and trade secrets, and the confidential information of its customers. These efforts have included implementing the following UL policies, directives, and procedures, which were in place from time to time through the course of Defendant's employment:

- Global Supplier Standards of Conduct;

- A&I (Audits & Inspections) Confidentiality Policy;

- BYOD (Bring Your Own Device) Mobile Device Policy North America;

- Commercial Resource Center Guidelines Webpage;

- Confidential Information and Trade Secrets Policy;

- Ethics & Compliance Website;

- Enterprise Acceptable Use of Assets;

- Enterprise Information Security Policy;

- Standards of Business Conduct;

- UL Enterprise Media Policy;

- UL Enterprise Social Media Policy;

- Media/Social Media Policy; and,

- US Employee Handbook.

39.     Once implemented, these policies applied to Defendant throughout the course of his employment and imposed numerous confidentiality requirements and obligations on him.

40.     For example, in UL's Confidential Information and Trade Secrets Policy, most recently revised in December 2017 (a copy of which is attached as **Exhibit 5**), UL details an

11

employee's responsibility to protect UL's confidential information, including their obligations when working with confidential information:

> To carry out our Public Safety Mission, our company depends on confidential and proprietary information about our services and business processes, as well as Confidential Information from our customers and other third parties. UL takes very seriously our responsibility to safeguard this Confidential Information. Unauthorized use or disclosure of Confidential Information may harm UL or those parties that have entrusted us with their Confidential Information, and can subject UL to legal liability. Each employee has a duty to use Confidential Information properly and to protect it against unauthorized disclosure. This includes taking steps to avoid inadvertent or "accidental" disclosures. We cannot identify every situation where Confidential Information or trade secrets are involved.

> \*\*\*

> When working with client Confidential Information:

> - Refer to UL's Enterprise Information Security Policy for specific steps to safeguard information. . . . .
> - Treat all Confidential Information relating to a customer's project or file as confidential to that customer unless the customer has specifically released the Confidential Information to another party. This includes even the fact that the product or service has been submitted for evaluation by UL.
> - Determine if an NDA (nondisclosure agreement) or confidentiality agreement exists for the particular client. If so, review this agreement with your management or the Legal Department to ensure all aspects of the agreement are understood and followed.
> - Only access client Confidential Information to the extent that you have a legitimate business need for that Confidential Information and only disclose this Confidential Information within UL to others who have the same business need.
> - Do not disclose any Confidential Information for component files to an end-user unless specific authorization to provide the Confidential Information has been received from the component file owner.
> - Do not disclose audit or follow-up service dates unless required to do your job and with proper authorization. . . .

> \*\*\*

> When working with UL Confidential Information:

> - Mark all UL Confidential Information with the words "Proprietary" or "Restricted" and "For UL Internal Use Only"

- Never use any Confidential Information for your personal gain or other purpose

*** 

When performing your daily activities:
- Think before discussing information with a third party. If Confidential Information must be disclosed to a third party, ensure that the appropriate authorization is in place.

(*See id.*).

41.     Defendant also executed a formal acknowledgement of, among other policies, the Confidential Information and Trade Secrets policy.

42.     The Confidential Information and Trade Secrets policy and the additional above-listed policies, directives, and procedures not only provide a broad definition of "confidential information" subject to protection—inclusive of UL customer and audit-related information—but they also expressly prohibit the dissemination of confidential information to third parties, absent pre-approval from UL and/or UL's customers or pursuant to applicable law.

43.     Defendant also participated in a series of training programs designed to further reinforce his responsibility to protect confidential information, including, but not limited to, Standards of Business Conduct training (which contains extensive information on record management, respect for property, confidential information and prohibited disclosure, and reporting requirements); Intro to Social Compliance Training - Part 3 Audit Process (which details the audit process and the prohibition of disclosing information); and UL SANS Security Awareness Training (which outlines data security requirements and practices).

44.     As an auditor, Defendant also is a member of the Association of Professional Social Compliance Auditors ("APSCA"), and he has confidentiality obligations under APSCA's Code of Professional Conduct as well. Specifically, APSCA requires its members to "maintain

confidentiality with respect to information gathered while executing a social compliance audit, and take all reasonable steps to prevent unauthorized access to, or inadvertent disclosure of, information collected during or relating to an audit."

45.     On April 3, 2019, and multiple times thereafter, Defendant certified that he would comply with the APSCA code.

46.     Further, at the start of each audit, UL's auditors, including Defendant, expressly advise the customer during the opening meeting of how "the entire audit process is confidential and will not be shared with anyone outside of the parties involved, including the factory, UL, and the customer[.]"

### Defendant's Transfer of UL's Electronically Stored Information to his Personal Accounts.

47.     During his employment with UL, Defendant conducted well in excess of 120 audits, including audits occurring within Illinois and audits for customers headquartered in Illinois.

48.     In the course of these audits, Defendant had access to countless volumes of confidential business information and trade secrets belonging to UL, as well as confidential information of UL's customers and their suppliers.

49.     UL's investigation into Defendant's conduct determined that in May 2019, and perhaps earlier, Defendant began transferring confidential and highly sensitive business information from UL's system to his personal email accounts and personal electronic storage systems, including Dropbox, iCloud storage, and on to Universal Serial Bus ("USB") drives.

50.     The investigation revealed that during his employment, Defendant transferred more than 20,000 emails and attachments by copying his personal email through the Blind Carbon Copy ("Bcc") feature, and by forwarding the emails that his work email address received to his personal email address.

51.     The investigation also showed that Defendant copied more than 56,000 of UL's files to his personal Dropbox account, including confidential audit materials, process documents and forms, diligence associated with certain colleagues, training materials from UL and third-party organizations, and additional sensitive information related to UL customers.

52.     The investigation further uncovered that Defendant took photos during supplier audits which he kept on his personal phone and synced with his personal iCloud account.

### *Defendant's Covert Assistance to the New York Times and the Resulting Article*

53.     In or around September 2023, Defendant unilaterally contacted *New York Times* journalist Hannah Dreier ("Dreier").

54.     UL did not have any knowledge or notice that Defendant had contacted Dreier.

55.     Defendant and Dreier began communicating back and forth and continued to communicate by phone, meetings, emails, and text messages until at least December 2023.

56.     UL's investigation into Defendant's conduct determined that between September 2023 and December 2023, Defendant provided to Dreier confidential audit reports prepared for UL's customers, including reports authored by Defendant.

57.     The confidential audit reports provided to Dreier included UL's confidential, propriety, and trade secret information, as well as UL's customers' and their suppliers' confidential and proprietary information.

58.     Defendant also provided Dreier with UL's Responsible Sourcing Social Compliance Auditing Standard Operating Procedure, Defendant's LMS Training Transcript, performance feedback from a UL manager following a complaint raised by a customer related to Defendant's conduct, various emails between Defendant and his internal business partners, and information about UL's audit process.

59.     Neither UL nor its customers approved or authorized Defendant to release confidential information and/or any trade secrets belonging to UL or UL's customers to the *New York Times* or to any other third party.

60.     On December 28, 2023, Dreier published an article with the *New York Times* concerning the social responsibility auditing industry (the "*New York Times* Article").

61.     The *New York Times* Article states Dreier reviewed "confidential audits conducted by several large firms." Upon information and belief, the audits Dreier referred to include UL audits for one or more of its customers that Defendant admitted providing to Dreier.

62.     The *New York Times* Article specifically references Defendant, stating, among other things, how Defendant has conducted more than 1,000 audits in the past decade and is currently employed by UL.

63.     The *New York Times* Articles also includes several quotes by Defendant, including quotes that directly connect him to audits completed of suppliers for UL customers headquartered in Illinois.

### UL Investigates and Defendant's Participation in the Investigation

64.     After the *New York Times* published the article, UL opened an investigation into, among other things, whether Defendant had provided the *New York Times* with confidential information in violation of any UL contracts or policies.

65.     During the investigation, UL learned that Defendant transferred and maintained confidential business information of UL's in his personal electronic accounts, which prompted UL to also look into how much of such information Defendant had transferred to his personal accounts.

66.     During the investigation, Defendant was asked to return his UL laptop; however, despite repeated requests, Defendant not only delayed the return of the device for about two weeks,

but he also deleted several categories of information from his laptop before returning it, including: his personal Dropbox folder containing the documents he provided to the *New York Times*, information evidencing his violation of Dropbox practices, and materials relating to diligence on UL colleagues (including confidential audit reports conducted by other employees).

67.     When UL asked Defendant about the deletion of documents, Defendant admitted that he deleted multiple files prior to returning the laptop. He also acknowledged and admitted to receiving prior instructions from UL's investigator to preserve all documents and information on his UL laptop.

68.     UL also asked Defendant to return and destroy all UL files in his personal possession. Defendant did return to UL copies of more than 76,000 documents; however, Defendant declined to respond to UL's request to destroy the files.

69.     After an exhaustive review of the produced documents, UL identified numerous missing documents based on the list of documents Defendant admitted were in his possession. Despite follow-up requests for these documents, Defendant declined to respond and/or declared there was "no reason to produce any such documents at this time." UL still, to date, has not received all of the documents and information that Defendant has admitted he has in his possession.

### *Investigation Findings and Defendant's Termination*

70.     During UL's investigation, Defendant admitted to providing documents and information to Dreier at the *New York Times*; transferring and maintaining a massive volume of UL's documents and information in his personal email, personal Dropbox account, and personal iCloud storage; and deleting information from his UL laptop prior to returning it and while acknowledging he had been instructed not to delete the information.

71.     Based on the totality of the evidence uncovered to date during UL's investigation,

including the extensive documentation returned by Defendant after UL's repeated requests, Defendant's admissions, and forensic analysis of Defendant's UL laptop, Defendant violated multiple agreements between UL and Defendant and numerous UL policies and procedures. In addition, Defendant's conduct interfered with UL's confidentiality obligations under its contracts with its customers.

72.     In short, not only did Defendant transfer outside of UL's secure computer and intranet system tens of thousands of documents containing UL's confidential and trade secret information, and confidential information belonging to UL's customers and their suppliers, but he voluntarily disclosed that confidential and trade secret information to the *New York Times.* He also did so without providing any notice to or seeking consent or approval from UL. Further, Defendant failed to comply with multiple requests and directives made to him during UL's investigation, and he admitted having deleted relevant information after being instructed not to do so.

73.     Based on the forgoing, on July 3, 2024, UL terminated Defendant's at-will employment for reasons provided to him in writing. (*See* **Exhibit 6**, UL's written notice of termination).

### COUNT I
### VIOLATION OF FEDERAL DEFEND TRADE SECRET ACT

74.     UL incorporates the preceding paragraphs as if fully set forth herein.

75.     Defendant's actions, as described above, constitute violations of one or more provisions of the DTSA.

76.     The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

77.     The DTSA further provides that "a court may grant an injunction – to prevent any

actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable….” 18 U.S.C. § 1836(b)(3)(A).

78.     By engaging in the conduct described above, Defendant has misappropriated, threaten to misappropriate, or inevitably will misappropriate UL's trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce.

79.     The trade secret information to which Defendant had access, which came into his possession, and which he misappropriated includes, but is not limited to:

- Audit reports, including onsite notes, audit process and methods, certain confidential photos taken of the customers' suppliers' internal facilities, equipment and/or operations that are not generally open to or disclosed to the public, and communications prepared by Defendant while he worked as an independent contractor and/or employee for UL, all of which is information that is compiled, assembled, analyzed and/or organized by UL as part of its internal audit procedures and processes;

- Audit reports and related confidential documentation prepared by UL employees and/or independent contractors other than Defendant;

- Internal communications on audit procedures and process;

- UL customer internal information and documents, including the identity and contact information of the customer's key representatives with respect to social responsibility compliance audits; and,

- UL's audit procedures and practices.

This information constitutes "trade secrets" as that term is defined under the Defend Trade Secrets Act.

80.     UL derives economic value and a competitive advantage from the fact that this information is not known to or readily ascertainable by, or otherwise available to its competitors who could, themselves, derive economic value from its disclosure or use.

81.     As alleged throughout this Complaint, UL has taken reasonable measures to keep this information secret by, among other things: (1) limiting the number of UL employees who have access to the information; (2) requiring employees who have access to such information to agree to maintain the confidentiality of the information; (3) by promulgating numerous confidentiality agreements and policies; and/or (4) by requiring that such confidential information be maintained only on UL's accounts, networks, and/or servers.

82.     These trade secrets are related to UL's services, which UL provides, distributes and uses in interstate and foreign commerce. For example, the trade secrets contain information about supplier audit services provided to UL customers with locations across the United States.

83.     As set forth herein, Defendant misappropriated, threatened to misappropriate, or inevitably will continue to misappropriate these trade secrets by, among other things, disclosing trade secret information belonging to UL to the *New York Times* or other media outlets, transferring and maintaining trade secret information belonging to UL in his personal accounts, and refusing to return and/or destroy trade secret information belonging to UL still in his possession or under his control.

84.     Defendant owed fiduciary and contractual duties to UL to maintain the secrecy of the trade secrets and limit the use of the trade secrets. Defendant also acquired and possessed the trade secrets by improper means and beyond any authorization from UL.

85.     UL communicated these trade secrets to Defendant in confidence.

86.     UL's trade secrets were not generally known to and are not readily ascertainable by

others through proper means.

87.     The acts and conduct of Defendant were willful, malicious, and in reckless disregard of the adverse consequences to UL.

88.     As a direct and proximate result of the conduct of Defendant, UL is entitled to actual damages in an amount to be determined at trial.

89.     Additionally, UL is entitled to attorneys' fees and exemplary damages in the amount of twice the damages awarded due to Defendant's malicious and willful misappropriation.

90.     As a result of the foregoing actions, UL has suffered and will continue to suffer irreparable harm.

91.     UL has no adequate remedy at law to prevent Defendant's use and disclosure of its trade secret information or to prevent this harm.

92.     UL is entitled to preliminary and permanent injunctive relief to enjoin Defendant from the possession, disclosure or use of UL's trade secret information in the future, as well as a mandatory injunctive order requiring Defendant to return any and all copies of UL's  trade secret information that is in his possession or under his control; to delete all such information from any computer or other electronic device or electronic storage device or facility that is in his possession or under his control; and to declare to the Court under oath that he has complied with the mandatory injunctive order. Unless enjoined by this Court, UL will continue to suffer irreparable harm.

### COUNT II
### VIOLATION OF ILLINOIS TRADE SECRET ACT, 765 ILCS 10651 *ET SEQ.*

93.     UL incorporates the preceding paragraphs as if fully set forth herein.

94.     By the conduct alleged herein and described above, Defendant improperly acquired and misappropriated, or threatened to acquire and misappropriate, or inevitably will acquire and misappropriate, UL's trade secret information, including, but not limited to:

- Audit reports, including onsite notes, audit process and methods, certain confidential photos taken of the customers' suppliers' internal facilities, equipment and/or operations that are not generally open to or disclosed to the public, and communications prepared by Defendant while he worked as an independent contractor and/or employee for UL, all of which is information that is complied, assembled, analyzed and/or organized by UL as part of its internal audit procedures and processes;

- Audit reports and related confidential documentation prepared by UL employees and/or independent contractors other than Defendant;

- Internal communications on audit procedure and process;

- UL customer internal information and documents, including the identity and contact information of the client's key representatives with respect to social responsibility compliance audits; and,

- UL's audit procedures and practices.

This information constitutes "trade secrets" within the meaning of the Illinois Trade Secrets Act, 765 ILCS § 1065 *et seq.*

95.     Defendant obtained UL's trade secrets under circumstances giving rise to a fiduciary and contractual duty owed by Defendant to UL to maintain their secrecy and limit their use.

96.     UL's trade secret information is sufficiently secret to derive economic value from not being generally known to or readily ascertainable by others who can obtain economic value from its disclosure or use.

97.     As alleged throughout this Complaint, UL takes reasonable measures to keep and

maintain the secrecy and confidentiality of the trade secrets.

98.     As set forth above, by the conduct alleged herein, Defendant misappropriated, threatened to misappropriate, or inevitably will continue to misappropriate disclosing trade secret information belonging to UL to the *New York Times* or other media outlets, transferring and maintaining trade secret information belonging to UL in his personal accounts, and refusing to return and/or destroy trade secret information belonging to UL still in his possession or under his control. **t** Defendant also acquired and possessed the trade secrets by improper means and beyond any authorization from UL.

99.     By the conduct alleged herein, Defendant breached or inevitably will breach his duty to maintain the secrecy of UL's confidential and trade secret information.

100.     As a direct and proximate result of Defendant's misappropriation of trade secrets, UL has suffered and will continue to suffer immediate irreparable harm, injury, and loss. Pursuant to the Illinois Trade Secret Act, actual or threatened misappropriation may be enjoined.

101.     The acts and conduct of Defendant were willful and malicious, justifying an award of exemplary damages and attorneys' fees.

102.     As a direct and proximate result of the conduct of Defendant, UL is entitled to damages in an amount to be determined at trial.

## COUNT III
## BREACH OF CONTRACT

103.     UL incorporates the preceding paragraphs as if fully set forth herein.

104.     UL and Defendant entered into valid and enforceable contracts, including the 2018 Agreement and the Confidentiality Agreement. (*See* **Exhibits 1 through 4).**

105.     Defendant signed the 2018 Agreement (**Exhibit 3**) in exchange for compensation, other benefits, and access to UL's confidential, propriety, and other trade secret information.

106. The 2018 Agreement contains valid and enforceable confidentiality provisions, which are still in effect and survive the termination of the Agreement.

107. Defendant further executed the Confidentiality Agreement (**Exhibit 4**) as a condition of employment in April 2019, in exchange for good and valuable consideration, including continued employment, compensation, and other benefits.

108. The Confidentiality Agreement contains valid and enforceable provisions, including among others, Defendant's obligation to not disclose confidential information without UL's prior written consent and to immediately deliver to UL all confidential information that is within Defendant's possession upon UL's request.

109. UL has performed all duties and obligations under the 2018 Agreement and the Confidentiality Agreement.

110. As set forth above, Defendant breached the terms of his 2018 Agreement and the Confidentiality Agreement by, among other actions, voluntarily disclosing UL's confidential information and UL's clients' confidential information to a third party, including the *New York Times,* and a reporter for the *New York Times*, without the prior written consent of UL.

*111.* As set forth above, Defendant also violated his contractual obligations under the Confidentiality Agreement by failing or refusing to "immediately deliver to UL all Confidential Information and all documents, notes, analyses, computer files, storage devices and other items that include Confidential Information that are in [his] possession[,]" at UL's request after UL learned that Defendant may have unlawfully shared confidential information with the *New York Times.*

112. As a direct and proximate result of the above breaches, UL suffered and continues to suffer damages, including, but not limited to, lost business, lost profits, costs of retaining clients,

and damage to goodwill, in an amount to be determined at trial. UL has also suffered and will continue to suffer immediate, irreparable harm warranting temporary and permanent injunctive relief. Injunctive relief is necessary as UL is without an adequate remedy at law to prevent this harm to UL.

113.     Indeed, without injunctive relief in the form of an order enjoining Defendant, as set forth above, UL will continue suffering losses, experiencing harm to its name, reputation, and other good will — something traditional legal remedies cannot adequately address.

**COUNT IV**
**BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH**

114.     UL incorporates the preceding paragraphs as if fully set forth herein.

115.     At all times pertinent hereto, Defendant, by virtue of his position at UL, owed a fiduciary duty of loyalty to UL.

116.     Defendant's employment offer letter, which Defendant signed in 2019, expressly included: "You agree that during your employment you will maintain the highest ethical standards in all aspects of your work."

117.     Defendant was entrusted by UL with access to its valued customers and confidential information that allowed him to perform his duties and to develop the relationships and goodwill which form the basis of UL's business relationships with its customers, all at UL's expense and direction. Defendant owed UL a fiduciary duty which required him to, among other things, devote all of his time and attention during business hours to the business of UL and to refrain from conducting activities in any manner inimical to UL's best interest.

118.     As set forth in detail above, Defendant breached his fiduciary duty to UL by disparaging UL's ability to service its existing customer accounts prior to his departure and while he was still employed by UL, and, upon information and belief, engaging in other conduct harmful

to UL. Defendant's efforts to sabotage UL's business while he was still an employee of UL is in direct violation of the fiduciary duties he owed to UL.

119.     As a direct and proximate result, UL has sustained and will incur damages, including, but not limited to, lost business, lost profits, damage to its goodwill, and costs of retaining existing customers whose confidential information Defendant shared with *the New York Times* and caused to then be publicly disclosed, in an amount to be proven at trial.

120.     The aforementioned conduct was intentional, malicious, and in bad faith, and has subjected and will continue to subject UL to cruel and unjust hardship in conscious disregard of UL's rights, so as to justify an award of exemplary and punitive damages.

<u>**COUNT V**</u>
<u>**CONVERSION**</u>

121.     UL incorporates the preceding paragraphs as if fully set forth herein.

122.     This claim is based solely on Defendant's disclosure of confidential information belonging to UL and confidential information belonging to UL's customers that are not protectable trade secrets.

123.     UL has the absolute and unconditional right to its property, including its confidential information, and to the immediate possession of such property.

124.     Pursuant to the Confidentiality Agreement, Defendant agreed to return all of UL's property, including, without limitation, UL's confidential information.

125.     Defendant has retained UL's property for his own use and/or in manner inconsistent with UL's ownership of and rights in that property and with the intent to permanently deprive UL of that property and/or negatively or irreparably altering that property so as to devalue or diminish that property and/or its nature/status as confidential and/or privileged information.

126.     Defendant, without the authorization of UL, wrongfully assumed control,

dominion, and/or ownership over UL's property in a manner inconsistent with UL's ownership of and rights in that property.

127.     UL has suffered actual damages as a result of Defendant's acts of conversion.

128.     UL has suffered and will continue to suffer irreparable harm as a direct result of Defendant's acts of conversion.

129.     Injunctive relief is necessary as the recovery of money damages alone would not fully compensate UL for Defendant's acts of conversion.

130.     Defendant's conduct as alleged herein was willful and malicious and entitles UL to recover punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that this Court find in its favor and against the Defendant as follows:

1.     A preliminary and permanent injunction, enjoining and restraining:

A.     Defendant, and anyone acting in concert with him, from violating, or participating in the violation of, any of the terms of his confidentiality agreements;

B.     Defendant, and anyone acting in concert with him, from utilizing, divulging, disclosing or misusing any UL Confidential Information (as defined by Defendant's agreements with UL) and trade secrets, including, without limitation, lists of customers and prospective customers; contract terms and conditions; customer information relating to services, employees, finances, and compensation; copyrighted materials; corporate, management, and business plans and strategies; audit files including, but not limited to, any notes, photos, email communications, written communications; policies, procedures, and processes.

2.     An order requiring Defendant to return any and all copies of UL's trade secret

information that is in his possession or under his control; to delete all such information from any computer or other electronic device or electronic storage device or facility that is in his possession or under his control; and to declare to the Court under oath that he has complied with such order.

3.      An order requiring Defendant to preserve all documents, electronically stored information and other information relevant to factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between Defendant and the *New York Times*; between Defendant and any UL employee or independent contractor; and between Defendant and any UL customer or prospective customer.

4.      An order granting preliminary and permanent injunctive relief in accord with Paragraphs 1 and 2 above, and as separately may be requested at a preliminary injunction hearing and any trial;

5.      An order awarding UL its actual and exemplary damages, in an amount to be determined at trial;

6.      An order awarding UL pre- and post-judgment interest as allowed by law, as well as its attorneys' fees and costs of this action; and

7.      An order awarding any and all other available damages, including punitive damages and such other and further relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated:  July 3, 2024                              Respectfully submitted,


                                                  /s/ Richard T. Kienzler
                                                  One of Its Attorneys

James M. Witz, Bar No. 59976
jwitz@littler.com
Richard T. Kienzler, Bar No. 6296926
rkienzler@littler.com
LITTLER MENDELSON, P.C.
321 North Clark Street
Suite 1100
Chicago, IL  60654
Telephone:    312.372.5520
Facsimile:    312.372.7880