# EXHIBIT 1

UL RS IAA



**INDEPENDENT ASSESSOR AGREEMENT**

Subscriber No: _____

Assessor No: _____

Agreement No.: _____

(For Internal UL Use Only)

**Choose a method to return the completed Agreement:**

**Mail to:** _____ ████████ _____

_____ ████████ _____

**Fax to:** _____   **E-mail to:** _____ ████████ _____

**THIS AGREEMENT is** made as of _____ May 17, 2017 _____, by and between UL Responsible Sourcing Inc. ("UL"), a Delaware limited liability company and

_____ Joshua Callington _____ ("Assessor"),

("Address").  Assessor is a resident of the State of _____ Oregon _____ and is qualified to conduct assessments, to evaluate workplace compliance with local labor, workplace safety laws, security regulations such as C-TPAT, international labor organization (ILO) standards, and/or the client's supplier code of conduct.  Additionally, the auditor is expected to write comprehensive evaluation reports in English for each audit conducted, in an accurate, detailed and timely manner and advisory services as requested by UL (collectively referred to herein as "Assessments or Services").  UL and Assessor are referred to individually as a "party" or together as "the parties."

1. **Scope**

   1.1   Assessor shall perform Assessments as requested by UL at facilities world-wide (the "territory") as directed by UL according to the terms of this Agreement.  The Clients for whom Assessor performs work under this Agreement are referred to herein as "UL Clients".

   1.2   Assessor may also perform advisory services for UL Clients related to C-TPAT, labor policies, supplier codes of conduct, and services related to UL's business.

   1.3   Assessor is not obligated to perform Assessments exclusively for UL.  UL is not obligated to request that Assessor perform all Assessments for UL in the territory.

   1.3   Assessor will be paid only for Assessments performed pursuant to the terms of this Agreement.  Assessor will not be required by UL to report to any UL location or any other office location.  Assessor will have no required working hours or schedule from UL (except as necessary to complete specific Assessments).

2. **Obligations of the UL Contracting Party**

   2.1   For each Assessment, UL shall provide Assessor with information required to perform the Assessment including, the scope of the Assessment, the location of the facility and the requested completion date or Assessment schedule.

   2.2   UL shall provide Assessor with all documents and supplies required to perform the requested Assessment including current requirements and instructions applicable to the Assessment.  UL shall promptly notify Assessor of any changes to the Assessment scope, requirements, instructions, location or schedule.

   2.3   UL may provide training to Assessor.  The parties shall agree in advance upon the time, location and fees (if any) for the training.

3. **Obligations of Assessor**

   3.1   Assessor shall perform each Assessment in a competent manner and in compliance with the applicable requirements, regulations and instructions.  Assessor represents and warrants that the best technical practices, skills, procedures, care and judgment shall be employed in performing Assessments and that the Assessments shall be performed in the most expeditious and economical manner consistent therewith.

   3.2   Assessor shall act according to the highest legal, ethical and moral standards at all times.  Assessor has read, understands and by signing this agreement agrees to comply with UL's Global Supplier Standards of Conduct and UL's Anti-bribery and Corruption Policy (available at www.ul.com/ulglobalethics).  Further, the Assessor agrees that they will comply with foreign corrupt practices laws, regulations, and other legal requirements including the U.S. Foreign Corrupt Practices Act and UK Bribery Act.  Assessor specifically warrants and represents that no offer, promise or payment of any money, gift or any other thing of value shall be paid to any person for the purpose of influencing official actions or decisions affecting this Agreement.

UL RS IAA

Assessor agrees to promptly notify the UL of any change in any laws, regulations or other legal requirements that may affect its performance of this Agreement.

3.3   Assessor represents and warrants that during the term of this Agreement it shall not cause UL to violate any U.S. trade sanction laws administered by the U.S. Department of Treasury, Office of Foreign Asset Control (http://www.ustreas.gov/ofac), shall obtain all applicable export licenses, and shall ensure that any payments made to or by UL or its affiliates will not be paid from or deposited into a financial institution and account subject to any U.S. trade sanction law.  The UL has the right to terminate the Agreement immediately if it is prohibited by U.S. law from doing business with Assessor.

3.4   Assessor shall prepare and maintain complete and accurate records and reports of all Assessments in such form and for such time as designated by UL.  Immediately after each Assessment, Assessor shall send the Assessment report to the individual, department and location designated by UL.  All air travel must be pre-approved by UL in advance.  All approved air travel must be arranged at the lowest available fare consistent with scheduling for work efficiencies.

3.5   UL shall have all right, title and interest in all records and documents pertaining to the Assessments.  All records and documents that Assessor creates pertaining to the Assessments are "works made for hire" on behalf of UL within the meaning and purview of Section 101 of the United States Copyright Act, 17 U.S.C. Section 101, and UL will be the copyright owner of such records and documents.  Upon UL's request, Assessor shall provide UL with all documents, information or assistance necessary to enable UL to perfect and protect its copyrights in any materials produced as a result of this Agreement. All materials UL provides to Assessor relating to the Assessments are property of UL, and Assessor may not sell or distribute the materials to any third parties.

3.6   Assessor shall permit UL's representatives, announced and unannounced, to attend the Assessments.

3.7   Assessor shall inform UL in writing of the name of the person who will act as the Assessment coordinator and the names of the persons who will conduct the Assessments.  Upon request, Assessor shall provide UL with curriculum vitae of its personnel who will conduct Assessments.  Only personnel who have UL's prior written approval shall perform the Assessments. Assessor shall notify UL in advance of any proposed change in personnel conducting Assessments.  At UL's request, Assessor shall promptly replace any of its personnel who conduct Assessments for UL.  Assessor shall not use subcontractors to perform Assessments without UL's prior written consent.

3.8   UL is entitled to inspect and review all services provided under this Agreement for conformity with Assessor's obligations under this Agreement.

4.   **Marks** - No licenses, express or implied, for any trademarks, service marks, certification marks (collectively referred to as "Marks") or copyrights are granted to either party or any third party.  Assessor shall not authorize any person to use UL's Marks.  Each party will be solely responsible for authorization, use and control of its marks.  However, each party agrees to notify the other if it is learned that a third party's use of the other party's mark is improper.

5.   **Advertising and Promotion** - Assessor may not refer to itself as a UL "accredited" organization.  Assessor may not refer to or use UL's name, or any name of any subsidiary or affiliate of UL, or any UL Mark in advertising, promotions or otherwise orally or in written materials, including, specifically, but not limited to, business cards, except with UL's prior written consent.

6.   **Fees and Expenses** - UL shall invoice its Clients directly and pay Assessor for each Assessment completed at least at the minimum of the rates provided in Schedule A within fifteen (15) days of receiving Assessor's invoice and/or required supporting documentation. Rates paid are subject to change based on location and complexity of the Assessment and will be made known to Assessor prior to such Assessment taking place.

7.   **Confidentiality**

7.1   Assessor shall not voluntarily disclose information obtained by Assessor from UL or its client(s) ("Confidential Information") to any third party, without the prior written consent of UL.  The term "Confidential Information" as used herein means and includes any and all data or information and documentation relating to the business of UL or its client(s) that is not generally known to the public or readily obtainable from outside sources.  Confidential Information includes, by way of example and without limitation, the following:  financial information, including but not limited to earnings, assets, debts, prices, cost information, budgets, sales and profit projections or other financial data; information used in the preparation and auditing of financial statements; marketing information, including but not limited to details about ongoing or proposed marketing strategies, marketing forecasts, or information about impending transactions; product information, including but not limited to development plans, product designs, product costs and pricing policies; information regarding actual or potential customers; employee information, compensation information and recruiting plans.  Assessor acknowledges that such information is confidential whether or not such information is labeled as such by UL or UL's client(s).  Assessor may disclose audit results to UL and its client(s) immediately upon the completion of the audit.  Assessor shall protect Confidential Information with the same degree of care that it uses to protect its own confidential information of a similar nature and never use less than a

UL RS IAA

reasonable degree of care to protect Confidential Information, which may include requiring its employees, if any, to sign appropriate nondisclosure agreements to comply with the terms of this Agreement.

7.2    Confidential Information shall not include information or material that is (a) in the public domain other than due to a violation of this Agreement; (b) documented by competent evidence to be known to Assessor before disclosure by Assessor under this Agreement and without violation of any confidentiality obligation owed to UL or any third party; or (c) independently developed by Assessor without reference or access to the Confidential Information, as demonstrated by competent evidence. If Assessor is required by law or regulatory authority to disclose any Confidential Information, Assessor shall: (a) promptly notify UL in writing upon receipt of the request; (b) reasonably assist the UL to obtain a protective order or other remedy of UL's election; (c) provide UL prior review of any disclosure; (d) provide only that portion of the Confidential Information that is legally required; and (e) make reasonable efforts to obtain reliable assurance that the Confidential Information shall be maintained in confidence.

7.3    Assessor agrees that all aspects of the services performed on behalf of UL and its clients, including without limitation the number and frequency of Assessments, shall be kept confidential.

7.4    Assessor hereby authorizes UL to transmit unencrypted confidential information and other information through the Internet or a public network to e-mail addresses or other locations provided by Assessor. Assessor acknowledges that the UL cannot guarantee the privacy and confidentiality of such information. Assessor agrees that UL's transmission of confidential information via the Internet of other public network shall not be a breach of any confidentiality obligation under this Agreement and that UL shall not be liable for any damages resulting from such transmissions.

8.    **Independent Entities** - The assessor is an independent person/entity and is not affiliated with or influenced or controlled by manufacturers, producers, suppliers or vendors of products in any manner that might affect their capacities to render reports of findings objectively and without bias. Specifically, he/she represents and warrants that, during the term of this Agreement:

(a)    There shall be no managerial affiliation with manufacturers, producers, suppliers or vendors;

(b)    the results of his/her work shall accrue no financial benefits via stock ownership or the like to any manufacturers, producers, suppliers or vendors of the products involved;

(c)    there shall be a sufficient breadth of interest or activity such that the loss or award of a specific contract to determine compliance of a manufacturer's, producer's, supplier's or vendor's facility or product with the applicable requirements or standards would not be a determinative factor in their financial well-being; and

(d)    his/her employment security status shall be free of influence or control of manufacturers, producers, suppliers and vendors.

9.    **Nature of Relationship**

9.1    The parties intend to create only an independent contractor relationship. This Agreement shall not create an agency or employment relationship, partnership, joint venture, or other business group or concerted action between the parties. Assessor acknowledges that at no time will it consider itself to be an employee, agent, partner or joint ventureer of UL. Neither party is authorized to incur any obligations on behalf of, or to bind the other in any respect. UL will not exercise any control over the manner and means by which Assessor performs the Assessments. Assessor understands that Assessor is not entitled to any of the rights, benefits, or compensation extended by UL to its employees.

9.2    Each party and each party's personnel, if such exists, shall at all times be under that party's exclusive direction and control and shall not be employees of the other party. Where applicable each party shall pay all wages, salaries and other amounts due its employees in connection with Assessments performed under this Agreement and without limitation shall be responsible for all reports and obligations respecting their relationship. **Prior to entering into this Agreement and once yearly thereafter, for each individual that Assessor employs that renders services to UL, Assessor shall provide UL with evidence of payment of wages, salaries, benefits, contributions to social security, and/or any other payments Assessor is required by law to pay its employees. UL will not pay any fees due to Assessor until evidence satisfactory to UL has been provided.**

9.3    Assessor agrees that no income, social security, or other taxes or amounts shall be withheld or accrued by UL for Assessor's benefit. Assessor will be responsible for withholding, accruing, reporting, and paying all income, social security, and other taxes and amounts required by law for all compensation hereunder. Assessor agrees to indemnify, defend and hold harmless UL for any claims, losses, costs, fees, liabilities, damages or injuries arising out of Assessor's breach of this section. Assessor agrees that UL makes no representations or warranties regarding the taxability of the sums received by Assessor.

9.4    Assessor acknowledges and agrees that UL had its own pre-existing relationship with UL Clients (as defined in paragraph 1.1, above.) Assessor acknowledges and agrees that UL has introduced and/or will introduce Assessor to UL Clients and that the Assessor would not have been able to have a business relationship with any UL Client without UL's disclosure. Assessor

UL RS IAA

agrees that, during the term of this Agreement and for a period of two (2) years after the last day it is on a UL related assignment, it will not solicit, accept business from or conduct any work related to the work it conducts under this agreement for any UL Client, on behalf of any entity or individual other than UL.

10. **Conflict of Interest** – Assessor: (i) shall not use its position for personal financial gain; (ii) shall not accept any personal advantage from anyone under circumstances which might reasonably be interpreted as an attempt to influence the recipients in the conduct of their duties; (iii) shall not extend any special favor to employees of UL under circumstances which might reasonably be interpreted as an attempt to influence them in the conduct of their duties; (iv) shall not have been involved in any way with designing the product, process or system to be assessed; and (v) if an agent authorized by an UL client(s), shall not have any crossover or sharing of information between its employees who conduct Assessments and its employees who act as agents authorized by an UL clients. Assessor must immediately disclose to UL actual or potential conflicts of interest, including any business relationship and/or any financial interest of an UL employee in the Assessor's business.

11. **Insurance -** Without limiting in any way Assessor's indemnification obligations under this Agreement, Assessor shall maintain adequate insurance and limits of liability including but not limited to automobile coverage and where possible general and professional liability coverage. Assessor shall name UL as an additional insured on each policy and shall provide to UL upon its request the Certificate(s) of Insurance evidencing all coverage(s). Assessor shall notify UL in writing no later than ten (10) days before any policy for the required insurance is canceled or modified.

12. **Indemnification -** Assessor agrees to assume all risk of loss and to defend, indemnify and hold harmless UL, its successors and assigns, members, trustees, officers, employees and agents from and against any and all liabilities, demands, claims, suits, losses, damages, causes of actions, fines or judgments, including costs, attorneys' fees and witnesses' fees of counsel of the UL Contracting Party's choosing for injuries to persons (including death) and for loss of, damage to or destruction of property (including property of the UL's clients) due to the Assessor's gross negligence or willful misconduct arising in connection with the Assessment or this Agreement, unless caused by UL's gross negligence or willful misconduct.

13. **Governing Law** Unless specifically prohibited by law, the parties agree that the laws of the State of Oregon, USA will apply to this Agreement, without reference to its choice of law principles.

14. **Termination**

14.1 Either party may terminate this Agreement upon ninety (90) days' written notice.

14.2 UL shall have the right to terminate this Agreement immediately if any of the following events occur: (i) Assessor fails to comply with any provision of this Agreement; (ii) Assessor suspends its payments, is bankrupt, is unable to pay debts when due, enters into liquidation or takes or suffers any similar action in consequence of its debts, whether voluntary or compulsory; (iii) a change in ownership of a controlling interest in Assessor, without UL's prior written consent; (iv) any misrepresentation by Assessor in connection with this Agreement; or (v) any trade sanction or embargo is imposed by the U.S. government upon the country in which Assessor is located or incorporated.

14.3 Upon termination of this Agreement, Assessor will discontinue Assessments and shall promptly deliver to UL all records and documents in connection with Assessments performed for the UL, as well as all documents, equipment, and other UL property UL had provided to Assessor.

14.4 The provisions of Paragraphs 7 (Confidentiality), 12 (Indemnification), 14 (Resolving Disputes), 18 (No Waiver), 20 (No Third-Party Beneficiaries), 22 (Notice) and 23 (Severability) shall survive the termination of this Agreement.

15. **Country Specific Terms and Conditions -** If there are changes to the terms of this Agreement for countries outside of the United States, then those terms will be set forth in Schedule B of this Agreement and supersede any conflicting terms in this Agreement. All other terms and conditions in this Agreement remain in full force and effect.

16. **Entire Agreement -** This Agreement constitutes the entire understanding of the parties and supersedes all prior communications, understandings, representations, negotiations and discussions, written or oral, between the parties regarding its subject matter. If any purchase order submitted in connection with this Agreement conflicts with this Agreement, this Agreement shall prevail.

17. **No Waiver -** A party's failure to insist upon the other party's performance of this Agreement or any of its provisions shall not constitute a waiver of any rights under the Agreement.

20. **No Assignment -** Neither party may assign or transfer, in whole or in part, its rights under this Agreement without the other party's written consent. Notwithstanding the foregoing, UL may assign or transfer, in whole or in part, its obligations under this Agreement to a UL Contracting Party parent, subsidiary, branch or affiliate solely at the discretion of UL and without notice.

UL RS IAA

21. **No Third-Party Beneficiaries** - No provision of this Agreement shall in any way inure to the benefit of any third person so as to make any such person a third-party beneficiary of this Agreement or otherwise give any third party any claim under this Agreement.

22. **English Language** - All communications, written or oral, between the parties shall be in English. This Agreement shall be executed in the English language and shall govern in the event that any translation of this Agreement is made.

23. **Notice** - All notices required to be given under this Agreement shall be in writing executed by an authorized person and shall be delivered by hand, by certified or registered mail (or an equivalent), return receipt requested, courier or facsimile (if confirmed by receipt). Notice shall be deemed to have been made, in the case of facsimile, upon confirmed receipt, and in the case of mail or courier, upon the earlier of (i) receipt or (ii) five (5) days after such notice is deposited in the mail to the address shown below:

UL Responsible Sourcing Inc.      with copy to:      UL LLC
Attention: General Manager                            Attention: General Counsel
333 Pfingsten Road                                 333 Pfingsten Rd.
Northbrook, Illinois 60062                         Northbrook, IL 60062
                                                    Fax (847) 498-3789

24. **Severability** - A judicial or administrative declaration in any jurisdiction of the invalidity of any one or more provisions of this Agreement shall not invalidate the remaining provisions of this Agreement, nor shall such declaration have any effect on the validity or interpretation of this Agreement outside of that jurisdiction.

The undersigned represent and warrant that they are authorized to execute this Agreement; that they have read the Agreement and understand its terms; that they have had access to legal counsel; and that they intend to be legally bound.

**WE AGREE TO THE TERMS AND CONDITIONS SET FORTH ON EACH PAGE OF THIS AGREEMENT AND WARRANT THAT NO ALTERATIONS OF ITS TEXT HAVE BEEN MADE WITHOUT UL'S PRIOR WRITTEN CONSENT.**

UL Responsible Sourcing Inc.             Joshua Callington

                                             *(Assessor's Complete Legal Name or Complete Legal Company Name)*

By: _____          By: _____
                                                   *(Signature)*

Name: Jorge Carrillo              Name: Joshua Callington
                                                 *(Typed Name)*

Title: Operations Manager, The Americas      Title: Auditor
       UL Responsible Sourcing

UL RS IAA

**SCHEDULE A TO INDEPENDENT ASSESSOR AGREEMENT**

**Between UL CONTRACTING PARTY and ASSESSOR**

1.      Assessment Service: If more than one type of service is to be provided and the fee schedule or the insurance is dependent on the type of service provided, the Schedule A must state which fee schedule and/or insurance is applicable to each service. If only one type of service is provided or the fee schedule and insurance is the same for all services provided, then Schedule A does not need to mention the type of service(s) to which the fee schedule and insurance is applicable.

2.      Fee Schedule: ▉ per audit manday.

3.      Insurance: None

      A.      Home Owners/Business Owners/Professional Liability

            Policy Nos.

                  Limits

      B.      Automobile Liability:

            Policy No.

            Limits:
                  Bodily Injury

                  Property Damage

J.C. _____ Initials
(UL Responsible Sourcing Inc.)

_____ Initials
(Assessor)

Date:  May 17, 2017

# EXHIBIT 2

UL RS IAA



| | |
|---|---|
| Subscriber No: _____ |
| Assessor No: _____ |
| Agreement No.: _____ |
| (For Internal UL Use Only) |

**INDEPENDENT ASSESSOR AGREEMENT**

**Choose a method to return the completed Agreement:**

**Mail to:** ████████████ _____

████████

**Fax to:** _____ **E-mail to:** ████████ _____

**THIS AGREEMENT** is made as of <u>November 4, 2017</u>, by and between UL Responsible Sourcing Inc. ("UL"), a Delaware limited liability company and

<u>Joshua Callington</u> _____ ("Assessor"),

("Address"). Assessor is a resident of the State of Oregon and is qualified to conduct assessments, to evaluate workplace compliance with local labor, workplace safety laws, security regulations such as C-TPAT, international labor organization (ILO) standards, and/or the client's supplier code of conduct. Additionally, the auditor is expected to write comprehensive evaluation reports in English for each audit conducted, in an accurate, detailed and timely manner and advisory services as requested by UL (collectively referred to herein as "Assessments or Services"). UL and Assessor are referred to individually as a "party" or together as "the parties."

1.  <u>Scope</u>

    1.1    Assessor shall perform Assessments as requested by UL at facilities world-wide (the "territory") as directed by UL according to the terms of this Agreement. The Clients for whom Assessor performs work under this Agreement are referred to herein as "UL Clients".

    1.2    Assessor may also perform advisory services for UL Clients related to C-TPAT, labor policies, supplier codes of conduct, and services related to UL's business.

    1.3    Assessor is not obligated to perform Assessments exclusively for UL. UL is not obligated to request that Assessor perform all Assessments for UL in the territory.

    1.3    Assessor will be paid only for Assessments performed pursuant to the terms of this Agreement. Assessor will not be required by UL to report to any UL location or any other office location. Assessor will have no required working hours or schedule from UL (except as necessary to complete specific Assessments).

2.  <u>Obligations of the UL Contracting Party</u>

    2.1    For each Assessment, UL shall provide Assessor with information required to perform the Assessment including, the scope of the Assessment, the location of the facility and the requested completion date or Assessment schedule.

    2.2    UL shall provide Assessor with all documents and supplies required to perform the requested Assessment including current requirements and instructions applicable to the Assessment. UL shall promptly notify Assessor of any changes to the Assessment scope, requirements, instructions, location or schedule.

    2.3    UL may provide training to Assessor. The parties shall agree in advance upon the time, location and fees (if any) for the training.

3.  <u>Obligations of Assessor</u>

    3.1    Assessor shall perform each Assessment in a competent manner and in compliance with the applicable requirements, regulations and instructions. Assessor represents and warrants that the best technical practices, skills, procedures, care and judgment shall be employed in performing Assessments and that the Assessments shall be performed in the most expeditious and economical manner consistent therewith.

    3.2    Assessor shall act according to the highest legal, ethical and moral standards at all times. Assessor has read, understands and by signing this agreement agrees to comply with UL's Global Supplier Standards of Conduct and UL's Anti-bribery and Corruption Policy (available at www.ul.com/ulglobalethics). Further, the Assessor agrees that they will comply with foreign corrupt practices laws, regulations, and other legal requirements including the U.S. Foreign Corrupt Practices Act and UK Bribery Act. Assessor specifically warrants and represents that no offer, promise or payment of any money, gift or any other thing of value shall be paid to any person for the purpose of influencing official actions or decisions affecting this Agreement.

UL RS IAA

Assessor agrees to promptly notify the UL of any change in any laws, regulations or other legal requirements that may affect its performance of this Agreement.

3.3     Assessor represents and warrants that during the term of this Agreement it shall not cause UL to violate any U.S. trade sanction laws administered by the U.S. Department of Treasury, Office of Foreign Asset Control (http://www.ustreas.gov/ofac), shall obtain all applicable export licenses, and shall ensure that any payments made to or by UL or its affiliates will not be paid from or deposited into a financial institution and account subject to any U.S. trade sanction law. The UL has the right to terminate the Agreement immediately if it is prohibited by U.S. law from doing business with Assessor.

3.4     Assessor shall prepare and maintain complete and accurate records and reports of all Assessments in such form and for such time as designated by UL. Immediately after each Assessment, Assessor shall send the Assessment report to the individual, department and location designated by UL. All air travel must be pre-approved by UL in advance. All approved air travel must be arranged at the lowest available fare consistent with scheduling for work efficiencies.

3.5     UL shall have all right, title and interest in all records and documents pertaining to the Assessments. All records and documents that Assessor creates pertaining to the Assessments are "works made for hire" on behalf of UL within the meaning and purview of Section 101 of the United States Copyright Act, 17 U.S.C. Section 101, and UL will be the copyright owner of such records and documents. Upon UL's request, Assessor shall provide UL with all documents, information or assistance necessary to enable UL to perfect and protect its copyrights in any materials produced as a result of this Agreement. All materials UL provides to Assessor relating to the Assessments are property of UL, and Assessor may not sell or distribute the materials to any third parties.

3.6     Assessor shall permit UL's representatives, announced and unannounced, to attend the Assessments.

3.7     Assessor shall inform UL in writing of the name of the person who will act as the Assessment coordinator and the names of the persons who will conduct the Assessments. Upon request, Assessor shall provide UL with curriculum vitae of its personnel who will conduct Assessments. Only personnel who have UL's prior written approval shall perform the Assessments. Assessor shall notify UL in advance of any proposed change in personnel conducting Assessments. At UL's request, Assessor shall promptly replace any of its personnel who conduct Assessments for UL. Assessor shall not use subcontractors to perform Assessments without UL's prior written consent.

3.8     UL is entitled to inspect and review all services provided under this Agreement for conformity with Assessor's obligations under this Agreement.

4.     **Marks -** No licenses, express or implied, for any trademarks, service marks, certification marks (collectively referred to as "Marks") or copyrights are granted to either party or any third party. Assessor shall not authorize any person to use UL's Marks. Each party will be solely responsible for authorization, use and control of its marks. However, each party agrees to notify the other if it is learned that a third party's use of the other party's mark is improper.

5.     **Advertising and Promotion -** Assessor may not refer to itself as a UL "accredited" organization. Assessor may not refer to or use UL's name, or any name of any subsidiary or affiliate of UL, or any UL Mark in advertising, promotions or otherwise orally or in written materials, including, specifically, but not limited to, business cards, except with UL's prior written consent.

6.     **Fees and Expenses -** UL shall invoice its Clients directly and pay Assessor for each Assessment completed at least at the minimum of the rates provided in Schedule A within fifteen (15) days of receiving Assessor's invoice and/or required supporting documentation. Rates paid are subject to change based on location and complexity of the Assessment and will be made known to Assessor prior to such Assessment taking place.

7.     **Confidentiality**

7.1     Assessor shall not voluntarily disclose information obtained by Assessor from UL or its client(s) ("Confidential Information") to any third party, without the prior written consent of UL. The term "Confidential Information" as used herein means and includes any and all data or information and documentation relating to the business of UL or its client(s) that is not generally known to the public or readily obtainable from outside sources. Confidential Information includes, by way of example and without limitation, the following: financial information, including but not limited to earnings, assets, debts, prices, cost information, budgets, sales and profit projections or other financial data; information used in the preparation and auditing of financial statements; marketing information, including but not limited to details about ongoing or proposed marketing strategies, marketing forecasts, or information about impending transactions; product information, including but not limited to development plans, product designs, product costs and pricing policies; information regarding actual or potential customers; employee information, compensation information and recruiting plans. Assessor acknowledges that such information is confidential whether or not such information is labeled as such by UL or UL's client(s). Assessor may disclose audit results to UL and its client(s) immediately upon the completion of the audit. Assessor shall protect Confidential Information with the same degree of care that it uses to protect its own confidential information of a similar nature and never use less than a

UL RS IAA

reasonable degree of care to protect Confidential Information, which may include requiring its employees, if any, to sign appropriate nondisclosure agreements to comply with the terms of this Agreement.

7.2     Confidential Information shall not include information or material that is (a) in the public domain other than due to a violation of this Agreement; (b) documented by competent evidence to be known to Assessor before disclosure by Assessor under this Agreement and without violation of any confidentiality obligation owed to UL or any third party; or (c) independently developed by Assessor without reference or access to the Confidential Information, as demonstrated by competent evidence. If Assessor is required by law or regulatory authority to disclose any Confidential Information, Assessor shall: (a) promptly notify UL in writing upon receipt of the request; (b) reasonably assist the UL to obtain a protective order or other remedy of UL's election; (c) provide UL prior review of any disclosure; (d) provide only that portion of the Confidential Information that is legally required; and (e) make reasonable efforts to obtain reliable assurance that the Confidential Information shall be maintained in confidence.

7.3     Assessor agrees that all aspects of the services performed on behalf of UL and its clients, including without limitation the number and frequency of Assessments, shall be kept confidential.

7.4     Assessor hereby authorizes UL to transmit unencrypted confidential information and other information through the Internet or a public network to e-mail addresses or other locations provided by Assessor. Assessor acknowledges that the UL cannot guarantee the privacy and confidentiality of such transmissions. Assessor agrees that UL's transmission of confidential information via the Internet of other public network shall not be a breach of any confidentiality obligation under this Agreement and that UL shall not be liable for any damages resulting from such transmissions.

8.     **Independent Entities -** The assessor is an independent person/entity and is not affiliated with or influenced or controlled by manufacturers, producers, suppliers or vendors of products in any manner that might affect their capacities to render reports of findings objectively and without bias. Specifically, he/she represents and warrants that, during the term of this Agreement:

(a)     There shall be no managerial affiliation with manufacturers, producers, suppliers or vendors;

(b)     the results of his/her work shall accrue no financial benefits via stock ownership or the like to any manufacturers, producers, suppliers or vendors of the products involved;

(c)     there shall be a sufficient breadth of interest or activity such that the loss or award of a specific contract to determine compliance of a manufacturer's, producer's, supplier's or vendor's facility or product with the applicable requirements or standards would not be a determinative factor in their financial well-being; and

(d)     his/her employment security status shall be free of influence or control of manufacturers, producers, suppliers and vendors.

9.     **Nature of Relationship**

9.1     The parties intend to create only an independent contractor relationship. This Agreement shall not create an agency or employment relationship, partnership, joint venture, or other business group or concerted action between the parties. Assessor acknowledges that at no time will it consider itself to be an employee, agent, partner or joint ventureer of UL. Neither party is authorized to incur any obligations on behalf of, or to bind the other in any respect. UL will not exercise any control over the manner and means by which Assessor performs the Assessments. Assessor understands that Assessor is not entitled to any of the rights, benefits, or compensation extended by UL to its employees.

9.2     Each party and each party's personnel, if such exists, shall at all times be under that party's exclusive direction and control and shall not be employees of the other party. Where applicable each party shall pay all wages, salaries and other amounts due its employees in connection with Assessments performed under this Agreement and without limitation shall be responsible for all reports and obligations respecting their relationship. **Prior to entering into this Agreement and once yearly thereafter, for each individual that Assessor employs that renders services to UL, Assessor shall provide UL with evidence of payment of wages, salaries, benefits, contributions to social security, and/or any other payments Assessor is required by law to pay its employees. UL will not pay any fees due to Assessor until evidence satisfactory to UL has been provided.**

9.3     Assessor agrees that no income, social security, or other taxes or amounts shall be withheld or accrued by UL for Assessor's benefit. Assessor will be responsible for withholding, accruing, reporting, and paying all income, social security, and other taxes and amounts required by law for all compensation hereunder. Assessor agrees to indemnify, defend and hold harmless UL for any claims, losses, costs, fees, liabilities, damages or injuries arising out of Assessor's breach of this section. Assessor agrees that UL makes no representations or warranties regarding the taxability of the sums received by Assessor.

9.4     Assessor acknowledges and agrees that UL had its own pre-existing relationship with UL Clients (as defined in paragraph 1.1, above.) Assessor acknowledges and agrees that UL has introduced and/or will introduce Assessor to UL Clients and that the Assessor would not have been able to have a business relationship with any UL Client without UL's disclosure. Assessor

UL RS IAA

agrees that, during the term of this Agreement and for a period of two (2) years after the last day it is on a UL related assignment, it will not solicit, accept business from or conduct any work related to the work it conducts under this agreement for any UL Client, on behalf of any entity or individual other than UL.

10. **Conflict of Interest** – Assessor: (i) shall not use its position for personal financial gain; (ii) shall not accept any personal advantage from anyone under circumstances which might reasonably be interpreted as an attempt to influence the recipients in the conduct of their duties; (iii) shall not extend any special favor to employees of UL under circumstances which might reasonably be interpreted as an attempt to influence them in the conduct of their duties; (iv) shall not have been involved in any way with designing the product, process or system to be assessed; and (v) if an agent authorized by an UL client(s), shall not have any crossover or sharing of information between its employees who conduct Assessments and its employees who act as agents authorized by an UL clients. Assessor must immediately disclose to UL actual or potential conflicts of interest, including any business relationship and/or any financial interest of an UL employee in the Assessor's business.

11. **Insurance** - Without limiting in any way Assessor's indemnification obligations under this Agreement, Assessor shall maintain adequate insurance and limits of liability including but not limited to automobile coverage and where possible general and professional liability coverage. Assessor shall name UL as an additional insured on each policy and shall provide to UL upon its request the Certificate(s) of Insurance evidencing all coverage(s). Assessor shall notify UL in writing no later than ten (10) days before any policy for the required insurance is canceled or modified.

12. **Indemnification** - Assessor agrees to assume all risk of loss and to defend, indemnify and hold harmless UL, its successors and assigns, members, trustees, officers, employees and agents from and against any and all liabilities, demands, claims, suits, losses, damages, causes of actions, fines or judgments, including costs, attorneys' and witnesses' fees of counsel of the UL Contracting Party's choosing for injuries to persons (including death) and for loss of, damage to or destruction of property (including property of the UL's clients) due to the Assessor's gross negligence or willful misconduct arising in connection with the Assessment or this Agreement, unless caused by UL's gross negligence or willful misconduct.

13. **Governing Law** Unless specifically prohibited by law, the parties agree that the laws of the State of Oregon, USA will apply to this Agreement, without reference to its choice of law principles.

14. **Termination**

14.1 Either party may terminate this Agreement upon ninety (90) days' written notice.

14.2 UL shall have the right to terminate this Agreement immediately if any of the following events occur: (i) Assessor fails to comply with any provision of this Agreement; (ii) Assessor suspends its payments, is bankrupt, is unable to pay debts when due, enters into liquidation or takes or suffers any similar action in consequence of its debts, whether voluntary or compulsory; (iii) a change in ownership of a controlling interest in Assessor, without UL's prior written consent; (iv) any misrepresentation by Assessor in connection with this Agreement; or (v) any trade sanction or embargo is imposed by the U.S. government upon the country in which Assessor is located or incorporated.

14.3 Upon termination of this Agreement, Assessor will discontinue Assessments and shall promptly deliver to UL all records and documents in connection with Assessments performed for the UL, as well as all documents, equipment, and other UL property UL had provided to Assessor.

14.4 The provisions of Paragraphs 7 (Confidentiality), 12 (Indemnification), 14 (Resolving Disputes), 18 (No Waiver), 20 (No Third-Party Beneficiaries), 22 (Notice) and 23 (Severability) shall survive the termination of this Agreement.

15. **Country Specific Terms and Conditions** - If there are changes to the terms of this Agreement for countries outside of the United States, then those terms will be set forth in Schedule B of this Agreement and supersede any conflicting terms in this Agreement. All other terms and conditions in this Agreement remain in full force and effect.

16. **Entire Agreement** - This Agreement constitutes the entire understanding of the parties and supersedes all prior communications, understandings, representations, negotiations and discussions, written or oral, between the parties regarding its subject matter. If any purchase order submitted in connection with this Agreement conflicts with this Agreement, this Agreement shall prevail.

17. **No Waiver** - A party's failure to insist upon the other party's performance of this Agreement or any of its provisions shall not constitute a waiver of any rights under the Agreement.

20. **No Assignment** - Neither party may assign or transfer, in whole or in part, its rights under this Agreement without the other party's written consent. Notwithstanding the foregoing, UL may assign or transfer, in whole or in part, its obligations under this Agreement to a UL Contracting Party parent, subsidiary, branch or affiliate solely at the discretion of UL and without notice.

UL RS IAA

21.  **No Third-Party Beneficiaries** - No provision of this Agreement shall in any way inure to the benefit of any third person so as to make any such person a third-party beneficiary of this Agreement or otherwise give any third party any claim under this Agreement.

22.  **English Language** - All communications, written or oral, between the parties shall be in English. This Agreement shall be executed in the English language and shall govern in the event that any translation of this Agreement is made.

23.  **Notice** - All notices required to be given under this Agreement shall be in writing executed by an authorized person and shall be delivered by hand, by certified or registered mail (or an equivalent), return receipt requested, courier or facsimile (if confirmed by receipt). Notice shall be deemed to have been made, in the case of facsimile, upon confirmed receipt, and in the case of mail or courier, upon the earlier of (i) receipt or (ii) five (5) days after such notice is deposited in the mail to the address shown below:

UL Responsible Sourcing Inc.       with copy to:    UL LLC
Attention: General Manager                             Attention: General Counsel
333 Pfingsten Road                                333 Pfingsten Rd.
Northbrook, Illinois  60062                        Northbrook, IL 60062
                                                  Fax (847) 498-3789

24.  **Severability** - A judicial or administrative declaration in any jurisdiction of the invalidity of any one or more provisions of this Agreement shall not invalidate the remaining provisions of this Agreement, nor shall such declaration have any effect on the validity or interpretation of this Agreement outside of that jurisdiction.

The undersigned represent and warrant that they are authorized to execute this Agreement; that they have read the Agreement and understand its terms; that they have had access to legal counsel; and that they intend to be legally bound.

**WE AGREE TO THE TERMS AND CONDITIONS SET FORTH ON EACH PAGE OF THIS AGREEMENT AND WARRANT THAT NO ALTERATIONS OF ITS TEXT HAVE BEEN MADE WITHOUT UL'S PRIOR WRITTEN CONSENT.**

UL Responsible Sourcing Inc.                      Joshua Callington
                                        *(Assessor's Complete Legal Name or Complete Legal Company Name)*

**By:** _____       **By:** _Joshua Callington_
                                          *(Signature)*

**Name:** Sheer Garcia           **Name:** Joshua Callington
                                          *(Typed Name)*

**Title:** Field Operations Supervisor – North America      **Title:** Auditor
          UL Responsible Sourcing

UL RS IAA

## SCHEDULE A TO INDEPENDENT ASSESSOR AGREEMENT

### Between UL CONTRACTING PARTY and ASSESSOR

1.      Assessment Service: If more than one type of service is to be provided and the fee schedule or the insurance is dependent on the type of service provided, the Schedule A must state which fee schedule and/or insurance is applicable to each service.  If only one type of service is provided or the fee schedule and insurance is the same for all services provided, then Schedule A does not need to mention the type of service(s) to which the fee schedule and insurance is applicable.

2.      Fee Schedule:      per audit manday, conditional to Joshua Callington procuring his own car rental insurance. In the event that Joshua Callington chooses to elect additional insurance through the car rental company, Mr. Callington will be personally responsible for additional insurance expenses.

3.      Insurance: None

       A.      Home Owners/Business Owners/Professional Liability

           Policy Nos.

               Limits

       B.      Automobile Liability:

           Policy No.

           Limits:
               Bodily Injury

               Property Damage

            _____ Initials
                       (UL Responsible Sourcing Inc.)

            _____ Initials
                                        (Assessor)

                       Date:  November 4, 2017

CONFIDENTIAL

# EXHIBIT 3

UL RS IAA – RS v10



**INDEPENDENT ASSESSOR AGREEMENT**

Subscriber No: _____

Assessor No: _____

Agreement No.: _____

(For Internal UL Use Only)

**THIS AGREEMENT** is made as of ___May 4, 2018___ , by and between UL Responsible Sourcing Inc. ("UL"), a Delaware limited liability company and ___Joshua Callington,_____._ Assessor is: a resident of the State of _Oregan_ and is qualified to conduct assessments, to evaluate workplace compliance with local labor, workplace safety laws, security regulations such as C-TPAT, international labor organization (ILO) standards, and/or the client's supplier code of conduct. Additionally, the auditor is expected to write comprehensive evaluation reports in English for each audit conducted, in an accurate, detailed and timely manner and advisory services as requested by UL (collectively referred to herein as "Assessments or Services"). UL and Assessor are referred to individually as a "party" or together as "the parties."

1. **Scope**

   1.1 Assessor shall perform Assessments as requested by UL at facilities world-wide (the "territory") as directed by UL according to the terms of this Agreement. The Clients for whom Assessor performs work under this Agreement are referred to herein as "UL Clients".

   1.2 Assessor may also perform advisory services for UL Clients related to C-TPAT, labor policies, supplier codes of conduct, and services related to UL's business.

   1.3 Assessor is not obligated to perform Assessments exclusively for UL. UL is not obligated to request that Assessor perform all Assessments for UL in the territory.

   1.3 Assessor will be paid only for Assessments performed pursuant to the terms of this Agreement and the Notes under attached Fee Schedule. Assessor will not be required by UL to report to any UL location or any other office location. Assessor will have no required working hours or schedule from UL (except as necessary to complete specific Assessments).

2. **Obligations of the UL Contracting Party**

   2.1 For each Assessment, UL shall provide Assessor with information required to perform the Assessment including, the scope of the Assessment, the location of the facility and the requested completion date or Assessment schedule.

   2.2 UL shall provide Assessor with all documents and supplies required to perform the requested Assessment including current requirements and instructions applicable to the Assessment. UL shall promptly notify Assessor of any changes to the Assessment scope, requirements, instructions, location or schedule.

   2.3 UL may provide training to Assessor. The parties shall agree in advance upon the time, location and fees (if any) for the training.

3. **Obligations of Assessor**

   3.1 Assessor shall perform each Assessment in a competent manner and in compliance with the applicable requirements, regulations and instructions. Assessor represents and warrants that the best technical practices, skills, procedures, care and judgment shall be employed in performing Assessments and that the Assessments shall be performed in the most expeditious and economical manner consistent therewith.

   3.2 Assessor shall act according to the highest legal, ethical and moral standards at all times. Assessor has read, understands and by signing this agreement agrees to comply with UL's Global Supplier Standards of Conduct and UL's Anti-bribery and Corruption Policy (available at www.ul.com/ulglobalethics). Further, the Assessor agrees that they will comply with foreign corrupt practices laws, regulations, and other legal requirements including the U.S. Foreign Corrupt Practices Act and UK Bribery Act. Assessor specifically warrants and represents that no offer, promise or payment of any money, gift or any other thing of value shall be paid to any person for the purpose of influencing official actions or decisions affecting this Agreement. Assessor agrees to promptly notify the UL of any change in any laws, regulations or other legal requirements that may affect its performance of this Agreement.

   3.3 Assessor represents and warrants that during the term of this Agreement it shall not cause UL to violate any U.S. trade sanction laws administered by the U.S. Department of Treasury, Office of Foreign Asset Control (http://www.ustreas.gov/ofac), shall obtain all applicable export licenses, and shall ensure that any payments made to or by UL or its affiliates will not be paid from

or deposited into a financial institution and account subject to any U.S. trade sanction law. The UL has the right to terminate the Agreement immediately if it is prohibited by U.S. law from doing business with Assessor.

3.4   Assessor shall prepare and maintain complete and accurate records and reports of all Assessments in such form and for such time as designated by UL.  Immediately after each Assessment, Assessor shall send the Assessment report to the individual, department and location designated by UL.  All air travel must be pre-approved by UL in advance.  All approved air travel must be arranged at the lowest available fare consistent with scheduling for work efficiencies.

3.5   UL shall have all right, title and interest in all records and documents pertaining to the Assessments.  All records and documents that Assessor creates pertaining to the Assessments are "works made for hire" on behalf of UL within the meaning and purview of Section 101 of the United States Copyright Act, 17 U.S.C. Section 101, and UL will be the copyright owner of such records and documents.  Upon UL's request, Assessor shall provide UL with all documents, information or assistance necessary to enable UL to perfect and protect its copyrights in any materials produced as a result of this Agreement. All materials UL provides to Assessor relating to the Assessments are property of UL, and Assessor may not sell or distribute the materials to any third parties.

3.6   Assessor shall permit UL's representatives, announced and unannounced, to attend the Assessments.

3.7   Assessor shall inform UL in writing of the name of the person who will act as the Assessment coordinator and the names of the persons who will conduct the Assessments.  Upon request, Assessor shall provide UL with curriculum vitae of its personnel who will conduct Assessments.  Only personnel who have UL's prior written approval shall perform the Assessments.  Assessor shall notify UL in advance of any proposed change in personnel conducting Assessments.  At UL's request, Assessor shall promptly replace any of its personnel who conduct Assessments for UL.  Assessor shall not use subcontractors to perform Assessments without UL's prior written consent.

3.8   UL is entitled to inspect and review all services provided under this Agreement for conformity with Assessor's obligations under this Agreement.

4.   **Marks** - No licenses, express or implied, for any trademarks, service marks, certification marks (collectively referred to as "Marks") or copyrights are granted to either party or any third party.  Assessor shall not authorize any person to use UL's Marks.  Each party will be solely responsible for authorization, use and control of its marks.  However, each party agrees to notify the other if it is learned that a third party's use of the other party's mark is improper.

5.   **Advertising and Promotion** - Assessor may not refer to itself as a UL "accredited" organization.  Assessor may not refer to or use UL's name, or any name of any subsidiary or affiliate of UL, or any UL Mark in advertising, promotions or otherwise orally or in written materials, including, specifically, but not limited to, business cards, except with UL's prior written consent.

6.   **Fees and Expenses** - UL shall invoice its Clients directly and pay Assessor for each Assessment completed at least at the minimum of the rates provided in Schedule A within fifteen (15) days of receiving Assessor's invoice and/or required supporting documentation. Rates paid are subject to change based on location and complexity of the Assessment and will be made known to Assessor prior to such Assessment taking place.

7.   **Confidentiality**

7.1   Assessor shall not voluntarily disclose information obtained by Assessor from UL or its client(s) ("Confidential Information") to any third party, without the prior written consent of UL.  The term "Confidential Information" as used herein means and includes any and all data or information and documentation relating to the business of UL or its client(s) that is not generally known to the public or readily obtainable from outside sources.  Confidential Information includes, by way of example and without limitation, the following:  financial information, including but not limited to earnings, assets, debts, prices, cost information, budgets, sales and profit projections or other financial data; information used in the preparation and auditing of financial statements; marketing information, including but not limited to details about ongoing or proposed marketing strategies, marketing forecasts, or information about impending transactions; product information, including but not limited to development plans, product designs, product costs and pricing policies; information regarding actual or potential customers; employee information, compensation information and recruiting plans.  Assessor acknowledges that such information is confidential whether or not such information is labeled as such by UL or UL's client(s).   Assessor may disclose audit results to UL and its client(s) immediately upon the completion of the audit.  Assessor shall protect Confidential Information with the same degree of care that it uses to protect its own confidential information of a similar nature and never use less than a reasonable degree of care to protect Confidential Information, which may include requiring its employees, if any, to sign appropriate nondisclosure agreements to comply with the terms of this Agreement.

7.2   Confidential Information shall not include information or material that is (a) in the public domain other than due to a violation of this Agreement; (b) documented by competent evidence to be known to Assessor before disclosure by Assessor under this Agreement and without violation of any confidentiality obligation owed to UL or any third party; or (c) independently developed by Assessor without reference or access to the Confidential Information, as demonstrated by competent evidence.  If Assessor is

required by law or regulatory authority to disclose any Confidential Information, Assessor shall: (a) promptly notify UL in writing upon receipt of the request; (b) reasonably assist the UL to obtain a protective order or other remedy of UL's election; (c) provide UL prior review of any disclosure; (d) provide only that portion of the Confidential Information that is legally required; and (e) make reasonable efforts to obtain reliable assurance that the Confidential Information shall be maintained in confidence.

**7.3**     Assessor agrees that all aspects of the services performed on behalf of UL and its clients, including without limitation the number and frequency of Assessments, shall be kept confidential.

**7.4**     Assessor hereby authorizes UL to transmit unencrypted confidential information and other information through the Internet or a public network to e-mail addresses or other locations provided by Assessor. Assessor acknowledges that the UL cannot guarantee the privacy and confidentiality of such transmissions. Assessor agrees that UL's transmission of confidential information via the Internet of other public network shall not be a breach of any confidentiality obligation under this Agreement and that UL shall not be liable for any damages resulting from such transmissions.

**8.**     <u>**Independent Entities**</u> **-** The assessor is an independent person/entity and is not affiliated with or influenced or controlled by manufacturers, producers, suppliers or vendors of products or consultants in any manner that might affect their capacities to render reports of findings impartially, objectively and without bias. Specifically, he/she represents and warrants that, during the term of this Agreement:

(a)     there shall be no managerial affiliation with manufacturers, producers, suppliers or vendors or consultants;

(b)     the results of his/her work shall accrue no financial benefits via stock ownership or the like to any manufacturers, producers, suppliers or vendors or the assessors consulting firm for the audits or products involved;

(c)     there shall be a sufficient breadth of interest or activity such that the loss or award of a specific contract to determine compliance of a manufacturer's, producer's, supplier's or vendor's facility or product with the applicable requirements or standards would not be a determinative factor in their financial well-being; and

(d)     his/her employment security status shall be free of influence or control of manufacturers, producers, suppliers and vendors.

**9.**     <u>**Nature of Relationship**</u>

**9.1**     The parties intend to create only an independent contractor relationship. This Agreement shall not create an agency or employment relationship, partnership, joint venture, or other business group or concerted action between the parties. Assessor acknowledges that at no time will it consider itself to be an employee, agent, partner or joint ventureer of UL. Neither party is authorized to incur any obligations on behalf of, or to bind the other in any respect. UL will not exercise any control over the manner and means by which Assessor performs the Assessments. Assessor understands that Assessor is not entitled to any of the rights, benefits, or compensation extended by UL to its employees.

**9.2**     Each party and each party's personnel, if such exists, shall at all times be under that party's exclusive direction and control and shall not be employees of the other party. Where applicable each party shall pay all wages, salaries and other amounts due its employees in connection with Assessments performed under this Agreement and without limitation shall be responsible for all reports and obligations respecting their relationship. **<u>Prior to entering into this Agreement and once yearly thereafter, for each individual that Assessor employs that renders services to UL, Assessor shall provide UL with evidence of payment of wages, salaries, benefits, contributions to social security, and/or any other payments Assessor is required by law to pay its employees. UL will not pay any fees due to Assessor until evidence satisfactory to UL has been provided.</u>**

**9.3**     Assessor agrees that no income, social security, or other taxes or amounts shall be withheld or accrued by UL for Assessor's benefit. Assessor will be responsible for withholding, accruing, reporting, and paying all income, social security, and other taxes and amounts required by law for all compensation hereunder. Assessor agrees to indemnify, defend and hold harmless UL for any claims, losses, costs, fees, liabilities, damages or injuries arising out of Assessor's breach of this section. Assessor agrees that UL makes no representations or warranties regarding the taxability of the sums received by Assessor.

**9.4**     Assessor acknowledges and agrees that UL had its own pre-existing relationship with UL Clients (as defined in paragraph 1.1, above.) Assessor acknowledges and agrees that UL has introduced and/or will introduce Assessor to UL Clients and that the Assessor would not have been able to have a business relationship with any UL Client without UL's disclosure. Assessor agrees that, during the term of this Agreement and for a period of two (2) years after the last day it is on a UL related assignment, it will not solicit, accept business from or conduct any work related to the work it conducts under this agreement for any UL Client, on behalf of any entity or individual other than UL.

10. <u>**Conflict of Interest**</u> **–** Assessor: (i) shall not use its position for personal financial gain; (ii) shall not accept any personal advantage from anyone under circumstances which might reasonably be interpreted as an attempt to influence the recipients in the conduct of their duties; (iii) shall not extend any special favor to employees of UL under circumstances which might reasonably be interpreted as an attempt to influence them in the conduct of their duties; (iv) <u>shall not have been involved in any way with designing the product, process or system to be assessed;</u> and (v) if an agent authorized by an UL client(s), shall not have any crossover or sharing of information between its employees who conduct Assessments and its employees who act as agents authorized by an UL clients. Assessor must immediately disclose to UL actual or potential conflicts of interest, including any business relationship and/or any financial interest of an UL employee in the Assessor's business.

11. <u>**Insurance**</u> **-** Without limiting in any way Assessor's indemnification obligations under this Agreement, Assessor shall maintain adequate insurance and limits of liability including but not limited to automobile coverage and where possible general and professional liability coverage. Assessor shall name UL as an additional insured on each policy and shall provide to UL upon its request the Certificate(s) of Insurance evidencing all coverage(s). Assessor shall notify UL in writing no later than ten (10) days before any policy for the required insurance is canceled or modified.

12. <u>**Indemnification**</u> **-** Assessor agrees to assume all risk of loss and to defend, indemnify and hold harmless UL, its successors and assigns, members, trustees, officers, employees and agents from and against any and all liabilities, demands, claims, suits, losses, damages, causes of actions, fines or judgments, including costs, attorneys' and witnesses' fees of counsel of the UL Contracting Party's choosing for injuries to persons (including death) and for loss of, damage to or destruction of property (including property of the UL's clients) due to the Assessor's gross negligence or willful misconduct arising in connection with the Assessment or this Agreement, unless caused by UL's gross negligence or willful misconduct.

13. <u>**Governing Law**</u>     Unless specifically prohibited by law, the parties agree that the laws of the State of Oregon, USA will apply to this Agreement, without reference to its choice of law principles.

14. <u>**Termination**</u>

    14.1    Either party may terminate this Agreement upon thirty (30) days' written notice.

    14.2    UL shall have the right to terminate this Agreement immediately if any of the following events occur: (i) Assessor fails to comply with any provision of this Agreement; (ii) Assessor suspends its payments, is bankrupt, is unable to pay debts when due, enters into liquidation or takes or suffers any similar action in consequence of its debts, whether voluntary or compulsory; (iii) a change in ownership of a controlling interest in Assessor, without UL's prior written consent; (iv) any misrepresentation by Assessor in connection with this Agreement; or (v) any trade sanction or embargo is imposed by the U.S. government upon the country in which Assessor is located or incorporated; or (vi) failure to meet ethical and impartiality standards of care.

    14.3    Upon termination of this Agreement, Assessor will discontinue Assessments and shall promptly deliver to UL all records and documents in connection with Assessments performed for the UL, as well as all documents, equipment, and other UL property UL had provided to Assessor.

    14.4    The provisions of Paragraphs 7 (Confidentiality), 12 (Indemnification), 14 (Resolving Disputes), 18 (No Waiver), 20 (No Third-Party Beneficiaries), 22 (Notice) and 23 (Severability) shall survive the termination of this Agreement.

15. <u>**Country Specific Terms and Conditions**</u> **-** If there are changes to the terms of this Agreement for countries outside of the United States, then those terms will be set forth in Schedule B of this Agreement and supersede any conflicting terms in this Agreement. All other terms and conditions in this Agreement remain in full force and effect.

16. <u>**Entire Agreement**</u> **-** This Agreement constitutes the entire understanding of the parties and supersedes all prior communications, understandings, representations, negotiations and discussions, written or oral, between the parties regarding its subject matter. If any purchase order submitted in connection with this Agreement conflicts with this Agreement, this Agreement shall prevail.

17. <u>**No Waiver**</u> **-** A party's failure to insist upon the other party's performance of this Agreement or any of its provisions shall not constitute a waiver of any rights under the Agreement.

18. <u>**No Assignment**</u> **-** Neither party may assign or transfer, in whole or in part, its rights under this Agreement without the other party's written consent. Notwithstanding the foregoing, UL may assign or transfer, in whole or in part, its obligations under this Agreement to a UL Contracting Party parent, subsidiary, branch or affiliate solely at the discretion of UL and without notice.

19. <u>**No Third-Party Beneficiaries**</u> **-** No provision of this Agreement shall in any way inure to the benefit of any third person so as to make any such person a third-party beneficiary of this Agreement or otherwise give any third party any claim under this Agreement.

20. <u>**English Language**</u> **-** All communications, written or oral, between the parties shall be in English. This Agreement shall be executed in the English language and shall govern in the event that any translation of this Agreement is made.

UL RS IAA – RS v10

21. **Notice** - All notices required to be given under this Agreement shall be in writing executed by an authorized person and shall be delivered by hand, by certified or registered mail (or an equivalent), return receipt requested, courier or facsimile (if confirmed by receipt).  Notice shall be deemed to have been made, in the case of facsimile, upon confirmed receipt, and in the case of mail or courier, upon the earlier of (i) receipt or (ii) five (5) days after such notice is deposited in the mail to the address shown below:

UL Responsible Sourcing Inc.                    with copy to:     UL LLC
Attention: Director Operations & Quality                          Attention: General Counsel
333 Pfingsten Road                                                333 Pfingsten Rd.
Northbrook, Illinois  60062                                       Northbrook, IL 60062
                                                                  Fax (847) 498-3789

22. **Severability** - A judicial or administrative declaration in any jurisdiction of the invalidity of any one or more provisions of this Agreement shall not invalidate the remaining provisions of this Agreement, nor shall such declaration have any effect on the validity or interpretation of this Agreement outside of that jurisdiction.

The undersigned represent and warrant that they are authorized to execute this Agreement; that they have read the Agreement and understand its terms; that they have had access to legal counsel; and that they intend to be legally bound.

**WE AGREE TO THE TERMS AND CONDITIONS SET FORTH ON EACH PAGE OF THIS AGREEMENT AND WARRANT THAT NO ALTERATIONS OF ITS TEXT HAVE BEEN MADE WITHOUT UL'S PRIOR WRITTEN CONSENT.**

**UL Responsible Sourcing Inc.**                          Joshua Callington
                                                          _(Assessor's Complete Legal Name or Complete Legal Company_

By: *Jorge Carrillo*  :                            By: *Joshua Callington*
    4A48EBDC790C467...                                     0297B9437BC043A...
                                                                          _(Signature)_
Name:    Jorge Carrillo                            Name:    Joshua Callington
                                                                          _(Typed Name)_
Title:   Operations Manager, North & Latin America Title:
         UL Responsible Sourcing                            CSR Auditor
         5/4/2018                                           5/14/2018 10:02:23 AM PDT

UL RS IAA – RS v10

**SCHEDULE A TO INDEPENDENT ASSESSOR AGREEMENT**

**Between UL CONTRACTING PARTY and ASSESSOR**

1. Assessment Service: If more than one type of service is to be provided and the fee schedule or the insurance is dependent on the type of service provided, the Schedule A must state which fee schedule and/or insurance is applicable to each service. If only one type of service is provided or the fee schedule and insurance is the same for all services provided, then Schedule A does not need to mention the type of service(s) to which the fee schedule and insurance is applicable.

2. Fee Schedule:  Fees will be negotiated by assessment and will vary according to its location, duration, scope and complexity. Minimum fee ranges are as follows:

   UL R agrees to compensate the Contractor for all UL R requested services provided by the Contractor at the agreed person-day rate, as shown below:

   - ███████ per audit manday with Contractor being responsible for all Insurance Coverage of rental vehicles                 ███████ / person-day

   Notes (*must complete or put "n/a"*):

   a. No report writing will be billed to UL R unless previously agreed by UL Responsible Sourcing.
   b. No travel time will be paid unless previously agreed by UL Responsible Sourcing in advance of the audit. All reasonable travel and incidental expenses incurred by the Contractor in order to undertake a project requested by UL Responsible Sourcing will be reimbursed upon presentation of proper documentation of those expenses and in accordance with the guidelines including but not limited to:
      - Lodging – actual amount reimbursed for an "average" or 3 star hotel or for any accommodations.
      - Meals – single day, lunch only up to $USD _N/A_ per day, or overnight if required by UL Responsible Sourcing. Actual amount reimbursed up to $USD _$50.00_ / day
      - Air Travel – non-refundable coach airfare reimbursed in full – if cancelled UL Responsible Sourcing will reimburse the auditor for unused tickets or cost for re-issue.

   The Contractor agrees to submit invoices and all required Audit documentation directly to UL Responsible Sourcing within 48 hours or 2 business days from completion of the assigned audit. UL Responsible Sourcing shall reimburse the Contractor for all completed services as assigned by UL Responsible Sourcing within 3 weeks from receipt of the Contractor's invoice. Failure to submit the required audit report within the specified 2 business days of completion of the audit may result in delayed payment of contractors invoice and may further cause up to a 20% reduction of the amount paid to the auditor for failure to report on time. Any deductions for failure to submit the audit report timely will be at the sole decision of UL Responsible Sourcing.

3. Insurance (*must complete or put "n/a"*):

   A.    Home Owners/Business Owners/Professional Liability:
                          N/A
         Policy Nos.
                  Limits

   B.    Automobile Liability:
         Policy No.              Geico
         Limits:                 ████████████
               Bodily Injury:    Bodily $50,000/$100,000
               Property Damage:  Property $100,000

Page **6** of **7**

_____ Initials
(_____, Responsible Sourcing Inc.)

_____ Initials
(Assessor)

Date: 5/14/2018 10:02:23 AM PDT _____

# EXHIBIT 4



5/8/2019

JOSHUA CALLINGTON



Dear JOSHUA:

**Congratulations and welcome to the UL family of companies! We are excited to confirm our offer to you as Team Leader CRS here at UL, where you will have the opportunity to push boundaries, provide peace of mind, and unlock what's next. UL delivers the best because we employ the best, and we are thrilled to have you join our team of skilled experts and trusted advisors.**

**Start Date & Location**
Your employment with UL will begin on 5/28/2019 reporting to Kelly Hutcheson, Regional Field Operations Manager A&I.

You will be based remotely, but will be associated with our UL location in Agoura Hills, CA and may be required to travel from time to time. The team is looking forward to you helping us continue our great Mission of making the world a safer, more secure and sustainable place to live, work and play.

**Total Rewards**
Our total rewards program is designed with your wellbeing in mind - the ones who fulfill the UL mission every day. Our pay, bonus and benefit offerings are competitive with the companies we compete with for talent, help us attract world-class individuals to successfully execute the company's strategy, and reinforce a business culture of integrity, competitiveness and collaboration.

**Salary**
Your total gross annual salary will be USD ▮▮▮▮▮▮, paid semi-monthly at USD ▮▮▮▮▮▮, subject to payroll and other withholding taxes as required by law. This position is Exempt.

**Benefits & Annual Leave/Vacation**
You will be eligible to participate in UL's U.S. Benefits Program, subject to the terms and conditions of the applicable plans. You will be provided with details about the Benefits Program during a Benefits Orientation. Additionally, you will be eligible to accrue up to 15 days of vacation per year as provided in UL's vacation policy.

**Incentive Plan**
You will be eligible for an All Employee Incentive Plan (AEIP) award of up to ▮▮▮▮ of Annual Base Salary, based upon achievement of financial goals and your personal objectives established by the Company.

The actual amount of your incentive award payment will be determined in line with the Plan and you must be actively employed at the time of payout to be eligible for any payment. If your hire date is October 2 or later, your actual consideration for incentive award eligibility begins January 1 of the next calendar year.

## Ethics & Privacy

You agree that during your employment you will maintain the highest ethical standards in all aspects of your work. You have read, understand and agree to comply with UL's Standards of Business Conduct. Further, you agree that you will comply with the foreign corrupt practices laws, regulations, and other legal requirements including the U.S. Foreign Corrupt Practices Act and UK Bribery Act.

You consent to us:

• Collecting personal information about you from time to time for our personnel administration purposes.

## Conflict of Interest

You agree that during your employment you will always act in the best interests of UL to avoid any actual or potential conflicts of interest that may influence you in the performance of your job. You also agree that if you do encounter an actual or potential conflict of interest, you will inform your manager immediately. In addition, you are prohibited from performing certain activities listed below for any Customer of UL with whom you have had a prior working relationship during the two years immediately preceding the project submittal to UL. A prior working relationship with a UL Customer is defined as any capacity wherein you were considered an employee or consultant of the UL Customer or provided consultancy services to the UL Customer.

Specific activities that cause a conflict of interest are:

• Performing the final review of, or making the certification decision for, any product or management system submitted by a UL Customer with whom you've had a working relationship during the two years immediately preceding the project submittal to UL, and/or,

• Participating in the resolution of any complaint or appeal filed by a UL Customer with whom you've had a working relationship during the two years immediately preceding UL's receipt of the complaint or appeal.

## Non-Compete

You agree that during your employment with UL and for a period of one (1) year following the termination of your employment with UL for any reason, you will not, without the express written consent of the President of UL, be employed by, consult with or manage any business entity or person involved in activities which are competitive with UL.

## Non-Solicitation

You agree that during your employment and for a period of six (6) months following the termination of your employment for any reason, you will not directly or indirectly solicit any other employee to leave the services of UL.

## Other Employment

You are required to devote your full time, attention and abilities to UL and to act in the best interests of the company. You shall not take up any other employment whether full-time or part-time without prior written approval of UL.

## Employment Offer is Subject to:

• Employee Manual, which may be changed from time to time upon the sole discretion of UL.

• Satisfactory references, checks and proven legal eligibility to work in the country of employment.

• Successful completion of our pre-employment procedures, which include:

    − Background Investigation
    − Driving Abstract

• Execution of the attached Confidentiality and Invention Assignment Agreement.

**Attachments:**

• Standards of Business Conduct.

• Confidentiality and Invention Assignment Agreement.

**Working at UL is an exciting journey that twists and turns every day. We thrive in the twists and revel in the turns. This is our everyday. Welcome!**

Sincerely,


Marina Jovanovic
Recruiter

---

 **Signature** JOSHUA CALLINGTON 4/30/2019 3:31 PM
(checking the checkbox above is equivalent to a handwritten signature)

Confidentiality & Invention Assignment Agreement
Standards of Business Conduct

THIS IS OUR **NORMAL.**



**CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT**

In consideration for my employment with UL Inc. (together with all other Affiliates (defined below), "UL"), I hereby agree to the following terms of this Confidentiality and Invention Assignment Agreement ("Agreement"):

1. I understand that during my employment with UL Inc. or any corporation, partnership, limited liability company, limited liability partnership, association, trust or other organization that directly or indirectly controls, is controlled by or is under common control with UL Inc. (collectively, Affiliates"; for purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any entity or organization, shall mean the possession, directly or indirectly, of the power (a) to vote more than 50% of the securities having ordinary voting power for the election of directors of the controlled entity or organization or (b) to direct or cause the direction of the management and policies of the controlled entity or organization, whether through the ownership of voting securities, by contract or otherwise), I may receive, observe, or otherwise be exposed to confidential and proprietary information about UL, its affiliates, clients, business partners, and/or other third parties to whom UL owes a duty of confidentiality (collectively, "Confidential Information"). Confidential Information includes without limitation business plans and strategies, financial information, testing procedures and equipment, Inventions (defined below) and client product information. During and after my employment with UL, I will keep all Confidential Information in strict confidence and will not disclose it without UL's prior written permission. During my employment, I will use Confidential Information solely as necessary for the performance of my duties as a UL employee and not for the benefit of any third parties, and I will not use Confidential Information after I am no longer a UL employee.

2. Immediately upon demand by UL or termination of my employment for any reason, I will immediately deliver to UL all Confidential Information and all documents, notes, analyses, computer files, storage devices and other items that include Confidential Information that are in my possession. Following my termination for any reason, I hereby authorize UL to notify my future employers of the terms of this Agreement and my responsibilities set forth herein.

3. All discoveries, ideas, inventions, improvements, processes, works of authorship, software, work product, designs, know how, trade secrets and Confidential Information that I create, conceive or first reduce to practice (whether alone or with others) during or within 6 months after my employment with UL (collectively, "Inventions") are the sole and exclusive property of UL. To the extent legal title to all such Inventions does not automatically vest in UL under applicable law, I hereby irrevocably assign (and agree to assign in the future) to UL, its successors and assigns all worldwide right, title and interest in and to such Inventions and all patent, copyright, trademark and other intellectual property rights therein. The assignment above does not apply to any Inventions for which no equipment, supplies, facility, or trade secret information of UL was used and which was developed entirely on my own time, unless (a) the Invention relates (i) to the business of UL or its affiliates, or (ii) to UL's or its affiliates' actual or demonstrably anticipated research or development, or (b) the invention results from any work I performed for UL or its affiliates.

4. I will promptly and fully disclose to UL all Inventions, and I will assist UL to obtain and enforce the intellectual property protection for all Inventions anywhere in the world. During and after my employment with UL, I will sign all applications, declarations, assignments and other documents and provide testimony and other assistance that UL may reasonably request to obtain such protection. I hereby grant UL a power of attorney to effectuate this Agreement in the event I am unable or unwilling to provide the foregoing in the future. During and after my employment with UL, I hereby waive and agree never to assert any "Moral Rights" or any other similar right to claim authorship, object or prevent modification, or control the publication or distribution with respect to any copyrightable works within Inventions.

5. I represent that my performance of this Agreement and my responsibilities as an employee of UL will not breach any similar agreement with any former employer or other party, and that I will not use or disclose any trade secrets or proprietary or confidential information from any former employer or third party during my employment with UL. I also represent that I will not bring with me to UL or use during my employment with UL any property of a former employer that would not generally be available to the public or has not been legally transferred to UL. I will not use or incorporate any of my pre-existing or independently-created intellectual property with or into any Inventions, but in the event I do so I hereby grant UL a non-exclusive, worldwide, fully-paid, royalty-free, irrevocable, perpetual, transferable and sublicensable license to use such intellectual property in connection with such Invention(s).

6. I understand that any breach or threatened breach of this Agreement by me may result in irreparable harm to UL or its affiliates, business partners or clients. As such, UL and/or its affiliates are entitled to injunctive relief to enforce this Agreement.

7. This Agreement is the whole agreement of the parties concerning the subject matter hereof and supersedes and replaces any existing agreement (written or oral) between the parties relating generally to the same subject matter. For the avoidance of doubt, any separate employment agreement between the parties remains in full force and effect but this Agreement is not an employment agreement. No amendments or modifications to this Agreement will be binding unless is in writing and signed by all parties. In the event that any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable,

or void, this Agreement shall continue in full force and effect without that provision. Any failure by UL to enforce any provision of   this Agreement shall not be construed as a waiver of UL's right to enforce such provision. All waivers must be in writing and signed   the party granting the waiver.   This Agreement will be governed and interpreted under Illinois law without regard to or application   of conflict of laws principles.  UL may freely assign or otherwise transfer this Agreement in whole or in part. This Agreement shall   be binding upon the parties' heirs, successors and assigns.

**AGREED AND ACCEPTED:**

UL Inc.

_____          _____
Name:                                                                          Name:
Date:                                                                            Title:
                                                                                      Date:

# EXHIBIT 5



| Legal | Document Number: 00-LE-P0400<br>Issue #: 5.0<br>Issued Date: 2010/9/3<br>Revision Date: 2017-12-20<br>Effective Date: 2017-12-20<br>Page 1 of 7 |
|---|---|

**CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY**

**Approval and Revision History Table:**

| |
|---|
| ISSUE 5.0: ADDED TEXT TO THE DEFINITION OF CUSTOMER INFORMATION TO STATE THAT SUCH INFORMATION MAY BE OBTAINED FROM THE CUSTOMER OR FROM OTHER SOURCES. REPLACED ROBERT JAMIESON WITH MANNY SINGH AS REVIEWER. |
| ISSUE 4.1: UPLOADED TRANSLATIONS OF POLICY ONLY. |
| ISSUE 4.0: REVISIONS TO POLICY INCLUDING REFERENCE TO THIRD PARTIES.  REMOVED APPROVER AND ADDED REVIEWER. |
| ISSUE 3.0: REVISIONS TO POLICY ADDING VISITOR AGREEMENT AND REFERENCING NEW GLOBAL HANDLING VISITORS TO UL FACILITIES POLICY.  CHANGE APPROVER FROM CHRIS GANGEMI TO TERRENCE R. BRADY AND ADD STEPHEN H. WENC AS AN APPROVER. |
| ISSUE 2.0:  REVISIONS TO POLICY PROVIDING FURTHER CLARIFICATION ABOUT TYPES OF CONFIDENTIAL INFORMATION AND STEPS TO BE TAKEN TO AVOID DISCLOSURE. |
| ISSUE 1.0: INITIAL RELEASE |

| Title:  Vice President, Intellectual Property and Litigation (Document Owner)<br>Name Paul Brown<br>2017-09-12 | | Title  SVP, Chief Ethics & Compliance Officer (Approver)<br><br>Name Terrence R. Brady<br>2017-11-28 | Title:  IT Director (Reviewer)<br><br>Name:  Manny Singh 2017-11-28 |
|---|---|---|---|

Copyright© UL LLC. All rights reserved. May not be reproduced without permission.  **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.**  This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date.  Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

| | | Page 2 of 7 |
|---|---|---|
| TITLE: CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY <br> Document Number: 00-LE-P0400 **– Issue 5.0** | | |

**TABLE OF CONTENTS**

1.0     PURPOSE ................................................................................................................. 3

2.0     SCOPE .................................................................................................................... 3

3.0     DEFINITIONS ........................................................................................................... 3

4.0     OBLIGATIONS UNDER THIS POLICY ..................................................................... 4

4.1     Treatment of Confidential Information and Trade Secrets ...................................... 4

4.2     Additional Protection for UL Trade Secrets ........................................................... 6

5.0     REPORTING A SUSPECTED DISCLOSURE OR SEEKING GUIDANCE ............... 6

6.0     CONSEQUENCES OF POLICY VIOLATION ........................................................... 7

7.0     APPLICABLE DOCUMENTS .................................................................................... 7

Copyright© UL LLC. All rights reserved. May not be reproduced without permission. **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.** This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date. Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

| | | Page 3 of 7 |
|---|---|---|
| TITLE: CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY<br>Document Number: 00-LE-P0400 **– Issue 5.0** | | |

**1.0    PURPOSE**

Confidential Information (including Trade Secrets) is critically important to UL and its business. The purpose of this policy is to provide direction on how to protect Confidential Information from unauthorized use or disclosure.

**2.0    SCOPE**

This policy applies to all employees, staff and trustees of Underwriters Laboratories Inc. and its affiliates and subsidiaries.

**3.0    DEFINITIONS**

*Confidential Information*:  Information about UL, its customers, employees, suppliers and other parties with which we conduct business that is not generally known or readily available to the public.   Such information may be marked "Confidential," "Proprietary," "Restricted", "Trade Secrets," "For Internal Use Only" or similar wording, or if not marked, it is reasonable to expect from the nature of the information that the owner would treat it as confidential.  If the confidential information is disclosed, it could reasonably be expected to place either the person or the entity at risk of criminal or civil liability or damage the person or entity's financial standing, employability, privacy or reputation. Confidential Information can be obtained (and improperly disclosed) in a variety of ways including verbally, physically (e.g., paper/hard copy documents or product samples), and electronically (e.g., email, Word, PDF and PowerPoint documents, file transfers, computer code, etc.).

If there is any doubt whether something is Confidential Information, you should err on the side of assuming that it is, and please contact UL's Legal Department for further guidance.

Confidential Data/Information includes but is not limited to the following:

**Customer Information** including but not limited to information about submissions, test records, test reports, status of testing of products, inspection reports, audit reports, product incident reports, product samples, prototypes, technical information, schematics, and drawings. Customer Information may be obtained directly from the customer, or from sources other than the customer.

**UL Information** including but not limited to technical information such as engineering ideas, software, test processes and methodologies, test equipment and fixtures, policy submissions to the U.S. and other governments, President or other Officer Messaging, and internal Standard Operating Procedures and Policies.

**Employee Information** including payroll records, salary and non-public benefits information, social security numbers, driver's license numbers, state identification card numbers, passport numbers, credit and debit card information, medical records or medical information, and other personally-identifiable information.

**Financial Information** including but not limited to Chief Financial Officer reports, sales projections, and financial analyses.

Copyright© UL LLC. All rights reserved. May not be reproduced without permission.  **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.**  This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date.  Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

| | | Page 4 of 7 |
|---|---|---|
| TITLE: CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY<br><br>Document Number: 00-LE-P0400 **– Issue 5.0** | | |

**Marketing and Business Information** including but not limited to strategic business initiatives, program elements, plans for new and/or current products or services, contractually negotiated costs and rates,  marketing plans, details about mergers, acquisitions of, partnerships or alliance with other companies and plans to enter into any of the foregoing.

**Trade Secrets:** Confidential Information that is commercially valuable because it is not available to the public, and reasonable efforts are made to keep it secret.  Although all Trade Secrets are Confidential Information, not all Confidential Information rises to the level of a Trade Secret.  UL Trade Secrets may be marked "Proprietary," "Trade Secrets," "For Internal Use Only" or something similar.  Information may also be identified as a UL Trade Secret by one or more of the following characteristics: (A) It is reasonable to expect from the nature of the information that UL would treat it as a trade secret; (B) the information is valuable in UL's business; (C) the information is not generally known and UL tries to keep it confidential; and (D) the information gives UL a competitive advantage to keep this information to itself.

If there is any doubt whether something is a Trade Secret, you should err on the side of assuming that it is, and please contact UL's Legal department for further guidance.

## 4.0   OBLIGATIONS UNDER THIS POLICY

### 4.1   Treatment of Confidential Information and Trade Secrets

To carry out our Public Safety Mission, our company depends on confidential and proprietary information about our services and business processes, as well as Confidential Information from our customers and other third parties. UL takes very seriously our responsibility to safeguard this Confidential Information. Unauthorized use or disclosure of Confidential Information may harm UL or those parties that have entrusted us with their Confidential Information, and can subject UL to legal liability.   Each employee has a duty to use Confidential Information properly and to protect it against unauthorized disclosure.

This includes taking steps to avoid inadvertent or "accidental" disclosures.

We cannot identify every situation where Confidential Information or trade secrets are involved.  However, when working with any information at UL, follow these general guidelines:

- When working with client Confidential Information:

  o Refer to UL's Enterprise Information Security Policy for specific steps to safeguard information.
  o Mark all customer Confidential Information with the words "Confidential" or "Restricted".
  o Treat all Confidential Information relating to a customer's project or file as confidential to that customer unless the customer has specifically released the Confidential Information to another party. This includes even the fact that the product or service has been submitted for evaluation by UL.
  o Determine if an NDA (nondisclosure agreement) or confidentiality agreement exists for the particular client.  If so, review this agreement with your management or the Legal Department to ensure all aspects of the agreement are understood and followed.
  o Only access client Confidential Information to the extent that you have a legitimate business need for that Confidential Information and only disclose this Confidential Information within UL to others who have the same business need.

Copyright© UL LLC. All rights reserved. May not be reproduced without permission.  **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.**  This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date.  Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

| | | Page 5 of 7 |
|---|---|---|
| TITLE: CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY<br><br>Document Number: 00-LE-P0400 **– Issue 5.0** | | |

- o Do not disclose any Confidential Information for component files to an end-user unless specific authorization to provide the Confidential Information has been received from the component file owner.
- o Do not disclose audit or follow-up service dates unless required to do your job and with proper authorization.
- o Do not use Confidential Information of a UL customer in providing professional services to a different UL customer unless specifically authorized.
- o Prior to sending an email, review all names that will receive the email to ensure that they are all authorized to receive the content.

- • When working with UL Confidential Information:
  - o Mark all UL Confidential Information with the words "Proprietary" or "Restricted" and "For UL Internal Use Only"
  - o Never use any Confidential Information for your personal gain or other purpose

- • When working with employee Confidential Information:

  - o Ensure personal information about UL employees such as payroll data, benefits claims, and other confidential personal information is only disclosed to those persons who are entitled by official duties to receive the information
  - o Forward any subpoena or official request for employee information to the Legal Department.
  - o Discuss with Human Resources when a request to provide employee confidential information has been received.

- • When working with customers, contractors/third parties or other visitors to UL's facilities:
  - o Read and follow the Handling Visitors to UL Facilities Policy (00-FM-P0851).
  - o For customers, a GSA contains nondisclosure language.

- • When performing your daily activities:
  - o Think before discussing information with a third party. If Confidential Information must be disclosed to a third party, ensure that the appropriate authorization is in place.
  - o Only access and use Confidential Information for the sole purpose of performing your job-related duties.
  - o Do not leave Confidential Information unattended where it can be easily viewed or accessed, such as sitting on your desk or computer screen, at the copier, in conference rooms after meetings are over, or other publicly accessible areas.
  - o Securely store documents, lab notebooks, hard and flash drives, test equipment and prototypes, and all other physical items containing Confidential Information, such as in locked drawers and cabinets.
  - o Password protect computers, servers, directories and files containing Confidential Information and do not share the passwords with anyone within or outside UL.
  - o When no longer needed, shred or otherwise securely destroy Confidential Information, unless required to keep under UL's Global Records Policy and Retention Schedule. All data/information intended for disposal must be properly shredded and/or deleted. Data on magnetic media such as hard disks, tapes, CDs, or removable storage devices shall be "destroyed" by physical shredding, multiple

Copyright© UL LLC. All rights reserved. May not be reproduced without permission. **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.** This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date. Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

| TITLE: CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY | | Page 6 of 7 |
|---|---|---|
| Document Number: 00-LE-P0400 **– Issue 5.0** | | |

reformatting (three or more times), or degaussing (for additional information refer to the Enterprise Information Security Policy).

- When you are outside of the office:
  - o Avoid discussing or accessing Confidential Information in public places such as trains, airplanes, elevators, and restaurants
  - o Do not share Confidential Information with friends and family
  - o Do not post Confidential Information on any website or social networking site.
  - o Ensure that your laptop and other electronic devices are not left in an unsecured area.
  - o Immediately notify UL if your laptop or other UL issued electronic device has been lost or stolen.

- When leaving UL's employment:
  - o Return to UL all copies and other tangible items containing Confidential Information you may have in your possession.
  - o Continue to maintain the confidentiality of any Confidential Information.

These guidelines apply to all forms of Confidential Information (whether verbal, physical/hard copy or electronic) throughout its entire life cycle (creation/acquisition, storage, usage, transmittal, retention, and disposal). Please remember that Confidential Information does not lose its status simply because it is part of an email or other informal communication or because it is converted or moved from one format to another.

## 4.2    Additional Protection for UL Trade Secrets

We must take extra care to protect UL Trade Secrets or they could be lost forever, causing UL immeasurable harm.  *In addition to following the guidelines listed above* for Confidential Information, you should follow these extra steps for UL Trade Secrets:

- Only make as many copies of material containing Trade Secrets as is necessary for your work at UL
- Restrict and control access (both physically and electronically) to Trade Secrets
- Mark materials containing Trade Secrets with the words "Proprietary" and "Trade Secrets"

Additionally, from time-to-time UL may decide to file a patent on a UL Trade Secret that is a machine, device, process, method or other patentable invention.   In many countries, public disclosure of an invention before a patent application is filed will result in the invention becoming unpatentable.  Therefore, never publicly display or demonstrate any novel UL-developed prototype machines, methods, equipment or software without checking first with your manager and UL's Legal Department.

## 5.0    REPORTING A SUSPECTED DISCLOSURE OR SEEKING GUIDANCE

If you know or suspect that Confidential Information has been or may be disclosed or accessed without authorization, you are required to  contact UL's Global Ethics Office by using any of the following resources:

Copyright© UL LLC. All rights reserved. May not be reproduced without permission.  **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.**  This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date.  Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

| TITLE: CONFIDENTIAL INFORMATION AND TRADE SECRETS POLICY | | Page 7 of 7 |
|---|---|---|
| Document Number: 00-LE-P0400 **– Issue 5.0** | | |

- o  Email Ethics@ul.com

- o  Submit a web allegation or inquiry at www.ulglobalethics.com

- o  Call the toll-free number in the US or Canada 1-800-715-7482 or visit www.ulglobalethics.com for international dialing instructions.

UL will not tolerate retaliation toward or harassment of employees who in good faith report a suspected or knowing violation(s) of this policy.  Individuals who take retaliatory action will be subject to disciplinary action up to and including termination.

Please check with UL's Legal Department for further guidance in the following situations:

- If you are unsure whether something is considered Confidential Information and/or a Trade Secret

- If you wish to disclose Confidential Information and/or a Trade Secret outside of UL for a justifiable business reason (you will also need approval from your manager and maybe others)

- If you receive information or materials that you suspect may be Confidential Information of a third party that did not approve the disclosure

- If you wish to display or demonstrate a prototype UL machine, piece of equipment, software or process for a third party

- If you have any other questions or concerns involving Confidential Information and Trade Secrets

## 6.0   CONSEQUENCES OF POLICY VIOLATION

A violation of this Policy is very serious and may result in disciplinary action, up to and including termination of employment.

## 7.0   APPLICABLE DOCUMENTS

| Doc. # | Title |
|---|---|
| 00-QA-P0026 | **Global Records Policy and Retention Schedule** |
| 00-IT-P0406 | **Enterprise Information Security Policy** |
| 00-FM-P0851 | **Handling Visitors to UL Facilities Policy** |

Copyright© UL LLC. All rights reserved. May not be reproduced without permission.  **UL PROPRIETARY AND CONFIDENTIAL. FOR UL INTERNAL USE ONLY.**  This document is controlled and has been released electronically. The version on the UL intranet is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date.  Users of hard copies should confirm the revision by comparing it with the electronically controlled version.

# EXHIBIT 6

 **Solutions**

Safety. Science. Transformation.™

July 3, 2024

<u>Personal and Confidential</u>

Joshua Callington


*With a copy to:*
Joshua Callington

Re: Termination of Employment

Dear Mr. Callington:

This letter is to inform you that effective today, July 3, 2024, UL LLC ("UL Solutions" or the "Company") has made a business decision to end your "at-will" employment. Following an internal investigation by an outside party in which you also participated, reasons supporting the Company's decision are as follows:

1. Your unapproved, ongoing, and improper electronic transfers of tens of thousands of UL Solutions' and its customers' internal business documents to your personal accounts. This included documents containing confidential business information belonging to UL Solutions and/or UL Solutions' customers. This systemic transfer to and storage in your personal accounts of such confidential business information violated numerous UL Solutions' policies, such as, but not limited to, UL Solutions' Information Security Policy; Acceptable Use of Assets Policy; Confidential Information and Trade Secrets Policy; and policies contained in UL Solutions' Standards of Business Conduct and Employee Handbook. Such conduct also appears to have violated expectations identified in your November 2023 SAN Security Awareness training, as well as the Association of Professional Social Compliance Auditors ("APSCA") Code;

2. Your failure to comply in a timely manner with UL Solutions' and/or the investigator's repeated directives to you to return to UL Solutions your UL Solutions' laptop and refrain from deleting any information from the laptop prior to returning it. Instead, you initially ignored the request and then delayed the return of the laptop until you had deleted what appears to have been—according to forensic analysis—highly relevant information related to the investigation;

3. Your voluntary disclosure and provision of confidential business information belonging to UL Solutions and UL Solutions' customers to the *New York Times*, including without any prior notice to or approval from UL Solutions or its customers. This conduct also violated numerous UL

UL LLC © 2024. All rights reserved.



Solutions' policies, various confidential business information agreements you entered into and possibly ones that UL Solutions entered into with third parties, and the APSCA Code and Standards of Professional Conduct;

4. Your failure to cooperate fully and honestly with UL Solutions' internal investigation by, among other things, withholding information relevant to the investigation and refusing to return and then deleting or destroying copies of the confidential information belonging to UL Solutions and UL Solutions' customers, including information that was unrelated and irrelevant to any purported whistleblower report or claim;

5. Your troubling and repeated statements made during the investigation that you are unaware that the information you disclosed was confidential to UL Solutions and its customers; that you are unaware there are any confidentiality obligations required by UL Solutions or APSCA concerning the information; and you are unaware of any UL Solutions policies that would have restricted disclosure. Your admitted lack of awareness is especially troubling due to your role as a Team Leader CRS, which requires you, among other things, to engage in and assist UL Solutions with training other UL Solutions auditors; and

6. Your poor judgment in not expressing your concerns—including about any possible illegal activity that your audit work for UL Solutions may not have uncovered—to UL Solutions, APSCA and/or an appropriate government agency or official, while choosing instead to reach out to the *New York Times* proactively, on your own and without any notice to, or input or approval from, UL Solutions. As you learned from and acknowledged during your employment with UL Solutions, UL Solutions provides its employees with numerous channels for asking questions, raising concerns, and making reports or complaints. Yet, you chose not to use any of them.

On July 5, 2024, you will receive a final paycheck, which includes your wages through the date of termination and any accrued but unused vacation, less applicable payroll deductions. Any medical, dental and vision insurance coverage you are currently receiving through the Company will also remain in place through the month of July. At that point, you have the option of continuing your benefits at your own expense under the Consolidated Omnibus Budget Reconciliation Act (COBRA) if you complete and return the COBRA election forms in a timely fashion. Complete COBRA information and election forms will be sent to you within two weeks of your termination date.

Please remember that following termination of your employment with UL Solutions, you will continue to be obligated to comply with the terms of all prior agreements — including those containing confidential business information provisions—that you have signed during or in connection with your employment by the Company with regards to the protection of confidential, proprietary and trade secret information. Of course, nothing in



any of those agreements prohibits or impedes you from communicating directly with any appropriate federal, state, or local government agency or official about any violation or potential violation of law, or from communicating confidentially with your legal counsel.

Also, you must return immediately to me **all** of UL Solutions' and UL Solutions' customers' business documents and information that is in your possession or under your control (in hard copy or electronic form, all copies thereof, and any password or codes to any encrypted files). For the applicable periods of time required by law, UL Solutions will endeavor to preserve the documents and information that you return to me in the event of future litigation by you or any other party. You must also return any other UL Solutions or UL Solutions customers' property that is in in your possession or under your control, including, but not limited to your ID badge, company credit cards, and any other materials of any kind that contain or embody any proprietary or confidential information (and all reproductions thereof).

Please contact me at karla.g.ouchi@ul.com if you have questions.

Sincerely,

Karla G. Ouchi
Senior Manager, Field HR Business Partner