IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UL LLC,

    *Plaintiff,*

-v-

JOSHUA CALLINGTON,

    *Defendant.*

Case No. 1:24-cv-05631
Hon. Andrea R. Wood

## MOTION TO DISSOLVE INTERIM PROTECTIVE ORDER

PLEASE TAKE NOTICE that, pursuant to this Court directives, Mr. Callington, by and through the undersigned counsel, hereby moves for the dissolution of the Interim Protective Order (CM/ECF No. 17) entered on October 24, 2024, for the following reasons:

## BACKGROUND

### A. UL Solutions, f/k/a Underwriters Laboratories ("UL LLC)

In 1894, an American electrical engineer named William Henry Merrill, Jr., founded a non-profit organization called Underwriters Laboratories ("UL"), with a clear mission that focused on product safety testing and certifications. For over a century, "UL operated as a nonprofit entity, earning global recognition for its rigorous product testing and the trusted UL Mark, which continues to serve as a symbol of safety on a wide range of products, including electrical appliances, building materials, and fire safety equipment, to this day.



In 2012, UL transitioned to a for-profit structure, ostensibly to expand its mission and adapt to evolving global demands. This shift allowed the company to diversify its offerings beyond traditional safety testing, moving into areas such as Environmental, Social, and Governance ("ESG") advisory, social compliance auditing, and sustainability services. In 2024, the company went public, raising $946 million through its IPO—and signaling the company's increasing focus on profitability.

Today, UL Solutions is a publicly traded company (NYSE: ULS), with annual revenues in excess of $2.5 billion per year. Upon information and belief, UL's social compliance auditing business generates roughly $250 million in annual revenues by providing supply chain risk and ESG compliance assessment services to numerous other publicly-traded companies, including many nationally recognized brands and retailers.

### B. Mr. Callington's Complicated Tenure at UL Solutions

Mr. Callington was employed with UL's social compliance auditing business for approximately 7 years, from May 17, 2017 through July 3, 2024. In that capacity, Mr. Callington was tasked with conducting audits at facilities that manufacture consumer products for distribution across the United States and Canada, for the purpose of evaluating their compliance with applicable labor and workplace safety laws, ESG mandates, and other ethical supply chain standards.

During that time, Mr. Callington became increasingly concerned about what he viewed as a degradation of ethics and standards, as management gradually shifted priorities away from conducting thorough and rigorous audits, and towards emphasizing client satisfaction and retention. On multiple occasions, Mr. Callington raised concerns, internally, about dangerous and/or unlawful conditions that he observed during onsite

audits, to which UL essentially instructed him to turn a blind eye. What started out as a handful of isolated instances eventually grew into a more systemic problem of encouraging auditors to engage in purposeful neglect, and even removing adverse findings from audit reports, after-the-fact, in some instances, to placate clients and satisfy its customers' demand for sham ESG certifications

From Mr. Callington's perspective, things reached a head when he learned that a 14-year-old undocumented migrant child suffered a terrible accident and lost his right arm while working the night shift at a slaughterhouse that UL had previously audited. *See* Hannah Drier, *The Kids on the Night Shift,* N.Y. Times (Sept. 18, 2023), https://www.nytimes.com/2023/09/18/magazine/child-labor-dangerous-jobs.html (reporting that "Marcos Cux… had just turned 14," when he lost his arm in an accident while working as part of the overnight cleaning crew at one of Perdue's poultry processing facilities in rural Virginia).[1] According to the *New York Times,* children like Marcos comprised a significant portion of the "overnight cleaning crew" at that facility—despite the fact that "[f]ederal law bans minors from [working in]… slaughterhouses," due to the high risk of injury. *Id.*

The thing that really bothered Mr. Callington about this story—aside from the plight of the children working in these factories—is that that UL had given that very same facility a passing score, in terms of being free of child labor and unsafe machinery.

This critical fact, which was not included in any of the news coverage surrounding the incident, is ultimately what prompted him to reach out to the newspaper. If the audit

---

[1] A subsequent investigation by the U.S. Department of Labor revealed that Marcos was only 13 when he started working at the factory; other sources reported that some children entering the factory carried "pink and purply sparkly backpacks," and looked very young. *See* Hannah Drier, *Company Hired 24 Minors to Clean Slaughterhouses, Labor Department Says*, N.Y. Times (Feb. 21, 2024).

had been conducted properly, he thought, the young boy would not have been working under those conditions; he would not have lost his arm. The whole situation was preventable, and all the right mechanisms for preventing it were in place. But that mechanism (*i.e.,* the UL audits designed to flag labor violations and workplace safety issues) was consistently failing to identify and protect children like Marco. Mr. Callington understandably felt a moral imperative to do something; a sense of responsibility, even, for not ever having done anything beyond repeatedly raising his concerns, internally, about UL's increasingly lax approach to audits that were designed to prevent accidents like what had happened to this young boy. If only more people understood how these compliance audit lapses were contributing to the problem, he thought, perhaps members of Congress, or other policymakers would intervene, or perhaps some level of media scrutiny would prompt companies like UL to voluntarily undertake appropriate corrective actions.

### C. The New York Times Reports on UL's Role and Complicity in Brushing Child Labor Violations Under the Rug, citing Mr. Callington as a source

On December 28, 2013, the *New York Times* published another article, following up on its previous reporting in a series of articles about child labor violations at American manufacturing facilities across the nation. *See* Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?,* N.Y. Times (Dec. 28, 2023), https://www.nytimes.com/2023/12/28/us/migrant-child-labor-audits.html.

According to that article, the New York Times conducted interviews with "dozens" of auditors who essentially corroborated the same issues that Mr. Callington had attempted to raise internally at UL, on countless occasions. Although Mr. Callington was the only auditor identified by name, the article confirmed that other, similarly situated professionals, shared his concerns about ESG compliance auditing firms "provid[ing] little

more than a veneer of compliance for global corporations, which overstate how rigorously they review sprawling supply chains." *Id.* ("Auditors for several firms said they are encouraged to deliver findings in the mildest way possible as they navigate pressure from … different sources"). The reporting also validated a theory that Mr. Callington had raised with UL management just a few months earlier, about why its audits were systemically failing to identify violations of child labor laws: "auditors typically start their inspections in the morning and stay for about seven hours… even at …[large] factories that operate around the clock," the article explained, "[so]… night shifts, where child labor violations most often occur, are almost never seen." *Id.*

The article portrays Mr. Callington as a hardworking and dedicated professional with a profound commitment to his purpose-driven work. *See id.* ("Mr. Callington sometimes squeezes in five audits a week, staying on the road for six-week stretches. He flies between coasts so regularly that he has stopped thinking of himself as having a home-base time zone, and during long drives occasionally turns to his phone to ask, '*Hey, Siri, where am I?*' "). *Id.* "'*If audits are done correctly, the world could be a better place,*' he said. '*Bettering the lives of workers is what these audits are supposed to be about.*'" *Id.* (quoting Mr. Callington).

"But more and more, he said, each audit had begun to feel like a struggle between wanting the truth and trying to avoid conflict…" *Id.* The article went on to cite examples from several of Mr. Callington's audits for well-known national retailers, to illustrate the types of problems he had encountered—like the time that he was removed from the client account for Walgreens and placed on a remediation plan, after failing three of the company's suppliers for "abusive working conditions." *Id.* Another example recounts how Mr. Callington had asked managers at UL Solutions if Costco and other clients might consider

implementing nighttime inspections, in light of the "recent news coverage that mentioned child labor raids at slaughterhouses," but never got a response. *Id*. And the time Mr. Callington was penalized for flagging 21 separate labor violations at a warehouse that supplies potatoes to major national retailers; as the article recounts, "the plant's management complained that he was demanding and argumentative, and his supervisor barred him from returning." *Id*. UL also required Mr. Callington to "complete a series of customer service trainings" in response to that particular incident, and generally continued to emphasize the importance of client satisfaction above all else. Id.

Disturbing as it is, these examples, and others cited in the article were really just the tip of the iceberg. As UL knows, the scope and impact of its questionable social compliance auditing operation extends far beyond the subject matter covered in that one New York Times article and has profound implications—not only for the everyday lives of American factory workers—but also for the flow of large institutional investments into public companies that fraudulently tout these dubious audits as evidence of their commitment to ESG principles. And that is why UL is so eager to silence Mr. Callington.

Simply put, this case is not about trade secrets; it is about the highly unethical and potentially fraudulent social compliance auditing practices that have enabled UL to rake in billions over the last decade—and the existential risk posed by whistleblowers, like Mr. Callington, who threaten to undermine that business model.

As an aside, it bears worth noting that Mr. Callington's decision to speak with the New York Times did, in fact, have the positive impact he had hoped for—albeit, at a significant personal cost to his own professional and financial interests. In response to that article, several large companies, including some of the ones Mr. Callington had named,

committed to undertaking meaningful steps towards eliminating child labor in their domestic supply chains. *See* Hannah Drier, *Confronted With Child Labor in the U.S., Companies Move to Crack Down,* N.Y. Times (Feb. 7, 2024), https://www.nytimes.com/2023/12/28/us/migrant-child-labor-audits.html ("Many major U.S. companies — including some of the country's biggest consumer brands… are [now] revising the kinds of audits they require… enhancing reviews of night shifts and shifts run by outside contractors… and moving away from announcing audits in advance.").

Meanwhile, UL's response to the article followed the more conventional corporate crisis management playbook tactics aimed at silencing whistleblowers. Mr. Callington was placed on paid leave while UL conducted an internal investigation, in which he fully cooperated, and which effectively ensured that Mr. Callington would not speak to any other media outlets while the company crafted its legal strategy to secure a more permanent solution. And approximately six months later, on July 3, 2024, UL filed this retaliatory lawsuit, alleging that Mr. Callington has misappropriated the company's alleged trade secrets—which UL conveniently defines as a "compilation" of information that includes, basically, everything that Mr. Callington did, said, touched, observed, and/or experienced, over the course of nearly a decade working at the company.

It should come as no surprise that UL's next move involved seeking some kind of injunctive relief to restrain Mr. Callington from speaking out against UL's course of conduct throughout the remainder of the litigation. To that end, UL managed to obtain a highly restrictive interim order that severely curtails Mr. Callington's ability to advocate for himself and speak out against UL, under the guise of a preliminary "Motion for an Order to

Preserve Evidence" (CM/ECF No. 5, Page ID # 76-80) before Mr. Callington had even retained counsel.

Seeing that Mr. Callington was unrepresented, appearing *pro se,* and requesting additional time to find representation, the Court's inclination to grant that motion was entirely reasonable, insofar the *interim* measure sought to protect *both* parties' interests, by preserving the status quo while Mr. Callington sought counsel. Now that those objectives have been met, however, the order must be dissolved—or, at minimum, replaced, with something far less restrictive.

## ARGUMENT

Though styled as an "Interim Protective Order," the substantive relief sought and obtained by UL at this early stage in the case is, in effect, a temporary restraining order ("TRO") that functions prior restraint against Mr. Callington's ability to speak about nearly all aspects of his experience working at UL. For all intents and purposes, it is the functional equivalent of a gag order—which UL now seeks to parlay into a preliminary injunction under the guise of its most recent motion for the entry of a more permanent so-called "confidentiality" order that would remain in place throughout the course of this litigation (CM/ECF No. 22, Page ID # 122-173).

Setting aside the fact that UL's attempts to restrain Mr. Callington's have no apparent basis in any cognizable legal theory or rule of law, the interim order must be dissolved for several reasons that also weigh against its more recent application for more extensive injunctive relief.

First, and perhaps more importantly, UL has not—and in all likelihood, cannot—identify any legitimate and commercially valuable trade secret that is in Mr. Callington's

possession. If it could, Mr. Callington would readily stipulate to an order preventing the disclosure of such materials, which should be readily identifiable by UL and its counsel. As UL concedes in its most recent filing, the undersigned counsel's repeated requests for a more specific subject matter list of materials which it contends are trade secrets have consistently been rebuffed, which creates a real notice problem—with respect to the lawsuit, in general—and with respect to the scope of any requested injunctive relief.

Furthermore, even in the hypothetical situation where a former employee does, in fact, have access to trade secrets that are, in fact, entitled to protection from competitors--that alone would hardly satisfy the onerous standard for imposing a court-ordered prior restraint on speech relating to all other aspects of his or her employment.

Although UL has not anchored its request for a protective order in any particular statutory provision or rule of law, the most generous interpretation of UL's proffered interest in protecting commercially valuable trade secrets would be to understand its request as seeking to invoke the injunctive relief provisions of the DTSA, *see, e.g.*, 18 U.S.C. §§ 1836(b)(3), 1835(a). Even then, however, mere allusions to the general *availability* of a injunctive relief in the remedial framework of a statute are rarely, if ever, sufficient to serve as the basis for awarding such drastic relief.

**If UL truly believes that it is entitled to enjoin Mr. Callington's conduct to protect its alleged trade secrets, it is by all means free to move for a preliminary injunction and make the requisite showing.** *See Creative Financial Staffing LLC v. Kubacki,* 2023 WL 1818560, at *3 (N.D.Ill., 2023) ("A preliminary injunction is an extraordinary and drastic remedy… that should not be granted unless the movant, *by a*

*clear showing*, carries the burden of persuasion.") (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972, (1997) (emphasis in original).

In this Circuit, as in all other jurisdictions, prevailing on such a motion would require UL to show, that: (1) "it has no adequate remedy at law," (2) "that it will suffer irreparable harm in the absence of an injunction," and (3) "that it is likely to succeed on the merits" of its trade secret claim, at the outset. *Id.* (citing *DM Trans, LLC v. Scott,* 38 F.4th 608, 617–18 (7th Cir. 2022) and *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). In the unlikely event that UL proceeds with the requisite motion and comes anywhere close to satisfying these "threshold requirements," the analysis would necessarily proceed to the next stage, in which this Court would be tasked with assessing 'whether the balance of harms favors [UL]… or whether the harm to other parties," including Mr. Callington, and/or "the public" is "sufficiently weighty that the injunction should be denied." *Id.*

Mr. Callington reserves the right to address such arguments in the event they are raised, at some later date, of course. For now, however, UL's request for injunctive relief must fail for the simple reason that it has not satisfied its burden on any of the requisite elements for a preliminary injunction—nor even attempted to do so, by filing a properly designated motion for the precise type of relief it seeks.

## CONCLUSION

For these reason, any and all injunctive provisions of the interim order that impose additional obligations and restrictions on Mr. Callington's conduct and activities, and which extend beyond the scope of otherwise applicable law, must be dissolved.2 To the extent that

---

² The undersigned counsel has advised Mr. Callington that certain aspects of the interim order may have been intended to provide him with some level of notice, as a courtesy

UL now seeks additional injunctive relief through its most recent motion for a so-called "confidentiality order," that motion can be addressed at the discovery stage, in accordance with the default provisions of Fed. R. Civ. P. 26, or denied outright, as premature at this juncture.

Dated: November 16, 2024
New York, NY

By: _/s/ Agatha M. Cole_
Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036
(828) 773-2628
agatha@beverlypllc.com

---

to a *pro se* litigant, regarding rights and obligations as a litigant before this Court. To the extent that the order delineates the parties' respective document preservation obligations, for example, Mr. Callington has no objection to that aspect of the order and fully appreciates that the obligation is continuing in nature, irrespective of whether an order to that effect remains on the docket.