# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

UL LLC,

        *Plaintiff,*

 -v-

JOSHUA CALLINGTON,

        *Defendant.*

Case No. 1:24-cv-05631
Hon. Andrea R. Wood

---

**SPECIAL MOTION TO STRIKE OR DISMISS ALL CLAIMS PURSUANT
TO ANTI-SLAPP PROVISIONS OF OREGON LAW, OR. REV. STAT. § 31.150**

---

Dated:   January 6, 2025

Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036

*Counsel for Defendant, Joshua Callington*

**Table of Contents**

INTRODUCTION .............................................................................................1

FACTUAL ALLEGATIONS ...........................................................................1

CHOICE-OF-LAW .........................................................................................4

ARGUMENT ..................................................................................................7

      I.      The claims asserted against Mr. Callington fall squarely within
            the scope of Oregon's anti-SLAPP statute. ......................................9

      II.     At this preliminary stage, it appears unlikely that UL can
            prevail on any of those claims. ........................................................11

CONCLUSION................................................................................................14

**<u>Cases</u>**

*ADR Tr. Corp. v. KPMG Peat Marwick,*
844 F. Supp. 431, 436 (N.D. Ill. 1994).................................................................... 13

*Chi v. Loyola Univ. Med. Ctr.,*
787 F.Supp.2d 797 (N.D.Ill. 2011) ................................................................. 5, 6, 9

*CoreCivic, Inc. v. Candide Group*, LLC,
46 F.4th 1136 (9th Cir. 2022) ......................................................................... 9, 11

*Dossett v. Ho-Chunk, Inc.,*
472 F. Supp. 3d 900 (D. Or. 2020)................................................................... 8, 10

*ExactLogix, Inc. v. JobProgress, LLC,*
508 F. Supp. 3d 254 (N.D. Ill. 2020) .................................................................. 12

*Fleetwood Packaging v. Hein,*
No. 14-cv-9670, 2014 WL 7146439 (N.D. Ill. Dec. 15, 2014) ............................... 12

*Gardner v. Martino,*
563 F.3d 981 (9th Cir. 2009)............................................................................ 7, 8

*Gunn v. Drage,*
65 F.4th 1109 (9th Cir. 2023) ...................................................................... 7, 8, 11

*Intercon Sols., Inc. v. Basel Action Network,*
969 F. Supp. 2d 1026 (N.D. Ill. 2013),
*aff'd,* 791 F.3d 729 (7th Cir. 2015)................................................................... 5, 7

*Murray v. UBS Securities, LLC,*
601 U.S. 23 (2024)............................................................................................ 12

*Northon v. Rule,*
637 F.3d 937 (9th Cir. 2011).............................................................................. 7

*Osundairo v. Geragos,*
447 F. Supp. 3d 727 (N.D. Ill. 2020) ....................................................... 5, 8, 9, 11

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
890 F.3d 828 (9th Cir. 2018).............................................................................. 9

*Schwern v. Plunkett,*
    845 F.3d 1241, 1242 (9th Cir. 2017)..................................................................... 7

*Shmushkovich v. Home Bound Healthcare, Inc.,*
    No. 12 C 2924, 2015 WL 3896947 (N.D. Ill. June 23, 2015) ................................ 12

*Steinmetz v. Coyle & Caron, Inc.,*
    862 F.3d 128, 136 (1st Cir. 2017) ........................................................................ 9

*Stevens v. Interactive Fin. Advisors, Inc.,*
    830 F.3d 735 (7th Cir. 2016)................................................................................ 13

*U.S. ex rel. Ceas v. Chrysler Group LLC,*
    191 F. Supp. 3d 885 (N.D. Ill. 2016) ................................................................... 12

*Underground Sols., Inc. v. Palermo,*
    41 F. Supp. 3d 720 (N.D. Ill. 2014) ...................................................................... 5

*United States v. Arthur Young & Co.,*
    465 U.S. 805 (1984)............................................................................................. 13

*Wahab v. Wahab,*
    No. 3:23-cv-00098, 2023 WL 5035662 (D. Or. Aug. 8, 2023)................................. 8

## Statutes

18 U.S.C. § 1514A ......................................................................................................... 12

18 U.S.C. § 1836............................................................................................................. 4

31 U.S.C. § 3730............................................................................................................. 12

735 ILCS 110/15............................................................................................................. 9

740 ILCS 174/15............................................................................................................. 12

765 IlCS 1065/1.............................................................................................................. 4

Fed. R. Civ. P. 12 ..................................................................................................... 1, 6, 9

Fed. R. Civ. P. 56 ....................................................................................................... 1, 9

Or. Rev. Stat. § 654.062................................................................................................. 12

Or. Rev. Stat. § 31.150............................................................................................ 1, 9, 10

## **Other Authorities**

*They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?,*
   N.Y. Times (Dec. 28, 2023) ........................................................................... 3

*California Law Imposes New Disclosure Obligations on Employers Conducting*
   *Voluntary Child Labor Audits*, JDSupra (Dec. 4. 2024) ....................................... 10

*Confronted With Child Labor in the U.S., Companies Move to Crack Down,*
   N.Y. Times (Feb. 7, 2024) ........................................................................... 10-11

Defendant Joshua Callington ("Mr. Callington"), by and through the undersigned counsel, hereby moves for the dismissal of all claims in the complaint, pursuant to Or. Rev. Stat. § 31.150, Fed. R. Civ. P. 12, and Fed. R. Civ. P. 56, for the following reasons:

## INTRODUCTION

Strategic Lawsuits Against Public Participation ("SLAPPs) are routinely brought to harass and intimidate ordinary citizens, activists, and whistleblowers who speak out on matters of public concern. These baseless lawsuits divert attention from the underlying issues that are cause for concern, while turning the justice system into a weapon for silencing speech that is vital to the public interest. Recognizing the vast resources that powerful corporations can put towards suppressing critical voices, most states have adopted anti-SLAPP statutes that protect the ability of all people to speak up, demand accountability and advocate for social change.

Because the instant matter is a textbook SLAPP suit, Mr. Callington respectfully asks this Court to dispose of it accordingly.

## FACTUAL ALLEGATIONS

The substantive factual allegations giving rise to UL's claims are found in paragraphs 17 through 73 of the Complaint [CM/ECF No. 1, at Page ID #6-18).

### *Defendant's Employment History with UL Solutions, f/k/a Underwriters Laboratories ("UL"), LLC*

As alleged in the Complaint, Plaintiff, UL LLC, is in the business of selling auditing services to publicly traded companies and their suppliers. *See* Compl. ¶ 17

("UL… provides social responsibility compliance auditing and inspection services");
*see also* Compl. ¶ 18 (explaining that these audits involve the assessment of "facilities,
processes, and systems" to "identify, address, and manage … sustainability issues …
supply network relationships, brand reputation, and various regulatory
requirements.") Compl. ¶ 18.[1]

Defendant Joshua Callington ("Mr. Callington") is a social compliance auditor
who was employed by UL for approximately seven years, from May 17, 2017 through
July 3, 2024. *See* Compl. ¶ 25-36 (explaining that Mr. Callington initially provided
auditing services through UL in an "independent contractor capacity," and then
switched to a "full-time" employee position as "Team Leader CRS,"[2] in or around late
May 2019).

During that time, Mr. Callington's auditing responsibilities included
"evaluating … compliance … with local labor laws, workplace safety laws, security
regulations, international labor organization standards, and/or [applicable] … code[s]
of conduct" and summarizing his findings in a "comprehensive evaluation report…
for each audit [that he] conducted." Compl. ¶ 29 (describing his responsibilities as an

---

[1]    Upon information and belief, UL is a successor and/or subsidiary of Underwriters
Laboratories, which previously functioned as a non-profit entity focused on rigorous safety testing of
consumer and industrial products throughout the 20th century. In or around 2012, UL transitioned to
a for-profit structure and started to diversify its offerings beyond traditional safety testing, moving
into areas such as Environmental, Social, and Governance ("ESG") advisory, social compliance
auditing, and sustainability services. In 2024, the company went public, raising $946 million through
its IPO, and signaling the company's increasing focus on profitability. For the purpose of this motion,
however, only those facts disclosed in the Complaint and accompanying documents or affidavits are
properly before the court. Accordingly, although Mr. Callington takes issue with the partial narrative
set forth in the Complaint, any additional commentary to that effect is for context and background
purposes only, and therefore reserved to footnotes in this section.

[2]    Although not specified in the Complaint, the acronym "CSR" stands for Corporate
Responsible Sourcing.

independent assessor); *see also* Compl. ¶ 36 (identifying the same core responsibilities for the "Team Leader" role, which primarily involved "[assessing] facilities … [on] quality control and compliance with labor laws, safety laws, and codes of conduct"). Compl. ¶ 36.

***Defendant's "Covert Assistance" to***<br>***the New York Times and the Resulting Article***

The gravamen of UL's Complaint centers on allegations that Mr. Callington provided "covert assistance" to an investigative reporter in connection with news coverage about the rising use of unlawful child labor in American manufacturing facilities. *See* "Defendant's Covert Assistance to the New York Times and the Resulting Article" Compl. ¶¶ 56-58 (alleging that "between September 2023 and December 2023… Defendant provided … [internal] audit reports… emails [and other documents]… [containing] confidential, proprietary, and trade secret information" to New York Times reporter, Hannah Drier).

The article giving rise to this lawsuit was published in *The New York Times* on December 28, 2023, and remains accessible on the newspaper's website. *See* Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?*, N.Y. Times (Dec. 28, 2023), *available at* https://www.nytimes.com/2023/12/28/us/migrant-child-labor-audits.html (last accessed Jan. 6, 2025). Accordingly, the Court may take judicial notice of the article and need not necessarily rely on the Complaint's characterization of its contents.

Following the publication of that article, "UL opened an investigation into … whether Defendant had provided the New York Times with confidential information

in violation of any UL contracts or policies," and concluded that he had. Compl. ¶¶ 64, 70-72. "Based on the foregoing… UL terminated Defendant's at-will employment" on July 3, 2024, and filed this lawsuit the very same day. Compl. ¶ 73.

The five-count Complaint asserts two separate causes of action for "misappropriation of trade secrets," under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), Compl. ¶¶ 74-92 ("Count I"), and the Illinois Trade Secret Act, 765 IlCS 1065/1 *et seq.*, Compl. ¶¶ 93-102 ("Count II"). Additionally, the Complaint includes state common law claims for Breach of Contract, Compl. ¶¶ 103-113, ("Count III"), Breach of Fiduciary Duties of Loyalty and Good Faith, Compl. ¶¶ 114-120 ("Count IV"), and Conversion Compl. ¶¶ 121-130 ("Count V").

## CHOICE-OF-LAW

As alleged in the Complaint, Mr. Callington is and was, at all times relevant to this action, domiciled in the State of Oregon. *See* Compl. ¶ 11 ("Defendant Joshua Callington's permanent home and residence is, upon information and belief, presently located in Portland, Oregon."). Furthermore, the first three exhibits attached to the Complaint are "Independent Assessor Agreements" that were expressly governed by Oregon law and entered between the parties on May 17, 2017, November 4, 2017, and May 8, 2018, respectively.[3] When Mr. Callington's classification as an "independent

---

[3]     *See* Independent Assessor Agreement (May 17, 2017) [Exhibit 1], CM/ECF No. 1-1 at Page ID # 34 ("Governing Law… Unless specifically prohibited by law, the parties agree that the laws of the State of Oregon, USA will apply to this Agreement, without reference to its choice of law principles"); Independent Assessor Agreement (Nov. 4, 2017) [Exhibit 2], *id.* at Page ID # 41 (same); Independent Assessor Agreement (May 8, 2018) [Exhibit 3], *id.* at Page ID # 48 (same).

contractor" was appropriately converted to W-2 employee status, however, UL contends that its so-called "employment offer … was subject to Defendant agreeing to the Company's Confidentiality and Invention Assignment Agreement," Compl. ¶ 34, a copy of which appears in the exhibits to the Complaint without any signature or acknowledgement [CM/ECF No. 1-1, Page ID # 56-57].[4] Assuming *arguendo*, that this document fairly represents the terms of a valid and enforceable agreement between the parties, its Illinois choice-of-law provision would apply to any contractual cause of action arising thereunder.

Applying the "doctrine of dépeçage," this Court has held that choice-of-law questions arising from an anti-SLAPP defense are typically governed by the law of the speaker's domiciliary, which may differ from the substantive state law under which the challenged claims are asserted. *See, e.g., Osundairo v. Geragos,* 447 F. Supp. 3d 727, 743 (N.D. Ill. 2020) (applying California's anti-SLAPP statute to assess the viability of a defamation claim asserted under Illinois law) (relying on *Underground Sols., Inc. v. Palermo*, 41 F. Supp. 3d 720, 724 (N.D. Ill. 2014) and *Chi v. Loyola Univ. Med. Ctr.,* 787 F.Supp.2d 797, 801 (N.D.Ill. 2011)); *see also Intercon*

---

[4]    Although not especially pertinent to the instant motion, it bears worth noting that the only documentation UL provides as support for this claim is a copy of a letter that shows strong indications of having been doctored in some manner [*see* Exhibit 4, at Page ID # 53-57]. Specifically, the first page of that letter is dated May 8, 2019 [Page ID # 53] and is significantly blurrier than the final page [Page ID # 55], which lists the "Confidentiality and Invention Assignment Agreement" under a section entitled "Attachments," and includes a time stamp  indicating that Mr. Callington acknowledged the letter by digital signature on April 30, 2019 ("4/30/2019 3:31 PM"), *i.e.,* roughly 8 days before the date of the letter itself, as the first page indicates. Moreover, the unsigned "Confidentiality and Invention Assignment Agreement" is subsequently included within the same Exhibit 4 (*see* Page ID # 56-57), so as to suggest that it would have been delivered within the same communication when it was not. To the extent that a more innocent explanation can account for these discrepancies, the undersigned counsel respectfully requests clarification on that point in UL's response to this motion.

*Sols., Inc. v. Basel Action Network,* 969 F. Supp. 2d 1026, 1035–36 (N.D. Ill. 2013)*, aff'd,* 791 F.3d 729 (7th Cir. 2015) (applying Washington's anti-SLAPP statute to claims asserted under Illinois law) ("As Washington has a strong interest in having its own anti-SLAPP legislation applied to speech originating within its borders and made by its citizens, the Court will apply [it's law]… in determining whether Defendants are immune from liability.).

Accordingly, the analysis herein proceeds on the understanding that Mr. Callington's anti-SLAPP motion is governed by Oregon law, while recognizing that any subsequent analysis concerning the sufficiency claims under Fed. R. Civ. P. 12(b)(6) is governed by the law under which each claim is asserted.

## ARGUMENT

As this Court has previously recognized, SLAPPs are typically filed by parties whose primary motive is to "chill the defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction…"

> By forcing defendants to expend funds on litigation costs and attorney fees, the SLAPP plaintiff's goal of discouraging the defendant's protest activities are achieved through the ancillary effects of the lawsuit, not through an adjudication on the merits.

*Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1033 (N.D. Ill. 2013), *aff'd,* 791 F.3d 729 (7th Cir. 2015). "Anti-SLAPP legislation is aimed at providing … expedited judicial review, summary dismissal, and recovery of attorney fees for the party who has been 'SLAPPed.'" *Id.* at 1034 (cleaned up); *see also Northon v. Rule,* 637 F.3d 937, 938 (9th Cir. 2011) (explaining that anti–SLAPP motions facilitate the "early dismissal of meritless lawsuits aimed at chilling expression through costly, time-consuming litigation." (quoting *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009); *Schwern v. Plunkett,* 845 F.3d 1241, 1242 (9th Cir. 2017) ("Oregon amended its anti-SLAPP statute in 2009 with the purpose of 'provid[ing] a defendant with the right to not proceed to trial… [which] is akin to a statutory immunity from [SLAPP] suit[s].").

Whether brought under Oregon law, or any other state's substantive laws, the resolution of an anti-SLAPP motion typically involves a two-step burden-shifting analysis. *See, e.g., Intercon Sols., Inc. v. Basel Action Network,* 969 F. Supp. 2d 1026, 1040 (N.D. Ill. 2013), *aff'd,* 791 F.3d 729 (7th Cir. 2015); *see also Gunn v. Drage*, 65 F.4th 1109, 1118 (9th Cir. 2023); *Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128, 136

(1st Cir. 2017); *see also Dossett v. Ho-Chunk, Inc.,* 472 F. Supp. 3d 900, 905-06 (D. Or. 2020) (describing the burden-shifting analysis under Oregon's anti-SLAPP statute).

At the outset, the movant bears the burden of demonstrating that the challenged claims are premised upon conduct that is covered by the applicable statute. *See, e.g., Wahab v. Wahab,* No. 3:23-cv-00098, 2023 WL 5035662, at \*2 (D. Or. Aug. 8, 2023) ("At the first step of the process, the court must determine whether the defendant has met its initial burden to show that the claim against which the motion is made 'arises out of' one or more protected activities described in [the statute]") (cleaned up).

If the challenged claims arise from conduct or activities described in the statute, then the burden shifts to the non-moving party. *See, e.g., Gunn,* 65 F.4th at 1118 ("Where the defendant satisfies her burden at the first step, 'the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated.'"); *Gardner,* 563 F.3d at 986 (9th Cir. 2009) ("plaintiffs [must then]… establish that there is a probability … [of] prevail[ing] on the claim by presenting substantial evidence to support a prima facie case."); *Dossett,* 472 F. Supp. 3d 900, 905-06 (D. Or. 2020) ("Substantial evidence means enough evidence from which a reasonable trier of fact could find …[for] plaintiff [on each claim]"); *see also Osundairo v. Geragos,* 447 F. Supp. 3d 727, 744 (N.D. Ill. 2020) ("If … defendant has made … [the requisite] showing, the burden shifts to the plaintiff to 'demonstrate through the pleadings and affidavits that there is a probability he will prevail on the claim.'"); *accord Wahab,* 2023 WL 5035662, at \*7

(explaining that "the merits of [p]laintiff's [claims]… are addressed at the second step of the analysis."). At this later stage in the analysis, the applicable standard of review depends on the nature of anti-SLAPP defense; if the motion hinges "on purely legal arguments," federal courts merely assess the sufficiency of the claims under Fed. R. Civ. P. 12; if the motion asserts "a factual challenge," however, it is treated as "a motion for summary judgment," Fed. R. Civ. P. 56, and discovery must be permitted, if necessary to resolve the motion. *Gunn*, 65 F.4th at 1119-1120 (citing *CoreCivic, Inc. v. Candide Group*, LLC, 46 F.4th 1136, 1143 (9th Cir. 2022)); *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828 (9th Cir. 2018); *accord Osundairo v. Geragos*, 447 F. Supp. 3d 727, 744 (N.D. Ill. 2020).

**I.      The claims asserted against Mr. Callington fall squarely within the scope of Oregon's anti-SLAPP statute.**

As is relevant here, Oregon's anti-SLAPP statute applies to "any claim … that arises out of …"

> **Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or**
>
> **Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.**

Or. Rev. Stat. § 31.150(2)(c),(d).[5]

Although only one of those criteria needs to be fulfilled for Mr. Callington to make the requisite prima facie showing, both are met here.

---

[5]      The Illinois Citizen Participation Act, 735 ILCS 110/15, provides similar protections "against claims premised on …'acts in furtherance of' … First Amendment rights." *Chi v. Loyola U. Med. Ctr.*, 787 F. Supp. 2d 797, 808 (N.D. Ill. 2011) (cleaned up).

In essence, all claims asserted against Mr. Callington stem from the same central allegation that he provided "statements" and "documents" to a reporter, on the understanding that the information would be used for the purpose of publishing an article that was critical of his employer for its role and complicity in brushing child labor violations under the rug. Without that allegation, there would be no basis for UL's claim of misappropriation, no alleged breach of the confidentiality provisions in his employment agreements, and no other theory to sustain any other cause of action.

Because *The New York Times* is a national newspaper of public record, UL cannot seriously counter the plain fact that his communications with the reporter were made in a "public forum in connection with an issue of public interest," within the meaning of Or. Rev. Stat. § 31.150(2)(c). *See Dossett v. Ho-Chunk, Inc.,* 472 F. Supp. 3d 900. And because those communications were in furtherance of his right to petition the government on an issue of public interest (*i.e.,* labor violations, workplace safety, and child labor issues, more specifically), his conduct also falls squarely within the ambit of Or. Rev. Stat. § 31.150(2)(d). In fact, Mr. Callington's petitioning activity was even successful and acheived its intended effects. *See California Law Imposes New Disclosure Obligations on Employers Conducting Voluntary Child Labor Audits,* JDSupra (Dec. 4. 2024), https://www.jdsupra.com/legalnews/california-law-imposes-new-disclosure-6642586/ ("On September 22, 2024, [the governor of] California … signed into law Assembly Bill 3234 … which requires employers to disclose the results of audits on child labor practices."); *see also* Hannah Drier, *Confronted With Child Labor in the U.S., Companies Move to Crack Down*, N.Y. Times (Feb. 7, 2024),

https://www.nytimes.com/2023/12/28/us/migrant-child-labor-audits.html ("Many major U.S. companies — including some of the country's biggest consumer brands… are [now] revising the kinds of audits they require… enhancing reviews of night shifts and shifts run by outside contractors… and moving away from announcing audits in advance.").

Accordingly, UL must now bear the burden of defending its suit by presenting "substantial evidence" that its claims nonetheless have merit. *See Gunn*, 65 F.4th at 1119-1120 (citing *CoreCivic, Inc. v. Candide Group*, LLC, 46 F.4th 1136, 1143 (9th Cir. 2022)); *accord Osundairo v. Geragos*, 447 F. Supp. 3d 727, 744 (N.D. Ill. 2020).

## II. At this preliminary stage, it appears unlikely that UL can prevail on any of those claims.

Based solely on the allegations in the Complaint, and without any further substantiation, it appears extremely unlikely that UL can prevail on any of its claims.

Insofar as UL's trade secret claims are concerned (Counts I and II), the Complaint fails to identify the substance of any legitimate trade secret in Mr. Callington's possession or specify the nature of those secrets which it contends were "misappropriated," by and through his disclosures to the New York Times. Although Mr. Callington looks forward to UL's anticipated substantiation of those allegations, the trade secret claims have no apparent merit, as currently presented. Furthermore, to the extent that UL relies on various internal policy documents as evidence of its efforts to protect said "trade secrets," it bears worth mentioning that none of those documents include the requisite notice of rights mandated by the DTSA's whistleblower immunity and anti-retaliation provisions.

Meanwhile, the breach-of-contract claim (Count III) appears to be premised on an agreement that was never executed, and that would arguably be unenforceable, even if it had been properly entered. *See, e.g., Fleetwood Packaging v. Hein,* No. 14-cv-9670, 2014 WL 7146439, at \*8 (N.D. Ill. Dec. 15, 2014) (explaining that confidentiality provisions are "restrictive covenants" and thus, void, if not "reasonably limited in scope" under Illinois law); *accord ExactLogix, Inc. v. JobProgress, LLC,* 508 F. Supp. 3d 254, 277 (N.D. Ill. 2020) (overly broad confidentiality provisions are unenforceable).

More importantly, because Mr. Callington meets the criteria for whistleblower protections under Sarbannes-Oxley, 18 U.S.C. § 1514A, the False Claims Act, 31 U.S.C. § 3730(h)(1), the federal regulations promulgated thereunder, *and* various other applicable state law provisions (*see, e.g.*, Or. Rev. Stat. § 654.062(5), 740 ILCS 174/15, *et seq.*), even an otherwise valid agreement "would be void as contrary to public policy" in connection with the conduct alleged here. *See Shmushkovich v. Home Bound Healthcare, Inc.,* No. 12 C 2924, 2015 WL 3896947, at \*1 (N.D. Ill. June 23, 2015) (explaining that employers cannot invoke confidentiality agreements to "conceal" their own "illegal activit[ies]"); *accord U.S. ex rel. Ceas v. Chrysler Group LLC,* 191 F. Supp. 3d 885, 888 (N.D. Ill. 2016) (collecting cases); *see also Murray v. UBS Securities, LLC*, 601 U.S. 23, 27 (2024).

The breach-of-fiduciary duty claim (Count IV) is subject to dismissal for the same reasons, because it is duplicative of previously asserted contract claim. Additionally, the fiduciary breach claim is legally deficient because UL has not

alleged facts from which this Court could conclude that Mr. Callington had any fiduciary obligations to UL. Nor can it, since an independent auditor's primary allegiance is to the public-at-large and public company shareholders. *See United States v. Arthur Young & Co.,* 465 U.S. 805, 818 (1984) ("[T]he independent auditor assumes a *public* responsibility transcending any employment relationship with the client.... This 'public watchdog' function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.") (emphasis in original); *accord ADR Tr. Corp. v. KPMG Peat Marwick,* 844 F. Supp. 431, 436 (N.D. Ill. 1994) ("Perhaps in *some* instances the function of an independent auditor could overlap into areas in which it would hold a fiduciary duty to its client… [b]ut in general that is not the case.") (emphasis added).

Finally, the claim for Conversion (Count V) is also defective. In order to sustain a common law tort claim for conversion, this Court would have to find that UL had an unconditional and exclusive right to possess and control the information disclosed by Mr. Callington to the New York Times. *See Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 738 (7th Cir. 2016). Because UL cannot claim any legitimate or cognizable property interest in preventing the disclosure of information concerning its illegal, unethical, and/or immoral acts from becoming public, its claim for conversion necessarily fails.

## CONCLUSION

For these reasons, and in the absence of a rather "substantial" showing to the

contrary, UL's Complaint must be dismissed.

Dated: January 6, 2024
New York, NY

By:     /s/ Agatha M. Cole
        Agatha M. Cole
        BEVERLY PLLC
        43 West 43rd Street, Suite 159
        New York, NY 10036
        (828) 773-2628
        agatha@beverlypllc.com

- 14 -