**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UL LLC,** | |
| Plaintiff, | Case No. 1:24-cv-05631 |
| v. | Hon. Andrea R. Wood |
| **JOSHUA CALLINGTON,** | |
| Defendant. | |

---

## PLAINTIFF UL LLC'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE OR DISMISS

---

**LITTLER MENDELSON, P.C.**

James M. Witz
321 North Clark Street, Suite 1100
Chicago, IL  60654
Telephone:   312.795.3246
Facsimile:    312.277.9416
E-mail:        jwitz@littler.com

Kevin E. Griffith (*pro hac vice*)
Emily E. Levy (*pro hac vice*)
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:   614.463.4216
Facsimile:    614.737.9135
E-mails:       kgriffith@littler.com
                   elevy@littler.com

February 13, 2025

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ ii

I.     INTRODUCTION ....................................................................................................1

II.    UNDISPUTED FACTS ...........................................................................................3

III.   LAW AND ARGUMENT ........................................................................................5

      A.    Standard Of Review ....................................................................................5

      B.    Callington's Anti-SLAPP Motion Is Untimely And Should Be Dismissed ...........5

      C.    Oregon's Anti-SLAPP Statute ....................................................................7

            1.    The Illicit Transfer Of UL's Electronically Stored Information Is Not A Protected Activity Under Oregon's Anti-SLAPP Statute ................7

            2.    UL Can Establish A Probability That It Will Prevail On Each Of Its Claims Against Callington ....................................................................9

                 a.    UL Will Prevail On Its Claims Under The Defend Trade Secrets Act And Illinois Trade Secret Act ....................................10

                 b.    UL Will Prevail On Its Breach Of Contract Claim ......................13

                 c.    UL Will Prevail On Its Breach Of Fiduciary Duty And Good Faith Claim ..........................................................................16

                 d.    UL Will Prevail On Its Conversion Claim ....................................17

IV.   CONCLUSION .....................................................................................................19

CERTIFICATE OF SERVICE ..........................................................................................21

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.,
    62 Ill. App. 3d 671, 379 N.E.2d 1228 (1978) ...........................................................................17

ADR Tr. Corp. v. KPMG Peat Marwick,
    844 F. Supp. 431 (N.D. Ill. 1994) ...........................................................................................17

Advantage Mktg. Grp., Inc. v. Keane,
    2019 IL App (1st) 181126, 143 N.E.3d 139 ............................................................................17

U.S. v. Arthur Young & Co.,
    465 U.S. 805 (1984)..................................................................................................................17

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)....................................................................................................................5

Ball v. Kotter,
    723 F.3d 813 (7th Cir. 2013) ....................................................................................................16

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007)....................................................................................................................5

C. R. v. Eugene Sch. Dist. 4J,
    308 Or. App. 773, 481 P.3d 334 (2021).....................................................................................5

Covenant Aviation Security, LLC v. Berry,
    15 F. Supp. 3d 813 (N.D. Ill. 2014) .........................................................................................10

Dames & Moore v. Baxter & Woodman, Inc.,
    21 F. Supp. 2d 817 (N.D. Ill.1998) ..........................................................................................17

In re Dealer Mgmt. Sys. Antitrust Litig.,
    680 F. Supp. 3d 1011 (N.D. Ill. 2023) .....................................................................................13

Deep Photonics Corp. v. LaChapelle,
    282 Or. App. 533, 385 P.3d 1126 (2016)....................................................................................8

Dep't of Hum. Servs. v. Lindsey,
    324 Or. App. 312, 525 P.3d 470 (2023)......................................................................................7

Edwards v. City of Chi.,
    389 Ill. App. 3d 350, 329 Ill.Dec. 59, 905 N.E.2d 897 (2009) ................................................18

## TABLE OF AUTHORITIES
### (CONT'D)

PAGE(S)

*Gen. Elec. Co. v. Uptake Techs., Inc.*,
  394 F. Supp. 3d 815 (N.D. Ill. 2019) ........................................................10

*Got Docs, LLC v. Kingsbridge Holdings, LLC*,
  657 F. Supp. 3d 1034 (N.D. Ill. 2023) ..............................................10, 11

*Handy v. Lane Cnty.*,
  360 Or. 605, 385 P.3d 1016 (2016) ...........................................................10

*Horbach v. Kaczmarek*,
  288 F.3d 969 (7th Cir. 2002) ......................................................................18

*Inmar, Inc. v. Vargas*,
  No. 18-cv-2306, 2018 WL 6716701
  (N.D. Ill. Dec. 21, 2018) .............................................................................11

*Jackson v. Hammer*,
  274 Ill. App. 3d 59, 210 Ill.Dec. 614, 653 N.E.2d 809 (1995) ................11

*Johnson v. City of Atlanta*,
  107 F.4th 1292 (11th Cir. 2024) ...................................................................2

*Labor Ready, Inc. v. Williams Staffing, LLC*,
  149 F. Supp. 2d 398 (N.D. Ill. 2001) .........................................................11

*Landmark Properties, Inc. v. Architects Int'l-Chicago*,
  172 Ill. App. 3d 379, 526 N.E.2d 603 (1988) ...........................................13

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
  342 F.3d 714 (7th Cir. 2003) ......................................................................11

*MacNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*,
  715 F. Supp. 2d 786 (N.D. Ill. 2010) .........................................................18

*RKI, Inc. v. Grimes*,
  177 F. Supp. 2d 859 (N.D. Ill. 2001) ...................................................15, 17

*Roberts v. City of Chi.*,
  817 F.3d 561 (7th Cir. 2016) ........................................................................5

*Rokowsky v. Vericity, Inc.*,
  632 F. Supp. 3d 797 (N.D. Ill. 2022) .........................................................16

## TABLE OF AUTHORITIES
### (CONT'D)

PAGE(S)

*Sonrai Sys., LLC v. Waste Connections, Inc.*,
  658 F. Supp. 3d 604 (N.D. Ill. 2023) ...............................................................11, 12

*Westrock Co. & Victory Packaging, LP v. Dillon*,
  21-CV-05388, 2021 WL 6064038
  (N.D. Ill. Dec. 22, 2021) ...........................................................................................10

*World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*,
  172 Cal. App. 4th 1561, 92 Cal. Rptr. 3d 227 (2009)............................................7

*Young v. Davis*,
  259 Or. App. 497, 314 P.3d 350 (2013).................................................................9


## STATUTES

18 U.S.C. § 1833 ..............................................................................................................13

18 U.S.C. § 1839(5)(A) ....................................................................................................12

18 U.S.C. § 1839(5)(B) ....................................................................................................12

765 Ill. Comp. Stat. 1065/2 ............................................................................................12

Or. Rev. Stat. § 31.150....................................................................................................1, 3, 8

Or. Rev. Stat. § 31.150(2)(b) ..........................................................................................8

Or. Rev. Stat. § 31.150(4) ...............................................................................................7

Or. Rev. Stat. § 31.150(5) ...............................................................................................3

Or. Rev. Stat. § 31.152(1) ...............................................................................................6


## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(6)...................................................................................................5, 19

U.S. Const. amend. I .......................................................................................................1, 3

iv

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE OR DISMISS[1]

Plaintiff UL LLC ("UL") respectfully submits this Memorandum in Opposition to Defendant Joshua Callington's ("Callington") Special Motion to Strike or Dismiss All Claims Pursuant To Anti-SLAPP Provisions of Oregon Law, Or. Rev. Stat. § 31.150 ("Callington's Motion"). (Callington's Motion, ECF No. 31).

## I.     INTRODUCTION

This case is not about the suppression of speech or an individual's right to petition. This case is not about First Amendment rights, as UL, Callington's former employer, is not a state actor. Rather, this case is about Callington's covert and unlawful theft of over *76,000* internal and confidential UL business documents from UL's computer system and electronically stored information ("ESI"). The undisputable facts show that Callington leveraged and misused his trusted social compliance auditor position to cover up his systematic collection, transfer, and dissemination—over a lengthy period of time and without UL's knowledge or consent—of thousands of internal documents containing highly sensitive confidential business information and trade secrets belonging to UL, its customers, and its customers' suppliers.

The full scope of Defendant's unlawful and unauthorized conduct cannot be known until UL conducts discovery in this case. But, for purposes of deciding whether to grant Defendant's Motion, it is undisputed that Callington—only after multiple demands by UL—returned to UL *copies* of a large portion of the documents he took from UL's computer system without UL's knowledge or authorization. These documents contain confidential, proprietary, and/or trade secret business information of UL, its customers, and its customers' suppliers. Notably, and to UL's

---

[1]     Because Callington filed two Motions to Dismiss/Motions to Strike (ECF Nos. 29 and 31), UL's Memorandum in Opposition responds to the most recent version, ECF No. 31.

knowledge and belief, Callington (1) omitted returning copies of whatever group of documents Callington had given to the *New York Times* without UL's knowledge or authorization; (2) deleted some of the documentation he took after UL instructed him not to delete any of the documentation he took; and (3) has retained copies of, or control over copies of, the documents he returned to UL, which he admitted during a previous conference with the Court he still possesses.

Finally, Callington has admitted that he contacted a reporter at the *New York Times* after she published an earlier article about corporate social responsibility audits. According to Callington's statements in a subsequent article about corporate social responsibility audits the reporter published, he believed that social responsibility audits were not as effective as they could be at uncovering potential child labor issues at suppliers' facilities because the child labor was occurring at night and after the auditors had left the site for the day. (*See* Exhibit 1, December 28, 2023, *New York Times* Article, 5).[2] Callington went on to state in the attached article that he had never found any child labor issues while employed with UL or during his career. (*Id.*, at 5). While formal discovery needs to be conducted, logically it stands to reason that the stolen UL documents and records that Callington provided to the *New York Times* reporter did not address the child labor issues that the reporter was investigating and questioning. Yet, Callington now further states that

---

[2]    To the extent Callington argues in his reply brief that UL improperly cites to an article that is neither attached as an exhibit to the Complaint nor contained in an affidavit, UL states that its citation is proper under the incorporation-by-reference doctrine. The doctrine provides that a document may be properly considered on a motion to dismiss if (1) the document was referenced in the complaint; (2) the document was central to the plaintiff's claims; and (3) its authenticity is undisputed. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1299 (11th Cir. 2024). Here, UL referenced the December 2023 *New York Times* article in paragraph 60 of the Complaint. The article is considered "central" to UL's claims (and Callington's Motion) because, as alleged, it illustrates Callington's improper retention and dissemination of UL's internal documents and ESI. Finally, its authenticity is not disputed. Additionally, because the incorporation-by-reference doctrine allows the *New York Times* article to be considered, Callington's request that the Court take judicial notice of the article is, therefore, not necessary. (*See* Callington's Motion, 3, ECF No. 31).

he provided the UL documentation to the reporter "for the purpose of publishing an article that was critical of his employer." (*See* Callington's Motion, 9, ECF No. 31).

Thus, contrary to Callington's assertion in his Motion, the question presented to this Court is not whether Callington has a First Amendment right to petition the government on an issue of public interest. It is whether Callington's conduct of indiscriminately copying and stealing a massive amount of UL's internal business records—including well before the *New York Times* published its initial article about corporate social responsibility audits—violated his contractual and other legal obligations owed to UL, violated the contractual and legal obligations UL owed to its customers and its customers' suppliers, and violated the confidentiality standards set forth in the Association of Professional Social Compliance Auditors ("APSCA") Code to which Callington was subject. (*See, e.g.*, Compl., at ¶¶ 44–45, ECF No. 1).

Based on the evidence available at this stage of litigation, which is cited in UL's Complaint, the exhibits supporting the Complaint, and in the *New York Times* article and Affidavits attached hereto, there is far beyond "a probability"—as UL is only required to show under Oregon's Anti-SLAPP statute—that UL will prevail on the merits of its claims filed in this case.

## II.  <u>UNDISPUTED FACTS</u>[3]

Pursuant to Or. Rev. Stat. § 31.150(5),[4] UL attaches an affidavit from Andrew VanHagen affirming the factual allegations in UL's Complaint are true and accurate. (*See* Exhibit 2, Andrew VanHagen Aff.).

---

[3]     The facts in this section are a recitation of the allegations in UL's Complaint and, for purposes of deciding Callington's Motion, must be taken as true and viewed in the light most favorable to UL.

[4]     Under Or. Rev. Stat. § 31.150, the Court may consider pleadings and affidavits when making a determination. Or. Rev. Stat. § 31.150.

Callington was a social compliance auditor employed by UL. (Compl., ¶¶ 25, 27). UL social compliance auditors are hired by UL's customers to evaluate suppliers in their supply chains in areas such as health and safety, environmental, and labor practices. (*Id.*, at ¶¶ 5, 29). In his role, Callington was trained on, and had extensive access to, confidential business information and trade secrets of UL, UL's customers, and UL's customers' suppliers. (*Id.*, at ¶¶ 19, 43, 48). Callington signed three separate agreements (referred to in the Complaint as "Independent Assessment Agreements") that outlined, among other things, the expectation that Callington indefinitely keep all aspects of his services confidential. (*Id.*, at ¶¶ 26–31). Callington further agreed as a condition of his employment to adhere to UL's Confidentiality and Invention Assignment Agreement, which states that Callington promises to (1) "keep all Confidential Information in strict confidence and ... not disclose it without [UL]'s prior written permission," and (2) upon termination, to "immediately deliver to [UL] ... all Confidential Information and all documents ... that include Confidential Information" in Callington's possession. (*Id.*, at ¶ 34).

Despite Callington's express agreement to maintain confidentiality, during an internal investigation that concluded on or about June 11, 2024, UL discovered that Callington had transferred a massive number of internal documents and ESI from UL's computer system to Callington's personal accounts and storage systems. (*Id.*, at ¶ 49). The investigation revealed that the following UL property was systematically exported to, or otherwise retained by, Callington over a period of at least four years: more than 20,000 emails, 56,000 files, and an unknown number of photos taken during supplier audits conducted by Callington. (*Id.*, at ¶¶ 50–52).

Callington's misconduct did not end there. Instead of using the documents to report a concern internally or to an appropriate government agency or law enforcement, Callington unilaterally sought out a reporter at the *New York Times*. (*Id.*, at ¶¶ 3, 53–55). Callington also

provided the reporter with documents he had taken from UL. (*Id.*, at ¶¶ 56–58). The reporter wrote an article with the information learned and the documents obtained directly from Callington, mentioning UL and some of UL's customers by name. (*Id.*, at ¶¶ 60–63). When UL had questions during its internal investigation about the nature and scope of Callington's conduct, Callington refused to fully cooperate with UL's investigation. Specifically, Callington (1) delayed the return of his company-issued laptop, (2) admittedly deleted materials relevant to UL's investigation after being directed not to delete anything, and (3) refused to respond to UL's repeated requests to destroy the documents and ESI he took. (*Id.*, at ¶¶ 64–68). To this day, Callington maintains an unknown number of confidential documents and ESI taken from UL that he previously admitted are in his possession. (*Id.*, at ¶ 69).

## III.     LAW AND ARGUMENT

### A.     Standard Of Review

"To survive a motion to dismiss [under Rule 12(b)(6)], the complaint must 'state a claim to relief that is plausible on its face.'" *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016) (quotations omitted). To be facially plausible, a complaint must include sufficient factual allegations to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### B.     Callington's Anti-SLAPP Motion Is Untimely And Should Be Dismissed[5]

A pillar of anti-SLAPP statutes is a defendant's ability to swiftly dispose of a lawsuit before significant costs and burdens are incurred. *See, e.g., C. R. v. Eugene Sch. Dist. 4J*, 308 Or. App.

---

[5]     UL does not agree with Callington's interpretation and application of Oregon's anti-SLAPP statute, including that UL's claims "fall squarely within" the scope of the statute. Nevertheless, for purposes of this

773, 777, 481 P.3d 334, 338 (2021) (The "purpose of the special motion to strike … is to expeditiously terminate unfounded claims.") (internal citations omitted). For that reason, most anti-SLAPP statutes provide a prescribed time in which to file the special motion. Oregon's statute provides that a special motion to strike *must* be filed within 60 days after service of the complaint, or at the court's discretion. Or. Rev. Stat. § 31.152(1). However, here, Callington filed his Motion ***120 days after*** the time contemplated by the Oregon legislature. (Callington's Motion, ECF Nos. 29 and 31).

Callington was on notice of UL's claims when he waived service on July 6, 2024. The Court graciously granted Callington's motion for enlargement of time to respond to UL's Complaint to allow Callington time to secure counsel. (*See* Callington's Mot. for Enlargement of Time, ECF No. 4). The record reflects that Callington secured counsel no later than October 23, 2024, when a Notice of Appearance was filed on behalf of Callington. (*See* Att'y Appearance, ECF No. 15). But Callington did not even file his motion within 60 days of hiring counsel. Rather, 75 days after that, Callington filed his Motion, arguing that UL's claims are barred by Oregon's anti-SLAPP statute. (*See* Callington's Motion, ECF Nos. 29 and 31). Callington's actions contradict the statutory purpose of an anti-SLAPP motion. Callington sat silently for ***six months*** before he moved to dismiss the claims against him. It is far too late for the anti-SLAPP statute to

---

motion, UL assumes that Oregon law would apply and therefore conducts the analysis of the purported "defense" under Oregon law.

However, it is worth noting that Callington may no longer be a resident of Oregon, making his assertion that "Mr. Callington is and was, at all times relevant to this action, domiciled in the State of Oregon" a misrepresentation of fact. (*See* Callington's Motion, 4). In Callington's unfair labor practice charge, which was filed on or around July 10, 2024, he listed an Arizona address: 205 S. Higley Road, Lot 213, Mesa, Arizona 85206. And, even assuming Callington were an Oregon resident, the work he performed for UL was scattered throughout the U.S., and UL does not concede the applicability of Oregon law to any aspect of this case other than its analysis of Oregon's anti-SLAPP statute.

fulfill its purpose of resolving the case promptly. Accordingly, Callington's Motion should be denied as untimely.

### C. Oregon's Anti-SLAPP Statute

A court has two tasks when a party moves to strike a cause of action under the relevant anti-SLAPP statute. The first task is to determine whether the defendant has met their initial burden "of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct" described in the statute. Or. Rev. Stat. § 31.150(4). Second, and only if the court concludes that the defendant has met their initial burden, the court must examine whether the plaintiff has demonstrated a probability of prevailing on the claims. *Id.* Callington fails on both prongs.

#### 1. *The Illicit Transfer Of UL's Electronically Stored Information Is Not A Protected Activity Under Oregon's Anti-SLAPP Statute*

Callington must show that UL's suit arises from a protected act taken *in connection with* or *in furtherance of* Callington's constitutional right of petition or free speech. *See*, *e.g.*, *World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*, 172 Cal. App. 4th 1561, 92 Cal. Rptr. 3d 227 (2009) (denying defendant's motion to dismiss under the applicable anti-SLAPP statute based on the principle that the claim does not arise from constitutionally protected activity simply because it is triggered by such activity). "In answering the factual question of what actions the claim arises out of, [the court must] view the evidence in the light most favorable to plaintiff … based on the affidavits submitted and the complaint." *Dep't of Hum. Servs. V. Lindsey*, 324 Or. App. 312, 319, 525 P.3d 470 (2023). UL's claims do not arise out of any protected activity but, instead, were triggered by Callington's unlawful and unapproved transfer and disclosure of UL's internal documents and ESI over a period of years.

In *Deep Photonics Corp. v. LaChapelle*, 282 Or. App. 533, 385 P.3d 1126 (2016), a corporation sued its shareholders for mismanagement of assets and intellectual property. The shareholders filed a third-party complaint against the corporation's legal counsel, alleging breach of fiduciary duty. *Id.*, at 538–40. The attorney, as a third-party defendant, filed a special motion to strike under Oregon's anti-SLAPP statute, arguing that the claims against him arose out of the provision of legal services in anticipation of litigation, which arguably qualified for protection under Or. Rev. Stat. § 31.150(2)(b). *Id.*, at 542–44. The court held that the actions from which the corporation's claims arose were *not* the attorney's statements in anticipation of litigation, but rather the attorney's actions in assisting in the corporation's wrongful actions against the shareholders and committing legal malpractice. The court stated:

> To "arise out of" the conduct described in subsection (2)(b), the act underlying the claim itself must have been an act in furtherance of the right to petition and not just associated with it. *See Kolar,* 145 Cal.App.4th at 1537, 52 Cal.Rptr.3d at 716 ("A cause of action may be 'triggered by' or associated with a protected act, but it does not mean the cause or action *arises* from that act."). Plaintiffs' claims do not "arise out of" statements that [the attorney] made to DPC in anticipation of litigation (or, indeed, his "approval" of the lawsuit). Rather, plaintiffs' claims "arise out of" [the attorney]'s *failure* to give competent legal advice to DPC, which is not an act in furtherance of the right to petition. In other words, plaintiffs' claim is not based on [the attorney]'s act of advising DPC to bring a lawsuit; it is based on [the attorney] not competently representing DPC's interests when he did so.

*Id.*, at 546–47.

The same analysis applies in this case. Contrary to what Callington would like this Court to believe, UL's claims are not predicated on Callington speaking to a reporter. Rather, UL's claims are rooted in Callington's unauthorized transfer of *thousands* of UL's internal documents and ESI from UL's secured computer system to Callington's personal accounts. This illicit transfer of documents and ESI is not, and should not be, legally protected under Or. Rev. Stat. § 31.150.

Callington has cited no Oregon case law that holds that covertly stealing more than 76,000 internal business documents, without the owner's knowledge or consent, and then providing some of the documentation to a national newspaper is protected conduct under any Oregon law, or under any other law for that matter. Consequently, Callington has failed to demonstrate that UL's claims pertain to any act covered by Oregon's anti-SLAPP statute.

Even if the Court finds that Callington's illicit conduct somehow was in furtherance of his right to petition, strong public policy reasons exist to decline protection to suspected wrongdoers, such as Callington, under the anti-SLAPP statute. Indeed, the reason the Illinois Trade Secrets Act was passed was, in part, to deter unlawful conduct by individuals that possess information that derives economic value from not being generally known or readily accessible to others. To rule that Callington's actions are protected and covered under Oregon's anti-SLAPP statute would effectively allow an employee to take *any* action that they deem fit under the guise of the constitutional right to petition. Put simply, a ruling for Callington sets a dangerous precent. It encourages, rather than discourages, employees to breach their confidentiality agreements or find novel ways to misuse their employer's internal documents and ESI. Callington's actions should not be considered a "protected activity."

### 2. *UL Can Establish A Probability That It Will Prevail On Each Of Its Claims Against Callington*

Even if Callington could show that UL's claims arise out of conduct protected by the anti-SLAPP statute—which he cannot show—Callington's Motion should nevertheless be denied under the second prong. UL's burden—to establish that there is a probability it will prevail on the claim—is a "low bar" that UL clearly meets. *See Young v. Davis*, 259 Or. App. 497, 508, 314 P.3d 350 (2013) (classifying bar as "low" because goal is to weed out meritless claims meant to harass or intimidate, not to require that plaintiff prove its case before being allowed to proceed further).

This is consistent with the "substantial evidence" standard, which requires only that UL present evidence "from which a reasonable trier of fact *could find* that the plaintiff met its burden of production." *Handy v. Lane Cnty.*, 360 Or. 605, 385 P.3d 1016, 623 (2016) (emphasis added). UL can prove, for each respective cause of action against Callington, a probability of success on the merits.

### a. UL Will Prevail On Its Claims Under The Defend Trade Secrets Act And Illinois Trade Secret Act

"To establish a violation of the DTSA or ITSA, Plaintiffs must prove that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Got Docs, LLC v. Kingsbridge Holdings, LLC*, 657 F. Supp. 3d 1034, 1043 (N.D. Ill. 2023) (citing *Westrock Co. & Victory Packaging, LP v. Dillon*, 21-CV-05388, 2021 WL 6064038, at *6 (N.D. Ill. Dec. 22, 2021) (internal quotations omitted). First, a trade secret existed. As a threshold matter, and as expressly outlined in the Complaint, UL provides the following list of trade secrets (which is not all encompassing, but those which UL believes Callington misappropriated):

> UL's audit reports, which is information and contains information that is compiled, assembled, analyzed and/or organized by UL as part of its internal audit procedures and processes, confidential documentation prepared by UL employees or independent contractors related to an audit report, audit procedures and process, UL's customer's internal information and documents, and UL's audit process and practices.

(Compl., ¶¶ 79, 94, ECF No. 1). Despite Callington's assertion that UL's Complaint "fails to identify the substance of any legitimate trade secret in Mr. Callington's possession[,]" at the pleading stage, a plaintiff "can describe trade secret information in general terms." (Callington's Motion, 11, ECF No. 31); *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 831–32 (N.D. Ill. 2019) (citing *Covenant Aviation Security, LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D.

Ill. 2014)). Here, UL included sufficient detail of the trade secrets at issue in its Complaint. *See Inmar, Inc. v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at \*\*3–4 (N.D. Ill. Dec. 21, 2018) (determining that, by describing trade secrets as "business development plans for existing clients, Plaintiffs' pricing and marketing strategies, lead sources, client lists, position in the market, and research dossiers[,]" plaintiff sufficiently plead that a trade secret existed and therefore the defendants motion to dismiss was denied); *see also Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill. 2001).

To the extent Callington is alleging that the trade secrets identified in the Complaint do not qualify as trade secrets, Callington has provided no support, caselaw or otherwise, for his allegation, and the Court should therefore accept the trade secrets as true. *See Got Docs*, 657 F. Supp. 3d at 1043 ("Under both [DTSA and ITSA], whether information qualifies as a trade secret is a question of fact that 'requires an ad hoc evaluation of all the surrounding circumstances.'" However, because the defendant did not challenge the trade secrets on a basis supported by authority, for the purposes of the motion, the Court accepted the trade secrets as true.).

A central focus of whether something qualifies as a trade secret is secrecy. There are two requirements for this showing: (1) "the information be sufficiently secret to impart economic value because of its relative secrecy[;]" and (2) the Company took "reasonable efforts to maintain the secrecy of the information[.]" *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003); *Jackson v. Hammer*, 274 Ill. App. 3d 59, 210 Ill.Dec. 614, 653 N.E.2d 809, 816 (1995) ("[T]he Act requires a plaintiff to take 'affirmative measures' to prevent others from using information."); *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 615 (N.D.

Ill. 2023) ("Both the DTSA and ITSA require a plaintiff to take reasonable efforts to secure and maintain the secrecy of alleged trade secrets.").

Here, UL takes substantial measures to secure and maintain the confidentiality of UL's trade secret information and the trade secret information of its customers, including limiting the number of UL employees with access to the information, requiring employees with access to such information to agree to maintain the confidentiality of the information, disseminating numerous confidentiality agreements and policies, and requiring that confidential information be maintained only on UL's accounts, networks, and/or servers. UL has invested significant time, money, and effort to protect and maintain confidentiality. In addition, UL has established various techniques and methods for obtaining information from customers' suppliers, how the information is safeguarded once received, and how the information is used and summarized for UL, UL's customers, and UL's customers' suppliers. Further, UL acquires economic value and a competitive advantage as its confidential information is not known to or readily ascertainable by, or otherwise available to its competitors who could, themselves, get economic value from its disclosure or use. Accordingly, trade secrets exist.

Second, it cannot be disputed that Callington misappropriated trade secret information. A "[p]laintiff may show misappropriation under the DTSA and ITSA either by proof that Defendant: (1) acquired a trade secret knowing or with reason to know that it was acquired by improper means; or (2) disclosed or used the trade secret without express or implied consent." *Sonrai Sys., LLC v. Waste Connections, Inc.*, 658 F. Supp. 3d 604, 616 (N.D. Ill. 2023) (citing 18 U.S.C. §§ 1839(5)(A)–(B); 765 Ill. Comp. Stat. 1065/2). As detailed in UL's Complaint, Callington misappropriated UL's trade secret information through improper acquisition, disclosure, and use. Callington (1) disclosed UL's and UL's customer's trade secret information

to the *New York Times*, (2) transferred, maintained, and continues to maintain UL's trade secret information in his personal accounts, and (3) acquired and possessed UL's trade secrets by improper means and beyond any authorization from UL. (Compl., ¶¶ 83, 98, ECF No. 1). Additionally, when asked to return and/or destroy UL's documents, including trade secret information, he has in his possession, Callington refused. (*Id.*). Finally, Callington's misappropriation of UL's and UL customers' trade secrets caused UL harm. UL has received complaints from its customers, lost profits, and damage to goodwill. Discovery in this case will further establish the damages present in this case.

Further, Callington's argument related to the lack of a notice of rights provision in UL's confidential information and trade secret policy has no bearing on whether UL states a claim. Under the DTSA, where a notice provision is absent "the employer may not be awarded exemplary damages or attorney fees[;]" however, the lack of a notice provision does not affect whether a claim under the DTSA has merit. *See* 18 U.S.C. § 1833.

### b.    UL Will Prevail On Its Breach Of Contract Claim

To succeed on a breach-of-contract claim, "a plaintiff must plead and prove (1) the existence of a valid and enforceable contract, (2) substantial performance by the plaintiff, (3) breach by the defendant, and (4) damages caused by that breach." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 1011, 1020 (N.D. Ill. 2023). First, the parties entered a valid and binding contract that is enforceable under Illinois law. Although Callington argues that the confidentiality agreement is unenforceable because it was not executed, Illinois courts have held a written, unsigned agreement enforceable when the parties acted in a way that is consistent with the written agreement. *Landmark Properties, Inc. v. Architects Int'l-Chicago*, 172 Ill. App. 3d 379, 383, 526 N.E.2d 603 (1988). Here, Callington executed the confidentiality agreement as

a condition of his employment in April 2019 when he signed his offer letter.[6] Callington's agreement to the offer of employment and the confidentiality agreement was in exchange for good and valuable consideration—continued employment (for more than five years), compensation, and benefits. Second, there can be no question that UL substantially performed its end of the agreement—UL provided Callington with more than five years of employment, compensation, and benefits. Third, as described herein, Callington breached his duties under the agreement by "disclos[ing] it without UL's prior written permission," by using the internal documents and ESI for reasons that were not "necessary for the performance of [his] duties as a UL employee and not for the benefit of any third parties," and failing to return or destroy UL's internal documents and ESI. Callington not only disclosed internal documents and ESI with confidential information to the *New York Times*, but also transferred thousands of documents to his personal file system, outside of UL's secure network. Finally, Callington's breach of his agreement damaged UL both fiscally and reputationally. After learning of Callington's disclosure of information, UL's customers have contacted UL to complain as the *New York Times* article refers to many of their businesses by name. UL continues to suffer damage including lost business and profits, costs of retaining clients, and damage to goodwill.

---

[6]      In Callington's Motion, footnote 4, he accuses UL, without evidence, of "doctor[ing]" Exhibit 4 of the Complaint; however, Callington also admittedly notes that this issue is "not especially pertinent to the instant motion." (*See* Callington's Motion, 5, ECF No. 31). UL agrees that this is not pertinent to Callington's Motion, but, in response, and as a threshold matter, UL has not "doctored" any documents nor is there any evidence that it has. After redacting the personal information on the first page of the exhibit and combining all the exhibits, that page became "blurry." UL is willing to provide a copy of Exhibit 4, without redactions, to Callington's counsel upon request. Additionally, the Confidentiality and Invention Assignment Agreement was included in the employment offer letter as a hyperlink on page 3 of the letter. The letter itself expressly stated: "Employment Offer is Subject to: … Execution of the attached Confidentiality and Invention Assignment Agreement." As to the dates, UL's former system populates the letter date automatically.

Callington's argument that the confidentiality agreement is unenforceable because it is "not reasonably limited in scope" is misplaced and without merit. Illinois courts have held that a confidentiality or non-disclosure provision in an employment agreement is reasonable, regardless of the corresponding time limitation or lack thereof. This is especially true when the employee developed substantial proprietary information in the course of their employment. *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 865 (N.D. Ill. 2001). The court in *RKI*, for example, ruled that the following provision was both reasonable and enforceable because it was necessary to protect trade secret and confidential information acquired through the defendant's employment:

> [D]uring the term of this Agreement ***and at any time after Employee leaves the Company***, Employee shall not, without prior consent of the company … directly or indirectly, communicate, disclose, transmit, disseminate or otherwise publish or reveal … to third parties, the Proprietary Information (as hereinafter defined) imparted to Employee by the Company … 'Proprietary Information' shall mean any and all information … not generally known or recognized as standard practices.

*Id.*, at 864 (emphasis added). The confidentiality provision in the Confidentiality and Invention Assignment Agreement, which UL already established is a valid contract under Illinois law, effectively mirrors the provision in *RKI*. It states, in pertinent part: "[Callington] may receive, observe, or otherwise be exposed to confidential and proprietary information about UL, its affiliates, clients … and/or other third parties to whom UL owes a duty of confidentiality (collectively, 'Confidential Information') … During and after [Callington's] employment with UL, [Callington] will keep all Confidential Information in strict confidence and will not disclose it without UL's prior written permission." It follows that the confidentiality provision at issue is both reasonable and necessary to protect the information bestowed on Callington during his employment with UL.

15

Finally, Callington's argument that the confidentiality agreement is void as contrary to public policy because he meets the "criteria for whistleblower protections[,]" has no merit. (*See* Callington's Motion, 12, ECF No. 31). As an initial matter, Callington did not engage in any protected activity, as making a report to a media outlet is not protected whistleblower conduct. Second, despite Callington's citations to various named and unnamed state and federal statutes, Callington has cited no cases demonstrating that the disclosure of internal documents and ESI to a media outlet is protected. Further, Callington's swift assertion that "employers cannot invoke confidentiality agreements to conceal their own illegal activities[,]" has no bearing on this matter. As a threshold matter, the confidential information Callington transferred to his personal files and disclosed contained no evidence of "illegal, unethical, and/or immoral acts" related to child labor. In fact, Callington, himself, admits this in the *New York Times* article, "I have audited these locations and was never able to detect these issues ..." and "[h]e had not seen any child labor in [one of the] factor[ies mentioned]." (Exhibit 1, *New York Times* Article, 2, 5). Simply put, Callington has never contended that UL acted illegally—his position is that the social auditing industry could do more to search for illegal activities when it audits suppliers. Accordingly, Callington's argument is without merit.

### c. UL Will Prevail On Its Breach of Fiduciary Duty And Good Faith Claim

"The elements of a breach of fiduciary duty under Illinois law are '(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains.'" *Rokowsky v. Vericity, Inc.*, 632 F. Supp. 3d 797, 808 (N.D. Ill. 2022) (citing *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013)).

Under Illinois law, "[d]uring the course of employment, an employee owes an undivided duty of fidelity and loyalty to his employer[]" and the "duty of loyalty includes acting solely in the

interest of the employer." *RKI*, 177 F. Supp. 2d at 877 (citing *Dames & Moore v. Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817 (N.D. Ill. 1998) and *ABC Trans Nat. Transp., Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill. App. 3d 671, 683, 379 N.E.2d 1228, 1237 (1978)); *see also Advantage Mktg. Grp., Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 22, 143 N.E.3d 139 ("[a] duty of loyalty to the employer extends to officers, directors*, and employees*") (emphasis in original). Callington's argument that he owed no fiduciary duty to UL is of no moment. All the cases cited by Callington refer to the auditor-client relationship, not the auditor-employer relationship, which is the pertinent relationship here. *See U.S. v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984); *see also ADR Tr. Corp. v. KPMG Peat Marwick*, 844 F. Supp. 431, 436 (N.D. Ill. 1994).

Further, Courts in this district have found a fiduciary duty/duty of loyalty where employees download/copy documents and information "in order to use it to compete with" a former employee. *See RKI*, 177 F. Supp. 2d at 877 (finding that "[b]y downloading or copying … data during the course of [the employee's] employment in order to use it to compete with [the employer] thereafter, [the employee] breached his duty of loyalty and fidelity to [the employer]"). As such, a fiduciary duty existed. Second, there can be no dispute that Callington breached his fiduciary duty by transferring and disclosing confidential business documents to a third party. Finally, Callington's breach damaged UL's reputation and economically. As described herein, UL's customers have contacted UL to complain as the *New York Times* article refers to many of their businesses by name. As such, UL continues to suffer damage including lost business and profits, costs of retaining clients, and damage to goodwill.

### d.      UL Will Prevail On Its Conversion Claim

To establish its conversion claim, UL must establish "(1) [it has a] right to the property; (2) that this right includes the absolute, unconditional right to immediate possession of the property; (3) [it] has demanded possession of the property; and (4) the defendant took control or

claimed ownership of the property wrongfully and without authorization." *MacNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 796–97 (N.D. Ill. 2010) (quoting *Edwards v. City of Chi.,* 389 Ill. App. 3d 350, 329 Ill.Dec. 59, 905 N.E.2d 897, 899–900 (2009)) (internal quotations omitted). "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *MacNeil Auto.*, 715 F. Supp. 2d at 796–97 (quoting *Horbach v. Kaczmarek,* 288 F.3d 969, 978 (7th Cir. 2002)).

Here, and unquestionably, UL has a right to its confidential internal business records, documentation, and ESI, and an absolute and unconditional right to immediate possession of the property. UL gave Callington access to UL documents and information he needed to conduct and complete audits. After learning that Callington transferred thousands of UL and UL customers' and suppliers' documents to his personal file system and shared these documents with the *New York Times*, UL demanded immediate return of all the documents and ESI he took and that was in his possession; however, Callington refused. Callington, to date, has wrongfully retained UL's property for his own use and/or in a manner inconsistent with UL's ownership of and rights in that property and with the intent to permanently deprive UL of that property and/or negatively or irreparably altering that property so as to devalue or diminish that property and/or its nature/status as confidential and/or trade secret information. As such, at this stage in the litigation, UL has presented sufficient evidence of more than "a probability" that it can establish and prevail on its conversion claim.

Further, Callington's argument that "UL cannot claim any legitimate or cognizable property interest in preventing the disclosure of information concerning its illegal, unethical, and/or immoral acts from becoming public, its claim for conversion necessarily fails" is of no moment. As detailed in Section III.c.2.b, there is no evidence that the confidential business

documents and ESI Callington transferred to his personal files and disclosed contained any "illegal, unethical, and/or immoral acts" related to child labor. This is further supported by the *New York Times* article. (*See* Exhibit 1, New York Times Article, 2, 5). As such, Callington's argument is without merit.

IV.    **CONCLUSION**

For the foregoing reasons, UL respectfully requests that this Court deny Callington's Motion to Dismiss/Motion to Strike. Callington cannot establish that UL's suit arises from or in any way implicates Callington's constitutional right of petition or free speech, in that UL is not a state actor but only a private sector business that is exercising its well-established legal rights to try to protect its confidential business information and trade secrets, as well as protect the confidential business information of its customers and suppliers as it is required to do by contracts and other legal duties with them. But, even if Callington could establish his requisite *prima face* case under the Oregon Anti-SLAPP statute, UL certainly has established far more than "a probability" it will prevail on the merits all of its claims. Accordingly, Callington's Motion should be denied under the legal standards contained in Oregon's Anti-SLAPP statute and Fed. Civ. Rule 12(b)(6).

Dated: February 13, 2025

Respectfully submitted:

**UL LLC**

By: /s/ *James Witz*
One of Plaintiff's Attorneys

James M. Witz
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone:  312.795.3246
Facsimile:  312.277.9416
E-mail:      jwitz@littler.com

Kevin E. Griffith (*pro hac vice*)
Emily E. Levy (*pro hac vice*)
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH 43215
Telephone:  614.463.4216
Facsimile:  614.737.9135
E-mails:     kgriffith@littler.com
             elevy@littler.com

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on the date shown below he caused a copy of the foregoing document to be filed electronically with the Clerk of the Court for the United States District Court for the Northern District of Illinois and served electronically on all counsel of record through the Court's filing system.


Dated: February 13, 2025                              */s/ James M. Witz*_____

4931-8449-2567.1 / 118575.1072