IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UL LLC, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 1:24-cv-05631 |
| | ) | |
| -v- | ) | Hon. Andrea R. Wood |
| | ) | |
| Joshua Callington, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

---

### AMICUS CURIAE BRIEF OF THE WHISTLEBLOWER AND SOURCE PROTECTION PROGRAM (WHISPeR) IN SUPPORT OF DEFENDANT'S ANTI-SLAPP MOTION

---

WHISTLEBLOWER & SOURCE PROTECTION
PROGRAM (WHISPeR), EXPOSEFACTS
Jesselyn Radack
1717 K Street, NW, Suite 900
Washington, DC 20006
(301) 351-3582

GOODMAN LAW OFFICE
Leonard C. Goodman
Angela J. Reaney
53 W. Jackson Blvd., Suite 1650
Chicago, IL 60604
(312) 986-1984

*Counsel for Amicus Curiae,
Whistleblower & Source Protection
Program (WHISPeR), ExposeFacts*

## CORPORATE DISCLOSURE AND NOTICE OF AFFILIATED ENTITIES

The Whistleblower and Source Protection Program (WHISPeR) at ExposeFacts is an independent, non-partisan, and non-profit program of the Institute for Public Accuracy ("IPA"), which is registered under 26 U.S.C. 501(c)(3), and does not issue stock or have any publicly held affiliates.

Dated: April 21, 2025

                                                          Respectfully submitted,

                                                          /s/ *Leonard C. Goodman*
                                                          Leonard C. Goodman
                                                          Angela J. Reaney
                                                          GOODMAN LAW OFFICE
                                                          53 W. Jackson Blvd., Suite 1650
                                                          Chicago, IL 60604
                                                          (312) 986-1984
                                                          lcgoodman@rcn.com

                                                          *Counsel for Amicus Curiae,*
                                                          *Whistleblower & Source Protection Program*
                                                          *(WHISPeR), ExposeFacts*

i

Table of Contents

INTRODUCTION AND INTEREST OF AMICUS CURIAE .............................................1

ARGUMENT ....................................................................................................................2

    I.   Lawsuits arising from journalistic source communications have significant chilling effects on public participation and are an affront to the public policy concerns that anti-SLAPP laws seek to address.........................................................2

    II.  Disclosures of non-public information to news media outlets by company insiders with concerns about the impact of their employers' potentially unlawful conduct on public health and safety qualify as protected activity under anti-retaliation provisions of federal and state whistleblower statutes.............................5

    III. Anti-SLAPP statutes advance legitimate state interests in policies that promote various types of public participation, irrespective of whether the conduct also qualifies as protected whistleblower activity or rises to the level of constitutionally protected First Amendment activity. .................................................6

CONCLUSION ..................................................................................................................7

Table of Authorities

Cases

*Chambers v. Dept. of Interior*, 602 F.3d 1370, 1379 (Fed. Cir. 2010) ............................6

*Dep't of Homeland Sec. v. MacLean,* 574 U.S. 383 (2015)..............................................6

*Garrison v. LA,* 379 U.S. 64, 74-75 (1964) .....................................................................6

*Mullen v. Meredith Corp.*, 271 Or. App. 698, 705 (2015)................................................7

*N.Y. Times v. Sullivan,* 376 U.S. 254, 270 (1964)..........................................................3,6

*Pickering v. Dep't of Education,* 391 U.S. 563 (1968) .....................................................6

*Snyder v. Phelps,* 562 U.S. 443, 451 (2011) ....................................................................6


Statutes

5 U.S.C. § 2302 .................................................................................................................6

10 U.S.C. § 1034 ...............................................................................................................6

10 U.S.C. § 4701 ...............................................................................................................6

12 U.S.C. § 922  ................................................................................................................6

18 U.S.C. § 1514A  ...........................................................................................................6

31 U.S.C. § 3730  ..............................................................................................................6


Other Authorities

Issam Ahmed, *'Process Is the Punishment': The Rise of SLAPP Suits in the US,*
    BARRON'S (Feb. 25, 2025)...........................................................................................3

Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S.
    Why Do They Fail?* N.Y. TIMES (Dec. 28, 2023).......................................................5

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

The Whistleblower and Source Protection Program (WHISPeR) at ExposeFacts is an independent, non-partisan, and non-profit program of the Institute for Public Accuracy ("IPA") that facilitates investigative journalism by providing legal representation to media sources and whistleblowers with a focus on human rights and civil liberties.

Since 2015, WHISPeR has fulfilled that mission, in part, by offering pro bono legal services to whistleblowers who undertake substantial personal risk to expose institutional misconduct, wrongdoing, and related matters of significant public interest to the press. In that capacity, WHISPeR has acquired considerable expertise on the rise of Strategic Lawsuits Against Public Participation ("SLAPPs") and other legal tactics—colloquially referred to as "lawfare"—that well-resourced plaintiffs can wage against ordinary citizens for publicly disclosing information or raising concerns that are antagonistic to their interests.

As explained herein, the unfortunate reality is that SLAPPs are remarkably effective at suppressing information that ought to be the subject of thorough investigative reporting and robust democratic debate. In addition to perpetrating a grave injustice on well-meaning citizens who are effectively silenced (or "SLAPPed" with a lawsuit for speaking truth to power), the rising prevalence of SLAPP litigation is especially concerning because of its tendency to conceal or obfuscate critically important public health and safety issues—and the significant chilling effects of these problematic lawsuits on protected speech, public participation, petitioning activity, and other meaningful aspects of civic engagement in a well-functioning deliberative democracy.

Moreover, although 35 states have enacted anti-SLAPP legislation since 1989, retaliatory lawsuits against journalists and their sources continue to proliferate at an alarming rate—a trend that is likely attributable to the extraordinary capacity of complex litigation to threaten, intimidate, harass and overwhelm all but the most sophisticated of targets.

1

For these reasons, WHISPeR has a particularly strong and compelling interest in the proper adjudication of cases involving the substance, scope, and validity of state anti-SLAPP laws.

Because federal courts rarely have the occasion to pass upon the merits of a properly asserted anti-SLAPP defense—the Court's decision in this case could have a profound impact on whistleblowers, investigative reporters and their sources, and other likely targets of SLAPP litigation. Accordingly, WHISPeR implores this Court to consider the disastrous public policy implications of allowing a SLAPP to proceed on allegations arising from journalistic source communications—particularly in a case where the substance of those disclosures led to groundbreaking investigative reporting in a prominent newspaper of national record and served as a catalyst for meaningful political action and policy interventions that effectuate social justice and progress.

## ARGUMENT

I. **Lawsuits arising from journalistic source communications have significant chilling effects on public participation and are an affront to the public policy concerns that anti-SLAPP laws seek to address.**

A free and independent press is essential to the functioning our democracy, which is founded upon on "the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times v. Sullivan,* 376 U.S. 254, 270 (1964). It is therefore regrettable that SLAPPs against media outlets, reporters and sources communications are on the rise, despite legislative efforts to curb these abusive lawsuits at the state level.

Investigative reporters rely on sources to inform the citizenry about matters of public concern. Unfortunately, however, SLAPP suits are an extraordinarily effective mechanism for intimidating sources and thwarting journalists' ability to report on facts and information that threatens powerful interests. That SLAPPs often succeed in achieving that objective, however,

2

has less to do with the merits of legal claims asserted therein than the inherent challenge of defending oneself against serious accusations in costly and burdensome litigation brought by institutional plaintiffs with virtually unlimited resources. *See* Issam Ahmed, *'Process Is the Punishment': The Rise of SLAPP Suits in the US*, Barron's (Feb, 25, 2025) (explaining that the majority of SLAPPs suits "target… ordinary individuals—from those posting negative reviews to local bloggers exposing shady business practices."), *available at* https://www.barrons.com/news/process-is-the-punishment-the-rise-of-slapp-suits-in-the-us-e720c992. *Id.*

From a practical standpoint, the bare minimum protections conferred by state anti-SLAPP laws provide little comfort to unrepresented SLAPP defendants—or even the privileged few who are able to retain counsel. For the latter group, the best-case scenario is a timely dismissal, along with an award for attorneys' fees and costs. And while fee-shifting provisions may deter some would-be plaintiffs from filing frivolous lawsuits, the mere prospect of recovering legal fees hardly serves as an incentive for individual litigants to dedicate time and resources towards mounting a successful defense. As a result, many SLAPP defendants capitulate to their adversaries' demands—either out of necessity, because they have no other viable option—or as a matter of basic self-preservation in light of the default cost-benefit analysis and risks. Accordingly, even SLAPP suits with no apparent basis in fact or law can effectively silence or prevent and dissuade conscientious insiders from disclosing critically important facts and information to the relevant authorities or engaging with the press on matters of significant public concern.

When journalists cannot obtain and report on information that should be made available to the public, accountability suffers, and bad outcomes ensue. And though all SLAPP suits categorically seek to suppress the free flow information, those that specifically target journalistic

3

source communications have particularly deleterious chilling effects on speech that is indisputably public in nature, on issues that reporters cover in a public forum (*e.g.,* news media), precisely because the substance of those disclosures concerns matter is of public interest. To the extent SLAPPs arise from a wide range of circumstances and contexts that may warrant different analytical lenses, lawsuits arising from journalistic source communications and related disclosures to news media outlets stand out as a particular affront to the public policy concerns that anti-SLAPP laws seek to address and should therefore warrant the highest degree of judicial discernment, skepticism, and scrutiny.

\*    \*    \*

The principal question in this case is whether an employer can sue its former employee for allegedly disclosing company trade secrets and/or confidential business information to an investigative journalist, which led to the publication of a highly critical article about social compliance audits and child labor issues in the New York Times. *See* Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?,* N.Y. Times (Dec. 28, 2023).

At first glance, this basic fact pattern appears to implicate issues which may not seem conducive to resolution at the pleadings stage (*e.g.,* fact questions surrounding the substantive subject matter of information that the employee disclosed to the press, whether those disclosures implicate a valid legal interest in company trade secrets or enforceable confidentiality obligations, and whether any that information was publicly disclosed in the published article, if so, etc.).

In the anti-SLAPP context, however, Courts are tasked with setting aside all these and engaging in a threshold inquiry concerning the defendant's claim of statutory immunity, in addition to any other affirmative defenses raised in a motion to dismiss. If the allegedly actionable conduct described in the complaint can fairly be characterized as protected activity under federal

4

and state whistleblower statutes, the First Amendment, or the broader range of activities covered by applicable anti-SLAPP laws, the case must be dismissed at the outset.

**II. Disclosures of non-public information to news media outlets by company insiders with concerns about the impact of their employers' potentially unlawful conduct on public health and safety qualify as protected activity under anti-retaliation provisions of federal and state whistleblower statutes.**

Whistleblower statutes cover a wide range of activities that protect individuals who report on suspected violations of state and federal law from unlawful retaliation. While the various types of unlawful activities giving rise to anti-retaliation protections for whistleblowers who report violations covers many different substantive areas of law and vary from one jurisdiction to the next—most if not all such provisions operate on the same key concepts and statutory definitions.

For example, "whistleblowing activity" generally refers to the reporting or disclosure of non-public information relating to conduct which the whistleblower reasonably believes is illegal, fraudulent, or otherwise presents a substantial threat of harm to general public welfare—even if that belief turns out to be mistaken.[1] And courts have recognized that media outlets are a legitimate recipient of whistleblower disclosures. *See, e.g., Pickering v. Dep't of Education,* 391 U.S. 563 (1968) (protecting the right of government employees to speak to the media on areas of public concern); *Dep't of Homeland Sec. v. MacLean,* 574 U.S. 383 (2015) (federal employees can lawfully disclose misconduct to the news media); *Chambers v. Dept. of Interior*, 602 F.3d 1370, 1379 (Fed. Cir. 2010) (protecting employee's media disclosures).

---

[1] *See generally,* 5 U.S.C. § 2302(b)(8)(B) (Whistleblower Protection Act of 1989 and its amendments); 18 U.S.C. § 1514A(a)(1) (Sarbanes-Oxley Act); 10 U.S.C. § 1034(c)(2) (Military Whistleblower Protection Act); 10 U.S.C. § 4701(a)(1) (whistleblower protections for government contractors); Dodd-Frank Act, 12 U.S.C. § 922 (protections for SEC whistleblowers); 31 U.S.C. § 3730(h)(1) (False Claims Act).

The anti-retaliation provisions in these statutes are broadly construed to protect whistleblowers from a wide range of adverse employment actions such as wrongful terminations, industry blacklisting, and retaliatory lawsuits premised upon protected whistleblowing activity.

SLAPPs that target whistleblowers for conveying information and concerns to news media outlets relating to an employer's potentially illegal conduct are a form of unlawful whistleblower retaliation, which is itself actionable under federal and state law.

### III. Anti-SLAPP statutes advance legitimate state interests in policies that promote various types of public participation, irrespective of whether the conduct also qualifies as protected whistleblower activity or rises to the level of constitutionally protected First Amendment activity.

The First Amendment has long been understood as implicating the rights of both citizens and member of press to speak freely on matters of public concern, *see N.Y. Times v. Sullivan,* 376 U.S. 254, 299 (1964) (Goldberg, concurring)—without having to fear the risk of potential liability arising from retaliatory lawsuits. *Snyder v. Phelps,* 562 U.S. 443, 451 (2011) (speakers protected from tort liability when engaging in speech on matters of public concern); *see also Garrison v. LA,* 379 U.S. 64, 74-75 (1964) ("For speech concerning public affairs is more than self-expression; it is the essence of self-government.").

This Court need not decide whether the conduct at issue in this case implicates constitutionally protected First Amendment rights, however, because anti-SLAPP statutes cast a significantly wider net that reflects a state's legitimate policy interest in promoting public participation—and regulating abusive litigation that runs counter to that interest—irrespective of whether the challenged conduct rises to the level of constitutionally protected activity or qualifies for protected status under any other source of applicable law.

The Oregon anti-SLAPP statute at issue here broadly applies to speech or conduct "in connection with an issue of public interest," regardless of whether that speech or conduct is

6

ultimately actionable. *Mullen v. Meredith Corp.*, 271 Or. App. 698, 705 (2015) (whether or not conduct was actionable is not relevant to the question of whether the anti-SLAPP statute applies).

The conduct at issue in this lawsuit clearly satisfies that standard.

## CONCLUSION

In sum, WHISP(e)R urges this Court to grant the pending anti-SLAPP motion and dismiss the case, which is premised upon a concerned employee's communications with investigative reporters on matters of significant public concern. The case presents such a clear-cut example of the types of litigation which anti-SLAPP laws seek to prevent that no other result can be sustained.

Dated: April 21, 2025

Respectfully submitted,

/s/ *Leonard C. Goodman*

Leonard C. Goodman
Angela J. Reaney
GOODMAN LAW OFFICE
53 W. Jackson Blvd., Suite 1650
Chicago, IL 60604
(312) 986-1984
lcgoodman@rcn.com

*Counsel for Amicus Curiae,*
*Whistleblower & Source Protection Program (WHISPeR), ExposeFacts*