# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UL LLC,<br><br>    Plaintiff,<br><br>v.<br><br>JOSHUA CALLINGTON,<br><br>    Defendant. | Case No. 1:24-cv-05631<br><br>Hon. Andrea R. Wood |

## PLAINTIFF UL LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A LIMITED PRELIMNINARY INJUCTION

James M. Witz
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone:   312.795.3246
Facsimile:   312.277.9416
E-mail:   jwitz@littler.com

Kevin E. Griffith (*admitted pro hac vice*)
Emily E. Levy (*admitted pro hac vice*)
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH 43215
Telephone:   614.463.4210
Facsimile:   614.737.9135
E-mail:   kgriffith@littler.com
          elevy@littler.com

<u>Dated</u>:   May 20, 2025

## I. **INTRODUCTION**

Consistent with the Court's guidance, Plaintiff UL LLC ("UL") seeks a *limited* preliminary injunction to protect the further use or disclosure of UL's confidential documents during the pendency of this lawsuit. Throughout his employment with UL as a social responsibility Team Leader auditor, Defendant Joshua Callington secretly took possession of almost *100,000* (discovery in this case may reveal an even higher number) of UL's internal business documents, including huge volumes of its electronically stored information ("ESI"). It is undisputed that he has disclosed at least some of the documents publicly, including to the *New York Times*. He and his counsel have represented to the Court that he plans to continue to disclose the documents. This motion for limited preliminary injunction seeks simply to prevent further unauthorized and unlawful dissemination of UL's documents.

This Court has noted that, at this early stage, it needs to see evidence that: (a) Callington took UL's internal documents without UL's authorization; (b) he actually possesses UL's documents; and (c) that such documents are confidential. With this motion, UL provides evidence to substantiate these assertions. UL establishes herein that Callington took personal possession of a massive amount of UL's internal business documents and ESI without UL's authorization or consent, that he was bound legally to protect the confidentiality of the documents and ESI, that his continued possession, use and disclosure of the documents breaches his contractual and other legal obligations, that UL lacks adequate remedy at law, it will be irreparably harmed absent injunctive relief, and that the public interest favors the injunction.

To protect UL's rights to its own documents and ESI, and to prevent present and future irreparable harm from Callington's use or disclosure of the UL documents and ESI he possesses and wishes to continue to use and disclose, UL respectfully requests a preliminary injunction order to:

1) Require Callington, within not later than 14 days after the Court's entry of an injunctive order, to produce to UL copies of any and all UL documents and ESI—and any other UL property, tangible or intangible—that is in his possession or under his control and that he acquired or took from UL through his employment or working-relationship with UL. This will reasonably allow UL to designate the documents and ESI as "confidential"—where needed and appropriate—under the Interim Document Preservation Non-Disclosure Order in place and/or under a final protective order that is put in place for this case; and

2) Restrain Callington from using, modifying, deleting, publishing, disseminating, or otherwise disclosing to any person or entity (except as required or allowed by law)—whether in hard copy or electronic form—any of UL's or its customers' or employees' confidential, proprietary, and trade secret information, business documents, ESI, personal identifying information, and any other property, tangible or intangible, that is in Callington's possession or under his control and which he acquired or took from UL through his employment or working-relationship with UL.

## II. PRELIMINARY STATEMENT

Although formal discovery has not begun in this litigation, UL gathered extensive evidence in connection with an internal investigation conducted with assistance from outside counsel. While much of that investigation is privileged, documents that Callington and his then-attorney, Michael Leonard, provided to UL during that time undeniably confirm how Callington secretly transferred thousands of UL's internal documents and ESI to himself electronically. He did so by using his personal Dropbox (cloud storage) account, the "forwarding" and Blind Carbon Copy ("Bcc") features in his work email account, and via personal USB storage devices plugged directly into his work laptop. Callington provided copies to UL—albeit only after repeated requests and demands made to him and his legal counsel—of approximately 76,000 documents he took from UL without its knowledge or approval. In other words, Callington continues to possess his own copies of roughly 76,000 documents.

That is only the beginning. Gaps remain in the copy set, and Callington and his then-counsel outright refused to return copies of many other UL documents. Callington continues to possess copies of the UL documents and ESI he transferred to himself. Callington's conduct has

2

violated contracts he entered into with UL, various UL policies and other contracts, and certain prohibitions and standards set forth in the code of conduct for the Association of Professional Social Compliance Auditors ("APSCA") (of which Callington was a member).

At least one obvious reason why Callington engaged in this massive misappropriation and still refuses to return UL's documents and ESI exists: Callington intends to continue to use and disclose UL's confidential business documents and ESI without any regard for any confidentiality contract and other legal obligations. This is why his current counsel has fought so hard to try to convince this Court to dissolve the interim confidentiality order the Court previously entered in this case. This also is why Callington's counsel refused to engage in meaningful discussions with UL's counsel over the terms of a standard and more fulsome protective order for this case, one patterned after the template protective order used in the Northern District, with several additions UL's counsel proposed to include in the order specific to this case. This is also why Callington filed an Anti-SLAPP motion, a first-of-its-kind maneuver to try to have UL's legal claims against on Callington's unlawful conduct dismissed, so Callington would not be under the jurisdiction of this Court and any protective orders it has or may issue.

Remarkably, Callington does not seek simply to disclose UL's documents in connection with a formal complaint to a governmental agency—which has always been permitted under the interim confidentiality order. No, Callington apparently desires to be able to disclose UL's internal and confidential business documents and ESI however and to whomever he wants, perhaps even (again) to the *New York Times*. In addition, during the last status conference with the Court, his counsel mentioned how Callington intends to provide some undisclosed types and amount of UL's documentation to an unnamed governmental official for an unstated purpose.

The problem with Callington's objective is that he completely disregards and will trample

all over UL's rights to develop, and its obligations to protect, its confidential business information. If allowed, and once UL's confidential business information is disclosed by Callington in the public domain, UL's competitors will be able—unfairly and without making the same time and financial investments UL has made—to gain competitive information, insights and advantages regarding, for example, how UL plans for, and how it conducts and reports findings on, social responsibility audits. This will include learning about UL's internal policies, practices, procedures, approaches, workflows, proprietary tools, and non-public information about UL's customers--all of which have combined to position UL as an industry leader in the social responsibility audit field. Such disclosure, on Callington's whim, would inflict irreparable harm on UL.

### III. STATEMENT OF FACTS

#### A. UL's Responsible Sourcing Business

UL provides, among other services, social responsibility compliance audits and inspection services to its customers in many industries. (Compl. ¶ 17). Customers retain UL and its Responsible Sourcing personnel to conduct confidential social responsibility compliance assessments and audits of their suppliers. Generally, these audits assess workplace conditions within a customer's supply chain, such as whether the physical conditions of the suppliers' plants or facilities, and treatment of their employees, comply with safety requirements. (Exhibit 1, Sperber Decl. ¶ 4). UL distinguishes itself from its competitors in a number of critical ways and strives to meet the highest standards for planning, conducting, and reporting findings of the audits it conducts. (*See generally* Exhibit 2, VanHagen Decl. at ¶ 4). UL has expended a great deal of time, brainpower, and financial resources to develop its own auditor training programs, auditing policies, quality standards and tools, grading matrix, workplace assessment criteria, workflow processes, and levels of review, all to build and maintain a competitive advantage in the social responsibility audit field. (*Id*. at ¶ 4).

UL's audit services require both customers and their suppliers to provide confidential business information to UL's auditors. (Ex. 1, Sperber Decl. ¶ 6). This information is then subject to and governed by non-disclosure agreements that UL enters into with its customers and their suppliers. (*Id*. at ¶ 16). The confidential information generally includes, but is not limited to, employee and management interview notes, descriptions and internal photos of the suppliers' facilities, internal processes, personnel files and employment records, payroll records, timecards, citizenship verification records, and workplace safety polices, practices and status of machinery and equipment. (*See generally* Ex. 1, Sperber Decl. ¶ 6; *see generally* Ex. 2, VanHagen Decl. ¶ 5).

UL's auditors review and compile this information and other confidential information obtained from customers and their suppliers to prepare a draft of an audit report, using the processes, templates, guidelines and checklists provided by UL to prepare the report. (Ex. 1, Sperber Decl. ¶ 6). The audit report is then reviewed by an internal UL review team to ensure compliance with the process and to analyze the findings against a proprietary grading matrix. (*See generally id.* at ¶ 7). Following the internal review and resolution of any outstanding issues, the report is provided to UL's customer and, in some instances, the audited supplier. (*Id*.). The report itself is marked confidential, stating: "This report contains privileged or confidential information and cannot be distributed without Client consent." (*Id*. at ¶ 9). UL has specific confidentiality policies, non-disclosure agreements with its customers, and confidentiality agreements with its auditors to further ensure the information is maintained as confidential. (*Id.* at ¶ 16). Further, the information is expected to be maintained on secure systems and not to be shared without receiving prior permission from UL.

> B. <u>Callington's Employment With UL And Confidentiality Agreements</u>

UL hired Callington as an independent contract auditor in May 2017 and later as a full-time employee, Team Leader CRS, in or around April-May 2019. (Compl. ¶¶ 25, 35). In these

roles, Callington was trained on, and had extensive access to, confidential business information and trade secrets of UL, UL's customers, and UL's customers' suppliers, as described above. (*See also* Compl. ¶¶ 19, 43, 48). For this reason, UL required that Callington agree to various confidentiality covenants. Callington signed three separate agreements (referred to in the Complaint as "Independent Assessment Agreements"), in which he expressly agreed to not voluntarily disclose UL and its customers' confidential information (as defined therein). (Compl. Exs. 1-3). Similarly, when UL hired Callington as a Team Leader CRS, UL required, as a condition of his employment, that Callington agree to a Confidentiality and Invention Assignment Agreement ("Confidentiality Agreement"). Specifically, Callington agreed to (1) "keep all Confidential Information in strict confidence and ... not disclose it without [UL]'s prior written permission," and (2) upon termination, to "immediately deliver to [UL] ... all Confidential Information and all documents ... that include Confidential Information" in Callington's possession. (Compl. ¶ 34; Compl. Ex. 4).

      **C.**      **Callington's Unauthorized Disclosure Of UL's And UL's Client Documents To The *New York Times* And UL's Investigation**

Despite Callington's agreements to maintain the confidentiality of UL's and its customers' confidential business information and documents, Callington contacted a reporter at the *New York Times* and disclosed to her a large volume of UL's confidential business documents and ESI he wrongfully took and disclosed to the *New York Times* without UL's knowledge and consent. (Compl. ¶¶ 3, 53–58; *see generally*, Exhibit 3, Malhotra Decl. ¶ 5(C); Exhibit 4, Callington's Former Counsel and Malhotra Emails Related to Document Requests). The reporter then wrote an article with information and documents obtained directly from Callington, which identified UL's customers by name. (Compl. ¶¶ 60–63). After the article was published, UL investigated and determined that Callington transferred to himself, over a period of at least four years, a massive

number of internal documents and ESI. He transferred the documents and ESI from UL's computer system to Callington's personal email and cloud accounts and USB dives, including, but not limited to, tens and tens of thousands of documents and emails, and an unknown number of photos taken during supplier audits conducted by Callington. (*Id*., at ¶¶ 49–52; Ex. 3, Malhotra Decl. ¶ 5(A)-(B); Exhibit 5, Malhotra and Callington's Former Counsel Emails Related to Callington's Transmission of Documents to Sidley). Importantly, much of the evidence of Callington's theft comes *from Callington himself*—he provided UL copies (but not originals) of some (but not all) of the documents he took. Callington continues to possess an unknown number of confidential documents and ESI taken from UL. (Compl. ¶ 69; *see generally* Ex. 3, Malhotra Decl. ¶ 5(A)-(B); Ex. 5, Malhotra and Callington's Former Counsel Emails Related to Callington's Transmission of Documents to Sidley).

## IV. PROCEDURAL BACKGROUND

On July 3, 2024, UL filed this lawsuit against Callington. (Doc. No. 1). On October 24, 2024, the Court entered an Interim Document Preservation Non-Disclosure Order while the parties discussed terms for an order for the remainder of the lawsuit. (Doc. Nos. 16 and 17). The parties could not reach an agreement on terms for a permanent order. Therefore, on November 15, 2024, UL filed a Motion for Entry of a Confidentiality Order, and Callington filed a Motion to Dissolve Interim Protective Order (which UL opposed). (Doc. Nos. 22 and 23). UL's Motion for Entry of a Confidentiality Order proposed for the Court enter an order modeled on this Court's uniform protective order and with a provision requiring Callington to produce copies of all the UL documentation in his possession to allow UL to designate, where appropriate, documents as "Confidential" under the protective order and for use only in this case. (Doc. No. 22). On May 5, 2025, the Court instructed UL to file a motion for a limited preliminary injunction. (Doc. No. 55).

V.  **LAW AND ARGUMENT**

A preliminary injunction is warranted when the moving party demonstrates that: "(1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2) legal remedies are inadequate; and (3) its claim has *some* likelihood of success on the merits." *Eli Lilly & Co. v. Aria Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018) (emphasis added). After this showing, the court balances on a 'sliding scale' the "harms to the moving party, other parties, and the public." *Id.* "The greater the movant's likelihood of success, 'the less strong a showing' the movant 'must make that the balance of harm is in its favor.'" *Epic Fresh Produce, LLC v. Olympic Wholesale Produce, Inc.*, No. 17-CV-8381, 2017 WL 6059971, at *3 (N.D. Ill. Dec. 7, 2017) (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003)).

A.  **UL Will Prevail On Its Breach Of Contract Claim**

UL is likely to succeed on the merits of its breach of contract claim.[1] To succeed on a breach of contract claim, a plaintiff must demonstrate: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach by the defendant; and (4) damages caused by the breach. *In re Dealer Mgmt. Sys. Antitrust Litig.,* 680 F. Supp. 3d 1011, 1020 (N.D. Ill. 2023).

1.  *Callington's Contracts With UL Are Valid And Enforceable*

While working for UL, Callington entered into several valid and enforceable contracts. Specifically, Callington entered into three separate Independent Assessor Agreements ("IAA"), the most recent one being on May 14, 2018. (Compl., Ex. 1-3). Each IAA contains confidentiality

---

[1] Because the Court's articulated concerns related primarily to UL's assertions that Callington took documents and that such documents are confidential to UL, UL focuses this limited motion on the two causes of action most related to those issues, breach of contract and conversion. The Court need not address UL's likelihood of success on all of its causes of action in order to award injunctive relief. *See, e.g., Dumanian v. Schwartz*, No. 19 C 6771, 2022 WL 2714994, at *12 n.8 (N.D. Ill. July 13, 2022) (citation omitted).

provisions, which remain in effect, prohibiting Callington from voluntarily disclosing confidential information he obtained from UL or its clients. (Compl., Ex. 3 at ¶ 14.4). Callington subsequently entered into a Confidentiality and Invention Assignment Agreement ("Confidentiality Agreement") as a condition of his employment with UL. In this Confidentiality Agreement, Callington agreed: (i) to keep UL's Confidential Information in strict confidence; (ii) to use such information "solely as necessary for the performance of my duties as a UL employee and not for the benefit of any third parties;" and (iii) to return to UL "immediately upon demand" all Confidential Information that was in his possession following the end of his employment. (Compl., Ex. 4 at ¶¶ 1-2). Callington has made no serious attempt during this litigation to argue that the IAA's are not valid or enforceable.[2] That is because the IAA's are reasonable in scope, supported by mutual consideration, and otherwise constitute valid and enforceable contracts. *See infra*, FN 4 (citing cases finding confidentiality agreements reasonable in scope). Indeed, UL duly compensated Callington in consideration for his independent auditing services and his agreement to maintain confidentiality over UL's and its clients' confidential information.

The Confidentiality Agreement is also enforceable. Callington agreed to the terms of the Confidentiality Agreement as a condition of his employment when he signed his offer letter in April 2019.[3] The Confidentiality Agreement is therefore supported by valuable consideration—hiring, continued employment, compensation, and employment benefits. *Duberville v. WMG, Inc.,* 2015 U.S. Dist. LEXIS 4157, *43 (N.D. Ill. Jan. 13, 2015) (recognizing that confidentiality

---

[2] Callington's sole argument in his Motion to Dismiss was that the Confidentiality Agreement was never executed and would be "arguably" unenforceable even if it had been. As further discussed herein, these arguments fail.

[3] To the extent Callington argues that the agreement is unenforceable because it post-dates his signature, that argument fails. UL's former system populates the letter date automatically. After Callington signed his offer letter, through the "click and accept system" on April 30, 2019, due to Callington's travel schedule and his inability to complete his I-9, the offer letter was updated with a new start date, but Callington was not required to re-sign the letter.

agreement did not require separate consideration because it was condition of plaintiff's employment). The fact that Callington did not sign the Confidentiality Agreement is of no consequence, as it was undeniably incorporated into his offer letter and a condition of his employment. Indeed, Callington's offer letter expressly provides that his employment offer is subject to "[e]xecution of the attached Confidentiality and Invention assignment Agreement." *See, e.g., AutoMed Techs., Inc. v. Eller,* 160 F. Supp. 2d 915, 919 (N.D. Ill. July 11, 2001) (unsigned confidentiality agreement attached to offer letter was enforceable regardless of whether employee actually signed both pieces of paper because letter incorporates non-competition agreement, employee was already subject to similar restrictive covenants in prior agreement, and employee worked for two additional years); *see also Landmark Properties, Inc. v. Architects Int'l-Chicago*, 172 Ill. App. 3d 379, 383, 526 N.E.2d 603 (1988) (Illinois courts have held written, unsigned contract is enforceable when parties acted in way that is consistent with written agreement).

As in *Eller*, Callington was already subject to confidentiality provisions in not one or two, but three IAAs. He later agreed, as a condition of his employment, to the Confidentiality Agreement, and proceeded to work for UL for over five additional years. As this Court recognized in *Eller*, this course of dealing suggests that Callington not only understood, but agreed to and accepted the terms of the Confidentiality Agreement.

While Callington argued in his Special Motion to Strike or Dismiss (Doc. Nos. 29 and 31) that the Confidentiality Agreement is "arguably" not reasonably limited in scope, such a determination at this stage—before facts are developed through discovery—is premature. *See LQD Bus. Fin., LLC v. FundKite, LLC,* No. 19 C 4416, 2020 U.S. Dist. LEXIS 23210, *12 (N.D. Ill. Feb. 11, 2020) (citing *Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 U.S. Dist. LEXIS 183037, at *21 (N.D. Ill. Oct. 25, 2018) ("At the preliminary injunction stage, the specific facts of

the case are still being developed by the parties. It is thus typically inappropriate to conclude such a claim is hopeless on a motion for preliminary injunction.")).[4]

### 2. *UL Performed Under The Contracts And Callington Breached His Contracts With UL*

UL substantially performed its obligations under the IAAs and the Confidentiality Agreement by employing Callington for over five years and duly compensating him, providing him benefits, and otherwise satisfying all contractual duties to him under the IAAs and Confidentiality Agreement. Callington has—and continues—to breach the IAAs and Confidentiality Agreement. First, the Confidentiality Agreement requires Callington to return all confidential information and documents to UL upon termination of his employment. He has not done so; he has provided copies of some 76,000 documents (but kept the originals) and has refused to return others altogether. This alone demonstrates breach. Second, the IAAs and Confidentiality Agreement expressly prohibit Callington from voluntarily disclosing UL's (and its clients') confidential information without its written permission. Callington blatantly breached these provisions by, *inter alia*, disclosing UL (and its clients') confidential information and business documents to a third party (i.e., the *New York Times*), and failing to use UL's confidential information "solely as necessary for the performance of [his job] duties." As a direct and proximate

---

[4] But, even if the Court were inclined to engage in a reasonableness analysis at this stage, the IAAs and the Confidentiality Agreement are reasonable in scope, and in turn, enforceable. To determine reasonableness, it is necessary to consider "whether enforcement of the covenant will injure the public, whether enforcement will cause undue hardship to the promisor and whether the restraint imposed by the covenant is greater than is necessary to protect the interests of the employer." *Moss Holding Co. v. Fuller,* No. 20-cv-01043, 2020 U.S. Dist. LEXIS 39068, **23-24 (N.D. Ill. March 6, 2020) (citation omitted). The covenants at issue in this case are substantially similar to provisions that Illinois courts have upheld in circumstances where an employee, like Callington, developed proprietary information during their employment. *See Moss*, 2020 U.S. Dist. LEXIS 39068, at *24 (plaintiff demonstrated likelihood of success on breach of confidentiality agreement with unlimited duration); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 865 (N.D. Ill. 2001) (finding provision prohibiting employee from disseminating proprietary information "at any time after Employee leaves the Company" was reasonable and enforceable); *Coady v. Harpo, Inc.,* 308 Ill. App. 3d 153, 162 (1st Dist. Ct. App. Sept. 30, 1999) (concluding that confidentiality agreement with unlimited geographic and durational limitations was reasonable and enforceable).

cause of Callington's breaches, UL has and will continue to suffer irreparable harm in the form of loss of customer goodwill and reputation, and loss of its confidential and trade secret information. Based on the above, UL is likely to succeed on the merits of its breach of contract claim.

### B. UL Will Prevail On Its Conversion Claim

To establish its conversion claim, UL must establish: (1) a right to the property; (2) an absolute, unconditional right to immediate possession of the property; (3) it demanded possession of the property; and (4) defendant took control or claimed ownership of the property wrongfully and without authorization. *MacNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 796–97 (N.D. Ill. 2010) (quoting *Edwards v. City of Chi.,* 389 Ill. App. 3d 350, 329 Ill.Dec. 59, 905 N.E.2d 897, 899–900 (2009)) (internal quotations omitted). "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *MacNeil Auto.*, 715 F. Supp. 2d at 796–97 (quoting *Horbach v. Kaczmarek,* 288 F.3d 969, 978 (7th Cir. 2002)); *Ill. Cent. R.R. v. Belcher,* No. 2:22-cv-353, 2023 U.S. Dist. LEXIS 198688, at *8 (N.D. Ind. Nov. 6, 2023) (plaintiff likely to succeed on merits of conversion claim where defendant stole source code and computer files).

During his employment with UL, Callington acquired access to UL documents and information necessary to conduct and complete audits. UL's investigation into Callington's wrongdoing revealed that he transferred *tens and tens of thousands* of documents to his personal Dropbox (cloud storage) account, consisting of UL's confidential audit materials, process documents and forms, and UL training materials. UL unquestionably has a right to—including an absolute and unconditional right to immediate possession of—its confidential information and business records that Callington transferred to himself. After learning that Callington transferred thousands of UL and UL customers' and suppliers' documents to his personal file system and shared these documents with the *New York Times*, UL demanded immediate return of all the

12

documents and information he took and in his possession; Callington refused. Simply, Callington wrongfully retained—and continues to possess—UL's property for his own use and/or in a manner inconsistent with UL's ownership of and rights in that property and with the intent to permanently deprive UL of that property and/or negatively or irreparably altering that property so as to devalue or diminish that property and/or its nature/status as confidential.

### C. No Adequate Remedy At Law And Irreparable Harm

UL will continue to suffer irreparable harm for which there is no adequate remedy at law without the requested preliminary injunctive relief. The Confidentiality Agreement expressly anticipates the need for injunctive relief and provides that "any breach or threatened breach of this Agreement by me may result in irreparable harm to UL or its affiliates, business partners or clients. As such, UL and/or its affiliates are entitled to injunctive relief to enforce this Agreement." (Compl., Ex. 4 at PAGEID #56). *See Moss Holding,* No. 20-cv-01043, 2020 U.S. Dist. LEXIS 39068, at \*\*26-27 (plaintiff satisfied its burden to show irreparable harm and inadequate remedy at law, in part, because confidentiality agreement anticipated need for injunctive relief).

Moreover, UL suffered and will continue to suffer intangible damages, such as loss of customer goodwill, reputational harm, and damage to its competitive position, which cannot be quantified. *Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"); *Foodcomm Int'l v. Barry,* 328 F.3d 300, 303 (7th Cir. 2003) (granting preliminary injunction on breach of fiduciary duty claim and recognizing that complete loss of client relationships constitutes irreparable injury). *See Moss Holding,* No. 20-cv-01043, 2020 U.S. Dist. LEXIS 39068, at \*\*26-27 ("Indeed intangible harms can include loss of a competitive position and losing customers."); *Mickey's Linen v. Fischer,* No. 17 C 2154, 2017 U.S. Dist. LEXIS 145513, \*61 (N.D. Ill. Sept 8, 2018) (recognizing that, in addition to lost sales and profits, other

intangible damages associated with such losses justify injunctive relief); *ABC Prods. v. Individuals*, No. 23 C 4131, 2024 U.S. Dist. LEXIS 67662, *11 (N.D. Ill. Jan. 9, 2024) (citing *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.")). Without the requested injunctive relief, UL's confidential business information, documents, and trade secrets will continue to be misappropriated and misused. UL will continue to suffer damage to its customer relationships, goodwill, and reputational harm that are impossible to ascertain or quantify at this preliminary stage.

### D. Balance Of Hardships And The Public Interest Weighs In Favor Of An Injunction

The balance of hardships heavily weighs in UL's favor. Indeed, as set forth above, UL will continue to suffer irreparable harm if Callington is not enjoined. On the other hand, Callington will suffer no harm by entry of a *limited* injunction requiring him to disclose and produce the documents and information still in his possession and preventing further dissemination of UL's confidential documents and trade secret information. Requiring Callington to simply comply with his contractual and legal obligations does not prejudice or harm Callington. Indeed, the relief that UL seeks would not even require Callington to fully relinquish possession over the UL documents and ESI in his possession but would, instead, simply allow UL to review and designate copies of the documents. This highly limited injunctive relief would enforce the provisions of Callington's contracts and confidentiality covenants with UL and will advance rather than disserve the public interest. Protecting trade secret and confidential information also advances the public interest, and courts within this District have recognized a public interest in enforcing valid contracts and protecting trade secret and confidential information. *See, e.g., Groupon, Inc. v. Shin,* No. 21 C 6082, 2022 U.S. Dist. LEXIS 2685, **19-20 (N.D. Ill. Jan. 6, 2022) (recognizing the public has

a "compelling interest in upholding valid and reasonable contracts" and "favors the protection of trade secret and confidential information gathered and developed by a company at significant expense."); *Brown & Brown, Inc. v. Ali,* 494 F. Supp. 2d 943, 955 (N.D. Ill. June 25, 2007) ("Courts in this District have recognized that the public interest is served by enforcing valid contracts" and citing cases). Accordingly, the balance of the hardships and public interest weigh in favor of the issuance of injunctive relief.

## VI. <u>CONCLUSION</u>

The factual record is undisputed: without any express or implied authority from UL, Callington transferred to his personal email and Cloud accounts, and USB drives, tens of thousands of documents and emails from UL's internal computer system. He also disclosed some of them to a *New York Times* reporter. After numerous requests, Callington provided copies of some documents and ESI he took from UL. But he admits he did not return copies of all the UL documents and ESI he took, and there as gaps of missing documents and emails in the tranches of documents and ESI he did return. Accordingly, UL respectfully requests a preliminary injunction order to:

> 1.     Require Callington, within not later than 14 days after the Court's entry of an injunctive order, to produce to UL copies of any and all UL documents and ESI—and any other UL property, tangible or intangible—-that is in his possession or under his control and that he acquired or took from UL through his employment or working-relationship with UL. This will reasonably allow UL to designate the documents and ESI as "confidential"—where needed and appropriate—under the Interim Document Preservation Non-Disclosure Order in place and/or under a final protective order that is put in place for this case; and

> 2.     Restrain Callington from using, modifying, deleting, publishing, disseminating, or otherwise disclosing to any person or entity (except as required or allowed by law)—whether in hard copy or electronic form—any of UL's or its customers' or employees' confidential, proprietary, and trade secret information, business documents, ESI, personal identifying information, and any other property, tangible or intangible, that is in Callington's possession or under his control and which he acquired or took from UL through his employment or working-relationship with UL.

Respectfully submitted,

**UL LLC**


By: /s/ *James M. Witz*
One of Plaintiff's Attorneys

James M. Witz
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL  60654
Telephone:	312.795.3246
Facsimile:	312.277.9416
E-mail:	jwitz@littler.com

Kevin E. Griffith (*admitted pro hac vice*)
Emily E. Levy (*admitted pro hac vice*)
LITTLER MENDELSON, P.C.
41 South High Street, Suite 3250
Columbus, OH  43215
Telephone:	614.463.4210
Facsimile:	614.737.9135
E-mail:	kgriffith@littler.com
	elevy@littler.com

## **CERTIFICATE OF SERVICE**

I certify that I have, this 20th day of May, 2025, filed a copy of the foregoing document, *Plaintiff UL LLC's Memorandum in Support of its Motion for a Limited Preliminary Injunction*, electronically. Counsel of record for Defendant may access this filing through the Court's system.

/s/ James M. Witz
An Attorney for Plaintiff

4920-4276-2565.1 / 118575.1072