IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UL LLC,

    Plaintiff,

 -v-

JOSHUA CALLINGTON,

    Defendant.

Case No. 1:24-cv-05631
Hon. Andrea R. Wood

## DECLARATION OF JOSHUA CALLINGTON

I, JOSHUA CALLINGTON, declare pursuant to 28 U.S.C § 1746, as follows:

1. I am the named defendant in this action. I am located within the United States, I am over the age of 18 years, and I am fully familiar with the facts set forth herein. If called to testify as a witness in this action, I could and would testify to these same facts.

2. I am a professional Social Compliance Auditor. In that capacity, I have conducted more than 950 audits across manufacturing facilities in North America, evaluating compliance with labor laws, workplace safety standards, and ESG-related codes of conduct, and issued reports based on my findings.

3. Throughout my career—including before, during and after my employment with UL—I have largely relied on the same cloud-based applications

and web-based technologies to securely and efficiently manage, store, and organize email communications, audit files, photos, and correspondence. These tools include a registered domain (Callington.net), which was originally registered on April 27, 2004, and which I use to manage email communications in conjunction with a Google Workspace account—and a Dropbox account that I started using as my primary file storage and document ecosystem on August 26, 2012, approximately five years prior to working with UL.

4. These tools are integral to performing my auditing duties, and UL management was aware of their use from the moment I started working with the company as an independent contractor. Throughout the course of my independent contractor arrangement with UL, for example, all email communications, documents, and audit files related to my work for UL were directed to my Callington.net email address, which I routinely accessed and synched across all my electronic devices (*i.e.,* cell phone, laptop), none of which were issued by UL.

5. On or around May 17, 2017, I began working for UL's Responsible Sourcing Division as an independent contractor.

6. During my time as an independent contractor for UL, I regularly worked 70 or more hours per week, typically working six days per week, and traveling extensively. My starting wage was $350 per audit day. My audit work frequently required long hours on site, late-night reporting, and weekend travel to

remote manufacturing locations. Despite these demands, I maintained a consistent track record of thorough, timely, and honest reporting.

7. At some point in 2019, UL asked me to formalize the nature of our working relationship to a full-time salaried (W-2 employee) position. As I understood it, this change was a necessary formality due to the fact that I was working almost exclusively for UL on a full-time basis.

8. On or about May 13, 2019, I transitioned into a position as a salaried employee with the title Team Leader CRS and continued to perform substantially the same auditing functions as I had under the independent contractor arrangement. Upon information and belief, awarding me this new title enabled the company to designate me and other similarly situated auditors as "exempt" from overtime laws. The upshot is that I would no longer have to travel on Sundays, as I had been doing regularly under the independent contractor arrangement. My starting salary in that position was $71,175 per year.

9. As part of that transition, I also received a company laptop. I continued using my own cell phone, with UL contributing a part of the cost for that expense as part of my salaried compensation plan. The company laptop came with some standard software programs like Microsoft Office and Google Chrome, pre-installed, and enterprise security software that prevented users from downloading other software programs that were not already pre-installed on the laptop. Only the

company's tech department could install additional software programs like Dropbox, which I believe had to be approved by one of my managers.

10. To the best of my recollection, I sought and obtained all requisite approvals to have Dropbox installed on my company issued laptop by the company's IT Department, with management approval. I could not have installed the software myself because of the embedded security restrictions on the device. Although I don't remember the exact process that I went through with the first company-issued laptop, I do recall having to obtain management approval to continue using Dropbox with a later issued laptop or system upgrade, which always involved having the IT Department install any additional software.

11. Throughout the course of my tenure as a salaried employee of UL, I continued using Dropbox as I had before to back up and manage audit reports, field notes, photographs, and other work-related materials. I also continued to use my Callington.net domain email accounts for the archival of emails. When UL gave me a company email address (Joshua.Callington@ul.com), I used this address in conjunction with my Callington.net email accounts so that everything would continue to integrate seamlessly.

12. Upon information and belief, UL had ultimate control over setting all of the administrative access permissions for authorized uses of my company laptop and company-issued email address. Anything outside the ordinary scope of that

would have been approved for a specific purpose, as was done with respect to my use of Dropbox.

13. Based on my experience with the company, I believe, (and think it is fair to assume), that the IT/tech management department was actively engaged in monitoring the use of company issued devices such that anything suspicious, surreptitious, or beyond the scope of authorized usage would have been flagged and remediated or addressed in some way. On at least one occasion that I can specifically recall, someone from UL's Global Cyber Security did, in fact, inquire about my use of Dropbox, and asked whether the program was necessary to the performance of my job functions. To the best of my recollection, my explanation was a non-issue, and whoever was responsible for making such decisions deemed it perfectly appropriate.

14. Throughout the seven or so years that I worked for UL, nothing about my use of a central email client, or Dropbox, or any other aspect of how I managed digital workflows was ever flagged as a problem. These tools were absolutely essential to managing the volume of data generated from the nearly hundred or so audits I was conducting each year. Dropbox allowed me to store files in the cloud, free up local hard drive space, and to retain seamless access to archived content. Files saved into my Dropbox folder synced automatically to the cloud and across my other devices. Photographs taken during audits were uploaded from my iPhone and

appeared in the corresponding folder on my desktop via the Dropbox application. It was all part of the ordinary workflow and everyone who conducted these audits had a similar process for managing their content.

15. Many of my colleagues also used Dropbox, and other similar cloud-based applications--openly, and as a routine part of the audit workflow.

16. To the best of my knowledge, I never accessed or viewed any document or information on UL's computer systems or network that I was not authorized to access, or for any unauthorized purpose. Any and all files, documents, or records that I accessed or maintained throughout the course of my employment with UL was in the legitimate, proper, and ordinary course of carrying out my job responsibilities at UL.

17. On September 18, 2023, reporter Hannah Dreier of the New York Times published an article titled *The Kids on the Night Shift*. This article spoke of a child named Marcos Cux who, while working the third shift at a Perdue slaughterhouse, lost his left arm in a machine that was inadvertently reenergized as he was cleaning it.

18. I had previously audited Perdue facilities in Georgia and North Carolina and reported to UL management that the sheer size of these factories was too much to be covered in a single-day assessment. I was disappointed that our audits had failed to capture both a potentially preventable injury and the existence of child

labor. In response to the concerns submitted to UL management about these audits, I do not recall any substantive changes that were made.

19. I felt morally compelled to act, and so it was on September 20, 2023 that I sent an email to reporter Hannah Dreier of the New York Times articulating that "because auditors are not reprimanded for turning in false or incomplete reports and because these retailers have devised a system to sideline the better auditors and any critical findings, these conditions are allowed to flourish." It was from there that a conversation ensued with Ms. Dreier about the scope and duty of these audits to identify and report unsafe circumstances at these supplier factories to protect vulnerable populations and, more broadly, to inform the buying public of the absence of illegal or morally corrupt conditions which could otherwise dissuade them from purchasing these products.

20. In the Complaint, and in Court filings related to this case, UL has repeatedly implied that I never raised any of my concerns about audit integrity internally, before speaking to the New York Times. This is false. I did so on multiple occasions, for multiple reasons, including but not limited to the concerns that were specifically discussed in the New York Times' series on social audits' failure to identify child labor issues in manufacturing facilities throughout the United States. These concerns and my attempts to address the root causes and issues, internally, are documented in emails, field observation forms, and direct communications with UL

management, which were automatically synched and saved to my electronic devices via Dropbox and Google Workspace by default.

21. On December 28, 2023, the New York Times published an article titled *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?* The article quoted me by name and included information that the reporter had gleaned from audit documents I had disclosed to her, in order to validate my concerns.

22. On December 28, 2023, UL informed me that I was being placed on a period of paid suspension, pending an internal investigation into whether I had disclosed confidential or proprietary documents to the New York Times.

23. In the course of the "internal investigation," I retained an employment attorney who advised me how to respond to various document requests from UL's counsel at the firm of Sidley Austin.

24. On March 4, 2024, I traveled to Chicago and participated in an eight-hour interview with three attorneys at the law firm of Sidley Austin.

25. To the best of my knowledge, I fully complied with UL's document requests asking for substantially all documents and email communications that I had acquired, by and through my employment with UL, which included over 700 audit reports and thousands of emails.

26. On the advice of counsel, however, I declined to produce copies of my personal communications with the New York Times.

27. On July 3, 2024, I received a letter notifying me that my employment with UL was terminated, effective immediately. UL filed this lawsuit against me on that very same day.

28. Upon information and belief, the timing of my termination and UL's filing of this lawsuit was strategically planned for the same date, to put me in a defensive position and before I could possibly file a retaliatory discharge claim in Oregon, or elsewhere, upon receiving notice of the termination.

29. In the Complaint and in other filings related to this case, UL seems to imply that I have indiscriminately disclosed and disseminated company documents far and wide, or that I intend to do so at some future date. This is also false.

30. To the best of my knowledge, I have never disclosed any document that UL treats as confidential to *any* person or entity aside from Hannah Dreier of the New York Times in connection with that specific article—and to appropriate government officials, for legitimate law enforcement purposes.

31. My sole purpose and intent in disclosing documents to the New York Times was to expose systemic audit failures that enabled child labor and other forms of abuse to persist undetected. I did so to protect vulnerable workers and help improve the transparency and effectiveness of ESG initiatives and auditing practices.

32. At all times, I acted in good faith and with the sincere belief that my actions were lawful, appropriate, and necessary to serve the public interest.

33. Moreover, I do not presently intend to disclose any documents acquired during my employment with UL to any other person or entity in the future (unless it is a lawfully protected disclosure to a government official, made on the advice of counsel, under applicable provisions of state and federal law).

34. Finally, to the best my knowledge, I have never been privy to information that was known to be a trade secret during my employment at UL. Nor have I ever disclosed any information which I knew to be a trade secret to any other individual or entity, competitor, or otherwise.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 13, 2025

*Joshua Callington*

_____

Joshua Callington