IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

UL LLC,

      *Plaintiff,*

  -v-

JOSHUA CALLINGTON,

      *Defendant.*

Case No. 1:24-cv-05631
Hon. Andrea R. Wood

---

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

---

Dated: June 14, 2025

Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036

*Counsel for Defendant, Joshua Callington*

BACKGROUND ................................................................................................ 1

PROCEDURAL HISTORY ................................................................................ 9

PRELIMINARY INJUNCTION STANDARD ................................................ 12

ARGUMENT .................................................................................................... 14

    I.  UL has not clearly demonstrated any reasonable likelihood of success
       on the merits. ...................................................................................... 16

        A.  UL is not likely to succeed on the merits of its breach-of-contract
           claim (Count III) ................................................................... 17

        B.  UL is not likely to succeed on the merits of its common law
           conversion claim (Count V) ................................................... 25

    II.  UL is solely to blame for any purported loss of goodwill or reputational
        injury that it claims to have suffered. ............................................ 26

    III. As a matter of public interest, the balance of harms weighs
        overwhelmingly against UL's request. ........................................... 27

CONCLUSION .................................................................................................. 27

## BACKGROUND

Consistent with previous filings, UL's most recent application for a preliminary injunction [CM/ECF No. 60, 61] recites the same combination of demonstrably false, inflammatory, and conclusory allegations of theft to obfuscate the true facts and frivolous nature of this case. Though tempted to respond with a line-by-line rebuttal to the most recent iteration of this specious narrative, Mr. Callington has prepared a simple, straightforward, declaration to supplement the record,[1] and is otherwise content with the version of events set forth in his prior submissions.[2]

As any reasonably discerning reader can easily surmise, the allegations that UL deceptively refers to as "undisputed" facts are hardly that.[3] To that end, here is a brief summary of the very few facts that are, in fact, undisputed, and the various points of contention in this case.

### A. Mr. Callington's Employment with UL Responsible Sourcing, Inc., a/k/a UL Solutions, f/k/a Underwriters Laboratories ("UL"), LLC

Plaintiff UL LLC is in the business of selling social compliance audit and certification services.[4] *See* Compl. [CM/ECF No. 1], at ¶ 17-18 ("UL… provides social responsibility compliance auditing and inspection services … [which involves assessing] facilities, processes, and systems [to]… identify, address, and manage …

---

[1] *See* Declaration of Joshua Callington (June 13, 2025) (filed June 14, 2025) [CM/ECF No. 68]

[2] *See, e.g.,* Motion to Dissolve Protective Order (Nov. 15, 2024) [CM/ECF No. 23]; Special Motion to Strike or Dismiss All Claims Pursuant to Anti-SLAPP Provisions of Oregon Law, OR. Rev. Stat. §31.150 (Jan. 7, 2025) [CM/ECF No. 31]; Reply in Further Support of Anti-SLAPP Motion (Mar. 20, 2025) [CM/ECF No. 46]

[3] *See, e.g., id* at 15 [Page ID # 444]; *see also* Pl. Opp. to Anti-SLAPP Mot. [CM/ECF No. 39], at 3-5 [Page ID # 311-313]

[4] *See* Motion to Dissolve Protective Order (Nov. 15, 2024) [CM/ECF No. 23] for a more detailed history and background on plaintiff's business.

sustainability issues … supply network relationships, brand reputation, and various regulatory requirements.").

In or around May 2017, Mr. Callington began working for UL's Responsible Sourcing division pursuant to an independent contractor arrangement—the material terms of which are undisputed and included below, for the Court's convenience:

## INDEPENDENT ASSESSOR AGREEMENT

THIS AGREEMENT is made as of May 17, 2017, by and between UL Responsible Sourcing Inc. ("UL") … company and Joshua Callington ("Assessor")… Assessor is qualified to conduct assessments, to evaluate workplace compliance with local labor, workplace safety laws, security regulations such as C-TPAT, international labor organization (ILO) standards, and/or the client's supplier code of conduct… [and] expected to write comprehensive evaluation reports…for each audit conducted, in an accurate, detailed and timely manner…

1. Scope … Assessor shall perform Assessments as requested by UL …

   [ . . . ]

7. Confidentiality

   [7.1] Assessor shall not voluntarily disclose information obtained… from UL or its clients ("Confidential Information") to any third party, without the prior written consent of UL… [and] shall protect Confidential Information with the same degree of care that it uses to protect its own confidential information of a similar nature and never use less than a reasonable degree of care to protect Confidential Information, which may include requiring its employees, if any, to sign appropriate nondisclosure agreements to comply with the terms of this Agreement.

   [7.2] If assessor is required by law or regulatory authority to disclose any confidential information, assessor shall: (a) Promptly notify UL of the request; (b) reasonably assist UL to obtain a protective order or other remedies at UL's election; (c) provide UL prior review of any disclosure; (d) provide only that portion of the Confidential Information that is legally required…

   [7.3] Assessor agrees that all aspects of the services performed on behalf of UL and its clients, including without limitation the number and frequency of Assessments, shall be kept confidential…

   [7.4] Assessor hereby authorizes UL to transmit unencrypted confidential information and other information through the Internet or a public network to e-mail addresses or other locations provided by Assessor. Assessor acknowledges that the UL cannot guarantee the privacy and confidentiality of such transmissions. Assessor agrees that UL's transmission of confidential information via the Internet of other public network shall not be a breach of any confidentiality obligation under this Agreement and that UL shall not be liable for any damages resulting from such transmissions.

   [ . . . ]

13. Governing Law … the laws of the State of Oregon, USA will apply to this Agreement, without reference to its choice of law principles.

14. Termination … Either party may terminate this Agreement upon [90 days' notice] …

   [14.3] Upon termination … Assessor will discontinue Assessments and shall promptly deliver to UL all records and documents in connection with Assessments performed for the UL, as well as all documents, equipment, and other UL property UL had provided to Assessor.

   [14.4] The provisions of Paragraphs 7 (Confidentiality) … shall survive the termination of this Agreement.

   [ . . . ]

21. No Third-Party Beneficiaries No part of this Agreement shall in any way inure to the benefit of any third person…

Independent Assessor Agreement (May 17, 2017) [CM/ECF No. 1-1, Page ID # 31-35].

2

It is equally undisputed that Mr. Callington worked as a full-time independent contractor for UL, during which time he signed two or more nearly identical agreements containing substantially the same terms. *Id.* [Page ID # 37-51].

In or around May 2019, Mr. Callington became a full-time W-2 employee and continued doing substantially the same audit work on a salaried basis. That much is undisputed, but it bears worth noting that the change was presented to him as a sort of "necessary formality," to remediate UL's sudden *mea culpa* about employee misclassification and related overtime pay issues. *See* Callington Decl. [CM / ECF 68, ¶ 7].

And pretty much everything else in this case is disputed, to some degree.

For example, UL insists that Mr. Callington entered into a separate "Confidentiality Agreement" with UL "as a condition of his employment," when he transition to the salaried position in 2019 [CM/ECF No 61, Page ID # 435].

However, UL has not been able to produce a signed copy of said agreement (or any other reliable indicia that Mr. Callington even received said agreement, at any point in time, in the course of his employment). In any event, the exhibits to UL's Complaint include an undated and unexecuted version of the purported agreement, which contains the following provisions:

### CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT

[1] … During and after my employment with UL, I will keep all Confidential Information in strict confidence and will not disclose it without UL's prior written permission. During my employment, I will use Confidential Information solely as necessary for the performance of my duties as a UL employee and not for the benefit of any third parties, and I will not use Confidential Information after I am no longer a UL employee.

[2] … Immediately upon demand by UL or termination of my employment for any reason, I will immediately deliver to UL all Confidential Information and all documents, notes, analyses, computer files, storage devices and other items that include Confidential Information that are in my possession.

—followed by a blank signature and date line.

> of this Agreement shall not be construed as a waiver of UL's right to enforce such provision. All waivers must be in writing and signed the party granting the waiver. This Agreement will be governed and interpreted under Illinois law without regard to or application of conflict of laws principles. UL may freely assign or otherwise transfer this Agreement in whole or in part. This Agreement shall be binding upon the parties' heirs, successors and assigns.
>
> **AGREED AND ACCEPTED:**
>
> UL Inc.
>
> _____        _____
> Name:                                                      Name:
> Date:                                                        Title:
>                                                                  Date:

*See* Confidentiality and Invention Assignment Agreement (undated / unexecuted) [CM/ECF No. 1-1, Page ID # 31-35].

Throughout his time as an independent contractor, and then salaried employee of UL, Mr. Callington used cloud-based software applications and other ubiquitous web-based technologies to manage the vast array of documents, email communications, and sheer volume of data (photos, etc.) generated by and through the day-to-day performance of his job function as a social compliance auditor (which involved collecting and synthesizing significant amounts of information from on-site inspections, records, etc). *See* Callington Decl. [CM/ECF No. 68], ¶ 3-4, 9-16; *id.* at ¶ 14 ("These tools were absolutely essential to managing the volume of data generated from the nearly hundred or so audits I was conducting each year. Dropbox allowed me to … free up local hard drive space … [while] retain seamless access to archived content…. [and] synced automatically… across [all] my…[electronic] devices.")

Mr. Callington claims that he and others at the company used Dropbox and similar software applications openly and without issue, as a routine part of their jobs,

*id.* (and so do several of his former colleagues)[5]—but UL insists it was all part of a "covert and unlawful" scheme or surreptitious plot to steal confidential information and trade secrets [CM/ECF No. 39, Page ID # 309, 315, 316, 317; CM/ECF No. 61, Page ID # 432-433].

### B. Mr. Callington's Journalistic Source Communications and Related Disclosures to the New York Times

It is undisputed that, at some point in or around the fall of 2023, Mr. Callington contacted a reporter at the New York Times to convey his concerns about the integrity of social compliance audits conducted by UL's Responsible Sourcing division—and its potential complicity in covering up the growing number of American factories employing undocumented migrant children, in violation of child labor laws. It is undisputed that he eventually disclosed certain documents relating to his work at UL, to validate those concerns. And it is undisputed that the New York Times published a widely-read Pulitzer Prize winning investigative reporting series on the issue that was aided, in part, by the information and documents he provided to the newspaper. *See* Callington Decl. at ¶¶ 17-31 [Page ID # 566-569]; *see also* "Defendant's Covert Assistance to the New York Times and the Resulting Article" Compl. [CM/ECF No. 1] ¶¶ 56-58 (alleging that "between September 2023 and December 2023… Defendant provided … [internal] audit reports… emails [and other documents]… [containing] confidential, proprietary, and trade secret information" to New York Times reporter, Hannah Drier); *see also* Callington Decl. at ¶¶ 17-31

---

[5] *See* Decl. of Agatha M. Cole re Confidential Witness Interviews (forthcoming).

The article giving rise to this lawsuit was originally published in the online edition of the New York Times on or about Dec. 28, 2023. *See* Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?*, N.Y. Times (Dec. 28, 2023), https://www.nytimes.com/2023/12/28/us/migrant-child-labor-audits.html. A few days later, the same article was featured on the front cover of *The New York Times*' Sunday edition, under a slightly different caption:



## An Industry Paid to Find Child Laborers, Doesn't

**By HANNAH DREIER**

One morning in 2019, an auditor arrived at a meatpacking plant in rural Minnesota. He was there on behalf of the national drugstore chain Walgreens to ensure that the factory, which made the company's house brand of beef jerky, was safe and free of labor abuses.

He ran through a checklist of hundreds of possible problems, like locked emergency exits, sexual harassment and child labor. By the afternoon, he had concluded that the factory had no major violations. It could keep making jerky, and Walgreens customers could shop with a clear con-

### Auditors Move Quickly and Leave Early

science.

When night fell, another 150 workers showed up at the plant. Among them were migrant children who had come to the United States by themselves looking for work. Children as young as 15 were operating heavy machinery capable of amputating fingers and crushing bones.

Migrant children would work at the Monogram Meat Snacks plant in Chandler, Minn., for almost four

more years, until the Department of Labor visited this spring and found such severe child labor violations that it temporarily banned the shipment of any more jerky.

In the past two decades, private audits have become the solution to a host of public relations headaches for corporations. When scandal erupts over labor practices, or shareholders worry about legal risks, or advocacy groups demand a boycott, companies point to these inspections as evidence that they have eliminated abuses in their supply chains. Known as social compliance audits, they have grown into

*Continued on Page 14*

According to that article, the New York Times had conducted interviews with "dozens" of auditors who essentially corroborated the same issues that Mr. Callington had attempted to raise internally on countless occasions. Although Mr. Callington was the only auditor identified by name, the article confirmed that other, similarly situated professionals, shared his concerns about social compliance audits "provid[ing] little more than a veneer of compliance for global corporations, which overstate how rigorously they review sprawling supply chains." *Id.* ("Auditors for several firms said they are encouraged to deliver findings in the mildest way possible

as they navigate pressure from … different sources"). The reporting also validated a theory that Mr. Callington had raised with UL management just a few months earlier, about why its audits were systemically failing to identify violations of child labor laws: "auditors typically start their inspections in the morning and stay for about seven hours… even at …[large] factories that operate around the clock," the article explained, "[so]… night shifts, where child labor violations most often occur, are almost never seen." *Id.*

The reporter who wrote the story, Hannah Drier, correctly portrayed Mr. Callington as a hardworking professional, dedicated to this purpose-driven work. *See id.* ("Mr. Callington sometimes squeezes in five audits a week, staying on the road for six-week stretches. He flies between coasts so regularly that he has stopped thinking of himself as having a home-base time zone, and during long drives occasionally turns to his phone to ask, '*Hey, Siri, where am I?*'"). "'*If audits are done correctly, the world could be a better place*,'" he said. *Id.* ("*Bettering the lives of workers is what these audits are supposed to be about.*") (quoting Mr. Callington). "*But more and more*," he said, "*each audit had begun to feel like a struggle between wanting the truth and trying to avoid conflict…*" *Id.* The article went on to cite examples from several of Mr. Callington's audits for well-known national retailers, to illustrate the types of problems he had encountered—like the time that he was removed from the client account for Walgreens and placed on a remediation plan, after failing three of the company's suppliers for "abusive working conditions." *Id.*

Another example recounts how Mr. Callington had asked managers at UL Solutions if Costco and other clients might consider implementing nighttime inspections, in light of the "recent news coverage that mentioned child labor raids at slaughterhouses," but never got a response. *Id.* And the time Mr. Callington was penalized for flagging 21 separate labor violations at a warehouse that supplies potatoes to major national retailers; as the article recounts, "the plant's management complained that he was demanding and argumentative, and his supervisor barred him from returning." *Id*. UL also required Mr. Callington to "complete a series of customer service trainings" in response to that particular incident, and generally continued to emphasize the importance of client satisfaction above all else. *Id.*

### C. Impact and Aftermath

Following the publication of that article, several large companies, including some of the ones Mr. Callington had named, committed to undertaking meaningful steps towards eliminating child labor in their domestic supply chains. *See* Hannah Drier, *Confronted With Child Labor in the U.S., Companies Move to Crack Down*, N.Y. Times (Feb. 7, 2024), https://www.nytimes.com/2023/12/28/us/migrant-child-labor-audits.html ("Many major U.S. companies—including some of the country's biggest consumer brands… are [now] revising the kinds of audits they require… enhancing reviews of night shifts and shifts run by outside contractors… and moving away from announcing audits in advance.").

Meanwhile, Mr. Callington was placed on paid leave and UL launched an internal investigation that was conducted by outside counsel at the law firm of Sidley Austin, to "gather evidence," (UL's own words) [at Page ID # 430] about the

circumstances surrounding his communications with the New York Times. That much is undisputed though various aspects of the investigation are hotly contested. For example, Mr. Callington believes he fully cooperated in that investigation in good faith, as evidenced by his voluntary compliance with outside counsel's document requests, among other things. UL, on the other hand, insists he resisted and refused to do everything exactly as they asked.

After gathering evidence against Mr. Callington for approximately six months UL terminated his employment on July 3, 2024, and filed this lawsuit the very same day.

## PROCEDURAL HISTORY

The five-count Complaint asserts two separate causes of action for "misappropriation of trade secrets," under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), Compl. ¶¶ 74-92, and the Illinois Trade Secret Act, 765 IlCS 1065/1 *et seq*., Compl. ¶¶ 93-102 (Counts I & II); a claim for Breach-of-Contract stemming from Mr. Callington's alleged violation of restrictive covenants on confidentiality and non-disclosure, Compl. ¶¶ 103-113, (Count III)—and two additional state common law claims for Breach-of Fiduciary Duty, Compl. ¶¶ 114-120 ("Count IV"), and Conversion, Compl. ¶¶ 121-130 ("Count V").

On or around September Sept. 17, 2024, this Court held a status conference in which Mr. Callington appeared *pro se* to explain that he was in the process of trying to secure legal representation and needed more time to do so. Transcript of Proceedings (Sept. 17, 2024) [CM/ECF No. 25, Page ID # 199]. UL consented to the

request on the condition that the Court enter an interim document preservation order that would also restrict Mr. Callington from making any further disclosures to the press. The Court agreed and instructed UL to draft the proposed order, *id.* [Page ID # 199-200]. Though styled as a precautionary interim measure to preserve the status quo and allow time for Mr. Callington to retain counsel, the proposed interim orders that UL subsequently submitted to this Court were so inherently problematic that the Court did not enter anything for another month or so, right around the same time that Mr. Callington retained counsel. *See* Appearance by Agatha M. Cole (Oct. 23, 2024) [CM/ECF No. 15]; Interim Document Preservation and Non-Disclosure Order (Oct. 24, 2024) [CM/ECF No. 17]. The undersigned counsel raised objections to the entry of that order, but the Court had already decided and believed the parties could ultimately reach an agreement on mutually acceptable terms in a stipulated order that would replace the interim measure. *See* Transcript of Proceedings (Oct. 24, 2024) [CM/ECF No. 26].

Thereafter, counsel for Mr. Callington repeatedly told UL's counsel that he would willingly stipulate to the entry of a protective order covering preventing the disclosure of trade secret information, but UL wanted something far more onerous and broad.

And though titled as an Interim Document Preservation and Non-Disclosure Order (Oct. 24, 2024) [CM/ECF No. 17], the substantive relief sought and obtained by UL (which remains in effect to this day), the text of that order functions as broad prior restraint on Mr. Callington's ability to speak about nearly all aspects of his

10

experience working at UL with anyone (including lawfully protected disclosures to government entities)—except as allowed pursuant to a narrow carve-out under the DTSA's whistleblower provisions, ¶4 —or pursuant to a subpoena, in which case the order contemplates that Mr. Callington would have to notify UL's counsel of the request and related disclosure, ¶6.

Because that is simply not workable, the undersigned counsel had no choice but to seek dissolution of the interim order and demand that UL substantiate its reasons in a properly supported application for injunctive relief. *See* Motion to Dissolve Protective Order (Nov. 15, 2024) [CM/ECF No. 23, Page ID # 182] (" "If UL truly believes that it is entitled to enjoin Mr. Callington's conduct to protect its alleged trade secrets, it is by all means free to move for a preliminary injunction and make the requisite showing."

The Court eventually granted that motion, in part--at least by implication if not expressly so—by ordering UL to file said motion, which is now before the court. *See* Pl. Mot. or Prelim Inj. (filed May 25, 2025) [CM/ECF No. 60, 61].

In the interim, Mr. Callington also filed the presently pending Special Motion to Strike or Dismiss All Claims Pursuant to Anti-SLAPP Provisions of Oregon Law, OR. Rev. Stat. §31.150 (Jan. 7, 2025) [CM/ECF No. 31], which has now been fully briefed.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant carries the burden of persuasion by a clear showing. *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1085 (7th Cir. 2008) ("[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (internal quotations and citation omitted). Motions for mandatory injunctions, which compel the non-moving party to take affirmative action, are viewed cautiously and issued sparingly. Jordan v. Wolke, 593 F.2d 772, 774 (7th Cir. 1978).

As the party seeking injunctive relief, UL bears the burden of showing that it is warranted. Accordingly, UL must show that it has some likelihood of succeeding on the merits, it is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in its favor, and the requested relief is in the public interest. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020); *Mays v. Dart*, 974 F.3d 810, 818-822 (7th Cir. 2020).

"In assessing whether [UL] has met its burden," the Court must view "the available evidence in the record from a 'neutral and objective viewpoint without accepting [UL's] allegations as true nor drawing all reasonable inferences in [its] favor.'" *Aon plc v. Alpine Rewards, LLC*, No. 22-CV-4762, 2023 WL 3713987 at *3 (N.D. Ill. Apr. 12, 2023) (quoting *Doe v. Univ. of Chicago*, 2022 WL 16744310, at *2 (N.D. Ill. 2022)).

For each claim that is asserted in support of the preliminary injunction, UL must specifically show that the "claim has some likelihood of success on the merits, not merely a better than negligible chance." _Mays v. Dart_, 974 F.3d 810, 822 (7th Cir. 2020) (internal quotation marks omitted) (citing _Eli Lilly and Co. v. Arla Foods, Inc._, 983 F.3d 375, 381 (7th Cir. 2018)). To show irreparable harm, UL must demonstrate that it will suffer "harm that 'cannot be repaired' and for which money compensation is inadequate." _Orr v. Shicker_, 953 F.3d 490, 502 (7th Cir. 2020) (quoting _Graham v. Med. Mut. of Ohio_, 130 F.3d 293, 296 (7th Cir. 1997)).

If the plaintiff proves the three baseline elements, "the court next must weigh the harm the plaintiff will suffer without an injunction against the harm the defendant will suffer with one" and consider "any effects on non-parties" to determine whether a preliminary injunction would be in the public interest. _Courthouse News Serv. v. Brown_, 908 F.3d 1063, 1068 (7th Cir. 2018). Under the Seventh Circuit's "sliding scale" approach, "the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." _Mays_, 974 F.3d at 818 (citing _Ty, Inc. v. Jones Grp., Inc._, 237 F.3d 891, 895 (7th Cir. 2001)).In weighing the harms, the court must bear in mind that "[a] preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" _Cassell v. Snyders_, 990 F.3d 539, 544 (7th Cir. 2021) (quoting _Orr v. Shicker_, 953 F.3d 490, 501 (7th Cir. 2020)). Moreover, "[a] preliminary injunction ordering the defendant to take an affirmative act rather than merely refrain from specific conduct is 'cautiously viewed

and sparingly issued.'" *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997)).

## **ARGUMENT**

Unsurprisingly, the "limited" preliminary injunction the UL seeks is actually quite epic in scope. Aside from imposing unwarranted restraints on Mr. Callington's conduct, it also seeks to impose burdensome and costly affirmative obligations that no party should ever have to assume unless or until litigation proceeds past the pleadings stage into the formal discovery phase. Specifically, UL asks this Court enter an order that would:

> 1) Require Callington, within not later than 14 days after the Court's entry of an injunctive order, to produce to UL copies of any and all UL documents and ESI—and any other UL property, tangible or intangible—that is in his possession or under his control and that he acquired or took from UL through his employment or working-relationship with UL. This will reasonably allow UL to designate the documents and ESI as "confidential"—where needed and appropriate— under the Interim Document Preservation Non-Disclosure Order in place and/or under a final protective order that is put in place for this case; and

> 2) Restrain Callington from using, modifying, deleting, publishing, disseminating, or otherwise disclosing to any person or entity (except as required or allowed by law)—whether in hard copy or electronic form— any of UL's or its customers' or employees' confidential, proprietary, and trade secret information, business documents, ESI, personal identifying information, and any other property, tangible or intangible, that is in Callington's possession or under his control and which he acquired or took from UL through his employment or working relationship with UL.

[CM/ECF 60].

14

At the outset, the scope of this proposed injunction is immediately suspect because it is fundamentally different from that it would be entitled to if it prevailed on any of the underlying claims in this lawsuit. *See Nw. Pallet Supply Co. v. PECO Pallet, Inc.*, No. 3:15-cv-50182 (N.D. Ill. May 13, 2016); *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *see also Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005) ("Preliminary injunctions are a tool appropriately used only to grant intermediate relief of the same character as that which may be granted finally.') (internal quotations, citation, and emphasis omitted); *Tekena USA, LLC v. Fisher*, No. 06 C 1558, 2006 WL 2536631, at *4 (N.D. Ill. Aug. 31, 2006) (same).

In its supporting brief, UL explains that its request for injunctive relief is now premised on its claims for Breach-of-Contract (Count III) and Conversion (Count V). *See* Pl. Br. [CM/ECF 61] at n. 1 [Page ID # 438] ("UL focuses this limited motion on … [those] two causes of action most related to those issues, breach of contract and conversion.") (citing *Dumanian v. Schwartz*, No. 19 C 6771, 2022 WL 2714994, at *12 n.8 (N.D. Ill. July 13, 2022) for the proposition that "the Court need not address UL's likelihood of success on all of its causes of action to award injunctive relief").

Even if UL were to prevail on the merits of both of those claims, neither would give rise to a remedy encompassing to the extraordinary scope of relief sought in UL's proposed injunction. This alone suggests that UL's motion should be denied.

And, in any event, both claims are also destined to fail on the merits.

15

## I. UL has not clearly demonstrated any reasonable likelihood of success on the merits.

As explained in previous filings, UL cannot prevail on the merits of any of its legal claims because each of those claims is premised on some combination of protected activity for which Mr. Callington is immune from suit,[6] and specious, conjectural, or conclusory allegations of theft that are either factually or legally defective. *See* Special Motion to Strike or Dismiss All Claims Pursuant to Anti-SLAPP Provisions of Oregon Law, OR. Rev. Stat. §31.150 (Jan. 7, 2025) [CM/ECF No. 31] and Reply in Further Support of Anti-SLAPP Motion (Mar. 20, 2025) [CM/ECF No. 46].[7] The arguments made therein are hereby incorporated by reference and worthy of repeating as the primary reason why the instant motion must fail—even if this brief is naturally more focused on identifying *additional* deficiencies in the claims that UL specifically invokes as the basis for seeking preliminary injunctive relief.

---

[6] The immunity conferred by Oregon's anti-SLAPP statute applies to any "statement made … [or] document presented," in a "public forum" and "in connection with an issue of public interest," Or. Rev. Stat. § 31.150(2)(c). Mr. Callington's communications and disclosures to *The New York Times* clearly qualify as protected conduct under the plain text of that provision—and UL tacitly concedes as much in its opposition to the pending anti-SLAPP motion. *See* Pl. Opp. [CM/ECF No. 39. Rather than disputing this point, UL now contends that those journalistic source communications have nothing to do with its legal clams—which is now apparently all premised on a dubious theory of theft. *Id.* [Page ID # 309, 315-16] ("*[This lawsuit is not premised on [his] … speaking to a reporter… I[t] is about [the] … covert and unlawful theft of… [company] documents.]*").

[7] The Court should also consider the amicus brief filed by WHISPER / Expose Facts [CM / ECF 52] in connection with this motion as it speaks directly to the public interest considerations involved in balancing the harms on whether to grant injunctive relief. The amicus brief also cites a very helpful precedent that was not otherwise identified in the parties' principal briefing, and which further supports granting the anti-SLAPP motion. *See Mullen v. Meredith Corp.,* 271 Or. App. 698, 705 (2015).

### A. UL is not likely to succeed on the merits of its breach-of-contract claim (Count III).

The preliminary injunction seeks to specifically enforce restrictive covenants on non-disclosure and confidentiality contained in:

(1) the Independent Assessor Agreements ("IAAs") [CM/ECF No. 1-1, Page ID # 31-51] that Mr. Callington executed in his capacity as an independent contractor from 2017-2018, which state that

> *Assessor shall not voluntarily disclose information obtained… from UL or its clients … without the prior written consent of UL* [¶ 7.1]

and purportedly remain effective in perpetuity, pursuant to the post-termination survival clause therein, *see* ¶ 14.4 (identifying provisions that "*shall survive the termination of this Agreement*");[8] and

(2) the Confidentiality and Invention Assignment Agreement ("Confidentiality Agreement") that Mr. Callington never signed (or potentially even received) [CM/ECF No. 1-1, Page ID # 31-35]—which UL claims he subsequently assented to "as a condition of his employment" with the transition to a salaried position,[9] and which provides as follows:

> … *During and after my employment with UL, I will keep all Confidential Information in strict confidence and will not disclose it without UL's prior written permission. During my employment, I will use Confidential Information solely as necessary for the performance of my duties as a UL employee and not for the benefit of any third parties, and I will not use Confidential Information after I am no longer a UL employee.* [ ¶ 1].

---

[8] According to UL, "[the] confidentiality provisions [in the IAAs]…. remain in effect, prohibiting Callington from voluntarily disclosing confidential information he obtained from UL or its clients" [CM/ECF No. 61 at Page ID #438-439].

[9] According to UL, "[The fact that Callington did not sign the Confidentiality Agreement is of no consequence" CM/ECF No. 61 at Page ID #440]

> … *Immediately upon demand by UL or termination of my employment for any reason, I will immediately deliver to UL all Confidential Information and all documents, notes, analyses, computer files, storage devices and other items that include Confidential Information that are in my possession.* [ ¶ 2].

Confidentiality Agreement (undated / unexecuted) at ¶ 1, ¶ 2.

### i. The restrictive covenants that UL seeks to enforce are probably invalid and almost certainly unenforceable.

Setting aside the questionable provenance and validity of that second agreement, UL has failed to persuasively demonstrate that any of the above provisions can or should be enforceable in the form of a preliminary injunction. The IAAs are governed by Oregon state law (*see* ¶ 13, "Governing law… the laws of the State of Oregon… apply… without reference to its choice of law principles."), and the purported Confidentiality Agreement, if valid, is ostensibly governed by Illinois state law—both jurisdictions that treat the validity, scope, and duration of restrictive covenants with exacting scrutiny. UL's motion papers treat this issue as an afterthought, addressing it only in a footnote, n. 4 [Page ID # 440] citing a few friendly precedents from cases that are either about protecting employers from unfair competition (*e.g., Moss Holding Co. v. Fuller,* No. 20-cv-01043 (N.D. Ill. March 6, 2020)) or very outdated and irreconcilable with modern precedents in either jurisdiction (*e.g., Coady v. Harpo, Inc.,* 308 Ill. App. 3d 153, 162 (1st Dist. Ct. App. Sept. 30, 1999)).

These precedents hardly suffice to sustain UL's insistence that each of the above provisions is facially valid and enforceable, as would be necessary to establish that UL is "clearly" entitled to the specific enforcement of those provisions via a court-

ordered preliminary injunction. *See, e.g., Nw. Pallet Supply Co. v. PECO Pallet, Inc.*, No. 3:15-cv-50182 (N.D. Ill. May 13, 2016) (J. Wood, A.R.) ("A preliminary injunction … should not be granted unless the movant carries the burden of persuasion by a clear showing) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1085 (7th Cir. 2008)).

Meanwhile, the covenants that UL seeks to enforce are virtually unlimited in scope and substance (*i.e.,* in perpetuity, without any geographic or other limitations, and covering substantially all "information obtained" or acquired in the ordinary course of employment). *But see Fleetwood Packaging v. Hein,* No. 14-cv-9670, 2014 WL 7146439, at *8 (N.D. Ill. Dec. 15, 2014) (explaining that confidentiality provisions are "restrictive covenants" and thus, void, if not "reasonably limited in scope" under Illinois law); *accord ExactLogix, Inc. v. JobProgress, LLC,* 508 F. Supp. 3d 254, 277 (N.D. Ill. 2020) (overly broad confidentiality provisions are unenforceable).

Moreover, the confidentiality provision in the IAA is facially invalid insofar as it imposes any illegal obligation to notify and, essentially, cooperate with UL in connection with government investigations and regulatory inquiries. *See* IAA at ¶ 7.2 ( "If assessor is required by law or regulatory authority to disclose any confidential information, assessor shall: (a) Promptly notify UL of the request; (b) reasonably assist UL to obtain a protective order or other remedies at UL's election; (c) provide UL prior review of any disclosure; (d) provide only that portion of the Confidential Information that is legally required…").

19

> To be clear [confidentiality provisions that] … restrict an employee's ability to report illegality to the government… [are] unenforceable and violate public policy constraints on contracting... For example, Dodd-Frank expressly permits whistleblowers to report misconduct to the SEC anonymously. Despite that statutory mandate, employers [continue to] use provisions … that require employees to notify the employer anytime the employee discloses information to a government agency.

Richard Moberly, *Confidentiality and Whistleblowing,* 96 N.C. L. REV. 751 (2018), *available at* http://scholarship.law.unc.edu/nclr/vol96/iss3/5. Such provisions have been repeatedly deemed unlawful and are the subject of multiple SEC enforcement actions. *See, e.g., SEC v. GPB Capital Holdings, LLC, et al.*, File No. 3-20904 (June 22, 2022); *In the Matter of Activision Blizzard, Inc.*, SEC File No. 3-21294 (Feb. 3, 2023); *see also Erhart v. BofI Holding, Inc.,* No. 15-cv-02287, 2017 WL 588390 (S.D. Cal. Feb. 14, 2017).

### ii.    UL has failed to articulate a plausible theory of breach.

Even assuming *arguendo* that each of the provisions UL invokes is valid and enforceable, however—then, what exactly is the alleged breach at issue in this lawsuit anyways? UL offers several theories:

First UL argues that Mr. Callington failed to "return all confidential information and documents to UL upon termination of his employment" in violation of the Confidentiality Agreement, ¶ 2 [Page ID # 440]. That theory omits quite a bit of relevant information about the circumstances surrounding Mr. Callington's termination, however. As UL admits, the company conducted a six-months long "internal investigation" to collect evidence that would support its filing of this lawsuit before issuing a termination notice. Mr. Callington fully cooperated in that so-called

investigation, retained employment counsel, and subsequently produced copies of every UL-related document in his possession, in response to document requests propounded by the company's outside counsel at Sidley Austin.[10] After gathering all that evidence against him, the company promptly issued a notice of termination and filed this lawsuit the very same day. Thus, even if Mr. Callington had wanted to voluntarily "return all confidential information and documents to UL upon termination," doing so would have violated his duty to preserve evidence and UL would surely be seeking spoliation sanctions instead. Furthermore, as Mr. Callington has repeatedly stated, destroying and/or returning those documents at that point in time would have impended one or more ongoing government investigations in which he is a willing participant and which he has absolutely no obligation to disclose to UL.

In the alternative, UL reverts back to Mr. Callington's disclosures to the New York Times—which it refers to as a "blatant" breach of the confidentiality provisions in both agreements [Page ID # 440]. What a strange pivot after *insisting*, in its response to the pending anti-SLAPP motion [CM/ECF No. 39], that this case is *__not__* about Mr. Callington's disclosures to that reporter. *Cf.* Pl. Opp. to Anti-SLAPP Motion [CM/ECF No. 39].[11] Without belaboring the point, which is already discussed at

---

[10] *See* Callington Decl. at ¶22-26.

[11] *"Contrary to what Callington would like this Court to believe … [this lawsuit] is not premised on [his] … speaking to a reporter,"* UL explains, as if befuddled by the notion that such irrelevant and extraneous allegations could be mistaken for the gravamen of its Complaint. *Id.* at Page ID # 316. Instead *"this case is about [the] … covert and unlawful theft of… [company] documents… over a lengthy period of time* [*i.e.,* in the ordinary course of Mr. Callington's employment]*" id.* at Page ID # 309, ostensibly before he ever engaged in said protected activity.

length in Mr. Callington's reply to that filing [CM/ECF No. 46], this second theory fails because it is premised on a non-actionable breach that qualifies as protected conduct under applicable anti-SLAPP law.

Finally, although not explicit, UL seems to hint at a third theory of prospective breach. As UL puts it,

> Callington intends to continue to use and disclose … [company] documents … without any regard for any confidentiality contract and other legal obligations. This is why his current counsel has fought so hard to try to convince this Court to dissolve the interim … order … and filed an Anti-SLAPP motion, a first-of-its-kind maneuver to try to have UL's legal claims … dismissed, so Callington would not be under the jurisdiction of this Court …
>
> …. he completely disregards and will trample all over UL's rights to develop, and its obligations to protect, its confidential business information … and [if allowed] once UL's confidential business information is disclosed by Callington in the public domain, UL's competitors will be able—unfairly and without making the same time and financial investments UL has made—to gain competitive information, insights and advantages regarding, for example, how UL plans for, and how it conducts and reports findings on, social responsibility audits. This will include learning about UL's internal policies, practices, procedures, approaches, workflows, proprietary tools, and non-public information about UL's customers--all of which have combined to position UL as an industry leader …

[CM/ECF No. 61 at Page ID # 432-433]. Whoa.

Starting from the top of that diatribe, UL's proffered inference about Mr. Callington's intentions is wholly speculative and flatly contradicted by the record. Mr. Callington has repeatedly indicated, in proceedings before this Court (both directly as a *pro se* litigant and, more recently, through his counsel), that he only intends to disclose certain documents in his possession to legitimate government officials and/or entities, as permitted by law and on the advice of counsel, in connection with or in furtherance of a legitimate government investigation or law

enforcement purpose.[12] Although Mr. Callington is in no way obligated to volunteer that much information to UL, he has done so in a good faith effort to be as transparent as possible, whilst balancing other legitimate and countervailing legal interests that weigh against a more fulsome disclosure.

In the event there was ever any ambiguity with respect to Mr. Callington's intentions, he is now also supplementing the record with a sworn declaration in which he unequivocally affirms that he has *never* disclosed any documents relating to his work for UL to *any* private individual or entity, aside from the disclosures that he made to Hannah Drier of the New York Times in connection with that article—and does not intend to so. *See* Callington Decl. ¶¶ 29-34.

Since his disclosures to the New York Times were made in connection with protected activity under applicable anti-SLAPP law—and since any past or forthcoming disclosures to government entities were, or are being, made pursuant to and consistent with other applicable federal and state laws—Mr. Callington should not be forced to explain or account for any of it in the context of a private action brought by his former employer. After all, that is precisely why anti-SLAPP laws exist. And yet, he has done so once again for good measure, whereas UL merely recites the same baseless conjecture and speculative allegations.

And as previously explained, UL cannot invoke its restrictive covenants to prevent Mr. Callington from disclosing documents and information which he

---

[12] *See, e.g.,* Transcript of Proceedings (Sept. 17, 2024) [CM/ECF No. 25, Page ID # 200] (Callington: "My only interest in the information is … whistleblower [activities]. I don't have any intention to use it for any commercial or business purpose").

23

reasonably believes evince unlawful conduct or activities to appropriate government authorities. *See* Anti-SLAPP / Motion to Dismiss [CM/ECF No. 61, Page ID # 286] (explaining that even an otherwise valid agreement is deemed "void as contrary to public policy" insofar as its enforcement seeks to suppress or conceal evidence of unlawful activity) (citing *Murray v. UBS Securities, LLC*, 601 U.S. 23, 27 (2024); *U.S. ex rel. Ceas v. Chrysler Group LLC,* 191 F. Supp. 3d 885, 888 (N.D. Ill. 2016) (collecting cases); *Shmushkovich v. Home Bound Healthcare, Inc.,* No. 12 C 2924, 2015 WL 3896947, at *1 (N.D. Ill. June 23, 2015)).

Secondly, to the extent that UL characterizes the pending anti-SLAPP motion as some kind of "maneuver" to evade this Court's jurisdiction, that is also flatly wrong. As counsel for Mr. Callington made clear in the very first few minutes of appearing before this Court, UL's filing of this retaliatory lawsuit has opened a proverbial can of worms that cannot be closed by or through the mere dismissal of its baseless legal claims.[13] There will very likely be counterclaims to deal with either way, whether filed under this precise case caption, or in the form of post-dismissal countersuit against UL—which would be filed in this district and appropriately flagged as a case relating to the instant matter.

As for the anticipated consequences of "allowing" Mr. Callington to be free from the restraints of a court-ordered preliminary injunction—UL's impassioned screed about unfair competition is disingenuous, at best, and completely divorced from any plausible inference that can be drawn from the facts of this case. Indeed, there are

---

[13] Transcript of Proceedings (Oct. 23, 2024) [CM/ECF No. 26, Page ID # 213-216]

millions, if not billions, of everyday Americans out there who—despite having various grievances, grudges or axes to grind with a former employer—are perfectly capable of moving on to other employers (including competitors, even, in some instances)— without needing a federal court-ordered preliminary injunction to govern their conduct in the name of preventing unfair competition. Mr. Callington is among them and—in the absence of *any* evidence or substantiation regarding the perceived threat to UL's competitive interests—should not be enjoined to conform his conduct in any particular way, just to comfort or convenience to his former employer.

### B. UL is not likely to succeed on the merits of its common law conversion claim (Count V)

UL's conversion claim is also destined to fail, for simple reason that is premised on allegations that are not true. As a matter of fact, the allegations giving rise to UL's claim of conversion are plainly and demonstrably false. The basic theory here is that Mr. Callington surreptitiously stole documents.

Even at this very early stage, the evidence weighs much more heavily in support of the countervailing inference that Mr. Callington only ever accessed or used company documents in the ordinary course of his employment with UL, in connection with the legitimate carrying out of his job functions, and as authorized by the company. *See* Callington Decl. ¶¶29-34.[14]

The only exception to that of course, are the disclosures he made to the New York Times, which are not actionable as a matter of law, Or. Rev. Stat. §31.150. If

---

[14] *See also* Decl. of Agatha M. Cole re Confidential Witness Interviews (forthcoming).

the factual allegations relating to Mr. Callington's protected activity are stricken from the Complaint, all that is left is baseless accusations seeking to vilify Mr. Callington's routine adoption of ubiquitous cloud-based software and mobile applications that millions of American professionals use every day, as a routine matter of convenience, to access work-related emails and files from multiple electronic devices. In an era when even the highest-ranking officials of the U.S. Department are known to occasionally skirt official cybersecurity policies when doing so interferes with convenience of access to top secret matters, no reasonable jury would fault Mr. Callington for doing the same, even if UL had a very clearly written policy disallowing it. Here, however, Mr. Callington credibly claims that UL specifically authorized and enabled his use of Dropbox by installing it on his company laptop, and that substantially the same types of software were used by similarly situated colleagues.

Because UL has failed to offer any plausible factual allegation or evidentiary indicia to support an alternative conclusion, it has plainly failed to meet its burden in seeking a preliminary injunction premised on a conversion claim.

## II. UL is solely to blame for any purported loss of goodwill or reputational injury that it claims to have suffered.

At this juncture, UL is so very far from meeting its burden on the very first threshold factor for obtaining a preliminary injunction that considering the additional factors is frankly a waste of time and judicial resources. Having been burdened by this frivolous litigation for nearly a year, Mr. Callington respectfully declines to proceed with a more in-depth analysis on the nature of UL's alleged

injury—aside from asking the Court to consider the true and proximate cause of any purported loss of good will and reputational damage that UL claims to have suffered.

## III.    As a matter of public interest, the balance of harms weighs overwhelmingly against UL's request.

Finally, for reasons thoroughly explained in Mr. Callington's previous filings, and with the support of an amicus brief that elaborates on the public interest implications of this case [CM/ECF No. 52], it is respectfully submitted that the balancing of the harms weighs especially heavy against UL's motion.

## <u>CONCLUSION</u>

For these reasons, Mr. Callington respectfully asks the Court to deny UL's request for a preliminary injunction and dismiss the Complaint in its entirety.

Dated: June 14, 2025
New York, NY

By:     */s/ Agatha M. Cole*
Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036
(828) 773-2628
agatha@beverlypllc.com

27