```
                   IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

UL LLC,                              )   Case No. 24 C 5631
                                     )
                   Plaintiff,        )
                                     )
              v.                     )
                                     )
JOSHUA CALLINGTON,                   )
                                     )   Chicago, Illinois
                                     )   June 26, 2025
                   Defendant.        )   2:12 p.m.


            TRANSCRIPT OF PROCEEDINGS - ORAL ARGUMENT
              BEFORE THE HONORABLE ANDREA R. WOOD


APPEARANCES: (VIA VIDEOCONFERENCE)


For the Plaintiff:    LITTLER MENDELSON PC
                      BY:  MR. RICHARD T. KIENZLER
                      321 N. Clark Street, Suite 1100
                      Chicago, Illinois 60654

                      LITTLER MENDELSON PC
                      BY:  MS. EMILY E. LEVY
                      41 S. High Street, Suite 3250
                      Columbus, Ohio  43215

For the Defendant:    BEVERLY PLLC
                      BY:  MS. AGATHA M. COLE
                      43 West 43rd Street, Suite 159
                      New York, New York  10036


Court Reporter:       GAYLE A. McGUIGAN, CSR, RMR, CRR
                      Official Court Reporter
                      219 S. Dearborn Street, Room 2524A
                      Chicago, Illinois 60604
                      312.435.6047
                      gayle_mcguigan@ilnd.uscourts.gov


                         * * * * *
               PROCEEDINGS REPORTED BY STENOTYPE
      TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
```

(Proceedings heard via videoconference:)

THE CLERK: The United States District Court for the Northern District of Illinois resumes in session, the Honorable Andrea R. Wood presiding.

Calling case number 24 Civil 5631, UL, LLC versus Callington.

THE COURT: So for the plaintiff?

MR. KIENZLER: Good afternoon, your Honor. Richard Kienzler and Emily Levy for the plaintiff, UL.

THE COURT: And for the defendant?

MS. COLE: Agatha Cole, Beverly PLLC, for Mr. Callington. And Mr. Callington is also here today.

And if it's all right with the Court, I did tell him that he doesn't have to be on video unless or until the Court addresses him directly.

THE COURT: That's fine.

Okay. So I have a good bit of briefing here. I have briefing that falls under the umbrella of the request for a limited preliminary injunction, and then I have the briefing in connection with the anti-SLAPP motion, to -- to strike. And then there's also additional declarations that have been submitted. There were declarations submitted by the plaintiff in support of their request for the limited preliminary injunction, a declaration from Mr. Callington, and then the, I guess, partially redacted declarations from the confidential

witnesses.

Just so I'm clear on the record that's in front of me, so, Ms. Cole, this week, the courtroom deputy who is regularly assigned to me is out, and so I don't know if you had attempted to send un-redacted versions of the declarations for *in camera* review or if you were waiting for an order from the Court to do so. There's not a wrong answer. I just want to make sure I understand what your intentions were with respect to their -- to those declarations.

MS. COLE: Yes, your Honor. I initially emailed those to Ms. Arcos and received an out-of-office that directed me to Ms. Nunez, and so I believe I emailed those to Ms. Nunez. If they were not received, I can resend them today.

THE COURT: Those are the un-redacted versions.

MS. COLE: Yes, your Honor.

THE COURT: Okay. Jannette, do we have un-redacted versions, like declarations?

Cole? C-O-L-E.

(Pause.)

THE CLERK: From today?

THE COURT: I think it might have been -- was it on Friday, Ms. Cole, that you sent them, at the time when you filed things under seal, or was it some time after?

MS. COLE: It was at the time -- yes. So it was Friday, June 20th, at 10:26 p.m. Eastern, so that would be 9:26

p.m. Central.

THE CLERK: Yes.

THE COURT: So this was with the request about filing things under seal. Got it, okay. Thank you. I do have those.

Okay. So I'm going to put aside for the moment how those will be treated because I want to address some other preliminary things.

So with respect to the limited request for a preliminary injunction, of course one of the key factors is a likelihood of success on the merits of the claim. And as I understand it, one of the main arguments from the defendant is that there's not going to be a likelihood of success on the merits because they expect to prevail, that this is a type of action that's prohibited by the Oregon anti-SLAPP statute. And in that way, the two motions -- the motion to strike under the anti-SLAPP action statute and the limited motion for preliminary injunction -- overlap.

Is that fair to say, Ms. Cole?

MS. COLE: Yes, that is a fair characterization of the issues thus far.

THE COURT: And in addition to that, on the merits of the plaintiff's claim, you are also arguing that there's no evidence of -- of I guess the breach of contract?

MS. COLE: Well, so we're arguing that there is -- there's no evidence of breach of contract. They have submitted

two agreements, one of which is signed, the other is just a document that is an agreement, that it's not clear whether my client ever received. But the point with the breach of contract is that, you know, even if both contracts are valid, there's no -- all of the other elements, from breach to damages, are defective and, most importantly, that there is no theft or misappropriation or anything that would support the conversion claim either.

THE COURT: Okay. And so for the trade secret claim, you would say there's no trade secret that --

MR. KIENZLER: Judge, I -- I apologize. I heard you the whole step of the way through, but after Ms. Cole, I just didn't hear -- your microphone didn't pick up, at least for me.

THE COURT: I'm sorry. Is this better? Maybe this will help.

MR. KIENZLER: I'm sorry to interrupt you. I just wanted to make sure to jump in there.

THE COURT: Okay. Count One of the complaint is a Trade Secret Act claim. I understand that the defense position is that there's no trade secret that has been adequately identified and, therefore, Mr. Callington, through his counsel, believes that that claim fails for that reason. Is that correct, Ms. Cole?

MS. COLE: That is correct.

I would add that there is no trade secret that has

been properly identified. And, secondly, even if there were properly identified trade secrets and a document that is in Mr. Callington's possession, there was no misappropriation. The only alleged misappropriation is the disclosure to the *New York Times*, which is protected activity within the meaning of the anti-SLAPP statute -- or not necessarily protected activity, but activity that is immune from suit.

THE COURT: Okay. Mr. Kienzler, are you basing your request for relief in the form of this limited injunction that would prevent further dissemination of whatever it is that Mr. Callington took with him on a likelihood of success on just the breach of contract and the conversion claims?

MR. KIENZLER: Yes, Judge.

THE COURT: Okay.

MR. KIENZLER: That's what we -- in our motion, those are the claims we focused on. We pointed you to authority that would support a likelihood of success on some, but not all the claims can support injunctive relief.

THE COURT: Thank you.

And then back to Ms. Cole for a moment.

Would you agree that at this point, based on the record, including Mr. Callington's declaration that was filed on the 13th, that he is admitting that he took with him from UL confidential information or information that was treated as confidential, and he disclosed that information to the reporter

from the *New York Times*?

MS. COLE:  I would agree with that, in part.  I think that I -- Mr. Callington did not take any documents.  He used documents in the ordinary course of his employment in a manner that was consistent with other similarly situated employees. And when UL, you know, turned -- cut off his access from the company, because everything was syncing to all of his devices, it -- local versions remained on his devices.

So we take issue with the word "took" as opposed to has in his possession.  But, otherwise, we do not dispute that these are documents that UL treats as confidential, along with all of its other internal business documents, and we do not dispute that Mr. Callington did, in fact, after raising issues internally for years and being ignored, sound the alarm and reach out to Ms. Dreier of the *New York Times*.

THE COURT:  And did the contact with Ms. Dreier take place before or after Mr. Callington left UL?

MS. COLE:  So the contact with Ms. Dreier was during his employment with UL.  And the day after or the -- either the same day or the day after the article was published, UL placed him on leave and started what is called an internal investigation, which was conducted by outside counsel at Sidley Austin, in which, in UL's own words, they were gathering evidence to determine whether Mr. Callington had provided documents to the *New York Times*, which he did not deny.  His

name is in the publication.

THE COURT: Yes. Okay. So I'm asking these questions because I'm just trying to confirm what's undisputed about what happened here.

Mr. Kienzler, do you actually disagree with anything that Ms. Cole just said in terms of the sequence of events other than your belief that Mr. Callington had no right to share those documents and that information with anyone, let alone a reporter?

MR. KIENZLER: Judge, I don't take issue with the chronology. Like, I mean, the reach-out took place during his employment. He was then placed on leave, and an investigation was started.

I would just briefly like to focus on something Ms. Cole left out, and this has to do with her taking issue with the word -- whether he "took" information.

Judge, the allegations in this case are not solely that he shared information with himself using Dropbox. I remind the Court that the allegations in this case include the fact that he gained possession of this information by BCC'ing it to himself.

So, you know, she takes issue with our -- the use of the word -- whether he "took" information. We think that our allegations demonstrate that he did. This was not all sort of out in the open and transparent.

So I'll stop there because I don't want to just dive into argument.

THE COURT: So you're saying, basically, there was no reason, in your view, for him to BCC the documents to himself in the ordinary course of his work. That's your position.

MR. KIENZLER: Correct, correct.

THE COURT: Hold on here.

Another question about the chronology, but a slightly different one, that I have for Mr. Kienzler.

So I suppose I didn't fully realize that before the lawsuit was filed here that Mr. Callington had another attorney who was assisting him in his communications with the company? And I think I saw a reference to a Mr. Leonard?

MR. KIENZLER: That's correct, your Honor.

THE COURT: And so Mr. Leonard is somebody that UL was dealing with on Mr. Callington's behalf prior to the filing of the complaint?

MR. KIENZLER: Yes, your Honor. Prior to the filing of the complaint, prior to Littler Mendelson's involvement on behalf of UL -- so the company was represented at that time by the law firm Sidley Austin. And Mr. Callington retained Mr. Leonard. And that's why you see email correspondence about document requests between an attorney from the Chicago office of Sidley Austin and Mr. Leonard.

And just to sort of round out Mr. Leonard's

involvement, your Honor, he -- he was an attorney that, when we filed this complaint last July, I sent it to Mr. Leonard and asked if he would waive service of the complaint. He agreed to waive service on Mr. Callington's behalf. And at some point thereafter, he withdrew from the representation. I'm not saying I'm entitled to know why, but I don't have further information for you on that issue.

THE COURT: Because Mr. Leonard did not ever file an appearance on behalf of Mr. Callington. Mr. Callington was initially *pro se* for some period of time. I gave him time to find counsel. He found Ms. Cole. But as I understand it now, prior to that *pro se* appearance, he had been represented by Mr. Leonard. It sounds like that was in connection with responding to requests from the company in connection with the internal investigation being conducted by Sidley Austin. Is that correct?

MR. KIENZLER: I agree with that, Judge.

The one thing I'll add is that if you look at the executed waiver of service that is filed on the docket in this case, you will see that it is signed by Mr. Leonard.

MS. COLE: I can offer clarification on the nature of the representation and why Mr. Leonard did not proceed to represent Mr. Callington in this case. Because it touches upon privileged information, I -- I would just ask for -- well, I mean --

THE COURT: I don't know that I need to know the reason why.

MS. COLE: Yeah.

THE COURT: I'm not particularly concerned about the reason why.

MS. COLE: I'm just concerned --

THE COURT: I'm just more concerned about the sequence of events. And it seems like it was through Mr. Leonard that certain documents were returned by Mr. Callington to UL, so that is why that --

(Unreportable crosstalk.)

MR. KIENZLER: That's correct, Judge.

THE COURT: So that was something that was conveyed through counsel, and that's how UL came to confirm, to some extent, what documents were still in Mr. Callington's possession at that point in time.

MR. KIENZLER: Correct, Judge.

THE COURT: But, Mr. Kienzler, it's your understanding that Mr. Leonard did not provide all of the documents that Mr. Callington had. Is that fair to say?

MR. KIENZLER: I mean, through objections to the document requests that the Sidley firm advanced, there were -- there are objections to those, and there were positions taken that documents wouldn't be produced at that time, so, yes.

THE COURT: And do you know, through those

communications with Mr. Leonard, what sort of documents those are? In other words, was there a discussion of we're not going to provide the documents in request to -- in response to Request Number 3 because X, Y, and Z. Like, do you have that sort of information? Or was it we're just objecting to this request and we're not going to tell you what we have or whether we have anything?

MR. KIENZLER: Judge, I would characterize the correspondence that we have as very similar to civil litigation discovery. Right? And so Mr. Leonard was putting forward objections and giving the basis for those objections, and there was -- there was a relatively significant back-and-forth between Sidley and Mr. Leonard.

THE COURT: Okay.

MS. COLE: Your Honor --

THE COURT: One more question for Mr. Kienzler and then, Ms. Cole, I'll give you a chance.

So, Mr. Kienzler, when you were receiving this information -- well, I guess it wasn't you. It was Sidley and your client. When your client received the information from Mr. Leonard, was it your understanding that you were just receiving copies? Because my takeaway from the briefing is that the understanding was at that time Mr. Callington was providing copies of what he had rather than divesting himself of the documents he had. In other words, he didn't send copies

of what he had and then delete it from his own materials. He kept what he had and shared copies with UL so that UL would know what he had.

MR. KIENZLER: Yes. Correct.

THE COURT: Okay. And is that consistent with your understanding, Ms. Cole?

MS. COLE: That is consistent with my understanding.

THE COURT: Okay. And then you wanted to jump in to respond to something, so I'll give you a chance to do that.

MS. COLE: I did.

So there was an extended back-and-forth between Sidley Austin and Mr. Leonard. It was just like document requests are propounded in civil litigation. There was a new max set up (audio interruption) document request to which Mr. Leonard advised Mr. Callington to produce essentially everything that was in his possession, acquired in connection with his employment (audio interruption) which he did fully. And UL I think is insinuating that they think there was something else, but, in fact, as I understand it and as Mr. Callington has represented in his filings and in his declaration, the only thing that his previous attorney, Mr. Leonard, advised him not to produce were Mr. Callington's communications with the *New York Times*, meaning his conversations with Ms. Dreier, and his personal notes from the interrogation at Sidley Austin's office.

In addition to producing thousands upon thousands of documents at UL's request, voluntarily, without asking for any -- anything in return other than, you know, goodwill, he -- the only thing that he withheld was his communications with the reporter and his notes from this interview that he also submitted to you in addition to making all these productions. So he went to Chicago, to Sidley's office in Chicago, and sat for a full-day interview with their attorneys and, as you can imagine, took notes during that interview, and then Sidley Austin turned around and said, "Oh, we want to see what notes you took during our interview of you."

So those are the only two categories of documents that Mr. Leonard advised him that he really -- there was no legal basis and he had no obligation to produce those and should not.

To the extent that UL is claiming that anything else has been withheld, we would respectfully request clarification on that, just as a matter of notice, because I -- it's not clear to me whether they're alleging that anything else has been withheld, and my understanding is that nothing else has been withheld.

THE COURT:  So to the extent the original motion for a confidentiality order was filed to help identify what Mr. Callington had so that it could be marked as confidential by UL, it sounds like you're saying they didn't need to do that because they already had copies of everything that came from UL

that was in Mr. Callington's possession. The only thing that he withheld were sort of new correspondence with the reporter and his own work product and notes from his interactions with the reporter.

MS. COLE: And his own interaction and notes from his interview at Sidley Austin. So when Sidley Austin brought him out to do an interview, after he had produced all these documents back to UL, he sat for a full-day interview at the law firm of Sidley Austin Chicago, and his notes from that interview at Sidley Austin were subsequently added to the document requests, and that's -- my understanding is that's what he did not produce, in addition to his reporter notes.

THE COURT: And so, Mr. Kienzler, are you seeking to include in this, I'll call it a, you know, sort of an anti-dissemination order or an order that would prevent Mr. Callington from disseminating confidential information any further than it's already been disseminated, are you including in that these notes that he would have taken of his interactions with the Sidley attorneys as well as any -- you know, anything he told the reporter?

So, in other words, presumably, you know, he had the conversation, he gave an interview to the reporter, and he may have shared his thoughts of things that were treated as confidential by the company, and so are -- is part of your argument that he shouldn't be able to disseminate those notes

because they reflect the confidential information, even though they're confidential information processed by Mr. Callington in his head, coming out in the form of whatever notes he took?

MR. KIENZLER: Yes, Judge. I mean, like -- yes, of course. It's -- I concede that it sort of gets ambiguous, but, I mean, to use the example, if I have a document that is confidential and I write on a legal pad information off that document, it doesn't mean that it has now sort of lost confidentiality just because I've taken a pen and written things down. So it depends on what the notes say. I guess -- I don't know how to answer it further than that. But to the extent a written document would reflect information on the confidential documents, then yes. To the extent it's innocuous notes, then no. I guess it depends.

THE COURT: Okay. And then one more question for Ms. Cole and then we can get into some real argument on the issues here.

So I looked through the additional witness declarations that you want to submit, and I will acknowledge I looked through the redacted ones primarily, but it seems to me that the witness declarations primarily support your position that what Mr. Callington said was true, that what he reported to the *New York Times* about what was going on was accurate, and he's got other people, you believe, who would be in a position to corroborate his version of events. Is that the primary

purpose of those declarations?

MS. COLE: So it is not. That -- I think that is true, in part, of the first confidential witness declaration. The first declaration summarizes two separate conversations. The first one was in September. And at that time, my primary reasons for reaching out to that witness were to understand and investigate this case. It was right around the time that Mr. Callington initially reached out.

The second conversation that is described in that first confidential witness affidavit is focused on the representations made by UL in its more recent filings about, you know, his quote/unquote theft of documents.

And I think that second and third affidavit are exclusively or at least mostly about that.

And so these are three other individuals saying, you know, I have direct knowledge of the internal operations of UL's responsible Sourcing Division and basically, you know, we all used cloud software, we all used email from our phones, took photos from our phone, you know, that kind of thing. And that's three separate individuals who worked for the company in a substantially similar capacity, some of which have worked as independent contractors or employees. And I would just note that for the independent contractor cohort, these individuals do not even receive computers from the company or -- or a UL email address. This is all in the declarations. They are

expected to use their own email and equipment and computers. And I think this is important because Mr. Callington started out as an independent contractor. And the email address that UL is complaining about him using, either directly or by BCC'ing information to his email inbox, is an email address at which UL would email Mr. Callington when he was an independent contractor.

So I think all of this belies the representations that they're making about his use of email being surreptitious or unauthorized or any other kind of ill intent that they are attempting to attribute to his ordinary, routine business use of ordinary routine technologies.

THE COURT: Okay. So two purposes for the declarations.

One, that these folks or -- that there are other people at the company who witnessed similar things as Mr. Callington and corroborate his version of what was going on there that he wanted to blow the whistle on, so to speak.

And then, two, these other employees are being offered to show that what UL is now saying was out-of-bounds behavior for an employee was, in fact, the usual way that employees in similar positions to Mr. Callington conducted their job responsibilities.

MS. COLE: Correct, your Honor. Thank you for summarizing that more succinctly than I did.

THE COURT:  But it's also possible that those other employees are also in violation of some confidentiality agreements if Mr. Callington is.  And I don't think I saw anybody else who said that they shared whatever they had on their personal email or their phones with, you know, a third party for a non-business purpose, so would that -- that would be a distinction.

MS. COLE:  Yes, that would be a distinction.

THE COURT:  Okay.  So with that in mind, I'm not sure -- while the declarations may provide some useful context, I'm not so sure that they speak to the really disputed issues here, which are whether UL is going to be able to make a sufficient showing that they have a likelihood of success on the contract or the conversion claim, and that even if they sort of can show that they have some likelihood of success, that they wouldn't run into a roadblock with respect to the anti-SLAPP statute because their claim arises out of a statement, document, or conduct that is covered by that Oregon statute.  And I think with respect to a likelihood of success on the merits, that is sort of a bucket that I would like to hear from the parties on.

With respect to whether I'm going to issue some sort of limited preliminary injunction that prohibits Mr. Callington from disseminating information any further, there are, of course, also issues regarding the balance of harm, whether

there's an adequate remedy at law, and the public interest, and all those things are addressed in the brief, but I can hear more from the parties on those issues as well.

So I do think that because of that bit of overlap with the anti-SLAPP motion, I'd like to hear from the parties essentially on your presentation of what I should do today. And I am very interested in your view on the merits of the contract claim and the conversion claim. I suppose to a secondary -- secondary extent, the two trade secret claims under federal and state law, but also the arguments about whether this is a type of -- a type of claim that is covered by the anti-SLAPP statute.

I will also point out that part of the anti-SLAPP process under Oregon law is the Court making a determination of whether the plaintiff has established a probability of prevailing on the claim. So in that sense, all of this overlaps as well. I don't know that I've given a lot of thought to whether the same degree of probability that's required in the anti-SLAPP provision analysis is the degree of probability required for Rule 65, at least under Seventh Circuit case law, but that's something I suppose I can sort out.

I'm going to start with the plaintiff here, Mr. Kienzler, and hear any further argument you want to make at this point about what I should do next. I think that's

probably the most succinct thing I can say. What do you want to tell me? What do you want to highlight that's in the briefing? What do you want to have happen next? And why should I give you that relief?

MR. KIENZLER: Sure, Judge. Thank you very much, and I appreciate it.

I'll just first make a point. I agree with you that the standard of -- there's sort of overlapping standards between the anti-SLAPP motion and the motion for preliminary injunction in the sense that if Mr. Callington meets his opening burden on the anti-SLAPP motion, which is the initial burden that he must carry, then -- then you look to see whether the plaintiff had a probability of establishing its claims, just like a motion for a preliminary injunction under Rule 65 requires a showing of likelihood of success.

Before I go any further, I just want to point out in the -- Mr. Callington's response brief on the motion for preliminary injunction, that they have labeled the additional factors of -- that are traditional to a Rule 65 analysis as being a waste -- "frankly, a waste of time and judicial resources." So that's on page 26. They haven't addressed the concept of irreparable harm or balance of harms or public interest in their response to the extent to put all their eggs in the basket of us not having a likelihood of success. So I just want to make that point at the outset.

And I will say, as I've said a couple minutes ago, we have focused our motion for preliminary injunction on a breach of contract claim and our conversion claim.

Our complaint includes the additional claims of breach of fiduciary duty and Federal and Illinois Trade Secrets claims.

We think we have a like -- a strong likelihood of success on our breach of contract claim and our conversion claim.

I will note that to the extent the declarations that Ms. Cole has submitted from witnesses whose identities have been shielded from us, to the extent we can glean anything from those -- and I sort of take issue with Ms. Cole talking about the substance of them in a contested hearing when it hasn't been provided to us, but I think that sort of is an obvious point that I don't need to spend too much time on. One portion of it that has been provided to us is that one of the three witnesses she wants you to rely on says that it was his or her understanding that the audit records and work product that goes into creating the audit that UL conducts are to be considered confidential and sensitive. So their own witness is putting forward evidence that that person views the work product that we're trying to protect through our motion as confidential and sensitive in nature.

So I don't know how Mr. Callington can have it both

ways by coming to you and saying nothing about his work was confidential or sensitive when this person seems to have a directly opposite view.

Judge, the conversion claim requires that Mr. Callington have information that belongs to UL in his possession. I don't even think that's disputed at this point. I think we've gone through that extensively today, and I think it's put forward in crystal-clear fashion in the documents. He has given us back copies of information and he's retained copies. So whether we're going to prevail on that claim is -- it will require us to show that we have a right to our information, that we have a right to immediate possession of it, that we've demanded possession of it, that he took control or is exercising control of it wrongfully and without authorization. I think we can make that showing based on the information before the Court. Sidley requested it back. He has refused to give it back. There's no dispute that he has possession of it now.

Now, whether or not he's entitled to retain it because of a belief that it supports some sort of illegal conduct, that he's -- that the government is investigating, I guess none of that information is sort of before the Court right now. But for the purposes of Rule 65 and for the purposes of meeting our burden under the Oregon statute, I don't know what else we would need to show. These are low thresholds. These are not

trial thresholds. These are low thresholds designed to take into account the stage -- preliminary stage of this litigation.

The same is true with the contracts. The contracts that he signed, both as an independent contractor and as an employee, require him to safeguard the information.

He -- we have alleged -- Ms. Cole can have a different perspective on this -- but we've alleged that he took possession of information in a surreptitious fashion. Just because UL might have known what his email address was, when he puts it on a BCC email, that does not signal to anyone that he's taking possession of the information in that email or attached to that email. Just like I have a public email address, you -- there are lots of public email addresses. But if you don't announce to the recipient of an email who is getting it, it doesn't really matter if they know -- if they know the BCC people or not. They're not being made aware of where that information is going.

So we've alleged that he took information in a surreptitious fashion, and there's no dispute that he disclosed it to the *New York Times* reporter.

So, again, we're going to hear from Ms. Cole that she has a different perspective as to whether he was allowed to do that or why he did that, but there's no dispute that that occurred. Okay?

And so from the standpoint of meeting our very low bar

of proving we have a probability of establishing a breach of the confidentiality agreement, both from the Rule 65 perspective and from the Oregon statute perspective, we think we've far exceeded those thresholds just on the limited record before the Court.

THE COURT: To get to the overlap with the anti-SLAPP issue, does your claim for either breach of contract or conversion arise from the -- a statement, an oral statement or a written statement or document, that was I guess presented by Mr. Callington to the media on an issue of public interest? Because I think just to even determine whether that statute applies, there are several categories -- well, there are four categories of statements that would be covered, and two of them seem potentially applicable here. One is: An oral statement made or written statement or other document presented in a place open to the public or a public forum in connection with an issue of public interest. And then the second one is: Any other conduct in furtherance of the exercise of the constitutional right of assembly, petition, or association, or the constitutional right of free speech or freedom of the press in connection with a pubic issue or an issue of public interest.

It seems like those would be the two categories under the Oregon statute that might be implicated here in that we're talking about statements that Mr. Callington made and documents

that he provided to the media, so that would be freedom of the press issue. And I'll treat a newspaper potentially as a public forum, so to speak. And it relates to an issue of public interest, arguably, because it deals with issues of enforcement of child labor regulations.

Would you agree then that to the extent this statute applies, it's for one of those two reasons?

MR. KIENZLER: No, Judge, we don't agree that they -- we don't agree that they've met their burden, which is the first prong of the statute. We do not concede that our claims arise from protected activity.

So Mr. Callington reached out to a newspaper reporter. How long that conversation occurred, took place, what was shared, I don't know yet. Discovery will bear that out.

After -- after the article was published, UL opened an investigation and looked into and conducted a forensic -- among other things, asked for Mr. Callington to turn his laptop back in to the company. He delayed doing so, he deleted information before he did so, and he didn't comply with that request.

We engaged in document requests to him. He fought those, objected to those. Ultimately, produced copies of information to us through the course of that.

So we terminated his employment after an extensive investigation, not because he spoke to the reporter, but because he -- we found that he was in possession of significant

amounts of company information that he then deleted or refused to divest himself of possession of. So we don't -- we don't concede that point. Ms. Cole will give a different perspective, but we don't concede that, and we don't think our claims arise from the mere fact that he reached out to a reporter.

THE COURT: And so your claims arise from the fact that he has this information and he is not returning it and divesting himself of any copies.

MR. KIENZLER: Correct.

THE COURT: Okay. A response from Ms. Cole?

MS. COLE: Yes, your Honor. Thank you.

There was a lot there that I would like to respond to. I'm going to try to take it from the point that we were just discussing and back up towards the beginning of that.

I believe your question was whether the breach of contract and the conversion claim specifically arose from the disclosures to the *New York Times*. And my understanding is Mr. Kienzler's response to that is, no, that's not the theory of breach. The theory of breach is that Mr. Callington has these documents.

I guess first, like, is that the theory? Because on the other hand, he also said, you know, just a moment ago, I think implied that the theory of the breach is the disclosure to the *New York Times*. And so I guess I would just ask for

clarity on like what is the alleged breach on the breach of contract theory.

If we assume -- I would also take issue with the representation that there were two separate contracts signed. I would agree that Mr. Callington did, in fact, enter the independent assessor agreements and that those were signed. There is no evidence of any kind of a confidentiality agreement subsequent to that. All that UL has provided is an unsigned document that is also undated, and I've provided a copy of that, copied and pasted into our brief.

But even if we assume -- let's give UL credit and just say they had all the contracts, all the contract provisions they claim they had. There's a real problem with the other elements of the breach of contract claim. The first one is the breach. What is the breach?

The breach -- the alleged breach in the complaint is disclosing information to the *New York Times*. And I think -- I thought that that was undisputed up to this point.

And then also what is the -- what is the damages? Are there any contract damages here? The damage, I think, to the extent that there has been any damage, it's the result of UL's own conduct. It's not a result of Mr. Callington's conduct.

So those are kind of the few points that I want to make on the breach of contract claim.

And I'll leave it at that for now.

THE COURT:  What about on the conversion claim? Because conversion just requires Mr. Callington to have something, belongs to this other person, the other person makes a demand -- I'm sorry, the other person has a legal right to have it back, they make a demand for it and he refuses.  Are you disputing that UL has a legal right to demand the return of all copies of any confidential information that Mr. Callington still has in his possession now that he is no longer an employee?

MS. COLE:  No.  That -- that is not disputed, that UL can demand its documents back.  And if UL had demanded its documents back and Mr. Callington had said, "Absolutely no way, I'm taking these, I'm giving them to everyone I know, ha, ha," obviously there would be some claims there, but that's not what happened here.

What happened is that he participated voluntarily in an internal investigation during which he disclosed to UL the documents that he had in his possession, which he does not dispute are confidential business documents, and UL has since gone back and forth between, oh, we want you to produce these documents, we're collecting -- gathering information to determine what you have and whether you disclosed it in violation of company policy, to then saying, you know, we want you to delete all the documents, while at the same time filing a lawsuit against him which would make that spoliation.

So it's not really clear what it is that UL wants. But to the extent that they are seeking, you know, exclusive possession of their own documents, it is UL's own conduct and course of action that has prevented Mr. Callington from deleting the documents in his possession.

THE COURT: With respect to the request that I issue an order that would enjoin Mr. Callington from further dissemination of the information and documents, have you decided to waive any argument or, you know, abandon any argument with respect to the balance of harms or irreparable harm, or is there something that you actually want me to consider on those points?

MS. COLE: Yes. So on the balance of harms, you know, I think that the characterization of our argument that it's a waste of time is not exactly accurate. I think that the merits of the claims here are so far below the standard for a preliminary injunction that we focus on the merits of those two claims.

THE COURT: Because what is --

MS. COLE: However --

THE COURT: -- what is the harm?

Let me rephrase this.

Is there any harm to Mr. Callington if I enter an order that says you can't share this information with anyone outside of discovery in this litigation or in response to a

lawful inquiry from a government agency? Where would be the harm to Mr. Callington?

MS. COLE: Yes. So I think there are several harms here.

The first harm is having your conduct governed by a preliminary injunction or any kind of a court order, period.

If you look at the correspondence between UL's counsel at Sidley and Mr. Leonard, it is clear that they were using this, in part, to just be, in my opinion, a pain in his side, you know, propounding document requests, making, you know, repeat demands, feigning, I think, you know, beliefs of non-compliance when he was clearly being very cooperative. And I think that, you know, it is always harmful to have your conduct regulated by a court order. He's not a criminal. He hasn't done anything wrong here. The only thing that he's done is speak to a reporter about child labor issues.

So I think the first point is a preliminary injunction regulating your conduct is always harmful.

As to the more specific harms in this case, I think that if the Court were to enjoin the conduct just as you described it, for example, if it said, you know, "Mr. Callington cannot disseminate those to anyone except for in response to a lawful government inquiry," then it puts us in a tough spot in terms of determining what is in -- within and with -- and outside the scope. There is already his

contractual obligations with respect to the independent assessor agreement, that he can't disseminate this information willy-nilly. And he obviously knows at this point that he might create some liability if he does in any way that isn't either protected under some federal or state law. Adding a preliminary injunction to that, though, in the words that you've stated, limits the scope of permissible disclosures to government entities to -- in response to a government inquiry, for example.

So if he wants to speak to a law enforcement agency that has legitimate law enforcement purposes for finding out information that's in one of these documents, the law allows him to make that disclosure to a government authority affirmatively. He doesn't have to do it in response to -- or he doesn't have to wait for a friendly subpoena or request.

THE COURT: But couldn't he also --

(Unreportable crosstalk.)

THE COURT: -- do that without sharing the confidential information?

So there has been a very detailed article that's out there in the world in the *New York Times*. If -- I don't think -- and Mr. Kienzler can respond to this in a moment -- but I don't think such an order would prevent Mr. Callington from saying, "Hey, government regulator, look at this article in the *New York Times*," and then if they decide this is

something we want to investigate, maybe we should seek information from this person, they could do it, which is -- in other words, he has things that he could do and say in exercising his First Amendment rights that would not require disclosure or dissemination of confidential information.  He could say, "I think this is a bad company.  Here's, you know, a *New York Times* article that explains why."

MS. COLE:  Yes, your Honor.  But, for example -- well, first of all, the article is limited to a very specific issue that that reporter was covering, the use of child migrant labor.  Mr. Callington's concerns are not limited to that. Mr. Callington's concerns are about this company's practices and how they are complicit in -- in allowing and enabling companies to misrepresent their ESG compliance across the board.  That affects everything from how large pension funds choose to invest, large pension funds.  It also affects compliance -- it concerns compliance with numerous federal and state laws.  And it doesn't just concern UL's conduct.  There are other players at issue.

And this -- this is a very common strategy in a whistleblower case where the bad actor wants to know exactly what is being disclosed to what government agencies and wants to try to stop it in its tracks, and that is precisely what such an order would do.

THE COURT:  Sure.  So in -- and, Ms. Cole, so in

another life, seems like a long time ago now, I worked for a government agency, and, you know, we would look for things that might need to be investigated, and one of the ways that we would do that is see if there were articles in the media that would suggest -- in my case, it was securities regulation -- maybe there's something going on with a company and maybe we should start investigating because we see somebody is talking about that in the media.

So it seems to me that, for better or for worse, the current state of things is that any government agency that's interested in investigating these issues knows about Mr. Callington, they can find Mr. Callington, but what you're suggesting is he needs to be able to affirmatively go out and try to drum up interest by sending documents, which strikes me as very different than he gets an inquiry from an agency who hears about this because it's already out there in the world and wants to talk to him, as opposed to he's affirmatively calling them up and saying "I want to tell you." There's a distinction here.

And I guess in terms of the harm to Mr. Callington, if he's allowed to answer the call if they approach him, but he's not allowed to affirmatively reach out to them, where is the harm to him?

And where is the harm to the public interest, because there are agencies that might be interested that cover these

subject matters, and I'm guessing they know how to find Mr. Callington if they -- if they need to find him. And he's got counsel, so it's even easier. It's -- I can tell you, it's harder to find people when they don't have counsel, but here they know that they can call you because your name is on the docket.

MS. COLE: Sure. So the harm to the public is that the government agencies do not, in fact, know or understand the scope of knowledge that Mr. Callington may seek to disclose to them at some point. I think a government agency that is investigating child labor or maybe ESG compliance generally would maybe know to reach out to Mr. Callington based on that article. The context in which Mr. Callington may disclose or may have disclosed information to state and federal agency -- government officials is well beyond the scope of what's in the public domain.

For example, if, hypothetically, someone were to file a PTM lawsuit under the False Claims Act. That -- the PTM disclosures to DOJ's Civil Division would have to concern something that has not already been publicly disclosed and -- so they're not interested in speaking to him about the child labor piece anyways because that's already out there. But he has an affirmative right to go to DOJ and say, "Hey, I saw something illegal here, there's a fraud on the government on this particular contract that relates to some audit that I had,

and I'd like to tell the government about it." How would an attorney in my position assess his ability to speak with DOJ in those circumstances? I'm not saying that that's going to happen, but that's just one of the examples of the harm or burden that comes from having your ordinary, legally protected conduct subject to an injunctive -- a court-ordered injunction.

Similarly, if you look at other programs like the SEC whistleblower program, hypothetically, if someone were to make a submission to the FCC Whistleblower Office about a particular topic, as a matter of practice, the way that that works is that there are a lot of follow-ups on initial submissions. And those may be pursuant to a request from the SEC Enforcement Division or it may be, you know, voluntarily providing information and evidence based on advice from counsel. That's another situation in which a court-ordered injunction would significantly burden the conduct of a whistleblower.

And there are many other examples and hypotheticals that I could think of, but I think these all go to the bottom-line point, which is that, you know, low as it may be, the standard for preliminary injunction is not nothing, and it is also not nothing to have to conform your conduct to a federal court order because your former employee has a contract claim against you. That seems really out of proportion here in terms of the balance of the harms.

And I think also with respect to the balance of the

harms, you know, there's all the points made in our anti-SLAPP motion that -- you know, the only disclosures that Mr. Callington has made to the *New York Times* or government officials are public interest matters, and not just public interest matters -- public interest matters that really matter for real people.

THE COURT: Okay. So, Mr. Kienzler, I do want to get your view, starting with would you -- are you seeking an order that would say if the agency -- investigator from the agency calls up Mr. Callington because they read about, you know, this case or they read the *New York Times* article, that he would not be able to speak with them?

Now, I would take -- just to address another issue, I would say that if Mr. Callington gets an official letter or subpoena from an agency, there certainly is a way to put a procedure in place where that gets submitted to the Court so that I can review it and determine whether it's inside or outside of the scope of the injunction and could give him relief and say, yes, you may provide this. And, you know, I think that can even be done on an *ex parte* basis. So I guess I'm less concerned about a mechanism that allows it to work in a way that doesn't put the burden on Mr. Callington or his counsel to figure out what's inside or outside the scope of the order, because that's something that I think can be worked around.

I'm more concerned about what UL really wants to accomplish here so that I can decide whether that's the right relief.

So if he is asked to come in and sit for an interview with somebody from an agency, if somebody calls him up and says, "We read that article in the *New York Times*, we'd like you to come in and do an informal interview," is he able to have that discussion, Mr. Kienzler?

MR. KIENZLER: Yes, Judge. We're not asking for that order today, and we haven't asked for that order, to limit that at any time in this proceeding. It's what -- it's what is included in the interim order that is in place right now. There is a carve-out that goes to exactly what Ms. Cole is talking about. We are not seeking -- interim protective order, paragraph six. We are not seeking to limit his ability to interact with a government official.

Judge, if I could just -- if I could just address some of the -- some of the argument that was just made.

First, whether I'm misconstruing her response brief, again, I'll just point you to page 26. Quote: At this juncture, UL is so very far from meeting its burden on the very first threshold factor for obtaining a preliminary injunction that considering the additional factors is frankly a waste of time and judicial resources.

So I'm not misconstruing her response brief. I'm

reading directly from it.

Okay. So, now, everything that was just advanced by Ms. Cole is new today, and that's fine. She's making some very strong assertions about UL engaging in very serious conduct. So we'll get into that in the course of this litigation, apparently.

But, Judge, there's no -- there's authority that's before you today that says that Mr. Callington can just simply continue to hold evidence -- or hold information that belongs to UL on the possibility that he might want to reach out to a government official in the future.

This sort of, like, ambiguous, very nebulous, something might happen in the future where I might need this information, is not what -- there's no authority that allows him to do that and just tell UL, "You have to let me keep this information, there's nothing you can do about it, because I might call a government official at some point in the future."

So I don't think that's really a correct interpretation of the carve-outs of statutes like the Defend Trade Secrets Act, but that's all beside the point because we're not even seeking an order that would bar him from participating in a government investigation. We're simply seeking an order that would prohibit him from further disseminating information, outside of a government investigation.

THE COURT: Would it prohibit him from trying to initiate that investigation? I'm going to go back and look at your language, because it does talk about sharing the information from UL, but we also talked about the fact that if he's sharing his notes on his impressions of things, that is potentially information derived from confidential information. So would you understand your order that you're asking for as prohibiting Mr. Callington from calling up an agency and saying "Hey, I want to talk to you about these things, can I come in," as opposed to them calling him.

MR. KIENZLER: I don't think -- I don't think we would be seeking to prohibit that, Judge.

You know, I'll just point you to the original *New York Times* article. It's unclear what he -- what Ms. Cole is talking about. What the article says is that, quote -- this is on document 39-1, page 6 of 9, quote: In his career, Mr. Callington had never found a case of migrant child labor which would trigger an automatic failing grade.

So that's what's in the article -- if -- I don't know what he's sharing with the *New York Times*. I don't know what he's sharing with government investigators. I don't know what he's planning on sharing with government investigators.

What I do think we're entitled to is ultimately, yes, what I would like to see happen here today, I would like ultimately for this case to move forward into discovery, one

way or the other, so that we can start to put together the pieces of what he's -- what information he has and whether he is entitled to retain it. But what we're seeking in the interim is an order that prohibits him from further disseminating the information in his possession.

THE COURT: Okay. I appreciate you both answering my questions. I do want to wind things down. I know we got started a little bit late, but we've been going for about an hour with questions and arguments. So I think I have the information that I need. I understand the parties' positions. I have your briefing.

It's not clear to me that the disputed declarations from the anonymous individuals necessarily move the needle on the key issues here, given the purpose for which they're offered, but I will issue a ruling that indicates my view on those and how they fit into all of this.

And I do think it probably makes sense, given how these issues have been presented, for me to try to get the parties, in relatively short order, a ruling that addresses both of these things and -- because, first of all, if it appears that the anti-SLAPP motion to strike is going to be successful or has some merit, then, of course, that undercuts what may be needed with respect to any restriction on Mr. Callington's activities. But if we are pushing forward into discovery, then something would be in place. That

something, even if there's no injunctive relief, per se, could be some form of a more traditional confidentiality order.

And I think I made this clear when I set this for a preliminary injunction hearing rather than a traditional discovery order proceeding that my concern here is that we're not really talking about how information provided through the discovery process is going to be handled by the parties. We're talking about how information that was allegedly taken, converted, not through a voluntary act by a litigant as part of discovery under the Federal Rules of Civil Procedure, but the allegation is these were taken improperly and consistent with Mr. Callington's duties.

It is entirely possible that there's a confidentiality order that gets entered for purposes of litigation, even if there's not the full injunctive relief that's -- that's worded here. There is sort of a balance that needs to be struck. But, you know, it is very clear certainly after this hearing that the defense position is this is in their possession and they want it to remain in Mr. Callington's possession for reason other than litigation, other than we need to develop evidence. Whatever counterclaim may come -- and we've talked about that before -- I think it's very clear that their position is: This isn't a discovery matter. This is a: We have a right to have this information apart from discovery and to use it for purposes other than this litigation. And that is

why I think this is the more appropriate procedural posture, though I will address all that.

The interim order will remain in place pending a resolution of the new motion from the plaintiff. And I do want to get to that, as I said, relatively quickly without losing anything on the analysis and get us to the next stage of this case.

So thank you for your argument. I'm going to set a further status date, which I think can likely be a phone status, and I'm anticipating getting an order to the parties in advance of that.

So give me one moment to take a look at the calendar.

(Pause.)

THE COURT: I think a telephonic status on Tuesday, July 22nd, at 10:30, which would enable me to get a ruling to the parties, maybe get some sort of schedule in place for what's going to happen next, and move forward.

If there's any circumstance in the interim that the parties feel requires a status hearing, you can always reach out to my chambers and ask for one or file an appropriate motion.

Does that date work, July 22nd, at -- I think I said 10:30?

MR. KIENZLER: Yes, it works for the plaintiff, your Honor.

THE COURT: Ms. Cole?

(Pause.)

THE COURT: I don't think we can hear you, Ms. Cole.

MR. KIENZLER: I heard you until now, but just not now.

THE COURT: Yes.

MS. COLE: I'm sorry, I was muted.

Mr. Callington has a conflict on that day, but I will preliminarily say that we can move forward with a status hearing then. But let me speak with my client, and I will alert your Honor's chambers if there is an issue with that date.

THE COURT: That's fine.

So what I'm anticipating is -- I'm not expecting a substantive hearing because I'm going to rule on the papers and get that to the parties and then, you know, assuming things are moving forward to the next stage, if that's -- if that's what's happening, I may ask for a proposed schedule, and then we'll be discussing that at the hearing.

If the motion to strike ends up appearing to be, you know, fatal to -- to the claim, we may be on a different track. But either way I'm not anticipating extensive argument. Certainly if something changes on my end, I'll let the parties know and we can adjust. And if the parties have something that comes up that you think is going to require that extensive

argument, just let me know, but -- yes, you can certainly reach out to adjust.

Thank you very much for answering my questions this afternoon.

MS. COLE: Thank you, your Honor.

MR. KIENZLER: Thank you for your time, your Honor.

THE COURT: We're adjourned.

(Concluded at 3:36 p.m.)

* * * * *

I certify that the foregoing is a correct transcript, to the extent possible, of the record of proceedings in the above-entitled matter given the limitations of conducting proceedings via videoconference.


*/s/ GAYLE A. McGUIGAN*                          *July 16, 2025*
GAYLE A. McGUIGAN, CSR, RMR, CRR
Official Court Reporter