## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS

UL LLC,

    *Plaintiff-Counterclaim Defendant,*

    -v-

JOSHUA CALLINGTON,

    *Defendant-Counterclaim Plaintiff.*

**ANSWER, DEFENSES AND COUNTERCLAIMS**

Case No. 1:24-cv-05631
Hon. Andrea R. Wood

[Jury Trial Demanded]

## ADMISSIONS AND DENIALS

Joshua Callington ("Mr. Callington") hereby answers the Original Complaint (Dkt. 1) filed by UL LLC, and admits, denies and alleges as follows:

1. Mr. Callington generally disputes UL's views on what "[t]his case is about" and denies the allegations in Paragraph 1, except as expressly admitted herein. Specifically, Mr. Callington admits that he routinely accessed and stored "internal business documents" on his personal electronic devices in the ordinary course of his work for UL but denies there was anything "covert" or "unauthorized" about this practice and denies that doing so "contradict[ed]" any professional or industry standard, norm, ethical rule, or applicable code of conduct. The remaining allegations in this paragraph are legal conclusions for which no further response is required, and which Mr. Callington denies to the extent that an answer is deemed necessary.

2.     Mr. Callington denies the allegation that he "transferred" work-related "documents and information" onto his personal electronic devices "without UL's knowledge or approval," and generally denies all other allegations in Paragraph 2, except as expressly admitted herein:

(i)     Mr. Callington admits that he used his cellphone for various work-related purposes—including but not limited to accessing email and collecting information at audit sites (*e.g.,* uploading scans of relevant documentation, taking photos and contemporaneous notes, etc.) and avers that his doing so was entirely consistent with UL's policy, practice and expectations; in fact, UL provided reimbursement payments in the amount of $65/month to compensate Mr. Callington for these business-related uses of his cell phone.

(ii)     Mr. Callington also admits that his cellphone was, at all relevant times, an iPhone manufactured by Apple—and that "iCloud" is, to the best of his knowledge, a default component of the standard operating system on all devices manufactured by Apple.[1]

(iii)     Mr. Callington admits that Dropbox (a secure cloud-based document management application) was the primary mechanism that he used to access and generate files in the routine course of his auditing work, at all times relevant to the allegations herein—but denies that this

---

[1] *See* "iCloud," APPLE at https://www.apple.com/icloud/ ("iCloud is built into every Apple device.").

was in any way surreptitious or unauthorized, as the Complaint clearly seeks to suggest.[2]

(iv)    Mr. Callington further admits that he "assist[ed]" the New York Times with its coverage on the troubling exploitation of migrant child laborers in U.S. manufacturing facilities—and that he did so, in part, by providing information, based on his personal knowledge and professional experience as a social compliance auditor, to an investigative journalist named Hannah Dreier, starting in or around the fall of 2023.

(v)    Mr. Callington admits that some of the information he provided to Ms. Drier was in the form of documents relating to his work for UL— but again, vehemently denies that his possessing those documents was in any way unauthorized, illegitimate, or unlawful; and—

(vi)    Mr. Callington admits that Ms. Drier subsequently authored a Pulitzer Prize winning series of articles that revealed, among other things, how companies who are "paid billions" to flag exploitative and

---

[2] To be clear, Mr. Callington did not have a company-issued laptop at any point during the two-year period that he was working as full time "independent contractor" for UL from 2017 to 2019. Nor did UL offer to provide one—or inquire about the software applications on those devices he was using to get that work done. As part of his transition to a salaried (W-2) role in mid-2019, Mr. Callington received his first company-issued laptop. The installation of Dropbox on that device was expressly authorized, approved, and performed by UL's own IT Department—as were subsequent updates and installations.

unsafe working conditions in American factories actually contribute to the problem, by systematically failing to do so.[3]

The remaining allegations in this paragraph are legal conclusions which do not require or warrant further response—and which Mr. Callington denies to the extent that an answer is deemed necessary.

3.      Mr. Callington admits that the allegations in Paragraph 3 correctly recite official written policies on internal reporting as documented in UL's Standards of Business Conduct. Mr. Callington further admits that UL had internal reporting mechanisms in place and avers that he used them, repeatedly, to raise concerns about the accuracy and integrity of audit results. For example, Mr. Callington routinely objected to management's removal of adverse findings in audit reports, after-the-fact, to placate clients. Mr. Callington also complained about being sent to facilities where previous UL audits had been so lax that he was perceived as unnecessarily demanding for exhibiting even the slightest degree of competency in requesting documents or following up on red flags and repeatedly observed that the time allotted for audits of larger facilities made it all but impossible to conduct meaningful assessments.  Mr. Callington denies that UL encouraged or welcomed these communications, which were consistently brushed aside, minimized, or ignored.

---

[3]      *See* Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?,* N.Y. Times (Dec. 28, 2023), https://www.nytimes.com/2023/12/28/us/migrant-child-laboraudits.html.

4.    Mr. Callington denies the allegations in Paragraph 4 insofar as it seeks to mischaracterize his full and voluntary cooperation in UL's internal investigation. To the extent UL faults Mr. Callington for refusing to "delete" all company documents in his possession, that request was neither reasonable nor fair because it would have required him to destroy evidence relevant to ongoing and anticipated legal proceedings. Given the circumstances, Mr. Callington's refusal to comply with that request was a well-considered decision that properly sought to avoid further exposure to a panoply of reasonably foreseeable claims and liabilities (*e.g.,* obstruction, spoliation, etc). All remaining allegations in this paragraph are legal conclusions that require no answer, and which Mr. Callington denies to the extent an answer is deemed necessary.

5.    Mr. Callington admits the allegations in Paragraph 5.

6.    Mr. Callington lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 6.

7.    Mr. Callington generally denies the allegations in Paragraph 7. The assertion that "Defendant [violated] UL's contracts, and violated UL's policies and various laws," is a conclusory legal allegation for which no answer is warranted, and which Mr. Callington denies to the extent that any further response is required. Furthermore, although Mr. Callington lacks sufficient knowledge or information to form a belief as to whether UL has, in fact, sustained any ascertainable damages in connection with events described herein—Mr. Callington vehemently denies that he is to blame or proximately cause any alleged reputational injury that is a reasonably

foreseeable and natural consequence of UL's own bad decisions, lack of integrity, and/or wrongful conduct. Simply put, Mr. Callington denies that his actions are the proximate cause of any purported injury to UL's reputational interests. Additionally, Mr. Callington denies that he was responsible for the training of other auditors in UL's responsible sourcing division, as alleged in the final sentence of this paragraph.

8.      Mr. Callington generally denies the allegations in Paragraph 8. Specifically, Mr. Callington lacks sufficient knowledge or information to form a belief as to whether UL has, in fact, sustained any economic damage and denies that his actions are the proximate cause of any purported injury to UL's reputational interests in any event.

9.      Mr. Callington admits that UL LLC is a limited liability company incorporated under Delaware law and headquartered in Illinois, as alleged in Paragraph 9. However, Mr. Callington lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph.

10.      Mr. Callington admits the allegations in Paragraph 10.

11.      Mr. Callington admits that he was a resident of Oregon at all times relevant to the Complaint, and that he worked for UL from May 2017 to July 2024. Mr. Callington admits that he was initially designated "as an independent contractor," but avers that he was, in all relevant respects, a full-time "employee" misclassified by UL throughout that time. Mr. Callington also admits that he later transitioned into a full-time salaried (W-2) position with the official job title of "Team Leader CRS," which he avers that UL misclassified as an overtime-exempt position.

12.     Paragraph 12 states legal conclusions which do not require an answer. To the extent an answer is deemed necessary, Mr. Callington denies the allegations but consents to the jurisdiction of this Court.

13.     Paragraph 13 states legal conclusions which do not require an answer. To the extent an answer is deemed necessary, Mr. Callington denies the allegations but consents to the jurisdiction of this Court.

14.     Mr. Callington admits the allegations in Paragraph 14.

15.     Mr. Callington admits the allegations in Paragraph 15.

16.     Paragraph 16 states legal conclusions which do not require an answer. To the extent an answer is deemed necessary, Mr. Callington denies the allegations but does not object to proceeding in this venue given the Court's demonstrated willingness to accommodate remote hearings.

17.     Mr. Callington admits and denies in part the allegations in Paragraph 17. Specifically, Mr. Callington admits that "UL provides social responsibility compliance auditing and inspection services … across a variety of industries," but either denies or lacks sufficient information to form a belief as to the remaining allegations. Mr. Callington especially questions the "significance" of UL's purported "effort" in "developing … customer listings" and "creating documents related to customers' audit requests," given that the vast majority of audits follow established protocols published by organizations like SEDEX and RBA; clients who wish to depart from those protocols typically create their own audit template, which is provided to UL. Mr. Callington further notes that many clients choose to make

their audit findings public, in whole or in part, as part of their marketing and/or investor relations materials—whereas others make them available upon request. Upon information and belief, for example, several of the audit reports referenced in Ms. Drier's reporting for New York Times were obtained directly from the factories, that provided them at Ms. Drier's request. To that end, Mr. Callington denies the implication that audit findings are always inherently confidential in nature.

18.     Mr. Callington admits that the allegations in Paragraph 18 accurately represent some of the circumstances in which UL's Responsible Sourcing group may be contracted to perform audits and examples of information that some clients may wish to obtain through such an audit.

19.     The allegations in Paragraph 19 are admitted and denied in part. Mr. Callington generally admits that gaining access to supplier facilities (*i.e.,* "worksites") and documentation related to labor practices is, in fact, a best practice and necessary precondition to conducting thorough audits. However, Mr. Callington avers that UL and/or its clients routinely limit the scope of audits or impose artificial restrictions on access to information that is critically important to the integrity of social compliance audits.

20.     Mr. Callington admits that UL has attached various "contracts and policies" to its Complaint but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 20.

21.     Mr. Callington admits that conducting social compliance audits is "important[t]... work" but otherwise denies or lacks knowledge as to the truth of all other allegations in Paragraph 21.

22.     Mr. Callington lacks sufficient knowledge or information to form a belief as to how "often [UL] enters into Non-Disclosure Agreements with customers," and otherwise denies the allegations in Paragraph 22. Mr. Callington also denies that all "information learned" through UL's social compliance audits is kept "strictly confidential," for reasons already explained above, *supra* at ¶17. Mr. Callington further avers that the reasons why companies procure UL's social auditing services rarely, if ever, center on purely benevolent concerns about protecting vulnerable workers from exploitative labor practices and unsafe factory conditions. For the vast majority of its clients, UL's social compliance auditing services are a necessary means to some end, such as satisfying ESG-related criteria for inclusion in some of the nation's largest pension fund investments, qualifying for large government contracts that require specific certifications and assurances as to the conditions in which goods are made. or building, improving, and rehabilitating consumer confidence and good will with respect to specific brands or products. For these, audit results are rarely kept "strictly confidential" when the findings are favorable.

23.     Mr. Callington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23.

### *Defendant's Employment History with UL*

24.     Mr. Callington admits the allegations in Paragraph 24.

25. Mr. Callington admits that he started working as an auditor for UL's Corporate Responsible Sourcing ("CRS") division pursuant to an "independent contractor" arrangement starting on or around May 26, 2017, and continued to do so for approximately two (2) years before transitioning to a salaried (W-2) position at UL's request.

26. Mr. Callington admits that he executed UL's Independent Assessor Agreement on or about May 17, 2017, and that Exhibit 1 to UL's Complaint appears to be a true and correct copy of that document, as alleged in Paragraph 26. *See* INDEPENDENT ASSESSOR AGREEMENT (May 17, 2017), Compl. Ex. 1 [Dkt. 1-1, at Page ID # 31-35].

27. Mr. Callington admits that he was asked to sign the Independent Assessor Agreement again several months later, which he did "on or around November 4, 2017," as alleged in Paragraph 27. Mr Callington further admits that Exhibit 2 to UL's Complaint appears to be a true and correct copy of that document. *See* INDEPENDENT ASSESSOR AGREEMENT (Nov. 4, 2017), Compl. Ex. 2 [Dkt. 1-1, at Page ID # 38-42].

28. Mr. Callington admits that he signed yet another version of UL's Independent Assessor Agreement "on or around May 4, 2018," and that Exhibit 3 to UL's Complaint appears to be a true and correct copy of that document, as alleged in Paragraph 28. *See* INDEPENDENT ASSESSOR AGREEMENT (May 4, 2018), Compl. Ex. 3 [Dkt. 1-1, at Page ID # 45-49].

29.    Mr. Callington admits that his role as an auditor for UL's Corporate Responsible Sourcing division typically involved visiting industrial and agricultural manufacturing facilities' to identify potential violations of federal labor law, evaluate compliance with health and safety regulations or other ESG-related concerns when requested by the client, and preparing written assessments based on his findings, as alleged in Paragraph 29.

30.    Mr. Callington admits that Paragraph 30 correctly quote the definition of "confidential information," as set forth in the Independent Assessor Agreement that he executed on May 4, 2018.

31.    Mr. Callington admits that the confidentiality provisions contained in UL's Independent Assessor Agreement purport to apply post-termination, and in perpetuity, without any apparent time limitation, as alleged in Paragraph 31.

32.    Mr. Callington admits the allegations in Paragraph 32, in part, except insofar as it omits important information about the circumstances surrounding his transition a salaried (W-2) position with UL. Specifically, in or around April 2019, Mr. Callington's then supervisor, Kelly Hutcheson, expressed concerns about UL's potential legal exposure for the misclassification of independent contractors and asked if he would be willing to transition into a full-time salaried position with the title of "Team Leader" in UL's Corporate Responsible Sourcing ("CSR") division, and for which he was asked to submit a formal application—even though the role was just a continuation of the full-time work he had already been doing for two years, as an "independent contractor." Upon information and belief, the term "leader" was

only included in his new title to provide cover for UL's misclassifying the role as an "exempt" managerial position to avoid paying him overtime wages for consistently logging 50-70 hours per week on UL audits and travel between audit sites.

33.    Mr. Callington admits that he transitioned from the independent contractor arrangement to the salaried W-2 position, as requested, "in or around April or May 2019," as alleged in Paragraph 33.

34.    Mr. Callington denies the allegations in Paragraph 34, except as expressly admitted herein. Specifically, Mr. Callington admits that Exhibit 4 to UL's Complaint includes a document entitled "CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT" [Dkt. 1-1, at Page ID # 56-57], which is neither dated nor signed. Mr. Callington does not have any record or recollection of ever signing that document or otherwise assenting to its terms.

35.    Mr. Callington admits that he received a formal written offer letter for the "Team Leader" position in or around April or May 2019, but does not specifically recall whether he was required to submit a formal electronic acknowledgement in response to that letter or otherwise memorialize his acceptance of the position, as alleged in Paragraph 35. Mr. Callington also admits that he was officially transitioned from an independent contractor arrangement to the salaried role, on or around May 28, 2019.

36.    Mr. Callington generally admits the allegations in Paragraph 36 but avers that his day-to-day job responsibilities did not change in any meaningful way with his transition from the independent contractor arrangement to a salaried

employee (W-2) status. Mr. Callington also denies that this "new" role involved any managerial oversight functions like "conduct[ing] training[s]" of other auditors.

### *UL Trade Secret Efforts*

37.     Mr. Callington admits the allegations in Paragraph 37.

38.     Mr. Callington admits that UL had various written internal policies and that some of those policies may evince UL's "efforts" to "protect… confidential information" from disclosure, but either lacks sufficient knowledge or otherwise denies the remaining allegations in Paragraph 38.

39.     The allegation in Paragraph 39 is a legal conclusion for which no answer is required, and which Mr. Callington denies to the extent an answer is deemed necessary.

40.     Mr. Callington does not recall ever having executed or acknowledged the existence of any document titled "Confidential Information and Trade Secrets Policy" in or around December 2017, or at any other time thereafter. Though Mr. Callington has no reason to dispute that the document exists and is accurately quoted in Paragraph 40, he ultimately lacks sufficient knowledge and information to form a definitive belief as to its subject matter.

41.     Mr. Callington lacks sufficient information to form a belief and/or alternatively denies the allegations in Paragraph 41.

42.     Mr. Callington lacks sufficient information to form a belief as to the factual allegations in Paragraph 42 and declines to answer the legal conclusions therein which require no response.

43.     Mr. Callington admits to having participated in online "LMS trainings for the Standards of Business Conduct," but does not specifically recall whether those trainings dealt with confidentiality issues, as alleged in Paragraph 43—and does not have any record or recollection of participating in trainings entitled "Intro to Social Compliance Training" or "UL SANS Security." Accordingly, Mr. Callington lacks sufficient information and/or alternatively denies the allegations in this paragraph.

44.     Mr. Callington denies the allegation in Paragraph 44 insofar as it uses the present tense to describe his membership in the Association of Professional Social Compliance Auditors ("APSCA"). Mr. Callington was, indeed, a member of that organization during his employment with UL. Upon information and belief, however, UL successfully lobbied the APSCA to revoke Mr. Callington's membership around the same time that it terminated his employment and filed this retaliatory lawsuit. In any event, APSCA guidance documents are far more complex than UL's allegations suggest. While it is true that the APSCA's Code of Conduct instructs members to "maintain confidentiality with respect to information gathered in connection with a social compliance services," this guidance should be understood alongside the APSCA's expectation that "Member Firms … [should] promote a culture of honesty and integrity in day-to-day operations," and related provisions on conflicts of interest. As with any professional code of conduct, principles and guidance published by the APSCA should be understood in a manner consistent with

the overall goal of promoting ethics and integrity in the profession, which is precisely what Mr. Callington sought to do by speaking to the press.

45.     Mr. Callington lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 45 because it is unclear what certification or document is being referred to in this paragraph.

46.     Mr. Callington denies the allegations in Paragraph 46, except as expressly admitted herein. Specifically, Mr. Callington admits that the quoted language in Paragraph 46 appears in a document entitled "SOP 7.3.2-1 - Social Compliance Assessment," which he received via email on or about November 9, 2023, but otherwise denies and/or lacks knowledge as to the remaining allegations in that paragraph.

### *Alleged Transfer of Information*

47.     Mr. Callington admits that he "conducted *well* in excess of 120 audits" (emphasis added) throughout the course of his employment with UL's Corporate Responsible Sourcing division. In fact, Mr. Callington completed a total of 715 audits at facilities located throughout the United States and Canada between May 2017 and December 2023. Though technically correct as written, the allegations in Paragraph 47 are therefore somewhat misleading.

48.     Mr. Callington denies the allegations in Paragraph 48, except as expressly admitted herein. Specifically, Mr. Callington admits that he routinely had "access" to confidential business information in the ordinary course of his auditing work. However, Mr. Callington either denies or lacks sufficient knowledge and

information to form a belief as to whether any such documents or records ever included legally protected trade secret information.

49.    Mr. Callington denies the allegations in Paragraph 49, except as already explained and admitted in part, *supra* at ¶ 2, 4.

50.    Mr. Callington denies the allegations in Paragraph 50, except as already explained and admitted in part, *supra* at ¶ 2, 4.

51.    Mr. Callington denies the allegations in Paragraph 51, except as already explained and admitted in part, *supra* at ¶ 2, 4.

52.    Mr. Callington admits that he used his iPhone to document worksite conditions at the facilities he audited, including by taking photographs, as alleged in Paragraph 52, which were uploaded directly to the corresponding audit file via the Dropbox. To the best of his recollection, Mr. Callington did not ever knowingly "store" any such photos to "iCloud," however, as his practice was always to upload contemporaneous documentation to Dropbox. To the extent that UL claims to have uncovered such photos in his iCloud account through some kind of forensic examination conducted, Mr. Callington would certainly be surprised, as that was not his practice—but cannot definitively deny the truth of that allegation without more information.

### *Alleged Covert Assist to NYT*

53.    Mr. Callington admits that he first contacted Ms. Drier about her reporting on child labor issues for the New York Times in or around September 2023, as alleged in Paragraph 53.

54.     Mr. Callington admits that he did not request UL's permission or otherwise notify the company about his decision to speak with the New York Times, as alleged in Paragraph 54. Mr. Callington lacks knowledge or information sufficient to form a belief as to when UL first learned that he had done so, however.

55.     Mr. Callington admits the allegations in Paragraph 55.

56.     Mr. Callington denies the allegations in Paragraph 56, except as already explained and admitted in part, *supra* at ¶ 2

57.     Mr. Callington denies the allegations in Paragraph 57, except as already explained and admitted in part, *supra* at ¶¶ 2, 48 and 54).

58.     Mr. Callington admits the allegations in Paragraph 58.

59.     Mr. Callington admits the allegations in Paragraph 59.

60.     Mr. Callington admits the allegations in Paragraph 60.

61.     Mr. Callington admits the allegations in Paragraph 61.

62.     Mr. Callington admits the allegations in Paragraph 62.

63.     Mr. Callington admits the allegations in Paragraph 63 insofar as it states that Mr. Callington was quoted in the New York Times article but otherwise denies or lacks sufficient information as to the remaining allegations in this paragraph.

### *Investigation*

64.     Mr. Callington admits the allegations in Paragraph 64 insofar as it states that "UL opened an investigation," but lacks knowledge or information

sufficient to form a belief as to the scope and purpose of that investigation from UL's perspective.

65. Mr. Callington does not fully understand the allegations in Paragraph 65. To the extent this paragraph concerns the use of personal electronic devices for his audit related work, Mr. Callington reincorporates his previous explanation and admissions, *supra* at ¶ 2, and denies the rest.

66. Mr. Callington denies the allegations in Paragraph 66, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

67. Mr. Callington denies the allegations in Paragraph 67, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

68. Mr. Callington denies the allegations in Paragraph 68, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

69. Mr. Callington denies the allegations in Paragraph 69.

70. Mr. Callington denies the allegations in Paragraph 70, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

71. Mr. Callington denies the allegations in Paragraph 71

72. Mr. Callington denies the allegations in Paragraph 72, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

73. Mr. Callington admits that UL terminated his employment via written communication on July 3, 2024, and otherwise denies the allegations in Paragraph 73

## COUNTS I & II
### (Alleged "Misappropriation" of Trade Secrets)

74.     Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs and generally denies that he is liable for "misappropriation" of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.,* as alleged in Count I of the Complaint.

75.     Mr. Callington denies the allegations in Paragraph 75.

76.     As for the recitation of law in Paragraph 76, Mr. Callington avers that the statutory definition for "misappropriation" is essential to the claim at issue here. Under the DTSA,

> [T]he term **"misappropriation"** means—
>
> (A) acquisition of a trade secret … by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret … without express or implied consent by a person who—
>
>> (i) used improper means to acquire knowledge of the trade secret;
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—(I) derived … through [improper means]; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret… or (III) derived from or through a person who owed a duty to … to maintain the secrecy of the trade secret or limit [its] use … or
>>
>> (iii) before a material change of the position of the person, knew or had reason to know that—(I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C.A. § 1839(5).

77.     Mr. Callington avers that no response is required or warranted to the recitation of law in Paragraph 77.

78.     Mr. Callington denies the allegations in Paragraph 78.

79.     Mr. Callington denies the allegations in Paragraph 79.

80.     Mr. Callington does not have sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 80.

81.      Mr. Callington admits in part and denies in part the allegations in Paragraph 81. Specifically, Mr. Callington admits that UL routinely requires employees to enter confidentiality and non-disclosure agreements but denies all other allegations in this paragraph.

82.     Mr. Callington does not have sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 82.

83.     Mr. Callington denies the allegations in Paragraph 83.

84.     Mr. Callington denies the allegations in Paragraph 84.

85.     Mr. Callington denies the allegations in Paragraph 85.

86.     Mr. Callington does not have sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 86.

87.     Mr. Callington denies the allegations in Paragraph 87.

88.     Mr. Callington denies the allegations in Paragraph 88.

89.     Mr. Callington denies the allegations in Paragraph 89.

90.     Mr. Callington denies the allegations in Paragraph 90.

91.     Mr. Callington denies the allegations in Paragraph 91.

92.    Mr. Callington denies the allegations in Paragraph 92.

93.    Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs and generally denies that he is liable for "misappropriation" of trade secrets under the Illinois Trade Secret Act ("ITSA"), 765 ILCS 10651 *et seq.*, as alleged in Count II of the Complaint.

94.    Mr. Callington denies the allegations in Paragraph 94.

95.    Mr. Callington denies the allegations in Paragraph 95.

96.    Mr. Callington denies the allegations in Paragraph 96.

97.    Mr. Callington denies the allegations in Paragraph 97.

98.    Mr. Callington denies the allegations in Paragraph 98.

99.    Mr. Callington denies the allegations in Paragraph 99.

100.    Mr. Callington denies the allegations in Paragraph 100.

101.    Mr. Callington denies the allegations in Paragraph 101.

102.    Mr. Callington denies the allegations in Paragraph 102.

## COUNT III
### (Alleged Breach-of-Contract)

103.    Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs as if fully set forth herein and generally denies that he is liable for breach of contract.

104.    Mr. Callington denies the allegations in Paragraph 104.

105.    Mr. Callington denies the allegations in Paragraph 105.

106.    Mr. Callington denies the allegations in Paragraph 106.

107.    Mr. Callington denies the allegations in Paragraph 107.

108.   Mr. Callington denies the allegations in Paragraph 108.

109.   Mr. Callington denies the allegations in Paragraph 109.

110.   Mr. Callington denies the allegations in Paragraph 110.

111.   Mr. Callington denies the allegations in Paragraph 111.

112.   Mr. Callington denies the allegations in Paragraph 112.

113.   Mr. Callington denies the allegations in Paragraph 113.

## COUNT IV
### (Alleged Breach of Fiduciary Duties)

114.   Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs as if fully set forth herein and generally denies that he is liable for any common law fiduciary breach.

115.   Mr. Callington denies the allegations in Paragraph 115.

116.   Mr. Callington denies the allegations in Paragraph 116.

117.   Mr. Callington denies the allegations in Paragraph 117.

118.   Mr. Callington denies the allegations in Paragraph 118.

119.   Mr. Callington denies the allegations in Paragraph 119.

120.   Mr. Callington denies the allegations in Paragraph 120

## COUNT V
### (Alleged Conversion)

121.   Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs as if fully set forth herein and generally denies that he is liable for any claim of common law conversion.

122.   Mr. Callington denies the allegations in Paragraph 122.

123.   Mr. Callington denies the allegations in Paragraph 123.

124.    Mr. Callington denies the allegations in Paragraph 124.

125.    Mr. Callington denies the allegations in Paragraph 125.

126.    Mr. Callington denies the allegations in Paragraph 126.

127.    Mr. Callington denies the allegations in Paragraph 127.

128.    Mr. Callington denies the allegations in Paragraph 128.

129.    Mr. Callington denies the allegations in Paragraph 129.

130.    Mr. Callington denies the allegations in Paragraph 130.

## AFFIRMATIVE DEFENSES

## DEFENSES TO ALL CLAIMS ASSERTED IN UL'S COMPLAINT

### Affirmative Defense No. 1

131.   The Complaint fails to state a claim upon which relief can be granted under any theory of recovery alleged herein.

### Affirmative Defense No. 2

132.   Mr. Callington's sole purpose and intent in disclosing documents to the New York Times was to expose systemic audit failures that have enabled child labor and other exploitative labor practices or health and safety violations to persist undetected. Mr. Callington did so to protect vulnerable workers and help improve the transparency and effectiveness of ESG initiatives and auditing practices.

### Affirmative Defense No. 3

133.   At all times relevant to the allegations herein, Mr. Callington acted in good faith, for good cause, and with the sincere belief that his actions were lawful, proper and justified, in furtherance of the public interest.

### Affirmative Defense No. 4

134.   Each and every claim asserted in the Complaint is barred by the doctrine of unclean hands.

### Affirmative Defense No. 5

135.   Each and every action related to Mr. Callington's journalistic source communications and related disclosures to the New York Times constitutes

protected activity for which he is immune from suit and liability under applicable state law anti-SLAPP statutes.

### Affirmative Defense No. 6

136.   UL is equitably estopped or otherwise barred from prosecuting this action because each claim asserted herein is false or frivolous and is being asserted in furtherance of an unlawful retaliation campaign against Mr. Callington.

### Affirmative Defense No. 7

137.   Each and every action taken by Mr. Callington constitutes protected activity under applicable whistleblower provisions of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, and applicable regulations promulgated thereunder, the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank"), 15 U.S.C. § 78u-6, and applicable regulations promulgated thereunder, *see, e.g.,* 17 C.F.R. § 240.21F-17.

### Affirmative Defense No. 8

138.   Each and every action taken by Mr. Callington constitutes protected activity under the qui tam whistleblower protections anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and applicable regulations promulgated thereunder.

### Affirmative Defense No. 9

139.   Each and every action taken by Mr. Callington constitutes protected activity under the anti-retaliation provisions of the Occupational Health and Safety Act 29 U.S.C. § 660(c), and applicable regulations promulgated thereunder.

### Affirmative Defense No. 10

140.     Each and every action taken by Mr. Callington constitutes protected activity under the anti-retaliation provisions of Oregon state law, O.R.S. §§ 659A.199, 659A.203, and regulations promulgated thereunder, *see, e.g.,* O.A.R. 839-004-0016.

### Affirmative Defense No. 11

141.     Each and every action taken by Mr. Callington constitutes protected activity under the Illinois Whistleblower Act, 740 ILCS 174

### Affirmative Defense No. 12

142.     Each and every action taken by Mr. Callington constitutes also constitutes protected activity under one or more provisions of applicable state labor law.

### Affirmative Defense No. 13

143.     Each and every action taken against Mr. Callington in connection with the facts alleged herein is also barred as unlawful retaliation under applicable state common law principles.

### Affirmative Defense No. 14

144.     Each and every claim premised on Mr. Callington's access to, possession or storage of UL's company documents fails to state a claim because Mr. Callington was acting in the course and scope of his employment by UL.

### Affirmative Defense No. 15

145. Each and every claim premised on the theory that Mr. Callington was not authorized to access, possess, or "transfer" of company documents to himself is barred by the doctrine of consent because Mr. Callington had full permission from UL to access the documents and information referenced herein.

### Affirmative Defense No. 16

146. Mr. Callington did not disclose any of the documents or information referenced herein to any other person or entity aside from: (a) the information and disclosures that he made to the New York Times, as alleged herein, and (b) lawful disclosures to federal and state government agencies for legitimate law enforcement purposes.

### Affirmative Defense No. 17

147. UL is estopped or estopped from asserting any of the causes of action alleged herein by reason of the fact that it willfully breached its own duties and obligations to Mr. Callington.

### Affirmative Defense No. 18

148. Some or all of UL's claims are barred because of UL's fraud.

### Affirmative Defense No. 19

149. Some or all of UL's claims are barred by the doctrine of contributory negligence.

### Affirmative Defense No. 20

150. UL violated its duties and obligations as a federal contractor to the U.S. government, including by, among other things, making false certifications in

violation of applicable Federal Acquisition Regulations, Federal Acquisition Regulation, 48 C.F.R. §§ 52.203–19.

### Affirmative Defense No. 21

151. UL cannot prevail on any cause of action stemming from the disclosure of documents or information that that is readily ascertainable in the public sphere.

### Affirmative Defense No. 22

152. UL cannot prevail on any cause of action because its theory of damages fails as a matter of law.

### Affirmative Defense No. 23

153. UL's alleged injuries are entirely theoretical or speculative and cannot support recovery.

### Affirmative Defense No. 24

154. UL is not entitled to damages because there is no evidence of any actual economic loss resulting from Mr. Callington's access to or retention of documents.

### Affirmative Defense No. 25

155. UL failed to mitigate its damages, has waived or is estopped from asserting its claims, and unreasonably failed to take corrective action to avoid or limit its own losses.

### Affirmative Defense No. 26

156. Any acts by Mr. Callington were not the proximate cause of any alleged injury suffered by UL.

### Affirmative Defense No. 27

157.   Any purported damages stemming from UL's alleged reputational injuries are attributable to UL's own wrongful conduct.

### Affirmative Defense No. 28

158.   UL is not entitled to equitable, preliminary, or injunctive relief because it has suffered no irreparable injury and possesses an adequate remedy at law.

### Affirmative Defense No. 29

159.   Granting UL's requested relief would unjustly enrich UL by providing more than that to which it is legally entitled.

### Affirmative Defense No. 30

160.   Defendant's conduct was not "willful and malicious" and does not entitle UL to recover punitive damages.

### Affirmative Defense No. 31

161.   Mr. Callington exercised reasonable care to prevent and promptly correct any potential loss or damage.

### Affirmative Defense No. 32

162.   UL cannot recover damages for any alleged breach or other cause of action stemming from disclosures to the New York Times or to any governmental or law-enforcement authority made for legitimate reporting or investigative purposes.

## ADDITIONAL DEFENSES SPECIFIC TO ALLEGED "MISAPPROPRIATION" OF TRADE SECRETS (COUNTS I & II)

### Affirmative Defense No. 33

163.   The information that was allegedly misappropriated does not qualify as a trade secret.

### Affirmative Defense No. 34

164.   UL has failed to comply with the DTSA's notice provisions.

### Affirmative Defense No. 35

165.   UL does not have any legally protected trade secret information that was disclosed to Mr. Callington, and which he subsequently disclosed, to anyone, for any unlawful purpose.

### Affirmative Defense No. 36

166.   Mr. Callington did not possess ever possess any documents or information which he knew to be a trade secret at any point in time during his employment with UL.

### Affirmative Defense No. 37

167.   To the best of his knowledge, Mr. Callington did not disclose any trade secret information to the New York Times and has never knowingly disclosed any information which he knew to be a trade secret to any other individual or entity, competitor, or otherwise.

### Affirmative Defense No. 38

168.   Mr. Callington did not "misappropriate" any trade secret, as that term is used in the DTSA, because there was nothing "improper" about  the "means"

through which he acquired documents provided to him in the ordinary course of his auditing work as is required to establish liability under 18 U.S.C.A. § 1839(5)(A), and because lacked the requisite scienter for liability under any of the alternative provisions at 18 U.S.C.A. § 1839(5)(B).

### Affirmative Defense No. 39

169.   Any alleged claim of "misappropriation" arising from Mr. Callington's disclosures to the New York Times is non-actionable as a matter of law.

### Affirmative Defense No. 40

170.   Any alleged claim of "misappropriation" arising from Mr. Callington's disclosures of information regarding conduct which he reasonably believed was in violation of law to state and government agencies is non-actionable, as a matter of law.

### Affirmative Defense No. 41

171.   Mr. Callington is entitled to the dismissal of the trade secret claims absent a more a more definite statement a more definite statement as to which precise statutory provisions he is alleged to have violated.

### Affirmative Defense No. 42

172.   UL is equitably estopped or otherwise barred from asserting a claim of misappropriation based on the disclosure of documents for which it has failed to enforce its own purported internal policies and/or efforts to preserve secrecy in any other context.

### Affirmative Defense No. 43

173. UL lacks standing to assert or prosecute any alleged trade secret violation as a third-party on behalf of its clients.

### Affirmative Defense No. 44

174. Mr. Callington did not use any of the documents or information referenced herein to engage in competition, or business, or in any other manner for his own economic benefit.

### Affirmative Defense No. 45

175. UL cannot state a claim for the misappropriation of trade for which it has voluntarily waived its purported right to secrecy or consented to disclosure to other similarly situated employees and/or contractors, clients, and/or business associates.

### Affirmative Defense No. 46

176. UL failed to undertake "reasonable efforts" to secure and maintain secrecy of its alleged trade secrets as required by 18 U.S.C. § 1839(3)(B) and 765 ILCS 1065/2(d)(2).

### Affirmative Defense No. 47

177. Some or all of Mr. Callington's actions may constitute protected activity under the DTSA's whistleblower immunity provision, 18 U.S.C. § 1833(b), and other federal and state whistleblower laws.

## ADDITIONAL DEFENSES SPECIFIC TO THE
## COMMON LAW CAUSES OF ACTION (COUNTS III, IV, V)

### Affirmative Defense No. 48

178.    The common law causes of action in Counts III, IV, and V, are preempted or otherwise displaced by UL's state law claims under ITSA.

### Defenses specific to alleged "Breach-Of-Contract" (Count III)

### Affirmative Defense No. 49

179.    UL is estopped or otherwise barred from enforcing the confidentiality and non-disclosure provisions discussed herein to prevent the disclosure of information that it is required to report or disclose under applicable federal and state law.

### Affirmative Defense No. 50

180.    UL is estopped or otherwise barred from enforcing the confidentiality and non-disclosure provisions discussed herein to prevent the disclosure of information which it is legally mandated to disclose as material information under applicable SEC regulations.

### Affirmative Defense No. 51

181. UL is equitably estopped or otherwise barred from enforcing confidentiality and non-disclosure provisions that it has elsewhere it denied having or imposing on its employees, such as in certifications made pursuant to Federal Acquisition Regulation, 48 C.F.R. § 52.203–19.

### Affirmative Defense No. 52

182.    Mr. Callington is entitled to the dismissal of the trade secret claims absent a more a more definite statement as to the specific contractual provision(s) Mr. Callington is alleged to have violated, and the precise conduct that it contends was a "breach" thereof.

### Affirmative Defense No. 53

183.    UL contractual claims under the Independent Assessor Agreements are expired or time-barred under applicable law and/or equitable principles.

### Affirmative Defense No. 54

184.    UL's contract claim for purported breaches of the INDEPENDENT ASSESSOR AGREEMENTS are unenforceable as to conduct undertaken after he transitioned from the independent contractor arrangement to a salaried position.

### Affirmative Defense No. 55

185.    UL's contract claim for purported breaches of the INDEPENDENT ASSESSOR AGREEMENTS are expired or time-barred under applicable law and/or equitable principles.

### Affirmative Defense No. 56

186.    UL's contract claim for purported breaches of the INDEPENDENT ASSESSOR AGREEMENTS  is barred by the doctrine of laches.

### Affirmative Defense No. 57

187. Any alleged claim for breach of the CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT FAILS as a matter of fact and law because Mr. Callington did not execute or otherwise assent to its terms.

### Affirmative Defense No. 58

188. The contractual provisions that UL seeks to enforce are facially invalid under applicable law.

### Affirmative Defense No. 59

189. The contractual provisions that UL seeks to enforce are void as a matter of public policy as against the conduct at issue in this action.

### Affirmative Defense No. 60

190. The contractual provisions are unenforceable as against the conduct at issue in this action.

### Affirmative Defense No. 61

191. Mr. Callington's access, possession, and storage of documents acquired by and through his legitimate employment cannot serve as a basis for any alleged "breach" of the contractual provisions which UL seeks to enforce.

### Affirmative Defense No. 62

192. UL has consented to or waived enforcement of its confidentiality restrictions and is estopped from asserting claims to the extent that doing so is inconsistent with its conduct in other contexts.

### Affirmative Defense No. 63

193.    Any alleged breach arising from Mr. Callington's disclosures to the New York Times is non-actionable as a matter of law.

### Affirmative Defense No. 64

194.    Any alleged breach arising from Mr. Callington's disclosures of information regarding conduct which he reasonably believed was in violation of law to state and government agencies is non-actionable, as a matter of law.

### Affirmative Defense No. 65

195.    UL has not suffered any cognizable injury or harm for which it can claim a right or entitlement to economic damages under contract principles at common law.

### Defenses specific to alleged "Breach of Fiduciary Duty" (Count IV)

### Affirmative Defense No. 66

196.    Mr. Callington did not owe a fiduciary duty to UL or its clients.

### Affirmative Defense No. 67

197.    UL is estopped from asserting a breach of fiduciary duty as against any purported employee that was misclassified under applicable labor law and/or from whom whom it continuously engaged in wage theft.

### Affirmative Defense No. 68

198.    UL's common law claim for fiduciary breach fails under Illinois law because there is no applicable case or precedent that supports its theory for imposing liability in any circumstance similar to facts of this case.

### Affirmative Defense No. 69

199.   Any alleged claim of fiduciary breach arising from Mr. Callington's disclosures to the New York Times is non-actionable, as a matter of law.

### Affirmative Defense No. 70

200.   Any alleged claim of fiduciary breach arising from Mr. Callington's disclosures of information regarding conduct which he reasonably believed was in violation of law to state and government agencies is non-actionable, as a matter of l

### Affirmative Defense No. 71

201.   Mr. Callington was not disloyal within the meaning of fiduciary law principles because none of the acts or conduct alleged can be shown to have been undertaken to benefit himself or another.

### Affirmative Defense No. 72

202.   As a matter of law, providing true and accurate information on matters of significant public concern is not a breach of the fiduciary duty of loyalty or good faith.

### Affirmative Defense No. 73

203.   As a matter of law, Mr. Callington reporting actual or perceived violations to appropriate government authorities and/or law enforcement does not give rise to a breach of the fiduciary duty of loyalty or good faith.

<u>Defenses specific to alleged "Conversion" (Count V)</u>

### Affirmative Defense No. 74

204.    Each and every action related to Mr. Callington's journalistic source communications and related disclosures to the New York Times constitutes protected activity for which he is immune from suit and liability under applicable state anti-SLAPP law.

### Affirmative Defense No. 75

205.    Mr. Callington is entitled to the dismissal of the trade secret claims absent a more a more definite statement a more definite statement as to the specific document(s) or property which it alleges that Mr. Callington has converted for his own benefit.

### Affirmative Defense No. 76

206.    UL's common law conversion claim fails under Illinois law because there is no applicable case or precedent that supports its theory for applying the equitable principles of conversion as a against a former employee, in favor of his employer, in any circumstance similar to facts of this case.

### Affirmative Defense No. 77

207.    The conversion claim fails to the extent that UL's purported right to possession was neither exclusive nor absolute.

### Affirmative Defense No. 78

208.    UL cannot state a claim for conversion because any legitimate demand for the return of its allegedly converted property has already been satisfied.

### Affirmative Defense No. 79

209.    UL is equitably estopped or otherwise barred from asserting a claim for conversion because the conduct giving rise to any alleged conversion was undertaken for the purpose of exposing its own bad acts and/or wrongful conduct.

### Affirmative Defense No. 80

210.    UL cannot assert or prosecute a claim for conversion relating to any documents or information that is readily ascertainable in the public sphere.

### Affirmative Defense No. 81

211.    UL cannot assert or prosecute a claim for conversion relating to any document that it does not have an exclusive and absolute right to possess.

### Affirmative Defense No. 82

212.    UL lacks third-party standing to assert or prosecute a common law claim for conversion relating to documents and/or information of its clients.

213.    was lawful and/or protected activity.

### Affirmative Defense No. 83

214.    UL's conversion claim also fails because it does not allege that Mr. Callington converted anything "for his own benefit."

### Affirmative Defense No. 84

215.    Mr. Callington did not, as a matter of fact, use any of the documents or information referenced herein to engage in competition, or business, or in any other manner for his own economic benefit.

## COUNTERCLAIMS

### Factual Allegations Common to Retaliation All Claims

216.   By and through the acts and conduct described herein, UL has made false or statements or certifications about its own business operations, policies, and practice, that are unlawful or otherwise actionable—and which has been, may presently be, and may at some point in the future become the subject of a state or federal government investigation.

217.   By and through the acts and conduct described herein, UL has aided and abetted or caused others to make false statements or certifications that are unlawful, fraudulent, and/or otherwise actionable—and which has been, may presently be, or may at some become the subject of a state or federal government investigation.

218.   At all times during which Mr. Callington is alleged to have acted in the manner described herein, Mr. Callington acted good faith, for good reason, based upon his reasonable belief that the conduct of UL and others not named herein was unlawful and harmful to the public.

219.   During the period between 2019 and 2023, and in Court filings related to this case, UL has repeatedly implied that Mr. Callington never raised any of his concerns about audit integrity internally, before speaking to the New York Times. This is false. Mr. Callington repeatedly objected to and expressed concerns about the integrity of audits being conducted by UL's Responsible Sourcing division, based in part on what he perceived as management's willingness to remove and/or minimize adverse audit findings as a matter of "customer service," and systematically incentivize turning a blind eye towards potentially egregious violations of law.

220.    In or around the fall of 2023, Mr. Callington became a journalistic source for the New York Times in connection with its investigative reporting on the rise of unlawful child labor in factories across the United States. Several months later, the New York Times published the article that prompted this lawsuit, in which Mr. Callington was identified by name and portrayed as an insider with legitimate concerns about how perverse incentives and conflicts of interest can operate as a structural thumb on the scale towards suppressing exploitative working conditions by the very companies who are "paid billions" to identify these issues:

> Spotting problems [has] … led to tension between Mr. Callington and his employer, UL Solutions, which began as a safety testing business and expanded more than two decades ago into social compliance audits. The company took in $2.5 billion in revenue last year and is on the cusp of an initial public offering.
>
> What Mr. Callington saw as a commitment to his job, his firm seemed to see as overzealousness.
>
> "The assessment is not meant to be a policing effort," the UL Solutions employee handbook says….

Dreier, They're Paid Billions, N.Y. TIMES, supra, n. 3.

221.    In or around January 2024, Mr. Callington filed a formal complaint with the Oregon Bureau of Labor and Industries ("BOLI") and the Occupational Safety and Health Division ("OSHA") regarding retaliatory acts that UL had taken against him following the publication of this article, which he reasonably believes constitute violate applicable whistleblower protections and anti-retaliation provisions under state and federal law.

222.   In or around June 2024, Mr. Callington provided information to the SEC's Whistleblower Office concerning conduct by UL which he reasonably believes constitutes a violation of securities law.

223.   UL has since undertaken several adverse actions against Mr. Callington, including but not limited to, subjecting him to a hostile work environment, engaging in harassment and intimidation tactics under the guise of an unreasonable and unnecessarily prolonged employee investigation before ultimately terminating his employment, blacklisting conduct, and bringing this frivolous action.

224.   Retaliation in Violation of the Sarbanes–Oxley Act, 18 U.S.C. § 1514A

225.   Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

226.   Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation for which UL is liable under 18 U.S.C. § 1514A.

## COUNTERCLAIM I
### Retaliation in Violation of Dodd-Frank Act,
### 15 U.S.C. § 78u-6

227.   Mr. Callington repeats each of the preceding paragraphs as if fully set forth herein.

228.   Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under 15 U.S.C. § 78u-61.

### COUNTERCLAIM II

### Retaliation in Violation of the False Claims Act,
### 31 U.S.C. § 3730(h)

229. Mr. Callington repeats each of the preceding paragraphs as if fully set forth herein.

230. Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under 31 U.S.C. § 3730(h).

### COUNTERCLAIM III

### Retaliation in Violation of the Occupational
### Health and Safety Act, 29 U.S.C. § 660(c)

231. Mr. Callington repeats each of the preceding paragraphs as if fully set ,forth herein.

232. Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under 29 U.S.C. § 660(c).

### COUNTERCLAIM IV

### Retaliation in Violation of the Occupational
### Health and Safety Act, 29 U.S.C. § 660(c)

233. Mr. Callington repeats each of the preceding paragraphs as if fully set ,forth herein.

234. Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under 29 U.S.C. § 660(c).

## COUNTERCLAIM V

### Retaliation in Violation of the Oregon Whistleblower Act,
### O.R.S. § 659A.199

235.   Mr. Callington repeats each of the preceding paragraphs as if fully set ,forth herein.

236.   Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under O.R.S. § 659A.199.

## COUNTERCLAIM VI

### Prohibited Acts by Non-Profit Employers,
### O.R.S. § 659A.203

237.   Mr. Callington repeats each of the preceding paragraphs as if fully set ,forth herein.

238.   Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under O.R.S. § 659A.203.

## COUNTERCLAIM VII

### Retaliation in Violation of the Illinois Whistleblower Act,
### 740 ILCS 174

239.   Mr. Callington repeats each of the preceding paragraphs as if fully set ,forth herein.

240.   Each and every action taken by Mr. Callington constitutes protected activity under the Illinois Whistleblower Act, 740 ILCS 174

## **DEMAND FOR JURY TRIAL**

Mr. Callington respectfully requests a jury trial on all claims and counterclaims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr.Callington respectfully requests judgment in his favor, dismissal of Plaintiff's claims with prejudice, and judgment on his Counterclaims, including compensatory damages, punitive damages, attorneys' fees, costs, and all further relief the Court

Dated: October 10, 2025

Respectfully submitted,

By:     _/s/ Agatha M. Cole_

Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036
(828) 773-2628
agatha@beverlypllc.com

*Counsel for Joshua Callington,*
*     Defendant-Counterclaim Plaintiff*