IN THE UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UL LLC, | **FIRST AMENDED** |
| *Plaintiff-Counterclaim Defendant,* | **ANSWER, DEFENSES** |
| -v- | **AND COUNTERCLAIMS** |
| JOSHUA CALLINGTON, | Case No. 1:24-cv-05631 |
| *Defendant-Counterclaim Plaintiff.* | Hon. Andrea R. Wood |
| | [Jury Trial Demanded] |

## ADMISSIONS AND DENIALS

Joshua Callington ("Mr. Callington") hereby answers the Original Complaint filed by UL LLC (Dkt. 1), as follows:

1.     Mr. Callington denies the allegations in Paragraph 1 except as expressly stated herein. Mr. Callington admits that he reviewed large amounts of "internal business documents" in the ordinary course of auditing work for UL.

2.     Mr. Callington admits that he typically accessed, reviewed, and stored such documents via a laptop or cell phone, and avers doing was consistent with his employer's expectations fact, UL even provided reimbursement payments in the amount of $65/month to compensate Mr. Callington for these business-related uses of his cell phone.

3.     Mr. Callington admits that his cellphone was, at all relevant times, an iPhone manufactured by Apple—and that "iCloud" is, to the best of his knowledge, a

default component of the standard operating system on all devices manufactured by Apple.[1]

4.     Mr. Callington admits that Dropbox (a secure cloud-based document management application) was the primary mechanism that he used to access and generate files in the routine course of his auditing work, at all times relevant to the allegations herein—but denies that this was in any way surreptitious or unauthorized, as the Complaint clearly seeks to suggest.[2]

5.     Mr. Callington further admits that he "assist[ed]" the New York Times with its coverage on the troubling exploitation of migrant child laborers in U.S. manufacturing facilities—and that he did so, in part, by providing information, based on his personal knowledge and professional experience as a social compliance auditor, to an investigative journalist named Hannah Dreier, starting in or around the fall of 2023.

6.     Mr. Callington admits that some of the information he provided to Ms. Drier was in the form of documents relating to his work for UL—but again,

---

[1] *See* "iCloud," APPLE at https://www.apple.com/icloud/ ("iCloud is built into every Apple device.").

[2] To be clear, Mr. Callington did not have a company-issued laptop at any point during the two-year period that he was working as full time "independent contractor" for UL from 2017 to 2019. Nor did UL offer to provide one—or inquire about the software applications on those devices he was using to get that work done. As part of his transition to a salaried (W-2) role in mid-2019, Mr. Callington received his first company-issued laptop. The installation of Dropbox on that device was expressly authorized, approved, and performed by UL's own IT Department—as were subsequent updates and installations.

vehemently denies that his possessing those documents was in any way unauthorized, illegitimate, or unlawful; and—

7.     Mr. Callington admits that Ms. Drier subsequently authored a Pulitzer Prize winning series of articles that revealed, among other things, how companies who are "paid billions" to flag exploitative and unsafe working conditions in American factories actually contribute to the problem, by systematically failing to do so.[3] The remaining allegations in this paragraph are legal conclusions which do not require or warrant further response—and which Mr. Callington denies to the extent that an answer is deemed necessary.

8.     Mr. Callington admits that the allegations in Paragraph 3 correctly recite official written policies on internal reporting as documented in UL's Standards of Business Conduct. Mr. Callington further admits that UL had internal reporting mechanisms in place and avers that he used them, repeatedly, to raise concerns about the accuracy and integrity of audit results. For example, Mr. Callington routinely objected to management's removal of adverse findings in audit reports, after-the-fact, to placate clients. Mr. Callington also complained about being sent to facilities where previous UL audits had been so lax that he was perceived as unnecessarily demanding for exhibiting even the slightest degree of competency in requesting documents or following up on red flags and repeatedly observed that the time allotted

---

[3]     *See* Hannah Drier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?*, N.Y. Times (Dec. 28, 2023), https://www.nytimes.com/2023/12/28/us/migrant-child-laboraudits.html.

for audits of larger facilities made it all but impossible to conduct meaningful assessments. Mr. Callington denies that UL encouraged or welcomed these communications, which were consistently brushed aside, minimized, or ignored.

9.      Mr. Callington denies the allegations in Paragraph 4 insofar as it seeks to mischaracterize his full and voluntary cooperation in UL's internal investigation. To the extent UL faults Mr. Callington for refusing to "delete" all company documents in his possession, that request was neither reasonable nor fair because it would have required him to destroy evidence relevant to ongoing and anticipated legal proceedings. Given the circumstances, Mr. Callington's refusal to comply with that request was a well-considered decision that properly sought to avoid further exposure to a panoply of reasonably foreseeable claims and liabilities (*e.g.,* obstruction, spoliation, etc). All remaining allegations in this paragraph are legal conclusions that require no answer, and which Mr. Callington denies to the extent an answer is deemed necessary.

10.     Mr. Callington admits the allegations in Paragraph 5.

11.     Mr. Callington lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 6.

12.     Mr. Callington generally denies the allegations in Paragraph 7. The assertion that "Defendant [violated] UL's contracts, and violated UL's policies and various laws," is a conclusory legal allegation for which no answer is warranted, and which Mr. Callington denies to the extent that any further response is required. Furthermore, although Mr. Callington lacks sufficient knowledge or information to

form a belief as to whether UL has, in fact, sustained any ascertainable damages in connection with events described herein—Mr. Callington vehemently denies that he is to blame or proximately cause any alleged reputational injury that is a reasonably foreseeable and natural consequence of UL's own bad decisions, lack of integrity, and/or wrongful conduct. Simply put, Mr. Callington denies that his actions are the proximate cause of any purported injury to UL's reputational interests. Additionally, Mr. Callington denies that he was responsible for the training of other auditors in UL's responsible sourcing division, as alleged in the final sentence of this paragraph.

13.    Mr. Callington generally denies the allegations in Paragraph 8. Specifically, Mr. Callington lacks sufficient knowledge or information to form a belief as to whether UL has, in fact, sustained any economic damage and denies that his actions are the proximate cause of any purported injury to UL's reputational interests in any event.

14.    Mr. Callington admits that UL LLC is a limited liability company incorporated under Delaware law and headquartered in Illinois, as alleged in Paragraph 9. However, Mr. Callington lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph.

15.    Mr. Callington admits the allegations in Paragraph 10.

16.    Mr. Callington admits that he was a resident of Oregon at all times relevant to the Complaint, and that he worked for UL from May 2017 to July 2024. Mr. Callington admits that he was initially designated "as an independent contractor," but avers that he was, in all relevant respects, a full-time "employee"

misclassified by UL throughout that time. Mr. Callington also admits that he later transitioned into a full-time salaried (W-2) position with the official job title of "Team Leader CRS," which he avers that UL misclassified as an overtime-exempt position.

17.     Paragraph 12 states legal conclusions which do not require an answer. To the extent an answer is deemed necessary, Mr. Callington denies the allegations but consents to the jurisdiction of this Court.

18.     Paragraph 13 states legal conclusions which do not require an answer. To the extent an answer is deemed necessary, Mr. Callington denies the allegations but consents to the jurisdiction of this Court.

19.     Mr. Callington admits the allegations in Paragraph 14.

20.     Mr. Callington admits the allegations in Paragraph 15.

21.     Paragraph 16 states legal conclusions which do not require an answer. To the extent an answer is deemed necessary, Mr. Callington denies the allegations but does not object to proceeding in this venue given the Court's demonstrated willingness to accommodate remote hearings.

22.     Mr. Callington admits and denies in part the allegations in Paragraph 17. Specifically, Mr. Callington admits that "UL provides social responsibility compliance auditing and inspection services … across a variety of industries," but either denies or lacks sufficient information to form a belief as to the remaining allegations. Mr. Callington especially questions the "significance" of UL's purported "effort" in "developing … customer listings" and "creating documents

related to customers' audit requests," given that the vast majority of audits follow established protocols published by organizations like SEDEX and RBA; clients who wish to depart from those protocols typically create their own audit template, which is provided to UL. Mr. Callington further notes that many clients choose to make their audit findings public, in whole or in part, as part of their marketing and/or investor relations materials—whereas others make them available upon request. Upon information and belief, for example, several of the audit reports referenced in Ms. Drier's reporting for New York Times were obtained directly from the factories, that provided them at Ms. Drier's request. To that end, Mr. Callington denies the implication that audit findings are always inherently confidential in nature.

23.     Mr. Callington admits that the allegations in Paragraph 18 accurately represent some of the circumstances in which UL's Responsible Sourcing group may be contracted to perform audits and examples of information that some clients may wish to obtain through such an audit.

24.     The allegations in Paragraph 19 are admitted and denied in part. Mr. Callington generally admits that gaining access to supplier facilities (*i.e.,* "worksites") and documentation related to labor practices is, in fact, a best practice and necessary precondition to conducting thorough audits. However, Mr. Callington avers that UL and/or its clients routinely limit the scope of audits or impose artificial restrictions on access to information that is critically important to the integrity of social compliance audits.

25.     Mr. Callington admits that UL has attached various "contracts and policies" to its Complaint but otherwise lacks knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 20.

26.     Mr. Callington admits that conducting social compliance audits is "important[t]… work" but otherwise denies or lacks knowledge as to the truth of all other allegations in Paragraph 21.

27.     Mr. Callington lacks sufficient knowledge or information to form a belief as to how "often [UL] enters into Non-Disclosure Agreements with customers," and otherwise denies the allegations in Paragraph 22. Mr. Callington also denies that all "information learned" through UL's social compliance audits is kept "strictly confidential," for reasons already explained above, *supra* at ¶17. Mr. Callington further avers that the reasons why companies procure UL's social auditing services rarely, if ever, center on purely benevolent concerns about protecting vulnerable workers from exploitative labor practices and unsafe factory conditions.  For the vast majority of its clients, UL's social compliance auditing services are a necessary means to some end, such as satisfying ESG-related criteria for inclusion in some of the nation's largest pension fund investments, qualifying for large government contracts that require specific certifications and assurances as to the conditions in which goods are made. or building, improving, and rehabilitating consumer confidence and good will with respect to  specific brands or products. For these, audit results are rarely kept "strictly confidential" when the findings are favorable.

28.     Mr. Callington lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23.

### *Defendant's Employment History with UL*

29.     Mr. Callington admits the allegations in Paragraph 24.

30.     Mr. Callington admits that he started working as an auditor for UL's Corporate Responsible Sourcing ("CRS") division pursuant to an "independent contractor" arrangement starting on or around May 26, 2017, and continued to do so for approximately two (2) years before transitioning to a salaried (W-2) position at UL's request.

31.     Mr. Callington admits that he executed UL's Independent Assessor Agreement on or about May 17, 2017, and that <u>Exhibit 1</u> to UL's Complaint appears to be a true and correct copy of that document, as alleged in Paragraph 26. *See* INDEPENDENT ASSESSOR AGREEMENT (May 17, 2017), Compl. Ex. 1 [Dkt. 1-1, at Page ID # 31-35].

32.     Mr. Callington admits that he was asked to sign the Independent Assessor Agreement again several months later, which he did "on or around November 4, 2017," as alleged in Paragraph 27. Mr Callington further admits that <u>Exhibit 2</u> to UL's Complaint appears to be a true and correct copy of that document. *See* INDEPENDENT ASSESSOR AGREEMENT (Nov. 4, 2017), Compl. Ex. 2 [Dkt. 1-1, at Page ID # 38-42].

33. Mr. Callington admits that he signed yet another version of UL's Independent Assessor Agreement "on or around May 4, 2018," and that Exhibit 3 to UL's Complaint appears to be a true and correct copy of that document, as alleged in Paragraph 28. *See* INDEPENDENT ASSESSOR AGREEMENT (May 4, 2018), Compl. Ex. 3 [Dkt. 1-1, at Page ID # 45-49].

34. Mr. Callington admits that his role as an auditor for UL's Corporate Responsible Sourcing division typically involved visiting industrial and agricultural manufacturing facilities' to identify potential violations of federal labor law, evaluate compliance with health and safety regulations or other ESG-related concerns when requested by the client, and preparing written assessments based on his findings, as alleged in Paragraph 29.

35. Mr. Callington admits that Paragraph 30 correctly quote the definition of "confidential information," as set forth in the Independent Assessor Agreement that he executed on May 4, 2018.

36. Mr. Callington admits that the confidentiality provisions contained in UL's Independent Assessor Agreement purport to apply post-termination, and in perpetuity, without any apparent time limitation, as alleged in Paragraph 31.

37. Mr. Callington admits the allegations in Paragraph 32, in part, except insofar as it omits important information about the circumstances surrounding his transition a salaried (W-2) position with UL. Specifically, in or around April 2019, Mr. Callington's then supervisor, Kelly Hutcheson, expressed concerns about UL's potential legal exposure for the misclassification of independent contractors and

asked if he would be willing to transition into a full-time salaried position with the title of "Team Leader" in UL's Corporate Responsible Sourcing ("CSR") division, and for which he was asked to submit a formal application—even though the role was just a continuation of the full-time work he had already been doing for two years, as an "independent contractor." Upon information and belief, the term "leader" was only included in his new title to provide cover for UL's misclassifying the role as an "exempt" managerial position to avoid paying him overtime wages for consistently logging 50-70 hours per week on UL audits and travel between audit sites.

38.     Mr. Callington admits that he transitioned from the independent contractor arrangement to the salaried W-2 position, as requested, "in or around April or May 2019," as alleged in Paragraph 33.

39.     Mr. Callington denies the allegations in Paragraph 34, except as expressly admitted herein. Specifically, Mr. Callington admits that Exhibit 4 to UL's Complaint includes a document entitled "CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT" [Dkt. 1-1, at Page ID # 56-57], which is neither dated nor signed. Mr. Callington does not have any record or recollection of ever signing that document or otherwise assenting to its terms.

40.     Mr. Callington admits that he received a formal written offer letter for the "Team Leader" position in or around April or May 2019, but does not specifically recall whether he was required to submit a formal electronic acknowledgement in response to that letter or otherwise memorialize his acceptance of the position, as alleged in Paragraph 35. Mr. Callington also admits that he was officially

transitioned from an independent contractor arrangement to the salaried role, on or around May 28, 2019.

41.    Mr. Callington generally admits the allegations in Paragraph 36 but avers that his day-to-day job responsibilities did not change in any meaningful way with his transition from the independent contractor arrangement to a salaried employee (W-2) status. Mr. Callington also denies that this "new" role involved any managerial oversight functions like "conduct[ing] training[s]" of other auditors.

### *UL Trade Secret Efforts*

42.    Mr. Callington admits the allegations in Paragraph 37.

43.    Mr. Callington admits that UL had various written internal policies and that some of those policies may evince UL's "efforts" to "protect… confidential information" from disclosure, but either lacks sufficient knowledge or otherwise denies the remaining allegations in Paragraph 38.

44.    The allegation in Paragraph 39 is a legal conclusion for which no answer is required, and which Mr. Callington denies to the extent an answer is deemed necessary.

45.    Mr. Callington does not recall ever having executed or acknowledged the existence of any document titled "Confidential Information and Trade Secrets Policy" in or around December 2017, or at any other time thereafter. Though Mr. Callington has no reason to dispute that the document exists and is accurately quoted in

Paragraph 40, he ultimately lacks sufficient knowledge and information to form a definitive belief as to its subject matter.

46.    Mr. Callington lacks sufficient information to form a belief and/or alternatively denies the allegations in Paragraph 41.

47.    Mr. Callington lacks sufficient information to form a belief as to the factual allegations in Paragraph 42 and declines to answer the legal conclusions therein which require no response.

48.    Mr. Callington admits to having participated in online "LMS trainings for the Standards of Business Conduct," but does not specifically recall whether those trainings dealt with confidentiality issues, as alleged in Paragraph 43—and does not have any record or recollection of participating in trainings entitled "Intro to Social Compliance Training" or "UL SANS Security." Accordingly, Mr. Callington lacks sufficient information and/or alternatively denies the allegations in this paragraph.

49.    Mr. Callington denies the allegation in Paragraph 44 insofar as it uses the present tense to describe his membership in the Association of Professional Social Compliance Auditors ("APSCA"). Mr. Callington was, indeed, a member of that organization during his employment with UL. Upon information and belief, however, UL successfully lobbied the APSCA to revoke Mr. Callington's membership around the same time that it terminated his employment and filed this retaliatory lawsuit. In any event, APSCA guidance documents are far more complex than UL's allegations suggest. While it is true that the APSCA's Code of Conduct instructs members to "maintain confidentiality with respect to information gathered in connection with a

social compliance services," this guidance should be understood alongside the APSCA's expectation that "Member Firms … [should] promote a culture of honesty and integrity in day-to-day operations," and related provisions on conflicts of interest. As with any professional code of conduct, principles and guidance published by the APSCA should be understood in a manner consistent with the overall goal of promoting ethics and integrity in the profession, which is precisely what Mr. Callington sought to do by speaking to the press.

50.   Mr. Callington lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 45 because it is unclear what certification or document is being referred to in this paragraph.

51.   Mr. Callington denies the allegations in Paragraph 46, except as expressly admitted herein. Specifically, Mr. Callington admits that the quoted language in Paragraph 46 appears in a document entitled "SOP 7.3.2-1 - Social Compliance Assessment," which he received via email on or about November 9, 2023, but otherwise denies and/or lacks knowledge as to the remaining allegations in that paragraph.

### *Alleged Transfer of Information*

52.   Mr. Callington admits that he "conducted *well* in excess of 120 audits" (emphasis added) throughout the course of his employment with UL's Corporate Responsible Sourcing division. In fact, Mr. Callington completed a total of 715 audits at facilities located throughout the United States and Canada between May 2017 and

December 2023. Though technically correct as written, the allegations in Paragraph 47 are therefore somewhat misleading.

53. Mr. Callington denies the allegations in Paragraph 48, except as expressly admitted herein. Specifically, Mr. Callington admits that he routinely had "access" to confidential business information in the ordinary course of his auditing work. However, Mr. Callington either denies or lacks sufficient knowledge and information to form a belief as to whether any such documents or records ever included legally protected trade secret information.

54. Mr. Callington denies the allegations in Paragraph 49, except as already explained and admitted in part, *supra* at ¶ 2, 4.

55. Mr. Callington denies the allegations in Paragraph 50, except as already explained and admitted in part, *supra* at ¶ 2, 4.

56. Mr. Callington denies the allegations in Paragraph 51, except as already explained and admitted in part, *supra* at ¶ 2, 4.

57. Mr. Callington admits that he used his iPhone to document worksite conditions at the facilities he audited, including by taking photographs, as alleged in Paragraph 52, which were uploaded directly to the corresponding audit file via the Dropbox. To the best of his recollection, Mr. Callington did not ever knowingly "store" any such photos to "iCloud," however, as his practice was always to upload contemporaneous documentation to Dropbox. To the extent that UL claims to have uncovered such photos in his iCloud account through some kind of forensic

examination conducted, Mr. Callington would certainly be surprised, as that was not his practice—but cannot definitively deny the truth of that allegation without more information.

### *Alleged Covert Assist to NYT*

58.    Mr. Callington admits that he first contacted Ms. Drier about her reporting on child labor issues for the New York Times in or around September 2023, as alleged in Paragraph 53.

59.    Mr. Callington admits that he did not request UL's permission or otherwise notify the company about his decision to speak with the New York Times, as alleged in Paragraph 54. Mr. Callington lacks knowledge or information sufficient to form a belief as to when UL first learned that he had done so, however.

60.    Mr. Callington admits the allegations in Paragraph 55.

61.    Mr. Callington denies the allegations in Paragraph 56, except as already explained and admitted in part, *supra* at ¶ 2

62.    Mr. Callington denies the allegations in Paragraph 57, except as already explained and admitted in part, *supra* at ¶¶ 2, 48 and 54).

63.    Mr. Callington admits the allegations in Paragraph 58.

64.    Mr. Callington admits the allegations in Paragraph 59.

65.    Mr. Callington admits the allegations in Paragraph 60.

66.    Mr. Callington admits the allegations in Paragraph 61.

67.     Mr. Callington admits the allegations in Paragraph 62.

68.     Mr. Callington admits the allegations in Paragraph 63 insofar as it states that Mr. Callington was quoted in the New York Times article but otherwise denies or lacks sufficient information as to the remaining allegations in this paragraph.

### Investigation

69.     Mr. Callington admits the allegations in Paragraph 64 insofar as it states that "UL opened an investigation," but lacks knowledge or information sufficient to form a belief as to the scope and purpose of that investigation from UL's perspective.

70.     Mr. Callington does not fully understand the allegations in Paragraph 65. To the extent this paragraph concerns the use of personal electronic devices for his audit related work, Mr. Callington reincorporates his previous explanation and admissions, *supra* at ¶ 2, and denies the rest.

71.     Mr. Callington denies the allegations in Paragraph 66, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

72.     Mr. Callington denies the allegations in Paragraph 67, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

73.     Mr. Callington denies the allegations in Paragraph 68, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

74.     Mr. Callington denies the allegations in Paragraph 69.

75. Mr. Callington denies the allegations in Paragraph 70, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

76. Mr. Callington denies the allegations in Paragraph 71

77. Mr. Callington denies the allegations in Paragraph 72, except as already explained and admitted in part, *supra* at ¶¶ 2, 4, 64.

78. Mr. Callington admits that UL terminated his employment via written communication on July 3, 2024, and otherwise denies the allegations in Paragraph 73

## COUNTS I & II
### (Alleged "Misappropriation" of Trade Secrets)

79. Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs and generally denies that he is liable for "misappropriation" of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.,* as alleged in Count I of the Complaint.

80. Mr. Callington denies the allegations in Paragraph 75.

81. As for the recitation of law in Paragraph 76, Mr. Callington avers that the statutory definition for "misappropriation" is essential to the claim at issue here. Under the DTSA,

[T]he term **"misappropriation"** means—

(A) acquisition of a trade secret … by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret … without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was— (I) derived … through [improper means]; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret… or (III) derived from or through a person who owed a duty to … to maintain the secrecy of the trade secret or limit [its] use … or

(iii) before a material change of the position of the person, knew or had reason to know that—(I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C.A. § 1839(5).

82.     Mr. Callington avers that no response is required or warranted to the recitation of law in Paragraph 77.

83.     Mr. Callington denies the allegations in Paragraph 78.

84.     Mr. Callington denies the allegations in Paragraph 79.

85.     Mr. Callington does not have sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 80.

86.      Mr. Callington admits in part and denies in part the allegations in Paragraph 81. Specifically, Mr. Callington admits that UL routinely requires employees to enter confidentiality and non-disclosure agreements but denies all other allegations in this paragraph.

87.     Mr. Callington does not have sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 82.

88.     Mr. Callington denies the allegations in Paragraph 83.

89.     Mr. Callington denies the allegations in Paragraph 84.

90.     Mr. Callington denies the allegations in Paragraph 85.

91.     Mr. Callington does not have sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 86.

92.     Mr. Callington denies the allegations in Paragraph 87.

93.     Mr. Callington denies the allegations in Paragraph 88.

94.     Mr. Callington denies the allegations in Paragraph 89.

95.     Mr. Callington denies the allegations in Paragraph 90.

96.     Mr. Callington denies the allegations in Paragraph 91.

97.     Mr. Callington denies the allegations in Paragraph 92.

98.     Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs and generally denies that he is liable for "misappropriation" of trade secrets under the Illinois Trade Secret Act ("ITSA"), 765 ILCS 10651 *et seq.*, as alleged in Count II of the Complaint.

99.     Mr. Callington denies the allegations in Paragraph 94.

100.    Mr. Callington denies the allegations in Paragraph 95.

101.    Mr. Callington denies the allegations in Paragraph 96.

102.    Mr. Callington denies the allegations in Paragraph 97.

103.    Mr. Callington denies the allegations in Paragraph 98.

104.    Mr. Callington denies the allegations in Paragraph 99.

105.    Mr. Callington denies the allegations in Paragraph 100.

106.    Mr. Callington denies the allegations in Paragraph 101.

107.    Mr. Callington denies the allegations in Paragraph 102.

## COUNT III
### (Alleged Breach-of-Contract)

108.    Mr. Callington  repeats his response to each of the preceding paragraphs as if fully set forth herein and generally denies that he is liable for breach of contract.

109.    Mr. Callington denies the allegations in Paragraph 104.

110.    Mr. Callington denies the allegations in Paragraph 105.

111.    Mr. Callington denies the allegations in Paragraph 106.

112.    Mr. Callington denies the allegations in Paragraph 107.

113.    Mr. Callington denies the allegations in Paragraph 108.

114.    Mr. Callington denies the allegations in Paragraph 109.

115.    Mr. Callington denies the allegations in Paragraph 110.

116.    Mr. Callington denies the allegations in Paragraph 111.

117.    Mr. Callington denies the allegations in Paragraph 112.

118.    Mr. Callington denies the allegations in Paragraph 113.

## COUNT IV
### (Alleged Breach of Fiduciary Duties)

119.    Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs as if fully set forth herein and generally denies that he is liable for any common law fiduciary breach.

120.    Mr. Callington denies the allegations in Paragraph 115.

121.    Mr. Callington denies the allegations in Paragraph 116.

122.    Mr. Callington denies the allegations in Paragraph 117.

123.    Mr. Callington denies the allegations in Paragraph 118.

124.    Mr. Callington denies the allegations in Paragraph 119.

125.    Mr. Callington denies the allegations in Paragraph 120

## COUNT V
### (Alleged Conversion)

126.    Mr. Callington hereby repeats and incorporates his responses to each of the preceding paragraphs as if fully set forth herein and generally denies that he is liable for any claim of common law conversion.

127.    Mr. Callington denies the allegations in Paragraph 122.

128.    Mr. Callington denies the allegations in Paragraph 123.

129.    Mr. Callington denies the allegations in Paragraph 124.

130.    Mr. Callington denies the allegations in Paragraph 125.

131.    Mr. Callington denies the allegations in Paragraph 126.

132.    Mr. Callington denies the allegations in Paragraph 127.

133.    Mr. Callington denies the allegations in Paragraph 128.

134.    Mr. Callington denies the allegations in Paragraph 129.

135.    Mr. Callington denies the allegations in Paragraph 130.

## AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

#### ( Unclean Hands )

136.    UL's claims are barred by the doctrine of unclean hands.

### Affirmative Defense No. 2

#### ( Equitable Estopple / Waiver )

137.    UL is equitably estopped and has waived its claims through its own

conduct, including false or frivolous assertions made in furtherance of retaliation.

### Affirmative Defense No. 3

#### ( Consent / Authorization )

138.    UL consented to and authorized Mr. Callington's access, possession, and

storage of company documents, barring claims premised on lack of authorization.

### Affirmative Defense No. 4

#### ( Protected activity )

139.    All claims premised upon the theory that Mr. Callington improperly

disclosed documents or information  coversion or other unlawful disclosures arise

from protected activity.

### Affirmative Defense No. 5

#### ( Statutory Immunity - Anti-SLAPP )

140.    Mr. Callington is immune from liability for claims arising from his

journalistic source communications and related disclosures to the New York Times

with journalists and related disclosures are barred by applicable state anti-SLAPP

statutes.

### Affirmative Defense No. 6

(Public Policy)

141.    Some or all of UL's claims are barred as a matter of public policy.

### Affirmative Defense No. 7

( Statutory Immunity  - Whistleblower )

142.    UL's claims are barred by under applicable antiretaliation and whistleblower provisions of federal and state law.

### Affirmative Defense No. 8

( Or. Rev. Stat. § 659A.210 )

143.    Some or all of UL's claims are barred by O.R.S. § 659A.210.

### Affirmative Defense No. 9

( Federal Contractor Estoppel 48 C.F.R. § 52.203-19 )

144.    UL is estopped by representations and certifications that it has made under the Federal Acquisition Regulations, including 48 C.F.R. § 52.203-19.

### Affirmative Defense No. 10

( DTSA Whistleblower Immunity )

145.    UL's DTSA claim is barred by 18 U.S.C. § 1833(b).

### Affirmative Defense No. 11

( DTSA )

146.    UL waived trade secret protections by and through its own failure to by failing to identify the scope of information it treats as a trade secret, failing to maintain secrecy or consenting to disclosure, and failing to comply with notice requirements and other provisions of the statute.

### Affirmative Defense No. 12

( Preemption / Displacement )

147. Common-law claims are displaced or preempted by applicable trade secret statutes.

### Affirmative Defense No. 13
( Laches / Statute of Limitations )

148. Certain claims are barred by laches and applicable limitations periods.

Public Policy Invalidity of Contractual Provisions –

149. Confidentiality and nondisclosure provisions are void or unenforceable as against public policy.

### Affirmative Defense No. 14
( Lack of Standing )

150. UL lacks standing to assert trade secret or conversion claims on behalf of third-party clients.

### Affirmative Defense No. 15
( No Equitable Relief / Adequate Remedy at Law )

151. UL is barred from equitable relief due to absence of irreparable harm and availability of legal remedies.

## FACTUAL ALLEGATIONS COMMON ALL COUNTERCLAIMS

152. Mr. Callington hereby repeats and incorporates by reference each of the preceding paragraphs in his Answer and Defenses above, as if fully set forth herein.

153. By and through the acts and conduct described herein, UL has made false or statements or certifications about its own business operations, policies, and practice, that are unlawful or otherwise actionable—and which has been, may

presently be, and may at some point in the future become the subject of a state or federal government investigation.

154.    By and through the acts and conduct described herein, UL has aided and abetted or caused others to make false statements or certifications that are unlawful, fraudulent, and/or otherwise actionable—and which has been, may presently be, or may at some become the subject of a state or federal government investigation.

155.    At all times during which Mr. Callington is alleged to have acted in the manner described herein, Mr. Callington acted good faith, for good reason, based upon his reasonable belief that the conduct of UL and others not named herein was unlawful and harmful to the public.

156.    During the period between 2019 and 2023, and in Court filings related to this case, UL has repeatedly implied that Mr. Callington never raised any of his concerns about audit integrity internally, before speaking to the New York Times. This is false.

157.    Mr. Callington repeatedly expressed concerns about audit integrity, internally at first, in a good faith attempt to identify actual violations of law or unsafe conditions and unethical practices which he reasonably believed were unlawful, that were consistently being ignored, glossed over, or actively concealed in the final work product that UL delivered to its clients.

158.    When he noticed that legitimate audit findings had been removed or deescalated after the fact, Mr. Callington would inquire about the changes to understand the circumstances surrounding those decisions.

159. It didn't take long for him to figure out that these types of changes, made on the backend, were usually part of a larger effort to appease and retain certain valuable clients.

160. On a handful of occasions, Mr. Callington unequivocally (albeit diplomatically) expressed opposition to what he perceived as a willingness to remove and/or minimize adverse audit findings as a matter of "customer service" and systematically incentivize turning a blind eye towards potentially egregious violations of law.

161. UL generally discouraged and sometimes even penalized Mr. Callington for resisting against these questionable practices.

162. In addition to lecturing him on the importance of customer satisfaction when clients were dissatisfied with adverse findings, Mr. Callington was sometimes removed from from certain client accounts for refusing to overlook specific violations of law and depart from documented standards.

163. In or around the fall of 2023, Mr. Callington became a journalistic source for the New York Times in connection with its investigative reporting on the rise of unlawful child labor in factories across the United States.

164. Several months later, the New York Times published the article that prompted this lawsuit, in which Mr. Callington was identified by name and portrayed as an insider with legitimate concerns about how perverse incentives and conflicts of interest can operate as a structural thumb on the scale towards

suppressing exploitative working conditions by the very companies who are "paid billions" to identify these issues:

> Spotting problems [has] … led to tension between Mr. Callington and his employer, UL Solutions, which began as a safety testing business and expanded more than two decades ago into social compliance audits. The company took in $2.5 billion in revenue last year and is on the cusp of an initial public offering.
>
> What Mr. Callington saw as a commitment to his job, his firm seemed to see as overzealousness.
>
> "The assessment is not meant to be a policing effort," the UL Solutions employee handbook says….

Dreier, They're Paid Billions, N.Y. TIMES, supra, n. 3.

165. To the best of his knowledge, Mr. Callington did not disclose any trade secret information to the New York Times and has never knowingly disclosed any information which he knew to be a trade secret to any other individual or entity, competitor, or otherwise.

166. In or around January 2024, Mr. Callington filed a formal complaint with the Oregon Bureau of Labor and Industries ("BOLI") and the Occupational Safety and Health Division ("OSHA") regarding retaliatory acts that UL had taken against him following the publication of this article, which he reasonably believes constitute violate applicable whistleblower protections and anti-retaliation provisions under state and federal law.

167. In or around June 2024, Mr. Callington provided information to the SEC's Whistleblower Office concerning conduct by UL which he reasonably believes constitutes a violation of securities law.

168.  UL has since undertaken several adverse actions against Mr. Callington, including but not limited to placing him on administrative leave and engaging in various intimidation tactics under the guise of an unreasonable and unnecessarily prolonged internal "investigation," before ultimately terminating his employment, blacklisting conduct and bringing this frivolous action.

## COUNTERCLAIM I
### Retaliation in Violation of the Sarbanes–Oxley ("SOX") Act, 18 U.S.C. § 1514A

169.  Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

170.  Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation for which UL is liable under 18 U.S.C. § 1514A.

## COUNTERCLAIM II
### Retaliation in Violation of Dodd-Frank Act, 15 U.S.C. § 78u-6

171.  Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

172.  Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under 15 U.S.C. § 78u-61.

173.

## COUNTERCLAIM III

**Retaliation in Violation of the False Claims Act ("FCA"),
31 U.S.C. § 3730(h)**

174. Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

175. Each of the foregoing adverse actions undertaken against Mr. Callington constitutes an independent unlawful act of retaliation, for which UL is liable under 31 U.S.C. § 3730(h).

## COUNTERCLAIM IV

**Unlawful Employment Practices in
Violation of the Oregon Safe Employment Act ("OSEA"),
Or. Rev. Stat. § 654.001, *et seq.***

176. Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

177. The Oregon Safe Employment Act ("OSEA"), Or. Rev. Stat. § 654.062(5) ("Notice of violation to employer by worker") provides that "[i]t is an unlawful employment practice" to "discharge" or "bar from employment," or "otherwise discriminate against" any employee because that employee has "[o]pposed…" or "complain[ed]" of any unlawful practice, "[commenced] or caused to be instituted [or testified in] any proceeding," or "exercised … [either on his own behalf or that of others] … any right afforded" thereunder. Pursuant to regulations promulgated by the Oregon Bureau of Labor and Industries, an employee who "communicat[es]" such opposition to a "newspaper" is well within the scope of protected activities covered by the statute. Or. Admin. Rule ("OAR") 839-004-0016(2) ("Scope of Protection under

ORS 654.062(5)"). (explaining that "[p]rotected actions include… communicating opposition to … [c]oworkers… [e]mployers [and]… [n]ewspapers and other media.").

178.    Each of the foregoing adverse actions that UL has undertaken against Mr. Callington constitutes an independent "unlawful employment practice" in violation of ORS 654.062(5).

## COUNTERCLAIM V

### Prohibited Conduct by a Nonprofit Employer in Violation of the Oregon Whistleblower Law, Or. Rev. Stat. § 659A.203.

179. Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

180.    Upon information, UL is or was a "nonprofit" organization during some or all of the period relevant to the allegations herein.

181. Pursuant to the State of Oregon's Whistleblower Law, Or. Rev. Stat. § 659A.200 *et. seq.*, "it is an unlawful employment practice" for any nonprofit employer to:

    (i)    Prevent, prohibit or take adverse action against any employee for "disclosing" information or evidence that the nonprofit employer has engaged in "a violation of any federal, state or local law, rule or regulation" or [m]ismanagement… abuse of authority or substantial and specific danger to public health and safety," Or. Rev. Stat. § 659A.203.(1)(b);

(ii)     Require employees "to give notice," prior to making any [such] disclosure," Or. Rev. Stat. § 659A.203.(1)(c);

(iii)    Discourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section. Or. Rev. Stat. § 659A.203.(1)(d); and

(iv)    Discourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section. Or. Rev. Stat. § 659A.203.(1)(d); or

(v)     Invoke or impose "any disciplinary action" against an employee for doing so, Or. Rev. Stat. § 659A.203.(1)(d).

182.    At all relevant times alleged herein, UL was in continuous violation of Or. Rev. Stat. § 659A.203.

## COUNTERCLAIM VI
### Discrimination and Retaliation in Violation of Or. Rev. Stat. § 659A.199; OAR 839-010-0100

183.    Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

184.    The State of Oregon also protects private sector employees from employer retaliation for reporting violations of state or federal law if the report is made in good faith. Or. Rev. Stat. § 659A.199(1) ("It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate

or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."). *See also* Or. Rev. Stat. § 659A.230 ("Employers may not discriminate or retaliate against an employee who in good faith reports criminal activity, has caused a complaint to be filed, has cooperated with law enforcement, has brought a civil action against an employer, or has testified at a civil proceeding or criminal trial.").

185.   At all times relevant to the allegations herein, Mr. Callington had (and still has) a reasonable and good faith belief that the subject matter of his internal reports at UL – and his subsequent disclosure of information to the New York Times and government authorities – concerned violations of federal and state law that jeopardize the health, safety, and well-being of American workers and consumers alike, global trade and markets, and the public at large.").

186.   With respect to his disclosures to the New York Times, specifically, Mr. Callington knew or had reason to believe that UL was consistently failing to capture the existence of child labor in the supply chains of major retailers like Costco and Walgreens due to audit integrity issues which he had previously raised and sought to raise and remediate on numerous occasions.

## COUNTERCLAIM VII
### Aiding and Abetting Unlawful Retaliation; Conspiracy

187.   Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

188.   Upon information and belief, UL together with its affiliates, clients, and unknown others has also conspired with, aided or abetted, incited, compelled or coerced others — including, but not limited to, the Association of Professional Social Compliance Auditors ("APSCA") — to engage in unlawful retaliation and discriminatory acts against Mr. Callington.

## COUNTERCLAIM VIII
### Blacklisting in Violation of Or. Rev. Stat. § 659.805,

189.   Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

190.   Based on his experience, expertise, and industry know-how, Mr. Callington earned credentials from the APSCA as a Certified Social Compliance Auditor.

191.   Following the publication of the New York Times article citing his concerns about UL's social compliance audits, the APSCA revoked Mr. Callington's certification for alleged violations of the credentialing organization's Code of Conduct.

192.   Upon information and belief, UL caused the revocation of Mr. Callington's credentials by APSCA, knowing that it would significantly hamper his ability to secure gainful employment elsewhere within the industry.

193.   UL's ongoing efforts to discredit its former employee for speaking up about the Company's questionable audit operation is a form of industry "blacklisting"

which is prohibited by Or. Rev. Stat. § 659.805, and which has caused significant harm to Mr. Callington's professional interests and employment prospects.

## COUNTERCLAIM IX
### Wrongful Retaliation and Discharge in
### Violation of Public Policy

194.    Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

195.    The tort of wrongful discharge is a recognized common law exception to the general precept that employment at-will may be terminated for any reason.

196.    The public policy of Oregon—which is embodied in the aforementioned provisions of Oregon's Labor and Employment Law, Title 51, Ch. 659—seeks to discourage employers from retaliating against good samaritans and whistleblowers who courageously come forward (often with great personal risk to their own interests) to expose fraud, misrepresentations, and other instances of harmful conduct that have been purposefully concealed from the public.

197.    That is precisely what Mr. Callington did when he shared his concerns with the New York Times about the integrity of social compliance audits that were consistently failing to flag obvious safety issues or exploitative working conditions (including but not limited to child labor violations) on factory floors across the United States.

198.    As a matter of public policy, Mr. Callington and other similarly situated individuals are entitled to protection against wrongful retaliation for speaking up in service of others and the public interest.

## COUNTERCLAIM X

### Retaliation in Violation of the Illinois Whistleblower Act, 740 ILCS 174 /15, *et seq.*

199.    Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

200.    Each and every action taken by Mr. Callington in an effort to disclose and shed light on UL's problematic business practices also constitutes protected activity under the anti-retaliation provisions of the Illinois Whistleblower Act, 740 ILCS 174.

## COUNTERCLAIM XI

### Intentional Infliction of Emotional Distress

201.    Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

202.    As alleged herein, UL has engaged in an extreme, outrageous and ongoing campaign of unlawful retaliation against Mr. Callington that involves— among other things—seeking to have him cast out of his profession—and burdening him with this lawsuit, based on meritless allegations of theft.

203.    Each and every one of UL's retaliatory actions against Mr. Callington discussed has been undertaken with the intent to inflict emotional distress.

204.    As a direct result of UL's retaliatory actions, Mr. Callington has, in fact, suffered significant hardships and severe emotional distress.

<u>**COUNTERCLAIM XII**</u>

**Failure to Pay Overtime; Misclassification**
**Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1)**

205.    Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

206.    The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), requires overtime pay at a rate not less than one and one-half times an employee's regular rate for work over forty hours in a week.

207.    Throughout the duration of his employment with UL, Mr. Callington regularly worked 50-70 hours per week.

208.    Throughout the duration of his employment with UL, Mr. Callington was an "employee" and UL was an "employer" within the meaning of 29 U.S.C. § 203(d),(e)(1).

209.    At all times relevant to the allegations herein, UL knew that Mr. Callington was improperly classified and worked well over 40 hours per week, but intentionally and willfully failed to provide an overtime premium pay.

210.    Plaintiff is thus entitled to, and hereby seeks, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorney's fees as provided by the FLSA.

## **COUNTERCLAIM XIII**

### **Failure to Pay Overtime; Misclassification**
### **Or. Rev. Stat. § 653.261(1)(a); OAR 839-020-0030**

211.    Mr. Callington repeats the allegations in each of the preceding paragraphs as if fully set forth herein.

212.    Oregon law requires employers to pay one and one-half times the regular rate for work in excess of forty hours in one week.

213.    Throughout the duration of his employment with UL, Mr. Callington regularly worked 50-70 hours per week.

214.    UL knew that Mr. Callington was improperly classified and worked well over 40 hours per week, but intentionally and willfully failed to provide overtime premium pay.

215.    Plaintiff is thus entitled to, and hereby seeks, unpaid overtime for hours worked in excess of forty in a week, plus interest, liquidated damages, penalties, costs and attorney's fees as provided by Or. Rev. Stat. § 653.261(1)(a).

## **DEMAND FOR JURY TRIAL**

Mr. Callington respectfully requests a jury trial on all claims and counterclaims so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Callington prays for a judgment in his favor and the following relief:

(i) Compensatory damages in an amount to be determined at trial to account for all monetary and non-economic losses sustained as a result of UL's unlawful acts (e.g., unpaid overtime, lost wages, emotional distress);

(ii) Statutory penalties, fees, and interest;

(iii) Punitive damages in an amount that is sufficient to account for UL's wrongful conduct;

(iv) An award of attorneys' fees, costs, and reasonable litigation expenses incurred in this lawsuit; and

(v) Any other equitable or declaratory relief deemed proper under the circumstances.

DATED: January 22, 2026      Respectfully submitted,

By:    */s/ Agatha M. Cole*

Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036
(828) 773-2628
agatha@beverlypllc.com

*Counsel for Joshua Callington,*
*Defendant-Counterclaim Plaintiff*