IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| UL LLC,<br><br>  *Plaintiff / Counter-Defendant,*<br><br>   -v-<br><br>JOSHUA CALLINGTON,<br><br>  *Defendant / Counter-Plaintiff.* | Case No. 1:24-cv-05631<br>Hon. Andrea R. Wood |

## MR. CALLINGTON'S RESPONSE IN OPPOSITION TO UL LLC'S MOTION TO DISMISS COUNTERCLAIMS [Dkt. 132]

i

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 1

STANDARD OF REVIEW ....................................................................................... 4

ARGUMENT ............................................................................................................ 5

I.   Mr. Callington's amended pleading satisfies all the material elements for each of the claims arising from UL's unlawful retaliation (Counterclaims I through XII). ........................................................................ 6

      A.  Retaliation Claims Arising Under Federal Law ................................ (Counts I, II and III) ........................................................................... 8

      B.  State Law Retaliation Claims ........................................................ 11

            i.    Oregon Safe Employment Act ("OSEA"), ORS § 654.001, *et seq.* (Counterclaim IV) ........................... 11

            ii.   Oregon Whistleblower Law, ORS § 659A (Counterclaims V and VII) .................................................... 12

            iii.  Post-Termination Industry Blacklisting, ORS § 659.805 (Counterclaim VIII). ................................... 13

            iv.  Illinois Whistleblower Act, 740 ILCS 174 /15, (Counterclaim X) ................................................................. 14

      C.  Common Law Tort Claims ............................................................... 14

            i.    Wrongful Retaliation and Discharge in Violation of Public Policy (Counterclaim IX) ....................................... 14

            ii.   Aiding & Abetting / Conspiring to Engage in Unlawful Retaliation (Count VII) ....................................... 15

            iii.  Intentional Infliction of Emotional Distress (Count XI) ..... 15

II.  Mr. Callington's allegations are wholly sufficient to survive dismissal on the wage and hour claims (Counts XII & XIII). ...................................... 15

CONCLUSION ....................................................................................................... 16

**BACKGROUND**

As both parties' pleadings make clear, Mr. Callington is a dedicated professional who already had an established a career as a leading auditor in the Environmental, Social, and Governance ("ESG") compliance space when he started working with UL's Responsible Sourcing Division in mid-2017.

Over the next few years, Mr. Callington was tasked with performing hundreds of supply chain audits for the dozen or so repeat clients that comprise UL's core customer base. And, at all times relevant to the allegations in his counterclaims, most (if not all) of those clients were major U.S. retailers or multinationals which (a) employed hundreds of thousands of individuals, either directly or indirectly, throughout North America; (b) routinely entered into government contracts for the provision of goods and/or services to federal and state entities throughout the United States; and (c) were publicly traded companies listed on a U.S. stock exchange.[12]

Throughout that time period, Mr. Callington observed that UL's policy, pattern or practice of elevating "customer satisfaction" and client retention above all else served as a strong incentive to overlook or brush aside egregious violations of applicable workplace safety and labor laws. As alleged in his amended pleading [CM/ECF No. 129], management routinely engaged in the setting aside,

---

[1] As is relevant here, that are, employ thousands of individuals—directly or indirectly—throughout North America, and.

[2] To the extent these particular aspects of UL's client base are not already discernable from the pleadings, Mr. Callington avers that identifying these clients by name would be sufficient for the Court to take judicial notice of those material facts and would readily do so with some level of assurance from the Court listing the names of those clients in his court filings will not be construed as a violation of the Preliminary Injunction Order [CM/ECF No. 91] (entered Aug. 7, 2025).

1

minimization, or erasure of adverse findings from audit reports in which he accurately represented the existence of unlawful conditions at facilities that UL was responsible for auditing, ¶¶ 157-161 [Page ID # 1170-71], and chastised or penalized him for being "overzealous" about the very compliance factors that he was tasked with assessing as part of these audits, ¶¶ 160-162, 164 [Page ID # 1171-72].

Nevertheless, Mr. Callington continued to conduct thorough audits and repeatedly conveyed his view that UL's policies and practice was leading to questionable and potentially fraudulent misrepresentations in the company's audit results, when presented with an opportunity to express these concerns internally. *Id.* at ¶¶ 155-162.

By 2023, Mr. Callington had grown increasingly frustrated by his employer's lack of ethics, integrity, or concern for workers at the facilities that it was responsible for auditing. In or around that fall, Mr. Callington spoke to a journalist who was investigating the rise of unlawful child labor and other workplace safety concerns in factories across the United States about his experience as an employee at UL and his views on the company's role in contributing to these systemic problems, ¶¶ 163-165 [Page ID # 1172-73].

Several months later, *The New York Times* published an article that portrayed Mr. Callington as a corporate insider and whistleblower with legitimate concerns about the "suppress[ion] of exploitative working conditions" by companies that are "paid billions" for private audit services which are ostensibly designed to flag those

very issues. *Id.* at ¶ 164; *see also* Hannah Dreier, *They're Paid Billions to Root Out Child Labor in the U.S. Why Do They Fail?*, N.Y. TIMES (Dec. 28, 2023).

Aside from confirming his belief that UL was effectively complicit in covering up unlawful child labor violations that article served as further validation of Mr. Callington's longstanding suspicion that UL's business model (*i.e.,* selling clean audits to any willing buyer, without regard to the veracity of the audit findings and representations made therein) was itself fraudulent and, therefore, probably illegal— though he hadn't given much thought to the specifics of which laws and regulations might be implicated up to that point in time.[3]

In any event, neither party disputes the nature or timing of UL's response to that article. As UL alleges in its own Complaint, Mr. Callington was placed on administrative leave while the company launched an "investigation" into the substance, scope, and circumstances surrounding his communications with the New York Times. UL Compl. [CM/ECF No. 1] at ¶ 64, Page ID # 16. Approximately six months later, on July 3, 2024, UL notified Mr. Callington that it was terminating his employment and filed this lawsuit the very same day. *Id.* at ¶ 73, Page ID # 18.

In addition to admitting these same basic facts in his amended answer, Mr. Callington asserts several counterclaims against his former employer, most of which stem from this sequence of unlawful retaliatory actions. *See* First Am. Answer,

---

[3] To the extent necessary, Mr. Callington is perfectly willing, ready, and able to expand upon the allegations regarding his subjective belief that UL's policy, pattern, and/or practice of omitting and/or misrepresenting material facts in its audit findings is unlawful, including by identifying the specific statutes and regulations which he believes have been implicated. If the facts alleged in his amended pleading are deemed to be lacking on that point, leave to amend should be freely granted for the purpose of supplementing those allegations to cure any such deficiency.

Defenses & Counterclaims [CM/ECF No. 129] (filed Jan. 22, 2026), at ¶¶ 169–215, Page ID # 1173-1182.

Predictably, UL has moved to dismiss Mr. Callington's counterclaims, arguing that each cause of action is legally defective in one way or another. *See* UL LLC's Mot. to Dismiss Mr. Callington's Counterclaims [CM/ECF No. 131] and Supp. Mem. [CM/ECF No. 132] [*hereinafter,* the "MTD"] (filed Feb. 23, 2026).

Because Mr. Callington has plausibly alleged facts that satisfy all material elements for each cause of action asserted in his counterclaims, the motion should be denied.

## STANDARD OF REVIEW

Throughout its briefing, UL seems to suggest that Mr. Callington's allegations should be held to the more onerous "particularity" requirement that applies to fraud claims under Fed. R. Civ. P. 9(b). *See* MTD at Page ID # 1196 (citing cases that stand for the uncontroversial proposition that securities fraud claims are must be pleaded with particularity as to the "specific provision or section" of law that is alleged to have been violated). Accordingly, it bears worth mentioning that none of the counterclaims are subject to a heightened pleading standard. Although Mr. Callington certainly alleges facts evincing that UL has engaged and participated in fraudulent activities, or conducted itself in a manner that amounts to, or results in, fraud—none of his counterclaims actually sound in fraud or stem from those activities. Instead, each counterclaim arises from some aspect of the employment relationship between the parties and/or adverse actions undertaken against him for engaging in lawfully protected activity. As with any other claim sounding in labor and employment or anti-

4

retaliation laws, the sufficiency of Mr. Callington's counterclaims is governed by Fed.R.Civ.P. 8(a)(2), which only requires "a 'short and plain statement'… sufficient to provide… 'fair notice' of [each]… [counter]claim and its basis." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008); *accord Kugler v. Bd. of Educ. of the City of Chicago,* No. 16 C 8305, 2017 WL 3169046, at \*2 (N.D. Ill. July 26, 2017) (explaining that the same default notice pleading rule applies to claims and counterclaims alike); *U.S. ex rel. Sibley v. Univ. of Chicago Med. Ctr.,* 44 F.4th 646, 658–62 (7th Cir. 2022) (distinguishing whistleblowers' substantive fraud claims from claims of unlawful retaliation for adverse actions undertaken against whistleblowers who exposed said fraud).[4] Applying that standard alongside Fed. R. Civ. P. 12(b)(6), each of the counterclaims in Mr. Callington's operative pleading is supported by "plausible" factual allegations, giving rise to a "cognizable" cause of action "upon which relief can be granted" if his version of events is borne out at trial. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Archer v. Chisholm,* 870 F.3d 603, 612 (7th Cir. 2017).

## ARGUMENT

At the highest level of abstraction, all of Mr. Callington's causes of action against his former employer fall into one of two broad categories. The overwhelming

---

[4] *See also, e.g., Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1103 (9th Cir. 2008) ("Because the [federal False Claims Act ("FCA") 31 U.S.C. § 3729 *et seq*]… is an anti-fraud statute … complaints alleging a FCA violation must fulfill the requirements of Rule 9(b)… In this case, however, we are presented only with …[an] FCA retaliation claim [31 U.S.C. § 3730(h)] … which 'does not require a showing of fraud and therefore need not meet the heightened pleading requirement'…" (quoting *U.S. ex rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 238 n. 23 (1st Cir.2004)); *accord U.S. ex rel. Chorches v. Am. Med. Response, Inc.,* 865 F.3d 71, 95 (2d Cir. 2017).

5

majority of his claims (Counterclaims I through XI) stem from the same broad theme of unlawful retaliation whereby UL is alleged to have undertaken some combination of unlawful adverse actions against Mr. Callington for engaging in one or more instances of lawfully protected activity. The final two causes of actions (Count XII & XIII) are wage and hour claims, stemming from UL's wanton disregard for applicable overtime laws.

## I. Mr. Callington's amended pleading satisfies all the material elements for each of the claims arising from UL's unlawful retaliation (Counterclaims I through XII).

Although each cause of action stems from a unique combination of facts and circumstances, all retaliation claims arise from the same basic fact pattern. Whether asserted under federal and state whistleblower statutes, or as common law tort causes of action, retaliation always necessarily involves some kind of unlawful "adverse action" that was undertaken against the complainant for engaging in lawfully "protected activity." *See Del Signore v. Nokia of Am. Corp.*, 672 F. Supp. 3d 560, 569 (N.D. Ill. 2023) ("Although the statutes governing them are not identical, plaintiff's retaliation claims all share the same basic elements.").

Here, all of Mr. Callington's protected activities stem from his dogged resistance and objections to UL's unlawful and unethical audit practices. In his unrelenting effort to push back against UL's problematic corporate culture and willful blindness, Mr. Callington reported his concerns across multiple channels and engaged in various types of lawfully protected activity—including but not limited to:

- raising objections and surfacing his concerns about the integrity of UL's internal complaints internally, in the first instance (¶¶ 157-158);

- reporting his concerns to the press and serving as the principal journalistic source for a Pulitzer Prize-winning *New York Times* exposé (¶¶ 163-164), which finally disturbed the status quo by prompting significant policy changes aimed at increasing transparency and accountability in the social compliance auditing industry, *see, e.g., California Law Imposes New Disclosure Obligations on Employers Conducting Voluntary Child Labor Audits*, JDSupra (Dec. 4. 2024); Hannah Drier, *Confronted With Child Labor in the U.S., Companies Move to Crack Down*, N.Y. Times (Feb. 7, 2024); and

- filing formal complaints with appropriate state and federal regulators about specific aspects of UL's wrongful policies and practice which he reasonably believes are fraudulent and therefore unlawful or have otherwise knowingly caused or contributed to the unlawful fraudulent conduct of others (¶¶ 153-155, 166-167, 169-175).

In response to Mr. Callington's protected activities, UL launched a continuous, escalating campaign of unlawful retaliation which included various workplace penalties and adverse actions undertaken during the course of his employment and after the termination of his employment, such as:

- subjecting him to reprimands and mandatory customer service trainings simply for thoroughly documenting labor violations;

7

- removing him from certain client accounts and or barring him from specific audit sites;

- placing Mr. Callington on administrative leave and subjecting him to a hostile, bad-faith internal investigation led by outside counsel for reporting his concerns to the press;

- terminating his employment and filing the instant, retaliatory lawsuit against him on the exact same day; and

- post-termination industry blacklisting conduct like pressuring the Association of Professional Social Compliance Auditors ("APSCA") to revoke his professional credentials, effectively casting him in a false light and blacklisting him from his chosen profession.

UL does not deny that it undertook each of these adverse actions—nor does it appear to dispute that Mr. Callington engaged in the aforementioned lawfully protected activities. Instead, UL's motion identifies a handful of purported deficiencies, all of which are either ill-conceived or immaterial—and/or otherwise easily curable with minor amendments. We address each in turn

### A. Retaliation Claims Arising Under Federal Law (Counts I, II and III)

At the outset, UL contends that the federal retaliation claims should be dismissed because Mr. Callington has failed to specially identify the exact statutory provisions and/or regulations that UL is alleged to have violated by and through its policies, practice and pattern of conduct. As previously explained, this argument is premised upon the ill-conceived notion that claims of retaliation for reporting fraud

8

should be held to the same heightened pleading as substantive allegations of federal securities fraud and/or government contract fraud.In order to state a viable cause of action under the anti-retaliation provisions of either Sarbanes-Oxley ("SOX"), 18 U.S.C. § 1514A (Count I), Dodd-Frank Act, 15 U.S.C. § 78u-6 (Counterclaim II), or the federal False Claims Act, 31 U.S.C. § 3730(h), it is wholly sufficient for Mr. Callington to allege that the substance of his complaints to the relevant government enforcement authorities concerned conduct which he "reasonably believed" was in violation of that law. *See e.g., Sibley*, 44 F.4th at 658–62; *MiMedx Group, Inc. v. Fox*, No. 16 CV 11715, 2018 WL 558500, at *8 (N.D. Ill. Jan. 24, 2018); *see also Harp v. Charter Commc'ns, Inc.,* 558 F.3d 722, 723 (7th Cir. 2009); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1000 (9th Cir. 2009). ‼

That said, to the extent that UL genuinely seeks clarification, Mr. Callington stands willing, ready and able to supplement his pleading as needed for the purpose of expanding upon the basis for his understanding that UL's fraudulent audits independently violate each of the aforementioned federal statutes. Moreover, although it is wholly immaterial to the legal sufficiency of his claims, Mr. Callington would readily accept the invitation to identify each specific provision (and regulation promulgated thereunder) which he believes UL has violated, if and when presented with any indicia of good faith that doing so might lead to a more productive path towards resolving his well-pleaded counterclaims.

UL's final attempt to eliminate the SOX retaliation claim on administrative exhaustion grounds [Page ID # 1200-01] is equally flawed. As an initial matter, this

9

argument relies on outdated precedents which previously held that failing to exhaust all available administrative remedies was a jurisdictional bar to bringing SOX retaliation claims in federal district courts. *But see Jaludi v. Citigroup and Co.,* 57 F.4th 148, 153 (3d Cir. 2023) ("Because …the [Sarbanne-Oxley's] … exhaustion requirement …[is not] jurisdictional, we proceed to the merits"); *accord Luong v. Super Micro Computer, Inc.,* No. 24-CV-02440-NW, 2025 WL 1696819, at *8 (N.D. Cal. June 17, 2025) ("Sarbanes–Oxley's 'exhaustion requirement should not become a tripwire for hapless plaintiffs.' ") (quoting *Erhart v. BofI Holding, Inc.,* 612 F. Supp. 3d 1062, 1087 (S.D. Cal. 2020)); *see also Hill Intl., Inc. v. Virgin Islands Pub. Fin. Auth., Off. of Disaster Recovery,* No. 3:24-CV-00049, 2025 WL 756696, at *6 (D.V.I. Mar. 5, 2025) ("[T]o the extent administrative exhaustion is required here, it is a claims-processing rule and not a statutory limit on the Court's jurisdiction.").

In any event, the exhaustion requirement is satisfied where, as here, the agency has been notified of the alleged retaliation such that it has a fair opportunity to intervene prior to the complainant's initiation of a federal district court action. *See Pfeifle v. Portland Terminal R.R. Co.,* No. 3:19-CV-01436-IM, 2021 WL 2624512, at *4 (D. Or. June 25, 2021) ("the agency must [only] be "given the opportunity to consider the issue before initiation" of a civil suit."). As alleged in his amended pleading, Mr. Callington initially filed his original retaliation complaint with OSHA in January 2024, and has since corresponded with agency representatives about subsequent developments in his case on several occasions thereafter. Even if the administrative exhaustion requirement was deemed jurisdictional, nothing would

10

prevent Mr. Callington from bringing this claim alongside his other counterclaims to federal district court after more than 180 days have passed since the filing of his initial administrative complaint. *See Nieman v. Nationwide Mut. Ins. Co.,* 706 F. Supp. 2d 897, 907 (C.D. Ill. 2010); *accord Opela v. Wausau Window & Wall*, 264 F. Supp. 3d 980, 986 (W.D. Wis. 2017).

In sum, UL's bid for the dismissal of the SOX retaliation claim is both factually flawed and immaterial as a matter of law.

### B.  State Law Retaliation Claims

Mr. Callington's state law claims include several distinct statutory causes of action arising under various provisions of applicable state law, including four (4) separate causes of action arising under various Oregon statutes (Counterclaims IV, V, VI and VIII), and another arising under the Illinois Whistleblower Act (Counterclaim X).

### i.  Oregon Safe Employment Act ("OSEA"), ORS § 654.001, *et seq*. (Counterclaim IV)

For his fourth cause of action, Mr. Callington's asserts a state law counterclaim for unlawful employment practices in violation of the Oregon Safe Employment Act ("OSEA"), ORS § 654.001. On this count, UL faults Mr. Callington for failing to specifically identify the nexus to health and safety hazards that specifically threaten workers in the State of Oregon. Because Mr. Callington was himself, at all times relevant to this action, an employee of UL residing in the State of Oregon, no further elaboration should be required on this point at this stage.

### ii. Oregon Whistleblower Law, ORS § 659A
### (Counterclaims V and VII)

The next set of counterclaims arise from distinct provisions of the Oregon Whistleblower Law, ORS § 659A, which apply to different types of employers. The anti-retaliation provision at ORS § 659A.199 broadly covers all employers, whereas ORS § 659A.203 imposes additional prohibitions on non-profit employers.

Here, UL absurdly contends that Mr. Callington has failed to plead a "causal link" between his protected activity and the various adverse actions that it has undertaken against him [Page ID # 1198]. In its own pleading, however, UL admits that it launched an internal investigation to determine if he spoke to the *New York Times* and then terminated him based on the findings of that investigation. Pursuant to OAR 839-010-0100, Mr. Callington's communications with and disclosures to the *New York Times* qualify as protected activity within the meaning of the state's anti-retaliation law. Accordingly, causation is overwhelmingly established on the face of the pleadings.

UL additionally contests the applicability of § 659A.203 based on its UL's alleged status as a nonprofit employer. For reasons surfaced in previous hearings and referenced in the amended pleading, Mr. Callington has a good faith belief that his employer was a "nonprofit" organization within the meaning of the statute at some or all of the relevant time periods relevant to this action (¶ 180). Given the opaque nature of UL's corporate disclosures and subsequent inquiries from the undersigned counsel, it is respectfully submitted that dismissing this claim without further discovery is premature. In the alternative, and in the event that his allegations are

12

deemed insufficient on this point, Mr. Callington respectfully requests leave to amend for the purpose of formally adding UL's non-profit parent entity (ULSE Inc.) as a party to this action under a joint employer theory of liability.

### iii. Post-Termination Industry Blacklisting, ORS § 659.805 (Counterclaim VIII).

The final statutory claim arising under Oregon law is based on Mr. Callington's allegation that UL has, and potentially still is, engaging in various forms of industry blacklisting conduct in violation of ORS § 659.805 (*i.e.,* notifying other potential employers that an he should not be hired or making derogatory comments about him to discourage them from doing so)

On this cause of action, UL actually makes a point. As it correctly points out, this particular statute concerns criminal conduct and does not expressly give rise to a private right of action [Page ID #1193].

Even so, however, the conduct at issue is still actionable at common law, and the violation of a criminal statute serve as prima facie evidence of negligence *per se*. Accordingly, Mr. Callington respectfully requests leave to amend for the purpose of converting this particular cause of action to corresponding common law claims for tortious interference and blacklisting.

13

### iv. Illinois Whistleblower Act, 740 ILCS 174 /15, et seq. (Counterclaim X)

Mr. Callington has also asserted a claim in the alternative under Illinois Whistleblower Act, 740 ILCS 174 /15. UL's extraterritoriality defense to this particular claim is somewhat baffling seeing that the company is headquartered in Chicago and admits to having executed at least some of the alleged retaliatory actions against Mr. Callington from that location. Nevertheless, because this particular cause of action is asserted in the alternative, Mr. Callington would not necessarily object to withdrawing the claim for the sake of efficiency upon careful consideration if the other state law claims are sustained.

### C. Common Law Tort Claims

#### i. Wrongful Retaliation and Discharge in Violation of Public Policy (Counterclaim IX)

Whether made in error or out of a general lack of consideration for Mr. Callington's (or the Court's) time and resources, UL's argument that the existence of other available statutory remedies serves to preempt the viability of overlapping common law claims is of no moment. The common law tort claims for wrongful retaliation and discharge in violation of public policy (Count IX) is properly pleaded in the alternative and not subject to dismissal under any ostensible theory of preemption at this stage. Moreover, it is well-established that common law retaliation claims can generally survive alongside other claims arising under state and federal law because the common law formulation covers a broader range of conduct than any specific anti-retaliation statute. *See also Czajka v. Anovion, LLC*, Slip Copy, 2025 WL

14

2239339 (N.D. Ill. Aug. 6, 2025) (explaining that common law retaliation claims can claims in any event, because).

### ii.    Aiding & Abetting / Conspiring to Engage in Unlawful Retaliation (Count VII)

Notwithstanding UL's invocation of the intra-corporate conspiracy doctrine, UL's insistence that it cannot "conspire with itself" or "abet its own conduct" [Page # 1193] inconsequential where, as here, the claim is based on alleges that UL conspired with *independent third parties*—like the Association of Professional Social Compliance Auditors (APSCA)—to retaliate against Mr. Callington Because APSCA is a distinct entity, the aiding and abetting claim is legally sound.

### iii.    Intentional Infliction of Emotional Distress (Count XI)

UL also attempts to minimize its conduct as a standard employment termination. It was not. UL engaged in a coordinated, multi-front campaign to professionally and financially ruin a whistleblower. UL forced him to endure an eight-hour interrogation in Chicago, successfully lobbied a third-party agency (APSCA) to revoke his professional license, and terminated him and filed a retaliatory federal lawsuit on the exact same day (Compl. ¶ 73, Dkt. 1; Decl. of Joshua Callington ¶ 24, Dkt. 68; First Am. Answer, Defenses & Counterclaims ¶ 191, Dkt. 129). This coordinated effort to bankrupt a whistleblower easily clears the pleading standard for "extreme and outrageous" conduct.

## II.    Mr. Callington's allegations are wholly sufficient to survive dismissal on the wage and hour claims (Counts XII & XIII).

Finally, UL's assertion that Mr. Callington's FLSA and Oregon overtime claims are "threadbare" ignores the specific facts pled in his Counterclaims

15

Mr. Callington alleges that, throughout the duration of his employment with UL, he "regularly worked 50-70 hours per week" due to long hours on audit sites and extensive travel, and that UL intentionally misclassified him to avoid paying overtime premiums (First Am. Answer, Defenses & Counterclaims ¶¶ 207, 209, 213–214, Dkt. 129). Alleging a specific misclassification scheme combined with an estimate of 50-70 hours per week more than satisfies the federal notice pleading standard. Mr. Callington is not required to provide a timesheet prior to discovery.

## CONCLUSION

For these reasons, Mr. Callington respectfully asks this Court to deny UL's motion to dismiss the counterclaims in its entirety.

Dated: March 25, 2026
New York, NY

Respectfully submitted,

By: _/s/ Agatha M. Cole_
Agatha M. Cole
BEVERLY PLLC
43 West 43rd Street, Suite 159
New York, NY 10036
(828) 773-2628
agatha@beverlypllc.com

*Counsel for Defendant / Counter-Plaintiff,*
*Joshua Callington*

16